# Exhibit A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES, an Illinois corporation, | ) |
| | ) |
| | ) Docket No. 05 C 3714 |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Chicago, Illinois |
| NU-PHARM, INC., a Canadian corporation, et al., | ) January 14, 2008 |
| | ) 9:09 a.m. |
| | ) |
| Defendants. | ) |

TRANSCRIPT OF PROCEEDINGS – Motions
BEFORE THE HONORABLE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff:      JONES DAY
                        BY:  MR. JASON G. WINCHESTER
                        77 West Wacker Drive
                        Chicago, Illinois  60601

For the Defendant       RAKOCZY, MOLINO, MAZZOCHI, SIWIK, LLP
Nu-Pharm, Inc.:         BY:  MS. DEANNE M. MAZZOCHI
                        6 West Hubbard Street, Suite 500
                        Chicago, Illinois  60610

Court Reporter:         FRANCES WARD, CSR, RPR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2118
                        Chicago, Illinois  60604
                        (312) 435-5561
                        frances_ward@ilnd.uscourts.gov

1          THE CLERK:   05 C 3714, Abbott Laboratories versus

2    NuPharm for status.

3          MS. MAZZOCHI:   Good morning, your Honor.   Deanne

4    Mazzochi on behalf of NuPharm.

5          THE COURT:   Good morning.

6          MR. WINCHESTER:   Good morning, your Honor.   Jason

7    Winchester for Abbott.

8          THE COURT:   Good morning.

9          I am just curious about our status.

10          MR. WINCHESTER:   The status, yes.   Well, it

11    changed, at least from our standpoint, on Friday, Judge, when

12    we got one of these nice little books (indicating), the first

13    one I have actually ever seen.   They petitioned the U.S.

14    Supreme Court to take review from the Federal Circuit, which

15    recently denied Apotex's petition for panel rehearing and

16    rehearing en banc from the October decision that, as you may

17    rememeber, upheld Judge Posner's modified injunction and

18    findings of infringement.

19          So where we are is the Federal Circuit has made

20    that ruling.   They have now tried to get a rehearing.   That's

21    been denied.   And they are pursuing further relief by way of

22    cert. petition.

23          THE COURT:   Let's set another status in about 90

24    days.

25          MS. MAZZOCHI:   Your Honor, if I may.   The patents

1   are set to expire in two weeks.  So, again, I don't know --

2   NuPharm maintains its position, first of all, that the

3   Apotex -- that Judge Posner's decisions are not binding on

4   it.  But I just wonder if there is any point in continuing

5   the present litigation given that the patents are set to

6   expire.

7         THE COURT:  I would encourage your client not to

8   flirt with the idea that the federal judge's order is not

9   binding on it.  I think that would not be a wise course.

10         Two weeks is two weeks.  The case will still be

11   before me.  Whether or not we can dispose of it in some

12   fashion after the Supreme Court decides whether or not it's

13   going to take cert. I think we should address when that

14   happens.

15         Let's say April 17th for status.

16         MR. WINCHESTER:  9:00 o'clock, Judge?

17         THE COURT:  9:00 o'clock.

18         MS. MAZZOCHI:  Thanks, your Honor.

19         THE COURT:  Thank you.

20             *    *    *    *    *

21   I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.

22

23   F_____ _____, 2008.
Official Court Reporter

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NU-PHARM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08-CV-00070 |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, | ) | Judge Richard W. Roberts |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, and ANDREW | ) | |
| C. VON ESCHENBACH, M.D., | ) | |
| Commissioner of Food and Drugs, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING AND SUBMISSION OF ADDITIONAL EXHIBIT

Proposed Intervenor Abbott Laboratories ("Abbott") submits this Notice of Filing, as requested by the Clerk of this Court, and states as follows:

1.      On Thursday, January 17, 2008, Abbott submitted its Motion for Leave to Intervene (and an accompanying memorandum of law) (Dkt. No. 5), within one day of learning about this action from Defendant FDA.  This motion establishes that Abbott should be granted leave to intervene as of right in this case because resolution of this suit would substantially affect Abbott's legal interests and no current party adequately represents Abbott's interests.

2.      The next day, Abbott submitted its *Omnibus Motion to Dismiss, or Alternatively, Transfer, and Response in Opposition to Motion for Temporary Restraining Order and/or Preliminary Injunction* with an accompanying memorandum of law and an appendix of exhibits. Abbott provided the Court and counsel for all parties with a copy of these materials.

3.      Abbott's omnibus motion is submitted for consideration along with its Motion for Leave to Intervene.

CHI-1628605v1

4.      In addition, in the factual background section of its memorandum of law in support of the omnibus motion (at p. 10-11), Abbott made reference to a hearing held on January 14, 2008, before the Honorable Rebecca R. Pallmeyer in the matter of *Abbott Labs. v. Nu-Pharm, Inc.*, No. 05 C 3714 (N.D. Ill.). After submitting its omnibus motion, Abbott was able to obtain an official transcript of the proceedings before Judge Pallmeyer, a copy of which is attached as Exhibit A for the Court's consideration. As the transcript shows, Nu-Pharm's counsel (the same law firm representing Nu-Pharm in this action) appeared before Judge Pallmeyer in the Northern District of Illinois last Monday and took the position that Nu-Pharm is not bound by the decision and injunctive order entered by Judge Posner, which order, among other things, prohibits FDA from approving Nu-Pharm's ANDA No. 77-615 prior to the expiration of Abbott's patents. (Ex. A at 2-3.) Judge Pallmeyer admonished counsel that "I would encourage your client not to flirt with the idea that the federal judge's order is not binding on it. I think that would not be a wise course." (*Id.* at 3.) Within hours of that hearing, Nu-Pharm filed the instant action, without providing notice to Abbott or to Judges Pallmeyer or Posner, urging this Court to direct FDA to award immediate, final approval of the ANDA, in violation of Judge Posner's injunction order.

Dated: January 22, 2008

Respectfully submitted,

*Gregory A. Castanias  (441129)
  Email: gcastanias@jonesday.com
Christopher S. Perry (503039)
  Email: csperry@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Tel: 1.202.879.3939
Fax: 1.202.626.1700

*Lead Counsel

OF COUNSEL
Daniel E. Reidy
James R. Daly
Jason G. Winchester
JONES DAY
77 W. Wacker Dr., Suite 3500
Chicago, IL  60601-1692
Tel: 1.312.782.3939
Fax: 1.312.782.8585

*Attorneys for Intervenor Abbott Laboratories*

- 3 -

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2008, I submitted a copy of the foregoing *Notice of Filing and Submission of Additional Exhibit* to the Clerk of Court's electronic mailbox at dcd_cmecf@dcd.uscourts.gov, and, that same day, sent copies of the same document to the following counsel of record via overnight delivery:

William A. Rakoczy
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610

Drake Cutini
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., N.W.
Washington, D.C. 20004


_____
Attorney for Abbott Laboratories

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NU-PHARM, INC.,      ) | |
|      ) | |
|     Plaintiff,      ) | |
|      ) | |
|    v.      ) | Civil Action No. 1:08-CV-00070 |
|      ) | |
| FOOD AND DRUG ADMINISTRATION,   ) | Judge Richard W. Roberts |
| MICHAEL O. LEAVITT, Secretary of   ) | |
| Health and Human Services, and ANDREW  ) | |
| C. VON ESCHENBACH, M.D.,     ) | |
| Commissioner of Food and Drugs,    ) | |
|      ) | |
|     Defendants.     ) | |

**OMNIBUS MOTION OF INTERVENOR
ABBOTT LABORATORIES TO DISMISS NU-PHARM'S COMPLAINT, OR
ALTERNATIVELY TO TRANSFER THIS MATTER TO ILLINOIS, AND
RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY INJUNCTION**

Intervenor Abbott Laboratories ("Abbott") respectfully requests that this Court dismiss

Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because the

allegations of the complaint fail to state a claim upon which relief can be granted. Alternatively,

Abbott requests that this matter be transferred in its entirety to the Northern District of Illinois,

where venue properly lies and where the district court already has issued an injunction order

prohibiting the very relief Nu-Pharm seeks in this case. *See 28* U.S.C. § 1404(a). Finally, if the

Court is nonetheless inclined to consider Nu-Pharm's motion for emergency injunctive relief,

Abbott respectfully requests that the motion should be denied because Nu-Pharm fails to satisfy

every applicable legal and factual requirement.

The bases for Abbott's Motion are more fully set forth in the attached Memorandum of

Law.

Dated: January 18, 2008

Respectfully submitted,

*Gregory A. Castanias  (441129)
  Email: gcastanias@jonesday.com
Christopher S. Perry (503039)
  Email: csperry@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Tel: 1.202.879.3939
Fax: 1.202.626.1700

*Lead Counsel

OF COUNSEL
Daniel E. Reidy
James R. Daly
Jason G. Winchester
JONES DAY
77 W. Wacker Dr., Suite 3500
Chicago, IL  60601-1692
Tel: 1.312.782.3939
Fax: 1.312.782.8585

*Attorneys for Intervenor Abbott Laboratories*

CHI-1627772v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NU-PHARM, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Civil Action No. 1:08-CV-00070 |
| FOOD AND DRUG ADMINISTRATION, | ) |
| MICHAEL O. LEAVITT, Secretary of | )   Judge Richard W. Roberts |
| Health and Human Services, and ANDREW | ) |
| C. VON ESCHENBACH, M.D., | ) |
| Commissioner of Food and Drugs, | ) |
| | ) |
| Defendants. | ) |

---

**MEMORANDUM IN SUPPORT OF OMNIBUS MOTION OF INTERVENOR
ABBOTT LABORATORIES TO DISMISS NU-PHARM'S COMPLAINT, OR
ALTERNATIVELY TO TRANSFER THIS MATTER TO ILLINOIS, AND
RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY INJUNCTION**

Daniel E. Reidy
James R. Daly
Jason G. Winchester
Brian J. Murray
Paula S. Quist
Melissa B. Hirst
JONES DAY
77 W. Wacker Dr., Suite 3500
Chicago, IL 60601-1692
Tel: 1.312.782.3939
Fax: 1.312.782.8585

*Gregory A. Castanias  (441129)
   Email: gcastanias@jonesday.com
Christopher S. Perry (503039)
   Email: csperry@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Tel: 1.202.879.3939
Fax: 1.202.626.1700

*Attorneys for Intervenor Abbott Laboratories*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND .....................................................................................................2

I.      ABBOTT'S PATENTS ................................................................................................2

II.     RELEVANT LITIGATION MATTERS .....................................................................2

        A.      The Apotex ANDA Litigation ..........................................................................2

        B.      Apotex Developed The Nu-Pharm ANDA Product At Issue In This Case
                In An Attempt To Avoid The Injunction ..........................................................3

                1.      During Trial Before Judge Posner, Apotex Determined To File A
                        New ANDA For Its Infringing Product ..............................................3

                2.      Apotex Tapped Nu-Pharm To Serve As The Nominal Applicant
                        For Its New ANDA .............................................................................4

        C.      The Nu-Pharm ANDA Is Adjudged to Infringe Abbott's Patents and FDA
                Is Specifically Barred from Approving It Until After Abbott's Patents
                Expire .............................................................................................................6

        D.      The Federal Circuit Has Upheld The Injunction Order, Barring FDA From
                Approving The Nu-Pharm ANDA Until After Abbott's Patents Expire,
                And That Injunction Remains In Full Effect ...................................................10

        E.      Nu-Pharm Filed This Action After Being Specifically Admonished By
                The Illinois Court That It Is Indeed Subject To The Injunction Order.................10

ARGUMENT..........................................................................................................................11

I.      NU-PHARM'S COMPLAINT FAILS TO STATE A CLAIM AND MUST BE
        DISMISSED AS A MATTER OF LAW ....................................................................11

        A.      Nu-Pharm's Complaint Is Actually A Sub Silentio Request To Set Aside
                The Injunction Order; It Is, Therefore, Not Properly Before This Court .............12

        B.      Nu-Pharm's Complaint Fails To State A Claim On Which Relief Can Be
                Granted ...........................................................................................................14

                1.      The FDA's Adherence To Judge Posner's Injunction Order Is Not
                        Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not
                        In Accordance With Law...................................................................14

                2.      The FDA's Decision To Abide By Judge Posner's Injunction
                        Order Did Not Exceed The FDA's Statutory Authority..........................16

                3.      Nu-Pharm's Claim For Relief Pending Review Must Also Fail .............18

# TABLE OF CONTENTS
(continued)

Page

II.   ALTERNATIVELY, THIS COMPLAINT SHOULD BE TRANSFERRED TO
      THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
      DISTRICT OF ILLINOIS ................................................................................19

III.  ALTERNATIVELY, IF THIS COURT ELECTS TO ADJUDICATE NU-
      PHARM'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR
      PRELIMINARY INJUNCTION, THAT MOTION SHOULD BE DENIED .................21

      A.    Nu-Pharm Has Little, If Any, Chance Of Success On The Merits Of Its
            Claims...................................................................................................22

            1.    There Is No Legal Authority For This Court To Order FDA To
                  Immediately Approve Nu-Pharm's ANDA .............................................23

            2.    Nu-Pharm's Arguments About Which Court Orders "Matter" Are
                  Sanctionable.................................................................................27

            3.    Nu-Pharm Is Unquestionably Bound By The Injunction Order .............29

      B.    Nu-Pharm Has Shown No Irreparable Injury Worthy Of Protection ..................33

      C.    The Balance Of Harms Strongly Favors Denying Nu-Pharm's Requested
            Relief ....................................................................................................36

      D.    The Public Interest Counsels Against An Injunction ...........................................38

IV.   FINALLY, NU-PHARM'S MOTION FOR INJUNCTIVE RELIEF CANNOT
      BE DECIDED WITHOUT FURTHER, ESSENTIAL DISCOVERY ...........................40

CONCLUSION ......................................................................................................42

# TABLE OF AUTHORITIES

## CASES

**Page**

*A.K. Stamping Co. v. Instrument Specialties Co.*,
106 F. Supp. 2d 627 (D.N.J. 2000)................................................................39

*Abbott Labs. v. TorPharm, Inc.*,
122 F. App'x 511 (Fed. Cir. 2005)..................................................................3

*Abbott Labs. v. TorPharm, Inc.*,
300 F.3d 1367 (Fed. Cir. 2002)...................................................................2, 3

*Abbott Labs. v. Apotex, Inc.*,
455 F. Supp. 2d 831 (N.D. Ill. 2006).....................................................*passim*

*Abbott Labs. v. TorPharm, Inc.*,
309 F. Supp. 2d 1043 (N.D. Ill. 2004)........................................................2, 3

*Abbott Labs. v. TorPharm, Inc.*,
156 F. Supp. 2d 738 (N.D. Ill. 2001)..............................................................2

*Abbott Labs. v. TorPharm, Inc.*,
503 F.3d 1372 (Fed. Cir. 2007)...........................................................*passim*

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
154 F.3d 1345 (Fed. Cir. 1998)...................................................................30

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
38 F. Supp. 2d 114 (D.D.C.1999).................................................................22

*Apotex, Inc. v. FDA*,
508 F. Supp. 2d 78 (D.D.C. 2007)..........................................................15, 16

*In re Barr Labs., Inc.*,
930 F.2d 72 (D.C. Cir. 1991).......................................................................27

*Bell Atlantic Corp. v. Twombly*,
__ U.S. __, 127 S. Ct. 1955 (2007) ...........................................................11

*Bell v. United States*,
__ F. Supp. 2d __, No. WDQ-06-3406, 2007 WL 3348347 (D. Md. Oct. 1, 2007)..........14

*Biodiversity Legal Found. v. Norton*,
285 F. Supp. 2d 1 (D.D.C. 2003)..................................................................23

## TABLE OF AUTHORITIES
### (continued)

Page

*Biovail Corp. v. FDA*,
    448 F. Supp. 2d 154 (D.D.C. 2006)....................................................................35

*Boston Scientific Corp. v. Schneider (Europe) AG*,
    983 F. Supp. 245 (D. Mass. 1997)....................................................................32

*Cal. Farm Bureau Fed'n v. Badgley*,
    2005 WL 1532718 (D.D.C. June 29, 2005).................................................20, 21

Magnavox Co. v. Sanders Assoc.,
    No. 80 C 4124, 1982 U.S. Dist. LEXIS 14936 (N.D. Ill. Sept. 24, 1982) .......39

*Connecticut v. Massachusetts*,
    282 U.S. 660 (1931) .........................................................................................35

*Dentsply Int'l, Inc. v. Kerr Mfg. Co.*,
    42 F. Supp. 2d 385 (D. Del. 1999) ..................................................................31

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997)..........................................................................11

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ...........................................................................13

*Hexacomb Corp. v. GTW Enters., Inc.*,
    No. 93 C 3107, 1994 WL 171533 (N.D. Ill. May 2, 1994) ...............................30

*Hunter v. FERC*,
    __ F. Supp. 2d __, 2007 WL 4302772 (D.D.C. Dec. 10, 2007)........................40

*Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*,
    331 F.2d 76 (D.C. Cir. 1973)............................................................................31

*Kahane v. Sec'y of State*,
    700 F. Supp. 1162 (D.D.C. 1998).....................................................................22

*Kowal v. MCI Comm'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994)..........................................................................11

*Lapin v. Shulton, Inc.*,
    333 F.2d 169 (9th Cir. 1964) ...........................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Lindland v. U.S. Wrestling Ass'n, Inc.*,
    227 F.3d 1000 (7th Cir. 2000) ................................................................... 29

*Lisle Corp. v. A.J. Mfg. Co.*,
    No. 02 C 7024, 2004 WL 765876 (N.D. Ill. April 7, 2004) ............................ 39

*Mann Mfg., Inc. v. Hortex, Inc.*,
    439 F.2d 403 (5th Cir. 1971) ...................................................................... 14

*Marshall County Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .................................................................. 11

*Martin-Trigona v. United States*,
    779 F.2d 72 (D.C. Cir. 1985) ...................................................................... 13

*Mother's Rest. Inc. v. Mama's Pizza, Inc.*,
    723 F.2d 1566 (Fed. Cir. 1983) .................................................................. 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................... 15

*Porter v. Kessner*,
    No. Civ. A. 00-1537, 2000 WL 1473592 (E.D. La. Jan. 2, 2000), *aff'd*, 286 F.3d
    1064 (5th Cir. 2001) ................................................................................... 13

*Pub. Citizen Health Research Group v. FDA*,
    740 F.2d 21 (D.C. Cir. 1984) ...................................................................... 23

*RCM Techs., Inc., v. Beacon Hill Staffing Group, LLC*,
    502 F. Supp. 2d 70 (D.D.C. 2007) ............................................................. 22

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 1 (1944) ....................................................................................... 30

*Roberts v. Harvey*,
    441 F. Supp. 2d 111 (D.D.C. 2006) ........................................................... 15

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
    91 F.3d 914 (7th Cir. 1996) ................................................................... 29, 30

*Salt Pond Assocs. v. U.S. Army Corps of Eng'rs*,
    815 F. Supp. 766 (D. Del. 1993) ........................................................... 18, 19

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Sandoz, Inc. v. FDA,*
439 F. Supp. 2d 26 (D.D.C.), aff'd, No. 06-5204, 2006 WL 2491087 (D.C. Cir.
Aug. 6, 2006)...................................................................................................35, 36, 37

*Schnitger v. Canoga Elecs. Co.,*
462 F.2d 628 (9th Cir. 1971)...............................................................................30

*Schreiber v. Kohn,*
434 F. Supp. 2d 1 (D.D.C. 2006)....................................................................20, 21

*Serono Labs., Inc. v. Shalala,*
158 F.3d 1313 (D.C. Cir. 1998).............................................................................22

*Smith Int'l, Inc. v. Hughes Tool Co.,*
718 F.2d 1573 (Fed. Cir. 1983).............................................................................37

*Taylor v. FDIC,*
132 F.3d 753 (D.C. Cir. 1997)...............................................................................11

*Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.,*
802 F. Supp. 1169 (D.N.J. 1992)............................................................................9

*Verband der Zuechter des Oldenburger Pferdes e.V. v. Int'l Sporthorse Registry, Inc.,*
55 U.S.P.Q.2d 1550 (N.D. Ill. 1999)......................................................................32

*Wis. Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985)........................................................................34, 35

## CONSTITUTION, STATUTES, REGULATIONS & RULES

U.S. Const., art. I, cl. 8...............................................................................................6

5 U.S.C. § 705 .........................................................................................................18

5 U.S.C. § 706(2)............................................................................................14, 16, 23

21 U.S.C. § 314.107(b)(3)........................................................................................26

21 U.S.C. § 355(b)(2)(A)(iv)......................................................................................7

21 U.S.C. § 355(j)(5)(B)(iii)................................................................................25, 26

21 U.S.C. § 355a(c)(2)......................................................................................37, 38, 39

## TABLE OF AUTHORITIES
### (continued)

Page

28 U.S.C. § 1391(e) ..................................................................................................... 19, 20

28 U.S.C. § 1404(a) ................................................................................................... 1, 19, 20

35 U.S.C. § 271(e)(2) ..................................................................................................... 7

35 U.S.C. § 271(e)(4) ..................................................................................................... 7

28 U.S.C. § 1254 ..................................................................................................... 38

21 C.F.R. § 314.107, 59 Fed. Reg. 505338 (Oct. 3, 1994) ........................................... 26

Fed. R. Civ. P. 65(d) ..................................................................................................... 29

## MISCELLANEOUS

15 Charles A. Wright, et al., *Federal Practice & Procedure* § 3854 ............................. 21

## INTRODUCTION

Nu-Pharm's action (which it tries to accelerate through specious motions for a temporary restraining order and/or preliminary injunction) places this Court in a wholly untenable position. Nu-Pharm asks this Court to enter an order directing the U.S. Food and Drug Administration ("FDA") to immediately approve Nu-Pharm's Abbreviated New Drug Application No. 77-615 prior to the expiration of two valid patents owned by Abbott. There is no dispute, however, that there is an existing injunction – entered by the U.S. District Court for the Northern District of Illinois and upheld by the Federal Circuit – that *specifically enjoins FDA from doing that very thing. (See* A0001 ("the effective date of any approval by FDA of ANDA Nos. 75-112 and 77-615 . . . shall be no earlier than January 29, 2008, the date of expiration of Abbott's [patents]".) [1] In order to grant Nu-Pharm the relief it seeks, therefore, this Court would be required (i) to disregard an injunction validly entered by another federal district court and affirmed on appeal; and (ii) to force FDA to violate that injunction, thereby putting the agency in contempt of the Illinois court. What Nu-Pharm asks, the Court should not, and indeed cannot, do.

As discussed in detail below, Nu-Pharm's complaint fails to state a claim upon which relief may be granted, and it should be dismissed outright as a matter of law. Alternatively, this matter should be transferred in its entirety to the Northern District of Illinois, where the injunction at issue was entered and where venue properly lies. Finally, if the Court is nonetheless inclined to consider Nu-Pharm's motion for emergency injunctive relief, that motion should be denied because Nu-Pharm fails to satisfy every applicable legal and factual requirement.

---

[1] All exhibits cited in this Memorandum are included in an external appendix that is consecutively paginated beginning with A0001. This appendix has a table of contents that describes each of the exhibits it contains.

## FACTUAL BACKGROUND

In order to appreciate the absurdity of Nu-Pharm's claims, the Court should understand the long history of relevant litigation – which began in 1997 and which has spawned a deep body of jurisprudence from both the Northern District of Illinois and the Federal Circuit, all of which Nu-Pharm would have this Court undermine in an accelerated injunctive proceeding.

## I.    ABBOTT'S PATENTS

Abbott owns U.S. Patent Nos. 4,988,731 and 5,212,326 (the "Abbott's patents"), which cover the compound divalproex sodium, the active ingredient in Abbott's widely-used anti-convulsive drug Depakote®. *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1370-74 (Fed. Cir. 2002) ("*Abbott II*"). Abbott's patents will not expire until January 29, 2008. (*See* A0002-9.)

## II.    RELEVANT LITIGATION MATTERS

### A.    The Apotex ANDA Litigation.

In April 1997, Apotex Corp. submitted ANDA No. 75-112 (the "Apotex ANDA") to the FDA, seeking approval to market a generic copy of Depakote® prior to the expiration of Abbott's patents. (A0015); *Abbott Labs. v. TorPharm, Inc.*, 309 F. Supp. 2d 1043, 1044 (N.D. Ill. 2004) ("*Abbott III*").[2] Abbott brought suit in the Northern District of Illinois, alleging that the proposed generic divalproex sodium product would, if marketed, infringe Abbott's patents. *See id.* Apotex denied infringement and sought to have the patents declared invalid and unenforceable. *See Abbott Labs. v. TorPharm, Inc.*, 156 F. Supp. 2d 738, 740 (N.D. Ill. 2001) ("*Abbott I*").

In 2001, the district court awarded Abbott summary judgment. *Id.* at 747-749. The Federal Circuit affirmed on all issues save one, remanding the matter for trial as to infringement

---

[2] The ANDA was originally submitted under the name TorPharm, Inc., which was a division of Apotex and now is known simply as Apotex Inc.

of a single claim limitation (whether the Apotex product was an "oligomer" – a molecule comprised of a relatively small number of repeating units joined together). *Abbott II*, 300 F.3d at 1381.

Trial was held in February 2004 before Seventh Circuit Judge Richard A. Posner, sitting by designation. After hearing all of the evidence, Judge Posner issued a detailed opinion on March 15, 2004, finding that Apotex's proposed product would infringe Abbott's patents. *See Abbott III*, 309 F. Supp. 2d at 1054. On March 31, 2004, Judge Posner issued an injunction order directing that:

> [Defendants], and their respective affiliates, successors in interest, and assigns are enjoined from commercially manufacturing, using, selling, or offering to sell generic divalproex sodium which the Court has found to be infringing within the United States, or from importing such product into the United States, until Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326 expire and defendants have received final approval from FDA to market generic divalproex sodium.
>
> The effective date for any approval by FDA of ANDA No. 75-112, *or any other application concerning defendants' generic divalproex sodium which the Court has found to be infringing*, shall be no earlier than January 29, 2008, the date of expiration of Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326.

(*See* A0010 (emphasis added).) On appeal, the Federal Circuit affirmed in a one-word order. *Abbott Labs. v. TorPharm, Inc.*, 122 F. App'x 511 (Fed. Cir. 2005) ("*Abbott IV*").

**B.    Apotex Developed The Nu-Pharm ANDA Product At Issue In This Case In An Attempt To Avoid The Injunction.**

**1.    During Trial Before Judge Posner, Apotex Determined To File A New ANDA For Its Infringing Product.**

As the 2004 trial progressed, Apotex CEO Barry Sherman worried that his company would lose, so he decided to take another shot at beating Abbott by submitting another ANDA for the same divalproex sodium product, in the hope of provoking new litigation before a new judge. (A0019, A0021.) Sherman's plan was to alter the manufacturing process for the product (including making certain changes that, by his own admission, would result in a product even

"more likely to infringe" Abbott's patents). (A0017, A0021). Before Judge Posner had even issued his decision, Sherman instructed his employees in March 2004 to rush forward with the project so that "we can file a new ANDA four months from now." (A0029.)

### 2. Apotex Tapped Nu-Pharm To Serve As The Nominal Applicant For Its New ANDA.

The fact that the injunction order was not limited to the Apotex ANDA only, but instead specifically barred FDA approval of *any* application relating to the same infringing product, ultimately did not deter Apotex's plans. It did, however, add a new wrinkle: Sherman testified that, when deciding whether to submit the new ANDA in Apotex's own name, "one of the principal concerns was there is an injunction." (A0023.) Sherman was admittedly concerned that the Injunction might apply "to Apotex with respect to divalproex sodium regardless of process." (*Id.*; A0025.) To provide some perceived cover for Apotex, Sherman decided to enlist another company to be the nominal ANDA applicant, with Apotex retaining ownership of the product and a role as the commercial manufacturer so that Apotex would "get [its] profit out of it, anyway." (A0023.)

Enter Nu-Pharm, a six-person operation in Ontario, Canada, whose sole business is marketing (in Canada only) Apotex-manufactured pharmaceutical products. (A0032-34, A0037-42.) Nu-Pharm does not develop, manufacture, or package drugs; it conducts no scientific testing; and it handles no regulatory dealings with agencies like Health Canada (the Canadian analog to FDA) regarding the products it sells. (A0039-40, A0044, A0047.) Rather, Nu-Pharm seeks out products that Apotex already markets in its own name, has Apotex manufacture those products with an "NU" mark and Nu-Pharm labeling, and then sells the products in Canada. Nu-Pharm's ties to Apotex are so strong that Nu-Pharm's president, Richard Benyak, does not view the two companies as competitors. (A0035.)

-4-

Nu-Pharm has never sought to sell products in the U.S., and has no infrastructure to do so.  (A0040, A0065.)  Consistent with its size, Nu-Pharm generally targets products with annual revenues of $2-$10 million.  (A0042-43.)  According to Benyak, Nu-Pharm does not "go after big products," in part because Apotex is "not going to give me a product that is a 100 million dollar product that they are selling, why would they give that to me?"  (A0043; *see also* A0034, A0036-37, A0039-40, A0042.)  Yet, in this case, Apotex claims to have anointed six-person Nu-Pharm to market the first U.S. generic version of Depakote® – a pharmaceutical product with annual sales exceeding $1 billion.  (A0045.)

Nu-Pharm nevertheless agreed to Apotex's scheme and lent its signature to the new ANDA application – after Apotex had completed product development (A0018, A0022, A0044-54, A0079-82); performed the biostudies (A0013-14, A0051, A0102-03) and stability studies (A0082-83, A0093-94, A0117-18); and drafted all of the ANDA documents for Nu-Pharm's signature (A0049-51, A0053, A0057, A0059-60, A0066-71, A0076-80, A0092-95, A0098-A0101, A0113, A0119-23).  Yet Nu-Pharm does not own the product; it belongs to Apotex.  (A0025 (Apotex's Sherman:  "Apotex … Apotex owns it"); *see also* A0056 (Nu-Pharm's Benyak agrees).)  Indeed, Benyak admitted that if he were to shop Apotex's divalproex sodium product to another company upon FDA approval, or otherwise attempt to cut Apotex out of the deal, his relationship with Apotex would be over and "it probably would be the end of Nu-Pharm."  (*Id.*; *see also* A0025.)

The details of Apotex and Nu-Pharm's undocumented arrangement are telling.  Apotex decided in April 2004, within two weeks of the entry of the injunction, that it would use Nu-Pharm to file the new ANDA.  (A0125.)  Yet Apotex did not share this plan with Nu-Pharm until December 2004 or January 2005, when Benyak had two brief conversations with Apotex's

president, Jack Kay, about pursuing an Apotex-made product in the U.S. market. (A0044-45, A0062.) Kay suggested the divalproex sodium product that Apotex was busy developing (and that Apotex had determined months earlier would be filed with the FDA in Nu-Pharm's name). Benyak agreed and left this brief exchange with the understanding that Apotex would "take care of it." (A0062.) There is no written contract or license agreement giving Nu-Pharm any rights with respect to the product. (A0025-26, A0048.)

Nu-Pharm's next contact with Apotex relating to this ANDA was about three months later, in late February or early March 2005, when a regulatory-affairs associate from Apotex appeared at Nu-Pharm's office with ANDA documents for Benyak to sign. (A0045-46, A0062.) Among these documents was the actual ANDA application, in which the signator must certify under penalty of perjury that, among other things, all information contained within the ANDA is accurate. (A0127-28.) The Apotex representative instructed Benyak to sign this document on behalf of Marcy Macdonald, an official from Apotex Corp. (the U.S. agent for purposes of the ANDA). (A0057, A0126.) When Benyak, who had nothing to do with appointing Apotex Corp. as the U.S. agent and had never spoken to anyone from that company, asked why Macdonald did not sign it herself, he was told to sign it for her, and so he did. (A0051, A0057, A0127-28.) When asked for the factual basis upon which he signed the Paragraph IV certification, attesting that the proposed product would not infringe Abbott's patents, Benyak responded with the circular answer that "an ANDA wouldn't be filed if it was obviously an infringing product, to my way of thinking." (A0052, A0129.)

C.    **The Nu-Pharm ANDA Is Adjudged to Infringe Abbott's Patents and FDA Is Specifically Barred from Approving It Until After Abbott's Patents Expire.**

On or about March 7, 2005, Apotex Corp. submitted (on behalf of "Nu-Pharm") ANDA No. 77-615 ("the Nu-Pharm ANDA") to the FDA, seeking approval of Apotex's "redesigned"

divalproex sodium product. (A0127-28, A0130-31.) The Nu-Pharm ANDA included a

Paragraph IV certification (*see* 21 U.S.C. § 355(b)(2)(A)(iv)) directed to Abbott's '326 and '731

patents. (A0129.) In May 2005, Nu-Pharm's counsel (the same counsel representing plaintiff

here and the same counsel that represented Apotex in *Abbott I, II, III, IV, V*, and *VI*) sent Abbott

notice of the filing of the Nu-Pharm ANDA. (A0132-46.) That notice carefully excluded any

mention of Apotex. (*Id.*)

On June 24, 2005, Abbott sued Nu-Pharm under 35 U.S.C. § 271(e)(2), alleging that the

generic product described in the Nu-Pharm ANDA would infringe Abbott's '326 and '731

patents. *See Abbott Labs. v. Apotex, Inc.*, 455 F. Supp. 2d 831, 835 (N.D. Ill. 2006) ("*Abbott V*")

(referring to *Abbott Labs. v. Nu-Pharm, Inc.*, No. 05 C 3714 (N.D. Ill.) (the "Nu-Pharm

Litigation"). The suit was assigned to Judge Rebecca Pallmeyer. *Id.* When Nu-Pharm produced

the ANDA in discovery, Abbott learned for the first time that Apotex was involved. (A0126-28.)

With leave of court, Abbott amended its complaint in the Nu-Pharm Litigation to add claims

against Apotex Inc. and Apotex Corp. for direct and induced infringement. *See Abbott Labs. v.

Apotex, Inc.*, 503 F.3d 1372, 1377 (Fed. Cir. 2007) ("*Abbott VI*"). The Apotex defendants

moved to dismiss, insisting that the Nu-Pharm ANDA "ha[d] nothing to do with [them]."

(A0148.)

The falseness of that assertion became clear in July 2006 when Abbott deposed key

personnel from Apotex and Nu-Pharm, including Sherman and Benyak. These people confirmed

under oath that every aspect of the product's development, as well as the preparation and

prosecution of the Nu-Pharm ANDA, was performed by Apotex. (A0018, A0022, A0044-54,

A0066-71, A0076-82, A0092-A0101, A0113, A0119-23.) By Sherman's admission, Apotex

chose to involve Nu-Pharm only because "there is an injunction" against Apotex and because

Nu-Pharm was willing to fund the next round of litigation against Abbott. (A0023; *see also* A0024 (Q: "Why involve Nu-Pharm?  A:  "I am giving them money.  They are taking on the litigation, and they are earning it.").).

Despite the injunction order (and despite having ample ability to do so), Apotex did not commission a single test to compare its new product to the old, infringing one before submitting the new ANDA. (A0016, A0027.)  For its part, Nu-Pharm had no involvement with the ANDA other than printing Apotex-drafted documents on Nu-Pharm letterhead and signing them as directed.  (A0046, A0049-50, A0066-71, A0149-52.)  Nu-Pharm knows nothing about the nature of the product described in the ANDA or the science underlying its creation and manufacture. (A0049-50, A0053, A0058-60.)

Through its own testing, Abbott confirmed that the product described in the Nu-Pharm ANDA is identical to that previously adjudged infringing and enjoined.  Armed with its test results, and sworn testimony and documents from Apotex and Nu-Pharm, Abbott filed a motion with Judge Posner on August 15, 2006, exposing Apotex's ruse and seeking to have the injunction order enforced against the Nu-Pharm ANDA. *Abbott V*, 455 F. Supp. 2d at 833, 835-36.  Judge Pallmeyer subsequently stayed the Nu-Pharm Litigation, recognizing that all of the issues in that case could effectively be adjudicated in the enforcement proceedings before Judge Posner.  (*See* Pl. Mem.[3], Ex. I.)

After briefing from both sides, Judge Posner held a hearing on August 30, 2006.  *Abbott V*, 455 F. Supp. 2d at 837.  Nu-Pharm was on notice of the proceedings before Judge Posner, but elected to have Apotex represent its interests (and the lawyers were the same in any event, since the two companies then shared, and continue to this day to share, the same counsel).

---

[3] Nu-Pharm's Memorandum in Support of its Motion for Temporary Restraining Order and/or Preliminary Injunction is cited as "Pl. Mem."

On October 6, 2006, Judge Posner granted Abbott's motion and extended the injunction order to cover the Nu-Pharm ANDA. Several findings from that decision impact the instant proceedings. *First*, the court noted that, according to Benyak and Sherman, "[t]he product for which Nu-Pharm filed the ANDA had been developed by Apotex, is owned by it, and, as Sherman has testified, we [Apotex] will get our profit out of it, anyway." *Id.* at 835. Apotex's choice of Nu-Pharm to file the ANDA was, the court concluded, merely "a subterfuge intended to give Apotex a crack at another district judge, who might, in an infringement suit by Abbott, conclude that it was a different, and noninfringing, product from the one I had enjoined." *Id.* Apotex's ploy was transparent to the trial judge, who was uniquely situated to assess the evidence in the first instance; Apotex ran the show, and Nu-Pharm was merely its "stalking horse." *Id.* *Second*, the court left no doubt that the product described in the Nu-Pharm ANDA would infringe Abbott's patents, finding that "there is no difference at all" between that product and the one previously found infringing and enjoined in 2004 (*id.* at 837) and that the fresh infringement evidence presented at the hearing relating to the redesigned "Nu-Pharm" product "overwhelmingly favor[ed] Abbott." *Abbott V*, 455 F. Supp. 2d at 839.

Based upon these findings, Judge Posner concluded that "the [2004] [I]njunction has been violated. Should the violation continue, Apotex – a large, successful, and sophisticated enterprise – will be risking heavy sanctions for its willful disobedience of the injunction. *For the present, however, it will suffice to extend the injunction to embrace the Nu-Pharm ANDA.*" *Id.* at 840 (emphasis added). The Court thus entered another injunction order (the "Injunction Order"), which states, *inter alia*, that:

> [t]he effective date of any approval by FDA of ANDA Nos. 75-112 [the Apotex ANDA] and 77-615 [the Nu-Pharm ANDA], or any other application concerning defendants' generic divalproex sodium which the Court has found to be infringing,

shall be no earlier than January 29, 2008, the date of expiration of Abbott's [patents].

(A1.)

### D. The Federal Circuit Has Upheld The Injunction Order, Barring FDA From Approving The Nu-Pharm ANDA Until After Abbott's Patents Expire, And That Injunction Remains In Full Effect.

Apotex appealed this decision (with Nu-Pharm again content to allow Apotex to advance its interests), and lost. The Federal Circuit found that, "[c]onsidering all the evidence, the district court did not clearly err in holding that the [Nu-Pharm ANDA] drug would infringe the claims of Abbott's patents." *See Abbott VI*, 503 F.3d at 1381. The court thus "decline[d] to vacate the revised injunction as Apotex requests." *Id.* Although the Federal Circuit did reverse the trial court's ruling holding Apotex to be in contempt of the original (2004) injunction order (*id.* at 1383), that reversal in no way affects the Injunction Order barring approval of the Nu-Pharm ANDA. Importantly, the Federal Circuit expressly did "not disturb" Judge Posner's findings that "'Apotex's choice of Nu-Pharm to file the ANDA was a subterfuge intended to give Apotex a crack at another district judge' who might find that Nu-Pharm ANDA drug non-infringing." *Id.* at 1379. Apotex's subsequent petition for panel and/or en banc rehearing was summarily denied by the Federal Circuit, and the mandate has issued. (A0153-54.) Apotex recently filed a petition for certiorari before the U.S. Supreme Court, but that petition does not impact the Injunction Order. That order stands in full effect.

### E. Nu-Pharm Filed This Action After Being Specifically Admonished By The Illinois Court That It Is Indeed Subject To The Injunction Order.

On the very day that the complaint in this action was filed, Nu-Pharm and Abbott appeared before Judge Pallmeyer in the Nu-Pharm Litigation for a status conference. In view of Apotex's petition to the Supreme Court, Judge Pallmeyer elected to continue her stay of the Nu-Pharm Litigation. (A0174.) Nu-Pharm's counsel (the same firm that represents Nu-Pharm in

-10-

this case) objected, arguing that Nu-Pharm is not properly subject to the Injunction Order entered by Judge Posner. Judge Pallmeyer disagreed, admonishing counsel that it would be unwise for Nu-Pharm to act as though it were not bound by the Injunction Order.

Ignoring Judge Pallmeyer's advice, Nu-Pharm filed this action a few hours later. Although Abbott's rights are clearly implicated by this proceeding, Nu-Pharm gave Abbott no notice of the case and did not serve Abbott (or Judges Pallmeyer or Posner) with even a courtesy copy of the complaint or associated motion papers. Instead, Abbott learned of this action from the FDA and immediately sought to intervene. (*See* Dkt. 5.)

## ARGUMENT

### I.   NU-PHARM'S COMPLAINT FAILS TO STATE A CLAIM AND MUST BE DISMISSED AS A MATTER OF LAW.

To survive a Rule 12(b)(6) motion, Nu-Pharm must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1965 (2007). That is, the complaint must "state a claim to relief that is plausible on its face." *Id.* at 1974. In determining whether this standard is met, the Court may consider not only facts alleged in the complaint, but also any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n. 6 (D.C. Cir. 1993). While the Court must, for purposes of a Rule 12(b)(6) motion, construe the complaint in Nu-Pharm's favor, it "need not accept inferences drawn by the plaintiff [] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor is the Court bound to accept Nu-Pharm's legal conclusions. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).

Nu-Pharm's complaint pleads two counts:  one for relief under two sections of the Administrative Procedure Act ("APA") (Compl. ¶¶ 31-33 (citing 5 U.S.C. § 706(2)(A) & (C)), and a second for interim relief under that Act (*id.* ¶¶ 34-35 (citing 5 U.S.C. § 705)).  Both counts, however, rest on a false legal conclusion:  that because the Injunction Order barring the FDA from granting final approval of the Nu-Pharm ANDA was issued by Judge Posner, rather than Judge Pallmeyer in the Nu-Pharm Litigation, it is (somehow) immaterial to the Nu-Pharm ANDA.  (Compl. ¶ 25.)  That is just plain wrong.

The Injunction Order, entered by Judge Posner and affirmed by the Federal Circuit, could not be more clear:  "The effective date of *any approval* by FDA of ANDA Nos. 75-112 and 77-615 [the Nu-Pharm ANDA], or any other application concerning defendants' generic divalproex sodium which the Court has found to be infringing, *shall be no earlier than January 29, 2008*, the date of expiration of Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326."  (A0001 (emphases added).)  The Injunction Order thus unambiguously bars the FDA from granting what Nu-Pharm seeks here:  final approval of the Nu-Pharm ANDA before the expiration of Abbott's patents.  With that false legal conclusion debunked, Nu-Pharm's claims must fail for at least two reasons:  (A) the complaint improperly asks this Court to set aside, *sub silentio*, an injunction issued by another federal court, and (B) the causes of action fail to state a claim on which relief can be granted.

### A.    Nu-Pharm's Complaint Is Actually A *Sub Silentio* Request To Set Aside The Injunction Order; It Is, Therefore, Not Properly Before This Court.

Because Judge Posner's Injunction Order prevents the FDA from approving the Nu-Pharm ANDA before Abbott's patent's expire, Nu-Pharm may not blithely waltz into this Court and seek an order that would violate that injunction, as though the Injunction Order did not exist.  This Court is, of course, not some uber-appellate court, designated to review and set aside the

careful work of Judge Posner and the Federal Circuit. *See, e.g., Porter v. Kessner*, No. Civ.A. 00-1537, 2000 WL 1473592, at *4 (E.D. La. Jan. 2, 2000) ("It is basic to our federal judicial system that decisions of a United States Court of Appeals can only be appealed to and by the Supreme Court of the United States.") (citing 28 U.S.C. § 1254), *aff'd*, 286 F.3d 1064 (5th Cir. 2001). So, before Nu-Pharm could even properly seek the relief it requests here, it would first have to seek relief from Judge Posner's Injunction Order. This it has not done, nor could it do so in this Court.

It is well-established that relief from an injunction "should be sought from the issuing court." *Lapin v. Shulton, Inc.*, 333 F.2d 169, 172 (9th Cir. 1964). Indeed, "for a nonissuing court to entertain an action for such relief would be seriously to interfere with, and substantially to usurp, the inherent power of the issuing court . . . to supervise its continuing decree by determining from time to time whether and how the decree should be supplemented, modified, or discontinued . . . ." *Id.* Accordingly, courts routinely hold that "considerations of comity and orderly administration of justice demand that [a] nonrendering court should decline jurisdiction of such an action and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there." *Id.*

For instance, in *Martin-Trigona v. United States*, the U.S. District Court for the District of Columbia denied plaintiff leave to file a complaint for failure to comply with a pre-filing injunction from the U.S. District Court for the District of Connecticut. 779 F.2d 72 (D.C. Cir. 1985). On appeal, he argued that he should have been relieved from the requirements of that injunction. The D.C. Circuit, however, disagreed, noting that that argument "should have been direct[ed] to the District Court in Connecticut." *Id.* at 73. It therefore affirmed the denial of leave to file. *Id.* at 74; *see also Feller v. Brock*, 802 F.2d 722, 728 (4th Cir. 1986) ("Several

-13-

appellate courts have stated that discretion requires a district court to decline to hear a claim

seeking relief from a judgment entered by a coordinate court . . . when it is apparent that the

parties can seek redress in the issuing court.") (collecting cases); *Mann Mfg., Inc. v. Hortex, Inc.*,

439 F.2d 403, 407-08 (5th Cir. 1971); *Bell v. United States*, __ F. Supp. 2d __, No. WDQ-06-

3406, 2007 WL 3348347, at *1 (D. Md. Oct. 1, 2007) ("The Court does not have the power to

void the injunction ordered in the District Court for the Middle District of Pennsylvania and

affirmed by the Third Circuit. An issuing court has continuing jurisdiction to modify or revoke

its injunction.").

The result here should be no different. Should Nu-Pharm wish to seek relief from Judge

Posner's Injunction Order, it is certainly free to ask him for such relief. It has not, however, even

attempted to do so, instead trying to end-run the Injunction Order, first before Judge Pallmeyer in

Illinois and now by declaring the injunction immaterial and simply demanding (in a pleading

filed without any notice to Abbott) that this Court order the FDA to violate it. That will not do.

The Court should dismiss this suit for that reason alone.

### B.    Nu-Pharm's Complaint Fails To State A Claim On Which Relief Can Be Granted.

Even were the Court to address the merits, Nu-Pharm's complaint must still fail because

the causes of action it asserts fail to state a claim on which relief can be granted.

### 1.    The FDA's Adherence To Judge Posner's Injunction Order Is Not Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law.

In Count I, Nu-Pharm's complaint first seeks relief under 5 U.S.C. § 706(2)(A). Under

that provision, as Nu-Pharm concedes, this Court may only set aside the FDA's decision

declining to grant final approval for the Nu-Pharm ANDA prior to Abbott's patents expiring if

that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." (Compl. ¶ 32.) "As a general matter, the scope of review" under that standard "is

narrow and a court is not to substitute its judgment for that of the agency." *Roberts v. Harvey*,

441 F. Supp. 2d 111, 118 (D.D.C. 2006) (internal quotations and citation omitted). Specifically,

courts will not disturb the decision of an agency that has "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983) (internal quotation marks and citations omitted).

        As a matter of law, FDA cannot be said to have acted in a manner that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" by following the

dictates of Judge Posner's Injunction Order – *i.e.*, *by following the law*. That is exactly what

another judge of this Court held just a few months ago in *Apotex, Inc. v. FDA*, 508 F. Supp. 2d

78 (D.D.C. 2007).[4] That case arose from a Hatch-Waxman suit filed against Apotex in a federal

district court in New York. Apotex had received final approval of a Paragraph IV ANDA, and

had marketed its generic drug for some time. Thereafter, the New York court ruled that

Apotex's ANDA product would infringe valid patents, and ultimately ordered that it could not be

finally approved until after a pediatric exclusivity period expired on October 20, 2007. To

comply with the court's injunction, the FDA revoked its final approval and granted the ANDA

only tentative approval. *Id.* at 81.

        After failing to secure a stay of the injunction from the Federal Circuit, Apotex filed an

APA suit in this District, just like this one, seeking interim and final relief ordering the FDA to

grant final approval of its ANDA. Specifically, Apotex argued (as does its stalking horse Nu-

Pharm here) that FDA's revocation of final approval based on the New York court's order,

_____

        [4] Counsel for Apotex in that case included William A. Rakoczy of Rakoczy Molino Mazzochi Siwik, LLP, who is Nu-Pharm's counsel in this case. *Id.* at 79.

without conducting its own analysis of whether the Apotex ANDA was subject to pediatric exclusivity, was arbitrary and capricious, and exceeded its statutory authority.  *Id.* at 83.  The District of Columbia court, however, would have none of it.  The Court noted that, "[a]s the FDA was not free to disregard the New York court's order, the federal defendants conclude that the plaintiff brought the instant suit as 'an unwarranted collateral attack upon the New York court's judgment.'"  *Id.* at 86.  And the Court ultimately agreed, finding that, with the New York court's injunction in place, plaintiff could not show that the FDA "had discretion to exercise" on its own.  Accordingly, the Court denied preliminary relief under the APA.

The facts here are materially indistinguishable.  Here, as in *Apotex*, a court order forbids the FDA from granting final approval of the Nu-Pharm ANDA until a fixed date.  Here, as there, the FDA has followed that injunctive order.  That cannot be said to violate the APA.  Indeed, any contrary conclusion would "directly contravene" the injunctive order, essentially forcing the FDA into contempt.  *Id.*  This only underscores why Nu-Pharm's suit is not really an APA challenge, but instead, an attempt to set aside Judge Posner's Injunction Order in this Court.  This collateral attack cannot succeed.

### 2. The FDA's Decision To Abide By Judge Posner's Injunction Order Did Not Exceed The FDA's Statutory Authority.

As a backstop, in Count I Nu-Pharm also seeks relief under 5 U.S.C. § 706(2)(C).  Under that provision, as Nu-Pharm recognizes, this Court may only set aside the FDA's decision declining to grant final approval for the Nu-Pharm ANDA if that decision was "in excess of [FDA's] statutory authority."  (Compl. ¶ 32.)  Nu-Pharm apparently contends (as is further fleshed out in its memorandum in support of its motion for a TRO or PI, at pp.13-22) that as a matter of the Hatch-Waxman Act, only Judge Pallmeyer in the Nu-Pharm Litigation has the

authority to enter an injunction preventing FDA from granting final approval of Nu-Pharm's ANDA, so that Judge Posner's Injunction Order is meaningless. Not so.

In fact, this is simply the same argument that Apotex's lawyers (the same law firm representing Nu-Pharm here) made to Federal Circuit, *i.e.*, that "because the Hatch-Waxman Act does not itself grant a district court subject matter jurisdiction to conduct . . . contempt proceedings," Judge Posner's Injunction Order "was a nullity." *Abbott VI*, 503 F.3d at 1378. But, as the Federal Circuit recognized, that is exactly backwards. A court has *inherent* authority to enforce its own injunctions, under the Hatch-Waxman Act or any other statute, regardless whether such statute expressly provides for contempt power. As the Federal Circuit explained: "Apotex errs by looking only to the district court's authority under the Hatch-Waxman Act when well-settled principles of equity govern injunctions in patent disputes just as in disputes in other areas of law. The power of a district court to enforce its injunction through contempt proceedings is no different." *Id.* (internal citations omitted). Nor, the Court continued, does the Hatch-Waxman Act counsel differently: "The statute is simply silent regarding a district court's contempt authority," and because a court must "assume Congress's familiarity with general principles of law when enacting a statute, Congress must have intended for the courts to maintain their inherent authority to enforce their own injunctions under the well-established principles of equity." *Id.* For Nu-Pharm's lawyers to now contend otherwise is disingenuous.

Again, Nu-Pharm knew full well that its interests in the Nu-Pharm ANDA were at stake in the contempt proceedings before Judge Posner. Judge Posner clearly found that Apotex and Nu-Pharm were hand in glove: Apotex infringed Abbott's patents by filing, through Nu-Pharm, the Nu-Pharm ANDA. *Abbott V*, 455 F. Supp. 2d at 835 ("Abbott did sue Nu-Pharm for infringement, because it was unaware that Nu-Pharm was merely a stalking horse for Apotex";

"It is obvious, and I find, that Apotex's choice of Nu-Pharm to file the [Nu-Pharm] ANDA was a subterfuge"). Accordingly, Judge Posner correctly enjoined the FDA from granting final approval of the Nu-Pharm ANDA before Abbott's patents expire. *Id.* at 840, *aff'd*, 503 F.3d at 1381 ("Considering all the evidence, the district court did not clearly err in holding that the Nu[-]Pharm ANDA drug would infringe the claims of the Abbott patents. . . . [I]t follows that Judge Posner acted entirely within his discretionary authority to issue an order expanding the original injunction."). The FDA did not exceed its statutory authority in so recognizing.

### 3.     Nu-Pharm's Claim For Relief Pending Review Must Also Fail.

Finally, in Count II, Nu-Pharm's complaint purports to seek "relief pending review" under 5 U.S.C. § 705. That statute provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, . . . may issue all necessary and appropriate process to postpone *the effective date of an agency action or to preserve status or rights* pending conclusion of the review proceedings." *Id.* (emphasis added.) But Nu-Pharm does not actually seek the relief available under that statute, *i.e.*, postponing the effective date of an agency action, or preserving status or rights. Instead, Nu-Pharm seeks to compel agency action, and indeed, to dictate the content of that action; it seeks "immediate final approval" of its ANDA "pending resolution of this matter on the merits, including an appeal to the D.C. Circuit." (Compl. ¶ 35.) That is impermissible.

"When viewed in its entirety, the plain language of" § 705 "reveals that the remedial powers granted to a reviewing court under this section are in fact extremely limited." *Salt Pond Assocs. v. U.S. Army Corps of Eng'rs*, 815 F. Supp. 766, 775-76 (D. Del. 1993). Specifically,

> The first section of the statute broadly describes when a court is authorized to act under the section (i.e., "*On* such conditions as may be required *and* to the extent necessary to prevent irreparable injury") (emphasis added). The second part of the statute narrowly describes the scope of relief the reviewing court is authorized to grant to the petitioning party ("the reviewing court ... may issue all necessary

and appropriate process *to postpone the effective date of an agency action OR preserve the status or rights pending conclusion of the review proceedings*") (emphasis added). Thus, the scope of relief available to the Plaintiff is limited to (1) a postponement of the agency action or (2) a preservation of the status or rights of the parties.

*Id.* at 776 (emphases added). The logical consequences of this plain text are obvious: "When the Court is determining interim relief, by its very terms, the statute *does not* confer jurisdiction onto the Court to alter the status quo nor does it allow the Court in issuing interim relief to actually dictate specific terms or conditions to a governmental agency." *Id.* (emphasis added). Because that is exactly what Nu-Pharm requests, that request, too, must fail as a matter of law.

## II.    ALTERNATIVELY, THIS COMPLAINT SHOULD BE TRANSFERRED TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS.

If this Court elects not to dismiss Nu-Pharm's action outright, then this entire matter should be transferred to the Northern District of Illinois in accordance with 28 U.S.C. § 1404(a). The interests of justice and the convenience of the parties warrant having this matter decided before the court that actually entered the Injunction Order at issue.

In its complaint, Nu-Pharm alleges that venue is proper in this District under 28 U.S.C. § 1391(e). (Compl. ¶ 10.) The District of Columbia is not the exclusive venue under that provision. Instead,

[a] civil action in which *a defendant* is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which . . . *a defendant* in the action resides . . . .

28 U.S.C. § 1391(e)(1) (emphases added). Abbott has moved to intervene as a defendant in this action. (*See* Dkt. 5.) This motion is unopposed by defendants and seeks intervention of right

due to the undeniable impact that this action could have on Abbott's legal rights.  (*See id.*)[5]
Should the Court grant that motion, Abbott will be a defendant in this action, and venue under
§ 1391(e)(1) thus would be proper in the Northern District of Illinois, where Abbott resides.[6]

A case may be transferred "to any other district or division where it might have been
brought . . . [f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C.
§ 1404(a).  In considering whether transfer is appropriate, courts in this circuit examine
numerous factors, including "the convenience of the parties," "whether the claim arose
elsewhere," and "whether transfer will prevent duplicative litigation." *See Cal. Farm Bureau
Fed'n v. Badgley*, 2005 WL 1532718, at \*1 (D.D.C. June 29, 2005).  The *Badgley* court placed
"great importance" on this final factor, noting that the Supreme Court has counseled: "To permit
a situation in which two cases involving precisely the same issues are simultaneously pending in
different District Courts leads to the wastefulness of time, energy, and money that § 1404(a) was
designed to prevent." *Id.* (quoting *Cont'l Grain Co. v. FBL-585*, 364 U.S. 19, 26 (1960)).

Transfer to the Northern District of Illinois is warranted here. *First*, there can be no
doubt that this litigation "arose elsewhere" – Abbott filed the Nu-Pharm Litigation in the
Northern District of Illinois and obtained the Injunction Order from Judge Posner prohibiting
final approval of the Nu-Pharm ANDA in that District. *See Abbott Labs. v. Nu-Pharm, Inc.*,
Case No. 05-CV-3714 (Pallmeyer, J.); *see also Abbott V*, 455 F. Supp. 2d at 840.

*Second*, by this action, Nu-Pharm is effectively challenging the underlying judgment of
the Northern District of Illinois, which holds that the ANDA product in question is infringing
and cannot be approved prior to the expiry of Abbott's patents.  Where a plaintiff's suit depends

---

[5] During a conference call with the Court's clerk, Nu-Pharm's counsel represented that plaintiff also has no objection to Abbott's intervention, so long as it would not cause any disruption to the schedule.  No such disruption has arisen, so Abbott's motion to intervene is unopposed.

[6] Abbott is an Illinois corporation with its principal place of business in the Northern District of Illinois.

largely on a judgment entered in a prior case, transfer to the district where that prior case was located is advisable. *See Schreiber v. Kohn*, 434 F. Supp. 2d 1, 2 (D.D.C. 2006) (transferring venue to the district where the judgment against plaintiff – which judgment was the basis of plaintiff's pending suit – had been entered). In *Schreiber*, the court explained that convenience and justice were served by transferring the case to the district that had "every connection with the case." *Id.* In particular, the court found that "Plaintiffs challenge to the lawfulness of the judgment alone requires that the case be transferred to the Western District of Texas for resolution." *Id.* The same should apply here.

*Finally*, the convenience of the parties would be served by a transfer. Abbott is located in the Northern District of Illinois, as are counsel for Plaintiff and Abbott. Nu-Pharm resides in Canada, so maintaining this litigation in the District of Columbia offers no increased convenience. Moreover, because both Judge Pallmeyer and Judge Posner have had significant experience with the facts underlying the Nu-Pharm ANDA, there will be less time needed for a trier of fact to get up to speed in order to reach the merits of the case.

In sum, another district court already has considered whether the Nu-Pharm ANDA can be finally approved by FDA prior to the expiry of Abbott's patents (the very question Nu-Pharm now puts to this Court) and has ruled that the answer is an unequivocal "No." There is no reason for this Court to exhaust its own scarce resources duplicating that effort. *See Badgley*, 2005 WL at 1532718, at *2 (citing 15 Charles A. Wright, et al., *Federal Practice & Procedure* § 3854 (noting that considerations raised by duplicitous litigation should be given "great weight" and "may be decisive in ruling on a transfer motion even though the convenience of the parties and witnesses point in a different direction")).

**III.    ALTERNATIVELY, IF THIS COURT ELECTS TO ADJUDICATE NU-PHARM'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION, THAT MOTION SHOULD BE DENIED.**

If the Court is more inclined to reach the merits (which it need not do), Nu-Pharm's motion for emergency injunctive relief should be denied. A temporary restraining order or preliminary injunction is a "drastic and extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party." *Kahane v. Sec'y of State*, 700 F. Supp. 1162, 1165 (D.D.C. 1998). Specifically, to justify the issuance of a temporary restraining order or preliminary injunction, a movant must demonstrate that (1) irreparable harm will result absent the immediate intervention of the court, (2) the movant is likely to succeed on the merits of the underlying dispute, (3) any harm to other parties that would be caused by granting the requested relief does not outweigh the equities in favor of granting the relief, and (4) granting the requested relief serves the public interest. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). A showing of substantial likelihood of success is especially important. *RCM Techs., Inc., v. Beacon Hill Staffing Group*, LLC, 502 F. Supp. 2d 70 (D.D.C. 2007). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C.1999). Based on these standards, denial is the only appropriate course here.

**A.    Nu-Pharm Has Little, If Any, Chance Of Success On The Merits Of Its Claims.**

For all of the reasons discussed above, Nu-Pharm's claims are so inadequate on their face that they should be dismissed under Rule 12(b)(6). Even if the Court is not inclined to dismiss the case at this juncture, however, these deficiencies – taken individually or collectively – are surely enough to negate any possible argument that Nu-Pharm has the requisite "substantial

likelihood" of success on the merits that is required for entry of a temporary restraining order or preliminary injunction. Yet, these are far from the only reasons to deny Nu-Pharm's motion. As discussed below, a host of additional legal impediments render Nu-Pharm's hopes for success exceedingly dim, at best.

**1.    There Is No Legal Authority For This Court To Order FDA To Immediately Approve Nu-Pharm's ANDA.**

Nu-Pharm demands that this Court enter an order compelling the FDA to finally approve the Nu-Pharm ANDA before January 29, 2008. (Compl., Count I; Pl. Mem. at 2.) As a matter of law, the Court cannot do that, and Nu-Pharm does not cite a single case saying otherwise.

*First*, Nu-Pharm purports to seek this relief under §§ 706(2)(A) and (C) of the APA, which permit a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). As discussed above, this Court cannot find FDA's actions in obeying the Injunction Order to be arbitrary, capricious, or improper in any respect, and thus Nu-Pharm's claim is doomed. Even setting aside that fatal defect, however, Nu-Pharm seeks relief well beyond what these statutory provisions could ever allow. Nu-Pharm does not merely seek to have this Court "hold unlawful" or "set aside" an action by FDA; instead, it is demanding that the Court affirmatively force FDA to take a specific action on a pending application. The statute does not provide for that.

Even in an action under section 706(1) of the APA (which allows a court to "compel agency action unlawfully withheld or unreasonably delayed"), the most Nu-Pharm could ever be entitled to is an order forcing the FDA to act, one way or the other, on its application. *See Pub. Citizen Health Research Group v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984) (the court "can order

an agency to either act or provide a reasoned explanation for its failure to act"); *see also*

*Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 12 (D.D.C. 2003) (this relief is

recognized to be "an extraordinary remedy [that] require[s] similarly extraordinary

circumstances to be present before [a court] will interfere with an ongoing agency process"). But

this is not what Nu-Pharm wants. It asks the Court to go further and to affirmatively mandate

what the substance of FDA's action must be. There is *no* legal authority, under the APA or

otherwise, for the Court to enter such an order.

 And there is good reason. An application for approval of a pharmaceutical drug must go

through rigorous scientific, medical, and regulatory review and can only be approved if it meets

a host of FDA criteria, including that the product will be safe and effective, is appropriately

labeled, and can be safely manufactured. This Court is in no position to determine that Nu-

Pharm's ANDA is ready to be finally approved and its drug product immediately marketed to the

American public, which is exactly what Nu-Pharm demands in this lawsuit. Although Nu-Pharm

claims that the only thing standing in the way of final approval is the Injunction Order, there is

no evidence to corroborate this allegation beyond the self-serving declaration of Nu-Pharm

president Richard Benyak. (Pl. Mem., Ex. D ¶ 10.) There is no communication from FDA

saying anything of the sort. [7]

 Indeed, the only undisputed facts suggest that FDA's substantive review of this ANDA is

*not* complete. If it were, one would expect that the application already would have been awarded

tentative approval by the FDA. Nothing prohibits the agency from granting tentative approval of

an application even during the pendency of the 30-month stay, thereby signaling that the

---

[7] As discussed in Part IV, *infra*, there would have to be discovery undertaken on this issue of the status of Nu-Pharm's ANDA before the Court could fully consider Nu-Pharm's pending motion for emergency injunctive relief. If there are factors other than the Injunction Order that prohibit immediate approval of the ANDA, then Nu-Pharm's motion would fall flat on that basis alone.

substantive review is complete and the ANDA is ready for approval but for the statutory stay. Tellingly, that has not happened here. That the Nu-Pharm ANDA *does not even have tentative approval* is a fair indicator that there are indeed factors unrelated to the Injunction Order that render this application unfit for immediate approval. The Court is in no position to hold otherwise.

*Second*, Nu-Pharm's entire argument is grounded on the false premise that it was somehow entitled to approval of its ANDA immediately after the 30-month stay resulting from Abbott's patent infringement lawsuit expired in November 2007. Indeed, Nu-Pharm stresses *ad nauseum* in its papers the notion that the FDA has "no discretion" to continue its review beyond 30 months, but instead "shall" approve the application that very day unless there is a court order telling the FDA that it may not do so (which, of course, there is here, but Nu-Pharm asks the Court to ignore it). (*E.g.*, Pl. Mem. at 4-5, 13-17.) Thus, in Nu-Pharm's view, once Judge Posner's Injunction Order is disregarded (which cannot happen), then every day "Nu-Pharm's" ANDA sits unapproved is a violation of the law. Nonsense.

Nu-Pharm cites no law compelling FDA to approve an ANDA within 30 months, because no such law exists. The statutory provision upon which Nu-Pharm relies merely states that, if a patent holder institutes an action for infringement within 45 days of receiving notice of the filing of an ANDA that contains a Paragraph IV certification, then "the approval [of the ANDA] shall be made effective upon the expiration of the thirty-month period beginning on the date of receipt of the notice . . . ." 21 U.S.C. § 355(j)(5)(B)(iii). This provision does no more than make clear that, if a timely patent infringement action is filed, the FDA cannot finally approve the ANDA at issue until after the 30-month stay has passed. As discussed above, however, if the agency completes its substantive review of the ANDA during that time, it can *tentatively* approve the

application.  If (as with the Nu-Pharm ANDA) there is no tentative approval during the 30

months, however, then "the approval" contemplated by this provision is missing – there is

nothing to "be made effective" upon the expiry of the stay.

And even if there has been tentative approval, FDA regulations make clear that the

agency *is not required* to make that approval "effective" immediately upon the expiration of the

30-month stay, regardless whether an injunction has been issued by any court (which is an

entirely separate, and dispositive, basis for refusing to do so).  FDA has expressly considered the

precise "shall be made effective" language of § 355(j)(5)(B)(iii) upon which Nu-Pharm relies,

and

> the agency interprets these provisions of the act as requiring, as a preliminary
> matter, final agency approval of the application in order for any approval to be
> made effective.  Thus, an applicant with a tentative approval may not begin
> marketing its drug product until it has received an approval letter from the agency
> because a tentative approval letter does not constitute final agency "approval" of
> the application.  In such cases, the agency will examine the application to
> determine whether there have been any changes in the conditions under which the
> application was tentatively approved.  The tentative approval would become final
> and, therefore, effective only when the agency sends an approval letter to the
> applicant.

*See* 21 C.F.R. § 314.107, 59 Fed. Reg. 505338, 50351-52 (Oct. 3, 1994).  Indeed, in its

regulation implementing this statutory provision, FDA recognizes this need for flexibility and

states that, once the 30-month stay expires, and in the absence of an injunction, approval of an

ANDA "*may* [not shall] be made effective."  21 U.S.C. § 314.107(b)(3) (emphasis added).  Thus,

contrary to Nu-Pharm's suggestion, nothing in § 355(j) establishes an absolute 30-month

deadline by which the FDA *must* approve an ANDA.

The falsity of Nu-Pharm's argument is further revealed when one examines that statute in

its entirety.  The sentence directly before the one cited by Nu-Pharm instructs that, if a patent

holder does *not* file an action for infringement within 45 days of receiving notice of the

-26-

submission of an ANDA that contains a Paragraph IV certification, then "the approval [of the ANDA] shall be made effective *immediately*." 21 U.S.C. § 355(j)(5)(B)(iii). Under Nu-Pharm's view, this provision (which contains the same magic word "shall") would mandate that FDA has less than *two months* to finally approve any ANDA that contains a Paragraph IV certification and that is not the subject of a patent infringement lawsuit. In Nu-Pharm's own words, the FDA would have "no discretion" to do otherwise. (Pl. Mem. at 5.) Of course, FDA must conduct the same rigorous review of an ANDA whether or not it is the subject of a patent lawsuit. It is inconceivable that Congress wrote this statute to allow FDA 30 months to review and approve an ANDA that is subject to a lawsuit, but less than two months if it is not. Yet, this is what Nu-Pharm would have the Court hold as a matter of law. Rather than commit such an error, the Court should instead interpret the statute in a manner consistent with FDA's own interpretation and hold that only where FDA has otherwise finished its substantive review of an application and granted tentative and final approval can that "approval" "be made effective" under this statute. That has not happened here with respect to the Nu-Pharm ANDA, and there is no deadline by which it must happen.[8] Consequently, even if there were no Injunction Order, Nu-Pharm's demand for emergency injunctive relief would fail.

### 2.    Nu-Pharm's Arguments About Which Court Orders "Matter" Are Sanctionable.

Nu-Pharm further contends that "courts uniformly agree that the only court that matters, and which may be used to delay approval, is the one hearing" a Hatch-Waxman suit against the

---

[8] Moreover, even if this statutory provision could be deemed to establish deadlines for the FDA to approve an ANDA, that alone would not justify the equitable relief Nu-Pharm seeks. The D.C. Circuit took up the issue of how long the FDA should be afforded to review an NDA application (where, unlike in the ANDA context, there actually is a formal review period) in *In re Barr Labs., Inc.*, 930 F.2d 72 (1991). As the court observed, "[e]quitable relief does not necessarily follow a finding of a violation [of a deadline]: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *Id.* at 74. Such relief is instead reserved for only egregious circumstances. *Id.* at 74-76. Nothing could justify such extraordinary relief here.

ANDA filer – here, Judge Pallmeyer in the Nu-Pharm Litigation. (Pl. Mem. at 19.) Indeed, Nu-Pharm goes so far as to claim that "[n]o court has *ever interpreted the statute otherwise*, and certainly not in any manner that would authorize FDA to delay approval based on an order entered in an action to which Nu-Pharm is not even a party" – *i.e.*, the contempt proceeding before Judge Posner. (*Id.* (emphasis added).) That is demonstrably false.

To the contrary, the Federal Circuit interpreted the Hatch-Waxman Act in just that way in *Abbott VI*, affirming Judge Posner's Injunction Order, which barred FDA from granting final approval of the Nu-Pharm ANDA until after the expiration of Abbott's patents. *See* 503 F.3d at 1381. On appeal, Apotex contended that this was improper because the Hatch-Waxman Act does not provide for contempt proceedings, and thus the only court with the power to enjoin approval of the Nu-Pharm ANDA was Judge Pallmeyer in the Nu-Pharm Litigation (the precise argument now urged upon this Court). The Federal Circuit rejected this claim, explaining that it was "*err[or]*" to "look[] only to the district court's authority under the Hatch-Waxman Act when well-settled principles of equity [including the availability of contempt] govern injunctions in patent disputes just as in disputes in other areas of law. . . ." *Id.* at 1379 (emphasis added); *see also id.* ("The statute is simply silent regarding a district court's contempt authority," and because a court must "assume Congress's familiarity with general principles of law when enacting a statute, Congress must have intended for the courts to maintain their inherent authority to enforce their own injunctions under the well-established principles of equity.").

The Federal Circuit thus directly held that Judge Pallmeyer in the Nu-Pharm Litigation is *not* the only court with authority to prohibit FDA approval of the Nu-Pharm ANDA, but that it was instead well within Judge Posner's authority to do so by way of enforcing his earlier injunction – even though Nu-Pharm technically was not a party to the matter before him. In light

of this ruling, it is far beyond disingenuous for the same lawyers who handled the proceedings before Judge Posner and the Federal Circuit to now come before this Court and represent that "[n]o court has ever interpreted the [Hatch-Waxman] statute in any manner that would authorize FDA to delay approval based on an order entered in an action to which Nu-Pharm is not even a party." (Pl. Mem. at 19.) This blatant falsehood alone is sufficient reason to deny the motion.

### 3.    Nu-Pharm Is Unquestionably Bound By The Injunction Order.

Moreover, Nu-Pharm is just wrong to suggest that because it was not a party to and never participated in the enforcement proceedings before Judge Posner, it is not bound by the Injunction Order. As an initial matter, this argument is irrelevant because the Injunction Order runs to the Nu-Pharm ANDA itself and prohibits FDA from approving that application. (*See* A0001.) That immutable fact by itself forecloses the relief Nu-Pharm seeks here. Even if it did not, however, Nu-Pharm is unquestionably bound by the Injunction Order. Apotex is named in the Injunction Order and, under Rule 65(d), that order is equally binding on Nu-Pharm, which was virtually represented by Apotex in the proceedings before Judge Posner and is also Apotex's agent and successor in interest.

The law is clear that an injunction applies not only to the parties named in the decree, but also to persons in active concert of participation with an enjoined party, so long as the non-parties have received actual notice of the injunction. Fed. R. Civ. P. 65(d). The rule "is designed to prevent" exactly what has happened here: "the addressee of an injunction [Apotex], eager to avoid its obligations, persuad[ing] a friendly third party [Nu-Pharm] to take steps that frustrate the injunction's effectiveness." *Lindland v. U.S. Wrestling Ass'n, Inc.*, 227 F.3d 1000, 1006 (7th Cir. 2000). Courts interpreting Rule 65(d) have, therefore, identified several circumstances when non-parties are subject to the terms of an injunction; two such circumstances include (1) when a non-party is a successor in interest to a party bound by an injunction, and (2) when a non-party is

otherwise in privity with such a party. *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d

914, 919 (7th Cir. 1996). Nu-Pharm is both.

*First*, it is well established that "[a]n injunction may bind nonparties who are successors

in interest to parties named in the injunction with respect to the subject matter of the injunction."

*Rockwell*, 91 F.3d at 919. Courts have defined "successor in interest" in the injunction context in

several ways, including as "an instrumentality through which an enjoined party seeks to evade an

order, or a party who is merely the tool of the enjoined party." *Hexacomb Corp. v. GTW Enters.,*

*Inc.*, No. 93 C 3107, 1994 WL 171533, at *4 (N.D. Ill. May 2, 1994) ("Successors and assigns

may, however, be instrumentalities through which defendant seeks to evade an order . . . . If they

are, by that fact they are brought within the scope of contempt proceedings by the rules of civil

procedure."))[9] As Judge Posner already concluded, Nu-Pharm is clearly just such an

"instrumentality" or "tool" of Apotex: "Apotex's choice of Nu-Pharm to file the ANDA was a

subterfuge intended to give Apotex a crack at another district judge, who might, in an

infringement suit by Abbott, conclude that it was a different, and noninfringing, product from the

one I had enjoined." *Abbott V*, 455 F. Supp. 2d at 831; (*see also* A0167-73 (wherein Judge

Posner described Nu-Pharm as nothing more than a "tool" used by Apotex to skirt the previous

injunction)). Indeed, Apotex admittedly chose to involve Nu-Pharm in its second go-around

only because "there [is] an injunction" against Apotex and because Nu-Pharm was willing to

---

[9] Courts have also held that a non-party may be bound as a "successor in interest" where it acquires, from the enjoined party, property which is the subject matter of the litigation. *Hexacomb Corp.*, 1994 WL 171533 at *4 (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1944)); *see also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345 (Fed. Cir. 1998) (an injunction may be enforced "against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons"); *Schnitger v. Canoga Elecs. Co.*, 462 F.2d 628 (9th Cir. 1971) (per curiam) (finding privity between a prospective buyer of infringing products and their manufacturer, who had previously been enjoined from selling them). Judge Posner has already held that the product described in the Nu-Pharm ANDA is identical to the Apotex/TorPharm product that Judge Posner previously found to be infringing. *Abbott V*, 455 F. Supp. 2d at 837-39. To the extent that Nu-Pharm has acquired any rights to the Nu-Pharm ANDA product at all, it has acquired these rights from Apotex, and therefore, would be subject to the injunction on this basis as well.

fund the next round of litigation against Abbott.  (*See* A0024 (Q: "Why involve Nu-Pharm?  A: "I am giving them money.  They are taking on the litigation, and they are earning it. "); *see also id.* at A0023 ("Q:  What does Apotex get out of cutting Nu-Pharm in on this product?  Sherman: Nu-Pharm is carrying the litigation."); A0159 (wherein Judge Posner found that "[t]he only reason for the [Nu-Pharm] lawsuit, which Apotex would like to pursue in the hope of generating a conflict between district court judgments, is Apotex's *use of a cat's paw to file the ANDA*, which induced Abbott to sue Nu-Pharm rather than merely ask me to rule that the injunction was being violated.") (emphasis added).)[10]

　　*Second*, Nu-Pharm is also bound because it is in privity with Apotex.  The "privity" concept is not limited simply to formal corporate affiliates; instead, a nonparty may be bound by a judgment in a prior action if one of the parties to the suit "is so closely aligned with [the nonparty's] interest" so as to be his virtual representative.  *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385 (D. Del. 1999); *Mother's Rest. Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1572 (Fed. Cir. 1983) (collecting cases applying the doctrine of virtual privity); *Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*, 331 F.2d 76 (D.C. Cir. 1973) (applying res judicata principals to bar subsequent litigation where non-party's interests were "so closely aligned" with those of party that they were fairly represented in previous proceedings).

　　Courts weigh several factors to determine whether a non-party was virtually represented by a party in previous litigation, including: (1) control or participation in the previous litigation;

---

[10] For its part, Nu-Pharm performed absolutely no work on the preparation or submission of the Nu-Pharm ANDA. (*See* discussion, *supra*, at 4-6.)  Apotex conducted and commissioned all of the underlying product development and testing, and drafted all of the application documents, which Apotex turned over to Nu-Pharm for the sole purpose of having the ANDA bear the letterhead and signature of Nu-Pharm. (*Id.*)  Apotex has been solely responsible for prosecuting the ANDA before the FDA, with no input from Nu-Pharm other than its signature. (*Id.*)  In fact, Nu-Pharm's president admitted that he had probably never seen the entire ANDA, and did not even know if Nu-Pharm had a copy of it. (A0050-51.)  As for the product itself, Nu-Pharm is admittedly ignorant of the nature of the product described in the ANDA or the science underlying its creation and manufacture. (A0046, A0050, A0053, A0058-59, A0072.)  Instead, Nu-Pharm relied on Apotex to "take care of it." (A0062.)

(2) deliberate maneuvering to avoid the effects of a judgment; (3) a close relationship between the parties; and (4) whether the relationship justifies binding the nonparty to the prior judgment. *See Verband der Zuechter des Oldenburger Pferdes e.V. v. Int'l Sporthorse Registry, Inc.*, 55 U.S.P.Q.2d 1550, 1557-58 (N.D. Ill. 1999) (so holding). In particular, the fact that "the party in the first action is now using the nonparty as its agent for the purpose of evading the earlier judgment" is a highly relevant consideration in the virtual privity analysis, because courts recognize that it would be "seriously unfair" to allow such attempted evasion. *Boston Scientific Corp. v. Schneider (Europe) AG*, 983 F. Supp. 245, 259-60 (D. Mass. 1997) (holding that manufacturer of product was precluded from contesting validity in litigation where seller previously litigated the issue; ruling was based, in part, on the entities' use of the same counsel in both proceedings and on the relationship between the parties (manufacturer and seller) with respect to the importation and sales of the product at issue").

Although Nu-Pharm now goes to great lengths to distance itself from Apotex, Nu-Pharm cannot possibly dispute that its interests are "closely aligned" with those of Apotex within the legal meaning of that term. Nu-Pharm's sole business is and always has been marketing Apotex-manufactured pharmaceutical products. (A0032-34, A0037-42.) There is no question that Apotex owns the Nu-Pharm ANDA product at issue. (A0025, A0056.) As has been the case historically, Nu-Pharm's only potential role with respect to this product on a going-forward basis is to market the generic drug that will be manufactured by Apotex. (A0032-34, A0037-42.) Both Apotex and Nu-Pharm obviously have an interest in bringing this product to market and will stop at nothing (including Judge Posner's prohibitive orders) to accomplish that objective. Even Nu-Pharm's own TRO/PI papers confirm that Apotex is still involved in every aspect of this ANDA, including "Nu-Pharm's" current efforts to obtain FDA approval of the product,

-32-

notwithstanding Judge Posner's Injunction Order. (*See* Pl. Mem., Ex. J (copying Apotex's head of intellectual property in its letter to the FDA, demanding immediate approval of the ANDA).)

Nor can Nu-Pharm in good faith dispute that its interests were adequately represented in the proceedings before Judge Posner. Nu-Pharm's own lawyers (in this case and in the Nu-Pharm Litigation) were counsel of record for Apotex in the proceedings before Judge Posner and the Federal Circuit. *See Abbott V*, 455 F. Supp. 2d at 832. Nu-Pharm was well aware of the fact Judge Posner would adjudicate infringement of the Nu-Pharm ANDA product in those proceedings, and in fact, its lawyers encouraged Judge Posner to make findings on this issue. *Id.* at 836-37. Nu-Pharm strategically elected (for reasons which are now readily apparent) not to appear on its own behalf before Judge Posner, but that is immaterial. Nu-Pharm had every right to allow Apotex (the far larger company and the one that actually developed and owns the product being adjudicated) to represent its interests in the enforcement proceedings. Further, the non-infringement evidence that Apotex proffered in those proceedings was identical to the evidence that Nu-Pharm submitted in support of its motion for summary judgment of non-infringement in the Nu-Pharm Litigation. (*Compare id., with* A0160-62.) Thus, there can be no question that Nu-Pharm was adequately represented in the enforcement proceedings before Judge Posner and is (like Apotex) bound by the Injunction Order.

**B.    Nu-Pharm Has Shown No Irreparable Injury Worthy Of Protection.**

Nu-Pharm further claims that, if this Court does not award "immediate injunctive relief requiring FDA to grant final, effective approval of Nu-Pharm's ANDA," Nu-Pharm will suffer "devastating and irreparable harm." (*See* Compl. ¶ 4.) Specifically, Nu-Pharm complains that, absent its requested relief, it will not be able to make a "timely entry" into the market for divalproex-sodium products and, without timely entry, it will suffer a "devastating and unrecoverable loss and effective destruction of Nu-Pharm's only U.S. business opportunity." (Pl.

Mem. at 25.)  But Nu-Pharm's claims of irreparable harm are logically, factually, and legally deficient.

*First*, that Nu-Pharm is attempting to expand its business into the U.S. via the Nu-Pharm ANDA product is of no moment.  Nu-Pharm is a Canadian company that sells a variety of Apotex's products in Canada.  There is no reason for this Court to be overly solicitous of Nu-Pharm's corporate strategies.

*Second*, there is no evidence to support Nu-Pharm's claim that the *only* way of "capitaliz[ing] on th[is] opportunity" is to receive approval before Abbott's patents expire.  (Pl. Mem. at 25-26.)  Nu-Pharm will have an opportunity to sell its product in the U.S. at the conclusion of Abbott's pediatric exclusivity, provided that FDA otherwise approves its ANDA.  That Nu-Pharm may have competition from other generic manufacturers does not remove all possibility of Nu-Pharm *participating* in the market, and Nu-Pharm does not argue otherwise.

*Third*, Nu-Pharm claims that it expects revenues of $139 million during the time period before Abbott's pediatric exclusivity expires and Nu-Pharm is subject to competition.  (Pl. Mem. at 26; *id.* at Ex. D ¶ 8.)  But Nu-Pharm never justifies that number.  There is no evidence to suggest that Nu-Pharm (or Apotex, the product's manufacturer) is prepared to begin commercial distribution or sales of the Nu-Pharm ANDA product.  As of July 2006, Nu-Pharm was a six-person company that had never before marketed, distributed, or sold a product in the U.S. market.  (A0032-34, A0037-42.)  Nothing in Nu-Pharm's filings suggests that it is in any respect better prepared today to commence these activities.  Its claims of irreparable harm are therefore entirely speculative and do not satisfy the requirement that the harm averred be "both certain and great; it must be actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

*Fourth* – and analogously – Nu-Pharm has yet to receive even tentative approval of its ANDA by the FDA. (*See* A0163-66.) Nu-Pharm offers no proof that the product described in the Nu-Pharm ANDA is scientifically viable, safe, and/or suitable for human consumption. Nu-Pharm ignores that issue and instead assumes that the only reason that the FDA is withholding approval of the Nu-Pharm ANDA is the previous litigation. There is no justification for that assumption, and this Court ought not credit it. *See Wis. Gas*, 758 F.2d at 674 ("Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time'") (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).

*Finally*, the chief harm alleged by Nu-Pharm is solely a monetary harm – the loss of the opportunity to make some $100 million by entering the divalproex-sodium market early. But "[i]t is well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas*, 758 F.2d at 674. For this reason, the court in *Sandoz, Inc. v. FDA* – a case cited by *Plaintiff* to support its irreparable harm analysis (Pl. Mem. at 27) – explained that a generic manufacturer's claim that it would lose "11 million in sales over 180 days if proposed intervenor-defendants are permitted to exercise their statutory exclusivity entitlements . . . . cannot be called anything other than merely economic." 439 F. Supp. 2d 26, 32 (D.D.C.) (internal quotations omitted), *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006).[11]

Relatedly, Nu-Pharm claims that absent some injunction, it will suffer a loss to reputation and lose access to major customers and contracts, as well as suffer a loss of goodwill. (Pl. Mem. at 27.) Again, it provides no support for these allegations, save its president's rote invocation of the same phrases. (*See id.* at Ex. D, ¶ 10.) In any case, though, "claims of potential harm to

---

[11] Nu-Pharm has claimed that its business will be crippled by its failure to market before the expiration of Abbott's statutory grant of pediatric exclusivity. But it does not claim that Nu-Pharm itself will be unable to function, that the company will no longer be able to sell its product in Canada, or even that Nu-Pharm will be unable to market its generic divalproex sodium product in the U.S. All it claims is a lost business opportunity – the *sine qua non* of "merely economic" loss. *See Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 164 (D.D.C. 2006).

[one's] business reputation are, at their core, arguments that [one] will suffer economic harm." *Biovail*, 448 F. Supp. 2d at 164. As such, they, too, are "insufficient to demonstrate irreparable injury." *Id.*

In sum, none of Nu-Pharm's claims of irreparable harm withstands scrutiny; combined with Nu-Pharm's failure to show a substantial likelihood of success on the merits, these facts should doom its claim for injunctive relief. *See Sandoz*, 439 F. Supp. 2d at 32 ("because [plaintiff] cannot establish a likelihood of success on the merits, its showing of irreparable harm must be very strong") (internal quotations omitted).

### C.    The Balance Of Harms Strongly Favors Denying Nu-Pharm's Requested Relief.

According to Nu-Pharm, the balance of hardships should be calculated as follows:

- FDA – no harm either way (because it has no commercial stake in the action);

- Nu-Pharm – serious harm if the injunction is not granted; and

- Abbott – no harm that it wouldn't suffer under a "proper interpretation of the statute" because its patents are "set to expire naturally on January 29, 2008."

(Pl. Mem. at 27.) This is entirely mistaken. As discussed in the previous section, Nu-Pharm's analysis of the harm that it will suffer[12] is irredeemably flawed. Nu-Pharm would not be irreparably harmed by the denial of the injunction, and granting the injunction does not serve the public interest. And, unsurprisingly, Nu-Pharm discounts the harms Abbott would suffer if the injunction were granted.

*First*, Abbott has two valid patents that are infringed by the Nu-Pharm ANDA product. *See Abbott V*, 455 F. Supp. 2d at 837-39. The Constitution confers upon a patentee the right to

---

[12] As Judge Posner observed in his order denying Apotex's request for a stay of his ruling pending appeal, Apotex's argument in favor of the harm that it would suffer was really tied to the fact that "Apotex hope[d] that it might obtain from another judge a judgment inconsistent with the injunction—a frank acknowledgement of forum shopping hardly worthy of legal protection." (*See* A0158.)

exclude others from the practice of the patented invention. U.S. CONST., art. I, cl. 8. And, as the Federal Circuit has explained, "[o]nce the patentee's patents have been held to be valid and infringed, he should be entitled to the full enjoyment and protection of his patent rights. The infringer should not be allowed to continue his infringement in the face of such a holding." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983) ("where validity and continuing infringement have been clearly established, as in this case, immediate irreparable harm is presumed").

Furthermore, in a Hatch-Waxman case, the only type of relief available to a patent holder is the very sort of injunction entered by Judge Posner against the Nu-Pharm ANDA. *See* 35 U.S.C. § 271(e)(4). If this Court were to enter an injunction contradicting the Injunction Order entered by Judge Posner, it would deprive Abbott of this relief and its full patent term, and would lead to Nu-Pharm being permitted to sell an infringing product without penalty.

*Second*, Abbott would be substantially harmed by the loss of its six-month period of pediatric exclusivity. The FDA has awarded Abbott this additional exclusivity, recognizing the completion of Abbott's extensive pediatric testing, and Abbott is legally entitled to this extended period of regulatory exclusivity in the market for divalproex-sodium products. *See* 28 U.S.C. § 355a(c)(B). As this District has noted, where the Hatch-Waxman Act confers a period of regulatory exclusivity, "[o]nce the statutory entitlement has been lost, it cannot be recaptured." *Sandoz*, 439 F. Supp. 2d at 32 (internal quotations omitted) (discussing the 180-day grant of exclusivity to first-filers). Nu-Pharm never challenges Abbott's legal right to this period of exclusivity, but impliedly urges the Court to ignore Abbott's rights and place a greater weight on Nu-Pharm's desire for a larger share of the divalproex-sodium market. (*See, e.g.*, Pl. Mem. at 25.) Given that Abbott's right to this six-month period of exclusivity is unchallenged – and the

extraordinary value of this exclusivity acknowledged (*id.* at 26) – the harm to Abbott from granting this injunction is clear.

**D.    The Public Interest Counsels Against An Injunction.**

Contrary to Nu-Pharm's assertions, the public interest would not be served by the issuance of Nu-Pharm's requested injunction. As shown below, *denial* of the injunction would serve the public interest.

*First*, Nu-Pharm correctly states that the public has an interest in the "faithful application of the laws." (Pl. Mem. at 28.) But Nu-Pharm's arguments in favor of its requested relief cannot reasonably be called a "faithful application of the laws." By demanding that this Court issue an injunction directing the FDA to immediately approve its ANDA, Nu-Pharm asks this Court to ignore (1) a lawfully entered injunction that has been upheld by the Federal Circuit; (2) the FDA's determination that the extensive pediatric testing conducted by Abbott entitles Abbott to a grant of pediatric exclusivity; (3) 21 U.S.C. § 355a(c)(2)'s addition of a six-month term of pediatric exclusivity to the end of the Abbott's patents' terms; (4) the patent laws of the United States; and (5) 28 U.S.C. § 1254, which makes clear that a United States district court has no jurisdiction to review a previous decision of a federal appellate court. An injunction that violates or ignores all of these principles (and many others) cannot tenably be described as serving the public's interest in the faithful application of the laws.

*Second*, Nu-Pharm mistakenly encourages the Court to disregard the lawful term of Abbott's patents because Nu-Pharm claims that its injunction "will provide consumers with a generic alternative to a widely-used anti-epileptic for which no generic product has been available for nearly 25 years." (Pl. Mem. at 28.) It is by no means clear that this statement is true; even if the FDA grants Nu-Pharm final approval, it is not certain that Nu-Pharm would be immediately able (legally or logistically) to market its product. Moreover, courts have

recognized that an infringer's pecuniary interest cannot outweigh the strong public interest in

maintaining a healthy patent system and protecting the rights of patent holders against

infringement. *See Lisle Corp. v. A.J. Mfg. Co.*, No. 02 C 7024, 2004 WL 765872, at *6 (N.D. Ill.

April 7, 2004); *Magnavox Co. v. Sanders Assoc.*, No. 80 C 4124, 1982 U.S. Dist. LEXIS 14936,

at *2 (N.D. Ill. Sept. 24, 1982) ("it is never in the public interest to allow a patent infringer to

continue in the commission of his wrong").

This concern is heightened here because the Nu-Pharm ANDA product has been

adjudged to infringe Abbott's patents and *Nu-Pharm does not challenge the merits of that finding

here*. Instead, Nu-Pharm encourages this Court to vacate Abbott's lawful patent term and allow

an adjudged infringer to enter the market early. As one court aptly noted:

> No public interest is served by allowing patent infringement. While this Court
> certainly favors vigorous competition in the marketplace, it also recognizes the
> importance of rewarding inventors for their creative genius and protecting their
> intellectual propoerty rights from infringers. Rather than stifle competition, such
> protection encourages the innovation that leads to new products.

*Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J.

1992). Thus, whatever interest exists in having more suppliers on the market for a product is

"strongly outweighed by the public policy in favor of enforcing patent rights and encouraging

inventors to develop new products" here. *A.K. Stamping Co. v. Instrument Specialties Co.*, 106 F.

Supp. 2d 627, 656 (D.N.J. 2000).

*Third*, Nu-Pharm ignores that pediatric exclusivity is designed to encourage drug

manufacturers to conduct studies and investigation concerning the effects of their drugs on

children – studies that the manufacturers might not otherwise do. The very notion of pediatric

exclusivity is tied to conduct that serves the public; the first step down the road to exclusivity

requires the Secretary to "determine[] that information relating to the use of an approved drug in

the pediatric population may produce health benefits in that population" and ask the drug's

maker to conduct such studies.  28 U.S.C. § 355a(c).  The results of such studies could, of course, reveal additional information that is in the public interest, as they clarify the most effective methods of administering a particular judge in children.  So, ensuring that a validly-awarded period of pediatric exclusivity applies is in the public interest; ignoring the statute in its entirety is not.

*Fourth*, the public has an interest in the conservation of scarce judicial resources.  *See Hunter v. FERC*, __ F. Supp. 2d __, 2007 WL 4302772, at *7 (D.D.C. Dec. 10, 2007) (so holding and denying an injunction in part based on the fact that other, similar litigation was pending).  And, demanding that this Court take up issues already decided by other federal courts encourages an unnecessary waste of federal resources and time.  As such, the duplication of effort does not serve the public interest.

*Finally*, the public has an obvious interest in having FDA approve only those products that have been proven safe and effective and that have met all other applicable criteria.  Forcing immediate final approval of an ANDA that has not even yet been tentatively approved by the agency cannot serve this important interest.

In view of these facts, denying the injunction – not issuing it – serves the public interest.

## IV.    FINALLY, NU-PHARM'S MOTION FOR INJUNCTIVE RELIEF CANNOT BE DECIDED WITHOUT FURTHER, ESSENTIAL DISCOVERY.

Nu-Pharm's motion for a TRO or PI can and should be denied on the papers.  If the Court is inclined to conduct a hearing on this motion, however, it is clear that this cannot be done until after Abbott has the opportunity to conduct discovery of certain matters that will be essential for the Court's consideration.

In particular, one key tenet of Nu-Pharm's motion is the assertion that the *only* thing standing in the way of final approval of its ANDA is the Injunction Order entered by Judge

Posner. (Pl. Mem. at 1, 12.) Yet, this contention is supported by nothing but the declaration of Nu-Pharm president Benyak. (*See id.* and Ex. D, ¶ 3.) There is no correspondence from FDA confirming that this is so. And the Court certainly is not obligated to take Mr. Benyak at his word, particularly when he already has been found to be at the very least complicit in a "subterfuge" with Apotex to attempt to skirt a valid court order by filing this ANDA in the first place. *See Abbott VI*, 503 F.3d at 1379; *Abbott V*, 455 F. Supp. 2d at 835. Obviously, if there are other factors independent of the Injunction Order that preclude the FDA from immediately approving the ANDA (such as scientific deficiencies, labeling problems, or the like), then, even notwithstanding its many other glaring deficiencies, the entire premise of Nu-Pharm's motion fails. The Court has to know this, at a minimum, before it could ever resolve the motion in Nu-Pharm's favor (which, of course, it should not do for a variety of other reasons already discussed). Abbott therefore should be allowed to conduct discovery regarding the precise status of the ANDA before the FDA before any hearing is held on Nu-Pharm's motion.

In addition, in order to evaluate the grandiose claims made by Nu-Pharm about the supposedly irreparable harm it will suffer absent an immediate mandatory injunction allowing it to go to market by the end of this month, the Court is entitled to know whether Nu-Pharm is even capable of manufacturing, distributing, and selling its product were Nu-Pharm to get its wish. As the declaration attached to Nu-Pharm's motion confirms, Nu-Pharm is a small company without a single employee or facility in the United States, and which has never before even attempted to seek approval of, much less to actually market and distribute, a product in the U.S. marketplace. (Pl. Mem., Ex. D ¶¶ 1-3.) During Nu-Pharm president Benyak's July 2006 deposition, he also admitted that this proposed generic Depakote® product was several orders of magnitude bigger than anything his tiny company ever had been given by Apotex during all of

the years these companies have done business together (which further underscores just how shady the undocumented arrangement with Apotex for this product truly is).  (A0034, A0036-37, A0039-45.)  Moreover, Benyak admitted that he did not have any infrastructure in place in the U.S. to distribute this product.  (A0040, A0065.)  Unless things have changed dramatically at Nu-Pharm, the assertion that this company will lose untold millions absent an immediate injunction is groundless.  In addition, there is no evidence before this Court that Nu-Pharm's intended supplier, Apotex, is ready to go into full commercial production of this product by month's end.  If Nu-Pharm (which does not manufacture a thing) has no immediate access to commercial scale batches, then its claims of irreparable harm fizzle out even further.  Abbott should be allowed to conduct discovery on these and other important issues before Nu-Pharm's motion is heard.

## CONCLUSION

For all of the reasons discussed above, Nu-Pharm's complaint should be dismissed as a matter of law, or alternatively transferred to the U.S. District Court for the Northern District of Illinois.  If the Court elects to keep and not dismiss this action, then Nu-Pharm's motion for a temporary restraining order and/or preliminary injunction should be denied.

Dated:  January 18, 2007

Respectfully submitted,

*Gregory A. Castanias  (441129)
  Email: gcastanias@jonesday.com
Christopher S. Perry (503039)
  Email: csperry@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Tel: 1.202.879.3939
Fax: 1.202.626.1700
*Lead Counsel

Of Counsel
Daniel E. Reidy
James R. Daly
Jason G. Winchester
Brian J. Murray
Paula S. Quist
Melissa B. Hirst
Jones Day
77 W. Wacker Dr., Suite 3500
Chicago, Illinois  60601-1692
Tel: 1.312.782.3939
Fax: 1.312.782.8585

*Attorneys for Intervenor Abbott Laboratories*

-43-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2008, I submitted to the Honorable Judge Richard W. Roberts the foregoing *Omnibus Motion of Intervenor Abbott Laboratories to Dismiss Nu-Pharm's Complaint, or Alternatively to Transfer this Matter to Illinois, and Response in Opposition to Motion for Temporary Restraining Order and/or Preliminary Injunction*, Abbott's Memorandum in support of that same motion, and supporting materials. I further certify that, on that same day, I sent copies of these materials to the following counsel of record via UPS:

William A. Rakoczy
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610

Drake Cutini
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., N.W.
Washington, D.C. 20004


_____
Attorney for Abbott Laboratories

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NU-PHARM, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:08-CV-00070 |
| ) | |
| FOOD AND DRUG ADMINISTRATION, ) | Judge Richard W. Roberts |
| MICHAEL O. LEAVITT, Secretary of ) | |
| Health and Human Services, and ANDREW ) | |
| C. VON ESCHENBACH, M.D., ) | |
| Commissioner of Food and Drugs, ) | |
| ) | |
| Defendants. ) | |

## TABLE OF CONTENTS

| DOCUMENT DESCRIPTION | PAGE |
|---|---|
| 10.6.06 Injunction Order in *Abbott Labs. v. Apotex, Inc.*, No. 97 C 7515 | A0001 |
| U.S. Patent No. 4,988,731 | A0002 |
| U.S. Patent No. 5,212,236 | A0005 |
| 3.31.04 Injunction Order in *Abbott Labs. v. Apotex, Inc.*, No. 97 C 7515 | A0010 |
| Excerpts of the deposition of Dr. Bernard Sherman (7.16.06) | A0011 |
| Email from B. Sherman to D. Barber et al. (3.25.04) | A0029 |
| Excerpts of the deposition of Richard Benyak (7.19.06) | A0030 |
| Excerpts of the deposition of Tom Molnar (7.18.06) | A0063 |
| Excerpts of the deposition of Donald Barber (7.7.06) | A0074 |
| Excerpts of the deposition of Evilene Eilert (6.26.06) | A0085 |
| Excerpts of the deposition of Ana Ivic (6.27.06) | A0115 |
| Email from E. Eilert to D. Barber et al. (4.15.04) | A0125 |
| Letter to FDA from Nu-Pharm naming Apotex Corp. as Nu-Pharm's authorized agent (3.7.05) | A0126 |
| Form 356(h) from the Apotex/Nu-Pharm ANDA (3.7.05) | A0127 |
| Paragraph IV certification from the Apotex/Nu-Pharm ANDA (3.7.05) | A0129 |
| Emails re: submission of the Apotex/Nu-Pharm ANDA (3.10.05) | A0130 |
| Letter from Nu-Pharm notifying Abbott of Nu-Pharm's paragraph IV certification as to two of Abbott's listed patents (5.12.05) | A0132 |
| Excerpts of Apotex's Memorandum in Support of its Motion to Dismiss Abbott's Third Amended Complaint (4.28.06) | A0147 |
| Email from T. Molnar to R. Benyak (1.21.05) | A0149 |

| DOCUMENT DESCRIPTION | PAGE |
|---|---|
| Email from A. Ivic to T. Molnar (4.29.05) | A0150 |
| Email from A. Ivic to T. Molnar et al. (8.5.05) | A0151 |
| Email from A. Ivic to T. Molnar et al. (3.4.05) | A0152 |
| Order from the Federal Circuit denying rehearing and rehearing en banc in *Abbott Labs. v. TorPharm*, No. 2007-1019 (12.5.07) | A0153 |
| 11.27.06 Order Denying Apotex's request for a stay pending appeal of the judgment in *Abbott Labs. v. Apotex, Inc.*, No. 97 C 7515 | A0155 |
| Nu-Pharm's Motion for Summary Judgment in *Abbott Labs. v. Nu-Pharm, Inc.*, No. 05 C 3714 (8.15.06) | A0160 |
| Printouts from the FDA Website showing generic drug manufacturers who have received tentative approval from the FDA to market their generic versions of Depakote® (as of 1.17.08) | A0163 |
| Excerpts from the transcript of the evidentiary hearing in *Abbott Labs. v. Apotex, Inc.*, No. 97 C 7515, before Judge Richard Posner (8.31.06) | A0167 |

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

ABBOTT LABORATORIES,                        )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )   No. 97 C 7515
                                            )
APOTEX, INC., and                           )   Judge Richard A. Posner
APOTEX CORPORATION,                         )   sitting by designation.
                                            )
            Defendants.                     )
                                            )
                                            )

## INJUNCTION ORDER

RICHARD A. POSNER, Circuit Judge:

 Apotex, Inc., Apotex Corp., and their respective affiliates, successors in interest, and assigns are enjoined from commercially manufacturing, using, selling, or offering to sell generic divalproex sodium which the Court has found to be infringing, including divalproex sodium products synthesized using the processes employed in connection with ANDA No. 77-615, within the United States, or from importing such products into the United States, until Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326 expire and defendants have received final approval from FDA to market generic divalproex sodium.

 The effective date of any approval by FDA of ANDA Nos. 75-112 and 77-615, or any other application concerning defendants' generic divalproex sodium which the Court has found to be infringing, shall be no earlier than January 29, 2008, the date of expiration of Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326.

IT IS SO ORDERED.

ENTER:

*Richard A. Posner*

RICHARD A. POSNER, Circuit Judge
United States District Court

DATED: October 06, 2006

# United States Patent [19]

## Meade

[11] Patent Number: 4,988,731

[45] Date of Patent: Jan. 29, 1991

[54] **SODIUM HYDROGEN DIVALPROATE OLIGOMER**

[75] Inventor: **Edwin M. Meade**, Duncan, Canada

[73] Assignee: **Abbott Laboratories**, Abbott Park, Ill.

[21] Appl. No.: **117,945**

[22] Filed: **Nov. 9, 1987**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 68,284, Aug. 20, 1979, abandoned.

[51] Int. Cl.⁵ .................... A61K 31/00; C07C 53/128
[52] U.S. Cl. .................................. **514/557**; 562/606
[58] Field of Search .................... 562/606; 514/557

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,895,976 | 7/1959 | Kairys et al. | 260/419 |
| 2,915,537 | 12/1959 | Meade | 260/419 |
| 4,127,604 | 11/1978 | Chignac et al. | 562/606 |
| 4,558,070 | 12/1985 | Bauer et al. | 514/557 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1074978 | 10/1954 | France | 562/606 |
| 2442M | 4/1964 | France | 562/606 |

#### OTHER PUBLICATIONS

"The Pharmacological Studies on Sodium Dipropylacetate Anticonvulsant Activities and General Pharmalogical Actions", K. Shuto and T. Nishigaki, Applied Pharmacology, 4[6], pp. 937–949 (1970).

*Primary Examiner*—Vivian Garner
*Attorney, Agent, or Firm*—Steven F. Weinstock

[57] **ABSTRACT**

This invention concerns certain diethyl- or dipropylacetic acid salts of sodium valproate which have physiological properties similar to those of valproic acid or sodium valproate but show highly superior stability characteristics.

**2 Claims, No Drawings**

A0002

4,988,731

1

# SODIUM HYDROGEN DIVALPROATE OLIGOMER

This is a continuation-in-part of copending application Serial No. 68,284, filed Aug. 20, 1979 now abandoned.

This invention relates to salts of valproic acid. In the last decade, 2-propylpentanoic acid and its alkali or earth alkali salts (hereinafter referred to as valproic acid and valproates or valproate salts, respectively) have been introduced in the arsenal of drugs useful for treating epileptic seizures or convulsions. Most commonly used are valproic acid itself or its sodium salt. The former is a liquid and as such is less desirable for preparing an oral dosage form while the latter is a solid that has poor stability characteristics partially due to pronounced hygroscopicity.

It has now been found that a highly stable, nonhygroscopic, solid entity can be prepared from valproic acid and its salts, representing a single chemical molecule with welldefined physical characteristics.

The new compound represents a single crystalline entity consisting of one molecule each of valproic acid or diethylacetic and a sodium valproate salt. There has been some uncertainty as to the structure of the compound. It was first hypothesized that the compound formed a complex in the form of a compound thus:



where M represented Na and n is 1 or 2.

Subsequent investigations have confirmed that the compound consists of one molecule each of valproic acid or diethylacetic acid and sodium valproate. However, it has been found that the molecules are distributed as an ionic oligomer, rather than as a dimer as originally believed. Thus, the sodium salt may be illustrated:



wherein m is about 2.

As can be seen from the foregoing structure, one mole each of the valproic acid moieties form coordinate bonds with the sodium of the sodium valproate molecule, and the valproate ion is ionically bonded to the sodium atom. The structure is thus consistent with the unique characteristics of the compound.

In the simplest embodiment, the above compound is prepared by dissolving one mole each of [Me(CH₂)₂]₂—CHCOOH and sodium valproate in 1000 ml of acetone at about 50° C. After cooling the solution to 0° C. or below, the formed new compound is filtered, washed if desired with pre-cooled acetone, and dried under reduced pressure to remove all traces of acetone. Alter-

2

nately, the new compound wherein n = 2 can be made in a two-component liquid medium which includes acetone. In this instance, sodium valproate is formed in situ by adding NaOH at a level of one half of a molecular equivalent of the valproic acid present, preferably as a solution in an acetone-miscible solvent for said NaOH, e.q. water. The new compound can be recovered from the liquid phase by evaporating the solvent(s) and, if desired, the new compound can be recrystallized, for instance from acetone/water, from acetonitrile or others, or the material may be spray-dried, lyophilized or purified by chromatography.

The new compound represents a single chemical molecule as can be determined by microanalysis, nmr spectrum, mixed melting point determination, IR spectrum and/or X-ray diffraction. The new compound does not have the aforementioned detrimental physical characteristics of either of the two starting materials; it is a crystalline, stable solid. Surprisingly, such a useful compound can be made only from valproic acid and diethylacetic acid on one side of the molecule, with the sodium or salt of valproic acid. When other valproate salts are used, i.e., the potassium, ammonium or magnesium salts, the resulting compound, either does not crystallize, does not form or is highly unstable in the presence of any atmospheric moisture.

The process for making the compounds of this invention are best illustrated by reference to the following examples which, however, are not intended to limit the invention in any respect.

## EXAMPLE 1

In 1000 ml of acetone at about 50° C. is dissolved 166 g of sodium valproate and 144 g of valproic acid. The solution is cooled to about 0° C., filtered and the crystalline precipitate is washed with pre-cooled acetone at about 0° C. The new compound is obtained in a yield of 90% of theory. Additional material can be obtained by using the acetone filtrate in a subsequent batch.

The new material is a stable, white, crystalline powder which melts at 98–100° C. Its moisture stability is established by placing samples of the material for 45 minutes in a controlled environment at room temperature and 80% relative humidity. No weight gain is observed, while under the same condition, the simple sodium salt of valproic acid gains between 17 and 24% in weight.

The infrared spectrum is consistent with proposed structure II and has the following characterizing absorption bands: strong bands at 2957, 2872, 2932, 1685, 1555 and 1370 cm⁻¹. The first two of these indicate the various methyl groups, the last two are due respectively to the antisymmetric and symmetric O—C—O—stretching vibrations of the carboxyl salt. The remaining

4,988,731

3

strong bands indicate the stretching vibrations of the various methylene groups and the C=O in the carboxylic acid group, while the weak, broad bands at 2450 and 1900 cm$^{-1}$ are due to intramolecularly bounded OH groups of the carboxylic acid.

## EXAMPLE 2

In the fashion of Example 1 but using sodium valproate with the molar equivalents of dibutylacetic acid or diethylacetic acid, respectively, the corresponding hydrogen sodium mixed salts of the assumed structure II with n=b 3 or 1, respectively, are obtained. In the instance of dibutylacetic acid, a very hygroscopic product is obtained which is very difficult to handle and therefore unsuitable for pharmaceutical dosage forms. The mixed salt obtained with diethylacetic acid is a white crystalline powder which is stable to ordinary storage conditions and essentially nonhygroscopic.

## EXAMPLE 3

In a comparison of anticonvulsant activities of
A: valproic acid (stable, liquid)
B: sodium valproate (hygroscopic solid)
C: compound (stable solid) of Example 1
the oral ED50 based on equimolar valproic acid equivalents are established by standard procedures. The results are as follows:

|  | A | B | C |
|---|---|---|---|
| Audiogenic seizures (mice) | 154 | 141 | 81 mg/kg |
| Pentylenetetrazole seizures (mice) | <800 | 282 | 178 mg/kg |
| Pentylenetetrazole seizures (rats) | 355 | 415 | 362 mg/kg |

In a bioavailability study carried out with (A) and (C) above in various animal species, the peak blood plasma levels of oral, equimolar doses are determined according to standard procedures, 30 minutes after drug administration.

|  | A | C |
|---|---|---|
| Mouse (200 mg/kg) | 133.7 | 207.4 mg/kg |
| Rat (200 mg/kg) | 84.1 | 63.0 mg/kg |
| Dog (25 mg/kg) | 65.2 | 73.6 mg/kg |
| Dog (25 mg/kg) AUC* | 82.3 | 95.0 hr · mcg/ml |

*Area under the curve value for 0–7 hours.

4

From the above examples, it will be seen that the new material has equal or better physiological properties than either valproic acid or sodium valproate. Since the new compound has far superior physical characteristics than either "monomer" from which it is made, it greatly facilitates the preparation of solid pharmaceutical dosage forms, and specific amounts can be weighed out and blended with starch and/or other binders to form a flowable powder which can be forwarded to standard tableting machines after granulation. Neither the hygroscopic sodium salt of valproic acid nor the liquid valproic acid itself can be processed in this fashion without special precautions or absorbents.

The new compounds can be tableted in accordance with Example XIII of U.S. Pat. No. 3,325,361 and analogous methods. In these procedures, one or more diluents and/or excipients are used, e.g., starch, talcum powder, lubricants, disintegrators, flavoring agents, coloring agents and the like. These additives, of course, are the usual pharmaceutically acceptable carriers or diluents employed in routine fashion by tablet formulators.

The above structure II is the most likely true two-dimensional view of the sodium/hydrogen divalproate and seems to be confirmed by IR and nmr spectra, by molecular weight and microanalytic values. Thus, the new material should be characterized not by depicting a structural formula but by reference to a single compound of formula (CH$_3$CH$_2$CH$_2$)$_2$CHCO$_2$Na/R$_2$CH-CO$_2$H or [(R$_2$CHCO$_2$) (R$_2$CHCO$_2$)]Na,H wherein each R is propyl, or by reference to sodium/hydrogen divalproate.

It will be understood that various changes and modifications can be made in the details of procedure, formulation and use without departing from the spirit of the invention, especially as defined in the following claims.

I claim:

1. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, (CH$_3$CH$_2$CH$_2$)$_2$CHCO$_2$Na/(CH$_3$CH$_2$CH$_2$)$_2$CHCO$_2$H, and containing about 4 such units.

2. An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures or convulsions, containing as the active principal an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, (CH$_3$CH$_2$CH$_2$)$_2$CHCO$_2$-Na/(CH$_3$CH$_2$CH$_2$)$_2$CHCO$_2$H, and containing about 4 such units.

*  *  *  *  *



US005212326A

# United States Patent [19]

## Meade

[11] Patent Number: 5,212,326

[45] Date of Patent: * May 18, 1993

[54] SODIUM HYDROGEN DIVALPROATE OLIGOMER

[75] Inventor: Edwin M. Meade, Duncan, Canada

[73] Assignee: Abbott Laboratories, Abbott Park, Ill.

[ * ] Notice: The portion of the term of this patent subsequent to Jan. 29, 2008 has been disclaimed.

[21] Appl. No.: 637,828

[22] Filed: Jan. 7, 1991

### Related U.S. Application Data

[63] Continuation of Ser. No. 117,945, Nov. 9, 1987, Pat. No. 4,988,731, which is a continuation of Ser. No. 545,719, Oct. 26, 1983, abandoned, which is a continuation-in-part of Ser. No. 68,284, Aug. 20, 1979, abandoned.

[51] Int. Cl.⁵ ...................... C07B 53/00; A01N 37/00; A61K 31/19

[52] U.S. Cl. .................................................... 562/606

[58] Field of Search ......................... 562/606; 514/557

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,127,604 | 11/1978 | Chignac et al. | 562/606 |
| 4,558,070 | 12/1985 | Bauer et al. | 562/606 X |
| 4,988,731 | 1/1991 | Meade | 562/606 X |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1074978 | 10/1954 | France | 562/606 |
| 2442M | 4/1964 | France | 562/606 |

Primary Examiner—José G. Dees
Assistant Examiner—Joseph M. Conrad
Attorney, Agent, or Firm—Steven F. Weinstock

[57] ABSTRACT

This invention concerns certain diethyl- or dipropylacetic acid salts of sodium valproate which have physiological properties similar to those of valproic acid or sodium valproate but show highly superior stability characteristics.

5 Claims, No Drawings

A0005

5,212,326

**1**

## SODIUM HYDROGEN DIVALPROATE OLIGOMER

This application is a continuation of Ser. No. 117,945, filed Nov. 9, 1987, now U.S. Pat. No. 4,988,731 issued Jan. 29, 1991, which is a continuation of Ser. No. 545,719 filed Oct. 26, 1983, now abandoned, which is a continuation-in-part of Ser. No. 068,284 filed Aug. 20, 1979, now abandoned.

This invention relates to salts of valproic acid. In the last decade, 2-propylpentanoic acid and its alkali or earth alkali salts (hereinafter referred to as valproic acid and valproates or valproate salts, respectively) have been introduced in the arsenal of drugs useful for treating epileptic seizures or convulsions. Most commonly used are valproic acid itself or its sodium salt. The former is a liquid and as such is less desirable for preparing an oral dosage from while the latter is a solid that has poor stability characteristics partially due to pronounced hygroscopicity.

It has now been found that a highly stable, nonhygroscopic, solid entity can be prepared from valproic acid and its salts, representing a single chemical molecule with welldefined physical characteristics.

The new compound represents a single crystalline entity consisting of one molecule each of valproic acid or diethylacetic and a sodium valproate salt. There has been some uncertainty as to the structure of the compound. It was first hypothesized that the compound formed a complex in the form of a compound thus:

$$CH_3(CH_2)_n\!\!-\!\!\underset{\underset{CH_3(CH_2)_n}{|}}{\overset{}{C}}\!\!H\!\!-\!\!C\overset{O\ldots MO}{\underset{OH\ldots O}{}}C\!\!-\!\!\underset{\underset{CH_2\!-\!CH_2\!-\!CH_3}{|}}{\overset{}{C}}H\!\!-\!\!CH_2\!-\!CH_2\!-\!CH_3 \quad (I)$$

where M represented Na and n is 1 or 2.

Subsequent investigations have confirmed that the compound consists of one molecule each of valproic acid or diethylacetic acid and sodium valproate. However, it has been found that the molecules are distributed as an ionic oligomer, rather than as a dimer as originally believed. Thus, the sodium salt may be illustrated:



wherein m is about 2 to 3.

As can be seen from the foregoing structure, one mole each of the valproic acid moieties form coordinate bonds with the sodium of the sodium valproate molecule, and the valproate ion is ionically bonded to the sodium atom. The structure is thus consistent with the unique characteristics of the compound.

In the simplest embodiment, the above compound is prepared by dissolving one mole each of $[Me(CH_2)_n]_2$-CHCOOH and sodium valproate in 1000 ml of acetone at about 50° C. After cooling the solution to 0° C. or below, the formed new compound is filtered, washed if

**2**

desired with pre-cooled acetone, and dried under reduced pressure to remove all traces of acetone. Alternately, the new compound wherein n=2 can be made in a two-component liquid medium which includes acetone. In this instance, sodium valproate is formed in situ by adding NaOH at a level of one half of a molecular equivalent of the valproic acid present, preferably as a solution in an acetone-miscible solvent for said NaOH, e.g. water. The new compound can be recovered from the liquid phase by evaporating the solvent(s) and, if desired, the new compound can be recrystallized, for instance from acetone/water, from acetonitrile or others, or the material may be spray-dried, lyophilized or purified by chromatography.

The new compound represents a single chemical molecule as can be determined by microanalysis, nmr spectrum, mixed melting point determination, IR spectrum and/or X-ray diffraction. The new compound does not have the aforementioned detrimental physical characteristics of either of the two starting materials; it is a crystalline, stable solid. Surprisingly, such a useful compound can be made only from valproic acid and diethylacetic acid on one side of the molecule, with the sodium or salt of valproic acid. When other valproate salts are used, i.e., the potassium, ammonium or magnesium salts, the resulting compound, either does not crystallize, does not form or is highly unstable in the presence of any atmospheric moisture.

The process for making the compounds of this invention are best illustrated by reference to the following examples which, however, are not intended to limit the invention in any respect.

### EXAMPLE 1

In 1000 ml of acetone at about 50° C. is dissolved 166 g of sodium valproate and 144 g of valproic acid. The solution is cooled to about 0° C., filtered and the crystalline precipitate is washed with pre-cooled acetone at about 0° C. The new compound is obtained in a yield of 90% of theory. Additional material can be obtained by using the acetone filtrate in a subsequent batch.

The new material is a stable, white, crystalline powder which melts at 98°–100° C. Its moisture stability is established by placing samples of the material for 45 minutes in a controlled environment at room temperature and 80% relative humidity. No weight gain is observed, while under the same condition, the simple sodium salt of valproic acid gains between 17 and 24% in weight.

The infrared spectrum is consistent with proposed structure II and has the following characterizing absorption bands: strong bands at 2957, 2872, 2932, 1685, 1555 and 1370 cm$^{-1}$. The first two of these indicate the various methyl groups, the last two are due respectively to the antisymmetric and symmetric O-C-O-stretching vibraitons of the carboxyl salt. The remaining strong bands indicate the stretching vibrations of the various methylene groups and the C=O in the carboxylic acid group, while the weak, broad bands at 2450 and 1900 cm$^{-1}$ are due to intramolecularly bounded OH groups of the carboxylix acid.

### EXAMPLE 2

In a comparison of anticonvulsant activities of
A: valproic acid (stable, liquid)
B: sodium valproate (hygroscopic solid)
C: compound (stable solid) of Example 1

5,212,326

3

the oral ED50 based on equimolar valproic acid equivalents are established by standard procedures. The results are as follows:

|  | A | B | C |
|---|---|---|---|
| Audiogenic seizures (mice) | 154 | 141 | 81 mg/kg |
| Pentylenetetrazole seizures (mice) | <800 | 282 | 178 mg/kg |
| Pentylenetetrazole seizures (rats) | 355 | 415 | 362 mg/kg |

In a bioavailability study carried out with (A) and (C) above in various animal species, the peak blood plasma levels of oral, equimolar doses are determined according to standard procedures, 30 minutes after drug administration.

|  | A | C |
|---|---|---|
| Mouse (200 mg/kg) | 133.7 | 207.4 mg/kg |
| Rat (200 mg/kg) | 84.1 | 63.0 mg/kg |
| Dog (25 mg/kg) | 65.2 | 73.6 mg/kg |
| Dog (25 mg/kg) AUC* | 82.3 | 95.0 hr · mcg/ml |

*Area under the curve value for 0-7 hours.

From the above examples, it will be seen that the new material has equal or better physiological properties than either valproic acid or sodium valproate. Since the new compound has far superior physical characteristics than either "monomer" from which it is made, it greatly facilitates the preparation of solid pharmaceutical dosage forms, and specific amounts can be weighed out and blended with starch and/or other binders to form a flowable powder which can be forwarded to standard tableting machines after granulation. Neither the hygroscopic sodium salt of valproic acid nor the liquid valproic acid itself can be processed in this fashion without special precautions or absorbents.

The new compounds can be tableted in accordance with Example XIII of U.S. Pat. No. 3,325,361 and analogous methods. In these procedures, one or more diluents and/or excipients are used, e.g., starch, talcum powder, lubricants, disintegrators, flavoring agents, coloring agents and the like. These additives, of course, are the usual pharmaceutically acceptable carriers or diluents employed in routine fashion by tablet formulators.

4

The above structure II is the most likely true two-dimensional view of the sodium/hydrogen divalproate and seems to be confirmed by IR and nmr spectra, by molecular weight and microanalytic values. Thus, the new material should be characterized not by depicting a structural formula but by reference to a single compound of formula $(CH_3CH_2CH_2)_2CHCO_2Na/R_2CH\text{-}CO_2H$ or $[(R_2CHCO_2)(R_2CHCO_2)]Na_x H$ wherein each R is propyl, or by reference to sodium/hydrogen divalproate.

It will be understood that various changes and modifications can be made in the details of procedure, formulation and use without departing from the spirit of the invention, especially as defined in the following claims.

I claim:

1. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 to 6 such units.

2. An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures or convulsions, containing as the active principal an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2\text{-}Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 to 6 such units.

3. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 6 such units.

4. An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures or convulsions, containing as the active principal an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2\text{-}Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 6 such units.

5. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and having physical/chemical properties as follows:

a. stable, white crystalline powder;
b. melting point of 98°-100° C.; and
c. an infrared spectrum having strong absorption bands at about 2957, 2872, 2932, 1685, 1555 and 1370 cm$^{-1}$.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   5,212,326                    Page 1 of 2
DATED        :   May 18, 1993
INVENTOR(S) :   Edwin M. Meade

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Column 1

Line 19, replace "from" with --"form"--

Line 25, replace "welldefined" with --"well-defined"--

Add --"II"-- adjacent to structure located between lines 47-55

Column 2

Line 5, underline separately --"in situ"--

Line 57, replace "vibraitons" with --"vibrations"--

Line 61, replace "bounded" with --"bonded"--

Line 62, replace "carboxylix" with --"carboxylic"--

Column 4

Line 24, replace "unit   formula,   $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$" with

--"unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$"--

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. :  5,212,326                        Page 2 of 2

DATED       :  May 18, 1993

INVENTOR(S) :  Edwin M. Meade

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 4,

Line 35, replace "unit   formula,   $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2$ $CHCO_2H$" with

--"unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$"--

Signed and Sealed this

Third Day of May, 1994

*Bruce Lehman*

**BRUCE LEHMAN**

*Attest:*

*Attesting Officer*                    *Commissioner of Patents and Trademarks*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES, an Illinois corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>TORPHARM, INC., a Canadian corporation,<br>APOTEX, INC., a Canadian corporation, and<br>APOTEX CORPORATION, a Delaware corporation,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 97 C 7515<br><br>)  Judge Richard A. Posner<br>)    sitting by designation. |

APR 0 1 2004

## INJUNCTION ORDER

RICHARD A. POSNER, Circuit Judge, sitting by designation:

TorPharm, Inc., Apotex, Inc., Apotex Corp., and their respective affiliates, successors in interest, and assigns are enjoined from commercially manufacturing, using, selling, or offering to sell generic divalproex sodium which the Court has found to be infringing within the United States, or from importing such product into the United States, until Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326 expire and defendants have received final approval from FDA to market generic divalproex sodium.

The effective date of any approval by FDA of ANDA No. 75-112, or any other application concerning defendants' generic divalproex sodium which the Court has found to be infringing, shall be no earlier than January 29, 2008, the date of expiration of Abbott's U.S. Patent Nos. 4,988,731 and 5,212,326.

IT IS SO ORDERED.

ENTER:

RICHARD A. POSNER, Circuit Judge
United States District Court

DATED: _March 31, 2004_

31

# VICTORY VERBATIM COURT REPORTING SERVICES

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EA/ld

ABBOTT LABORATORIES,                 }        Civil Action No.
an Illinois corporation,             }        05 C 3714
                                     }
                                     }    Judge Rebecca Pallmeyer
        Plaintiff,                   }
                                     }
                                     }
            v.                       }
                                     }
                                     }
NU-PHARM, INC., a Canadian           }
corporation, APOTEX INC.,            }
a Canadian corporation, and          }
APOTEX CORP., a Delaware             }
corporation,                         }
                                     }
        Defendants.                  }

- - - - - - - - - -

This is the Deposition of BERNARD CHARLES SHERMAN in
the above-noted matter, taken at the law offices of
McCARTHY TÉTRAULT, Toronto Dominion Bank Tower, Toronto
Dominion Centre, 44th Floor, Toronto, Ontario, on the
17th day of July, 2006.

- - - - - - - - - -

CONFIDENTIAL

- - - - - - - - - -

**Ernst & Young Tower**
**222 Bay St. Suite 900**
**Toronto, Ont. M5K 1H6  416-360-6117**

# VICTORY VERBATIM COURT REPORTING SERVICES

APPEARANCES:

JASON G. WINCHESTER, ESQ.          – for the Plaintiff
Jones Day
77 West Wacker
Chicago, Illinois
60601-1692
DEANNE M. MAZZOCHI, MS.          – for the Defendants
Rakoczy Molino Mazzochi
    Siwik LLP
6 West Hubbard Street
Suite 500
Chicago, Illinois
60610

- ii -

## INDEX OF EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| P79 | Apotex Inc.'s Response to 30(b)(6) Deposition Notice | 1 |
| P80 | Deposition transcript of Bernard C. Sherman, November 16, 1999 | 58 |
| P81 | Deposition transcript of Bernard C. Sherman, November 17, 1999 | 58 |
| P82 | E-mail from Mr. Sherman to Don Barber and others, March 25, 2004 | 90 |
| P83 | Memorandum from B. Sherman to D. Coffin-Beach and N. Cappuccino, December 9, 1996 | 165 |

- i -

## INDEX OF PROCEEDINGS

| | PAGE NUMBER |
|---|---|
| BERNARD CHARLES SHERMAN, affirmed | |
| Examination by MR. WINCHESTER | 1 - 173 |
| Re-Examination by MS. MAZZOCHI | 173 - 174 |
| Continued Examination by MR. WINCHESTER | 174 - 187 |
| Errata Sheet | 188 |

B.C. Sherman - 1

```
 1   BERNARD CHARLES SHERMAN, affirmed
 2   EXAMINATION BY MR. WINCHESTER:
 3   1.      Q.    Dr. Sherman, good afternoon.  Thank
 4   you for coming, and first of all...
 5            A.    Is it afternoon already?  It is not
 6   afternoon yet.
 7            MR. WINCHESTER:    It is not afternoon
 8   quite yet, you are right.  We have been
 9   delayed, and for that, I do apologize, and
10   I appreciate you coming today.
11
12   — EXHIBIT NO. P79 :  Apotex Inc.'s Response to 30(b)(6)
13                       Deposition Notice
14
15   BY MR. WINCHESTER:
16   2.      Q.    First off, I should hand you what I
17   have marked as Plaintiff's Exhibit 79, which is a
18   response to a 30(b)(6) deposition notice.  You don't
19   need to read it.
20            Do you understand that you have been the person
21   appointed by Apotex Inc. to come and testify on
22   behalf of the company with respect to certain topics
23   of information relevant to the case?
24            A.    Yes.
25   3.      Q.    I want to talk to you first about
```

**Ernst & Young Tower**
**222 Bay St. Suite 900**
**Toronto, Ont. M5K 1H6  416-360-6117**

A0012

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 6

1  trust, I think, yes. But, again, if you are talking
2  about companies that, in fact, are owned through the
3  trust, there may be...I am not sure what companies
4  you are talking about, but certainly Apotex Corp.
5  and Apotex Inc., I do control both as trustee.
6  16.    Q.    Is there any higher officer than you
7  within Apotex Inc., Apotex Corp., Apotex Pharmachem,
8  any of those companies?
9          A.    No.
10 17.    Q.    You mentioned for Apotex Inc., that
11 company is owned, you think, 100 percent by Apotex
12 Pharmaceutical Holdings Inc., is that right?
13         A.    Yes.
14 18.    Q.    Do you hold a title within Apotex
15 Inc.?
16         A.    Chairman.
17 19.    Q.    Any others?
18         A.    No.
19 20.    Q.    You are also referred to as a CEO of
20 Apotex Inc.?
21         A.    Yes.
22 21.    Q.    Are you also the president of Apotex
23 Inc.?
24         A.    No.
25 22.    Q.    Who is the president?

B.C. Sherman - 7

1          A.    Jack Kay.
2  23.    Q.    Can you spell his last name?
3          A.    K-A-Y.
4  24.    Q.    Is Apotex Inc. the largest of the
5  companies that you own and operate under the Apotex
6  name?
7          MS. MAZZOCHI:    Objection. Vague.
8          THE DEPONENT:    I don't know what you
9  mean by "largest". In what sense?
10
11 BY MR. WINCHESTER:
12 25.    Q.    Let's say in terms of number of
13 employees.
14         A.    Yes.
15 26.    Q.    Does Apotex Inc. play a particular
16 role within the group of companies that you own and
17 control that operate under the name Apotex?
18         A.    I don't understand that. It plays a
19 role. It does certain things, other companies do
20 other things.
21 27.    Q.    What does Apotex Inc. do?
22         A.    Well, it primarily...its primary
23 business is the development and manufacture and sale
24 of pharmaceutical products, pharmaceutical dosage
25 forms.

B.C. Sherman - 8

1  28.    Q.    Within Apotex Inc., do you have the
2  capability to conduct research and development of
3  pharmaceutical formulations?
4          A.    Yes.
5  29.    Q.    You also have the capability within
6  Apotex Inc. of conducting analytical scientific
7  testing on drugs you develop?
8          A.    Yes, some capability, not
9  something...we use other outside organizations to
10 test various things, as well. But certainly, we do
11 have substantial resources in-house for certain
12 types of testing.
13 30.    Q.    Do you know, as you sit here today,
14 which types of tests you can do in-house versus
15 which ones you need to go to an outside laboratory?
16         A.    I would have some knowledge, not
17 complete knowledge.
18 31.    Q.    Tell me, without holding you to the
19 full universe, tell me what your understanding is of
20 what tests you can perform in-house at Apotex Inc.
21 versus when you have to go outside.
22         A.    Certainly all of the standard tests
23 that are required by pharmacopoeias for raw
24 materials and finished products. All, or almost all
25 of those, we would have the capability to do

B.C. Sherman - 9

1  in-house.
2  32.    Q.    Can you list any of them off the top
3  of your head?
4          A.    IRs, UVs, HPLC tests of various
5  sorts, GC, mass spec. We have various types of
6  instrumentation. We can do a wide variety of
7  testing of pharmaceuticals.
8  33.    Q.    Do you know whether Apotex Inc. has
9  the capability to perform powder X-ray diffraction
10 testing?
11         A.    I am not sure about that one.
12 34.    Q.    How about solid state NMR testing?
13         A.    Again, I don't know what we...I know
14 we...I have seen results of tests for various
15 products. Whether or not those are done in-house or
16 contracted out, I don't know.
17 35.    Q.    Does Apotex Inc. have the capability
18 of conducting biostudies, bioequivalents, or
19 bioavailability studies on products you develop?
20         A.    Not Apotex Inc. itself, but again,
21 we have a related company that has that capability,
22 and we do some biostudies for our related companies,
23 and some are contracted out to other CROs.
24 36.    Q.    What is, or are, the related
25 companies you mentioned that conduct biostudies?

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416-360-6117

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 10

1  A. I am not sure what the name of the
2  company is that does the biostudies. It may be
3  Apotex Research Inc. We refer to it as the BioMed
4  Division, but I think that it is Apotex Research
5  Inc., but I am not certain if that is the correct
6  corporate name.
7  37.  Q. I think you are right, actually. I
8  have heard it referred to both ways. Do you know
9  which entity owns Apotex Research Inc.?
10  A. I believe that would be Apotex
11  Pharmaceutical Holdings Inc.
12  38.  Q. So, that one, if you are right, is a
13  sister company within your organization to Apotex
14  Inc.?
15  A. Yes.
16  39.  Q. Again, within Apotex Inc., do you
17  have the capability to commercially manufacture drug
18  products you develop?
19  A. Yes.
20  40.  Q. Do you have the capability within
21  Apotex Inc. to package those drugs?
22  A. Well, when I say yes, I should say
23  we have a very substantial capability. That doesn't
24  mean that we can necessarily make everything we
25  sell. Some things we don't have the technologies to

B.C. Sherman - 11

1  do, and we will license in some products, but that
2  is the minority of what we...of the products that we
3  sell. We make, ourselves, most of what we sell, but
4  not everything.
5  41.  Q. What factors would go into your
6  decision to have certain of drugs you develop
7  manufactured by some company, other than Apotex?
8  MS. MAZZOCHI:  Are you talking about the
9  finished dosage form, or every step of the
10  raw material process?
11  THE DEPONENT:  Apotex Inc. doesn't make
12  the raw materials. You are talking about
13  dosage forms, I presume?
14
15  BY MR. WINCHESTER:
16  42.  Q. Yes.
17  A. Yes. Well, if it is a technology
18  that we don't have in-house. For example,
19  metered-dose inhalers, we don't make those. We buy
20  one in. I can't think of anything else right now.
21  I think we...that may be the only product we are not
22  making ourselves right now. I am not sure.
23  43.  Q. Do you know of any solid state
24  dosage forms that you don't have the facilities to
25  make within Apotex?

B.C. Sherman - 12

1  A. I can't think of any, but we have a
2  large product line. I am not certain, and I
3  don't...it is a big organization.
4  44.  Q. I won't hold you to all of it. Does
5  Apotex Inc. have the capability of packaging the
6  finished drugs once you have made them?
7  A. The same answer. Most things, yes.
8  I am not...the things that we make, we package. I
9  don't think we contract out packaging generally.
10  There are...just a minute, there are a lot of
11  injectable products I think we are bringing in.
12  Injectable cyclosporins, I think, are coming in from
13  a company in India now.
14  So, anyway, the same answer. Basically, we
15  make a lot of things. We package most of what we
16  make, if not all, and some things we buy in that we
17  are not capable of manufacturing in-house, and then
18  it is more than one.
19  45.  Q. If you make it, do you package it?
20  A. I am not sure that is the case 100
21  percent, but generally, yes.
22  46.  Q. Does Apotex Inc. have the capability
23  to conduct release testing of the products you make?
24  A. What do you mean by that?
25  47.  Q. General, in an ANDA, they would be

B.C. Sherman - 13

1  listed in-process characterization tests, assays,
2  things of that nature. Do you know what I am
3  talking about?
4  A. Yes. Do you mean dissolution tests?
5  Do you mean the testing you need to do to release
6  the product for sale, or do you mean rate of
7  release, as in dissolution?
8  48.  Q. The tests you need to do to release
9  the product for sale.
10  A. Generally, yes.
11  49.  Q. And this would include things like
12  IR, assay, sodium content testing, water content
13  testing, things of that nature?
14  A. Yes.
15  MS. MAZZOCHI:  Objection. Calls for
16  speculation.
17  THE DEPONENT:  Generally, yes. There
18  may be certain tests, again, that we
19  contract out. I don't know the specifics,
20  but generally, yes.
21
22  BY MR. WINCHESTER:
23  50.  Q. How many facilities does Apotex Inc.
24  operate?
25  A. Well, there are a lot of facilities.

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416-360-6117

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 54

1  have already talked about. This is the BioMed
2  Division, right?
3      A.  Yes.
4  197.     Q.  I want to run another few companies
5  by you that were actually in that book, but you
6  don't need to look. Do you control, or have any
7  ownership interest in any of these companies,
8  Nucro-Technics Analytical Laboratory?
9      A.  No.
10 198.     Q.  Do you know what that company does?
11     A.  It is a contract research
12 organization. Maybe they do bioavailability
13 studies, other studies. I am not sure. Clinical
14 trials. They do a variety of CRO type work.
15 199.     Q.  How about SGS Pharmaceutical
16 Laboratories, do you own or control that one?
17     A.  I have never heard of them, as far
18 as I know.
19 200.     Q.  Alpha Laboratories Inc.?
20     A.  I have heard the name. We have no
21 connection with them.
22 201.     Q.  You don't own that one, or control
23 that one?
24     A.  No.
25 202.     Q.  And you have no...

B.C. Sherman - 55

1      A.  No interest whatsoever in any of
2  them.
3  203.     Q.  No official position with any of
4  them, either?
5      A.  No. I hope not.
6  204.     Q.  When was Torpharm renamed as Apotex
7  Inc.?
8      A.  I don't know the date. A few years
9  ago.
10 205.     Q.  But mid-2004 sound right?
11     A.  It could be. I thought it was a
12 little earlier, but it could be.
13 206.     Q.  I have seen it April 2004 on some
14 documents, if that sounds right?
15     A.  Okay.
16 207.     Q.  Why was the decision made to rename
17 Torpharm as Apotex Inc.?
18     A.  Just for operational efficiency. We
19 had...we wanted to consolidate the organizations
20 that were running those factories, and also the
21 Richmond Hill site.
22     So now, all of the planning is done centrally,
23 the single...VP of...for manufacturing, et cetera,
24 quality control, we...when we started out at the
25 Torpharm site years ago, we were too busy at the

B.C. Sherman - 56

1  Signet site to take on the United States, and my
2  view was if we didn't build a separate organization
3  to do the U.S., we would never get it done. So,
4  that was the basis of that decision.
5      As time went on, we had a high degree of
6  competency at both sites, and there was a lot of
7  duplication. So, we decided to consolidate for
8  efficiency purposes.
9  208.     Q.  Was the Novex Pharma branch we have
10 talked about also renamed at the same time as Apotex
11 Inc.?
12     A.  Yes.
13 209.     Q.  Were there other companies that were
14 renamed at the same time, besides the former
15 Torpharm and the former Novex Pharma?
16     A.  Nothing that comes to mind.
17 210.     Q.  All right. Let's talk divalproex
18 products. About 1997, Torpharm, the company we have
19 been talking about, submitted an ANDA to the FDA for
20 what was labelled a divalproex sodium product,
21 right?
22     A.  Right.
23 211.     Q.  And this is a product that you
24 developed for Torpharm?
25     A.  It was developed at Torpharm on my

B.C. Sherman - 57

1  instructions, yes.
2  212.     Q.  And this is one where you actually
3  developed the process, the formulation process, and
4  handed it off to....
5      A.  Yes.
6  213.     Q.  ...formulation development, as we
7  have talked about?
8      A.  I can't recall today what work, if
9  any, I did at the Signet site before I handed it off
10 to Etobicoke, but the intellectual input was mine.
11 214.     Q.  And there was a lawsuit that arose
12 between Abbott, Apotex, and Torpharm over that ANDA,
13 right?
14     A.  That is correct.
15 215.     Q.  Did you give your deposition in that
16 case?
17     A.  I believe so.
18     MR. WINCHESTER:  Again, you don't need
19 to look at them. I am just going to mark
20 this Plaintiff's 80. Deposition
21 transcripts, Plaintiff's 80 and 81. Eighty
22 is a copy from November 16, 99.
23 Eighty-one is from November 17, 99 in the
24 case of Abbott Laboratories versus Torpharm
25 Inc., Apotex Inc., and Apotex Corp.,

# VICTORY VERBATIM COURT REPORTING SERVICES



B.C. Sherman - 66

1  don't need to get into that.
2      MS. MAZZOCHI:   The courts are not a
3  definitive...concerning the structure of
4  divalproex sodium...
5      MR. WINCHESTER:   Please, we don't need
6  to go there.
7      MS. MAZZOCHI:   Well, then don't.
8
9  BY MR. WINCHESTER:
10  243.     Q.    March 2005...
11          A.   Yes.
12  244.     Q.    ...before that time, what tests did
13  you direct your scientists to conduct to determine
14  whether the product of your revised hot melt process
15  or your new spray-dry process were any different
16  than the product found to be infringing in the
17  Torpharm case?
18      MS. MAZZOCHI:   In answering that
19  question, I will instruct you not to reveal
20  any communications that you had with your
21  attorneys.
22      THE DEPONENT:   I didn't do that at all.
23  I don't...I simply had our staff make up
24  lots by both processes, make new tablets
25  and submit them to complete independent

B.C. Sherman - 67

1  work necessary for ANDA filing purposes,
2  that is all.
3      That meant a bioequivalent study was
4  done, and stability studies were done
5  independently on both of those two
6  formulations, both of them using the two
7  different processes, because there is no
8  guarantee they would end up being similar
9  in terms of stability.
10
11  BY MR. WINCHESTER:
12  245.     Q.    In March 2004, you had a product, a
13  divalproex sodium product, found to be infringing by
14  the courts. You were enjoined for making it. You
15  have a supposedly new divalproex sodium product.
16  You are telling me you directed nobody to test the
17  two to see if they were the same as what you were
18  enjoined from making?
19      MS. MAZZOCHI:   Again, in responding to
20  that question, I will instruct you not to
21  reveal any communications you have had with
22  counsel.
23      THE DEPONENT:   I have already answered
24  you. I didn't instruct anybody to do any
25  testing. We made these new products for

B.C. Sherman - 68

1      Nu-Pharm. Nu-Pharm decided to submit an
2  ANDA, and run litigation on it, and I don't
3  know what was done. I didn't do that.
4  There was no reason for me to do that.
5  I didn't do any testing.
6
7  BY MR. WINCHESTER:
8  246.     Q.    Apotex Inc. is the proposed
9  manufacturer for this product, right?
10          A.   Yes.
11  247.     Q.    So, how can you say it would make no
12  difference to you? You have an injunction in place
13  that says you can't make the generic divalproex
14  sodium product found infringing in that case, yet
15  you are telling me it is not relevant to you to know
16  whether the product that you are intending to make
17  under the Nu-Pharm name is the same thing?
18      MS. MAZZOCHI:   That is a completely
19  argumentative question, totally lacking
20  foundation, and argumentative. I suggest
21  you rephrase it.
22      MR. WINCHESTER:   It is not an answer.
23      MS. MAZZOCHI:   If you can answer it.
24      THE DEPONENT:   I can answer it. You
25  asked me what tests we did. We didn't do

B.C. Sherman - 69

1  any tests, but I know it is not the same
2  because when we had done the first process,
3  it was specifically designed to ensure that
4  it was a two-phase material that contained
5  sodium valproate crystals, and therefore...
6  and the new processes are designed to make
7  sure that doesn't occur.
8      So, my expectation is that both of the
9  products that Nu-Pharm submitted to ANDA
10  are, in fact, different from what we filed
11  in the first place through Apotex Inc.
12
13  BY MR. WINCHESTER:
14  248.     Q.    What you are talking about is the
15  temperature limitation under the Torpharm process,
16  right?
17          A.   Yes. That was specifically designed
18  when the Apotex submission was done to ensure that
19  the process was...the product was a two-phase
20  product consisting of sodium valproate crystals, and
21  the other phase being a solid solution of sodium
22  valproate and valproic acid. And that was the basis
23  that I knew that the first process gave a
24  non-infringing product.
25      The Court was wrong. I mean, it was held to be

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 78

267.    Q.    That is what you did. You lost that
one. The Court found that, in fact, all those
efforts you made resulted in an infringing product?
    MS. MAZZOCHI:    Object to the form of the
question, to the extent it seeks a legal
conclusion. And mischaracterizes the
Court's prior decision.
    THE DEPONENT:    The Court found that the
product that was the subject of
that...infringed, yes.

BY MR. WINCHESTER:
268.    Q.    As developed by you, and all of the
ways you have just explained to me?
    A.    Yes.
269.    Q.    Okay. How does it serve your
purpose in attempting to make a new non-infringing
product to take out the heat limitation, and heat it
all the way up to full dissolution?
    A.    Well, I have told you, that the
change in the process, which, in my view, was likely
to have...to give a different result because I have
eliminated the seeds of sodium valproate, and now,
in fact, produce, ironically, arguably I have taken
away that which I have put in before to make sure it

---

B.C. Sherman - 79

couldn't be an infringing product. And this...even
though the old process was found to be infringing...
was wrongly found to be infringing, wasn't
infringing.
    The new thing I designed, if anything, could be
thinking in advance, possibly more likely to
infringe because it...I eliminated the two-phase
aspect and made it single-phase. So, the irony is I
made it different knowing that it would be probably
be subject to testing, which might or might not be
able to prove it was a different product.
    And knowing that, even though I was confident
in the first process did not give what was claimed,
it was possible that the second one might, or likely
the second one might.
    So, I changed it in a way to result in a
different process making it perhaps more likely, in
the case of the hot melt, that it would be
infringing, even though I felt that it was
impossible to be infringing because I don't think
that what is claimed even exists. Does that answer
you?
    MS. MAZZOCHI:    Probably not.

BY MR. WINCHESTER:

---

B.C. Sherman - 80

270.    Q.    Given that state of mind...
    A.    Yes.
271.    Q.    ...what testing did you order to be
done to resolve that issue in your own mind? Is
this...
    MS. MAZZOCHI:    In answering that
question, I want to instruct you to exclude
any communications you had with attorneys.
    THE DEPONENT:    I didn't do...order any
testing to be done. I simply made a new
product using two different processes, both
of which were different from what was made
before, expecting that neither of them
would produce what was patented, any more
than what was done before produced what was
patented, but expecting that they might be
different...the three of them could be
different from each other in what they
were.
    And figuring that if Nu-Pharm wanted
to take its chances and conduct the
litigation and try to see what it could do,
that was fine with me. And I assumed that
experts would look at the materials and the
experts would give whatever evidence they

---

B.C. Sherman - 81

give. But my expectation is that neither
of them, if looked at properly by competent
scientists who were truthful, could be held
to be infringing.

BY MR. WINCHESTER:
272.    Q.    So, is this all an effort to take
another whack at a non-infringement finding?
    MS. MAZZOCHI:    Objection. Totally
mischaracterizes the prior testimony.
    THE DEPONENT:    It is two more ways of
making product which are non-infringing in
the hope that the Court will properly find
one or both to be non-infringing, because I
believe they are non-infringing, or likely
be non-infringing, not because I have test
results, but because I believe that it is
impossible for anything to be what is
claimed.

BY MR. WINCHESTER:
273.    Q.    This is back to your idea that there
is no such oligomer as the one claimed in Abbott's
patent, right?
    A.    The patent...when I saw that patent;

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 82

1  I was convinced it was a fraud from the minute I
2  read it.
3  274.    Q.    Do you have any additional
4  educational degrees since 1999?
5         A.    No.
6  275.    Q.    Have you taken any additional course
7  work since 1999?
8         A.    No.
9  276.    A.    February 2004...
10        A.    Yes.
11  277.   Q.    ...let's say you had won that
12  case...
13        A.    Yes.
14  278.   Q.    ...and the courts had found your
15  product was not infringing...
16        A.    Yes.
17  279.   Q.    ...was it your plan to actually make
18  and market the product according to the Torpharm
19  ANDA?
20        A.    Well, I am not sure we had plans.
21  That probably would have been what we would have
22  done in the ordinary course.
23  280.   Q.    At that time, did your thoughts or
24  plans, to the extent you had them, include any role
25  for Nu-Pharm?

B.C. Sherman - 83

1         A.    Well, Nu-Pharm would have probably
2  ended up doing the product also, at least for
3  Canadian submission. I think they did, actually.
4  281.   Q.    How about for the U.S.?
5         A.    U.S., probably not.
6  282.   Q.    Did anybody help you in designing
7  the flaking process or the spray-drying process as
8  they currently appear in the ANDA under Nu-Pharm's
9  name?
10        A.    Well, the staff at the Etobicoke
11  plant would have, to the extent that they did
12  experiments and reported results. It was on my
13  instructions.
14  283.   Q.    How about the initial invention of
15  the process?
16        A.    I don't think so.
17  284.   Q.    This is something you came up with
18  yourself, right?
19        A.    Yes. There were two processes. The
20  other one also, in my view, was...the use of an
21  aqueous system also would be a good idea because I
22  believe the evidence specifically was that
23  divalproex sodium, as claimed by Abbott's patents,
24  isn't formed in aqueous solution. That was Abbott's
25  evidence.

B.C. Sherman - 84

1         So, that seemed to me like a good approach,
2  even though, again, I believe that no matter what we
3  did, it would be impossible for it to be infringing
4  because I don't think it exists. But Abbott's own
5  evidence, as I recall, was that it doesn't form an
6  aqueous solution. So, that seemed like a good
7  approach to make it essentially impossible for
8  Abbott to claim infringement.
9  285.   Q.    You were talking about the aqueous
10  solution made in the spray-drying process?
11        A.    Yes.
12  286.   Q.    There is a portion of that process
13  that actually is a drying step, right?
14        A.    I am not sure if it is dried
15  after...I don't recall the details of what we ended
16  up with, but it is spray-dried, and whether it is
17  further dried to drive off the remaining water or
18  not, I am not sure.
19  287.   Q.    Did anyone from Nu-Pharm ask you to
20  develop either of the processes?
21        A.    I don't think so. I think that the
22  conversation...there was a conversation...I think,
23  Jack Kay probably spoke to Richard, and I can't
24  recall the details now, but they were interested in
25  our doing it, and I think the discussions were

B.C. Sherman - 85

1  contemporaneous.
2  288.   Q.    Again, your best recollection is,
3  though, you did this on your own, in terms of
4  developing these new processes, and not at the
5  request of Nu-Pharm?
6         A.    I can't recall the chronology,
7  whether or not the chronology was, "Are you
8  interested if we do it?" That was the discussion...
9  done before we did it, or whether we did it first,
10  then said, "Are you interested in filing an ANDA and
11  challenging patents?" I don't remember the
12  chronology, so I can't give you a definitive answer.
13  It was all around the same time.
14  289.   Q.    You understand you have been put up
15  as Apotex Inc.'s representative to testify for the
16  company on this subject, right?
17        A.    Yes, yes.
18  290.   Q.    What did you do, before you came
19  here, to figure this out?
20        A.    Figure what out?
21  291.   Q.    Whether the cart came before the
22  horse.
23        A.    I didn't know what questions you
24  were going to ask. I don't recall. I don't think I
25  did anything. I am not sure there are any records

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 86

1  of it. Discussions were...we have discussions from
2  time to time with Nu-Pharm and other people that we
3  deal with.
4      Jack Kay, in particular, who is the president
5  of Apotex deals primarily with the commercial
6  issues. And I don't recall any discussions.
7  Actually, I do not recall, personally, ever
8  discussing the matter at all with Benyak, or anybody
9  else at Nu-Pharm. I may have, but I don't remember.
10  I don't know.
11  292.   Q.   Well, you understand you are the
12  person that is here today to talk about, on behalf
13  of your entire company, as to your dealings with
14  Nu-Pharm with respect to this product, correct?
15      A.   It puts me in a difficult situation.
16  I don't know all of the knowledge that is in
17  everybody's head of the company. I can only tell
18  you I am as informed as anybody, generally, and I
19  will give you the best answers I can.
20  293.   Q.   Did you talk with Jack Kay before
21  you came here today and ask him what dealings he had
22  with anyone with Nu-Pharm on this product?
23      A.   No, no.
24  294.   Q.   Did you do anything before you came
25  here today to figure out what Apotex's dealings with

B.C. Sherman - 87

1  Nu-Pharm were with respect to this product, other
2  than what is in your head?
3      A.   Well, no, because I know generally
4  what happened. I didn't know that you would want
5  specifics of who spoke to what, when. I don't know
6  if that information is available, and I certainly
7  don't have it in my head. I don't think...I don't
8  know what information beyond that.
9      I do know, generally, what happened, that
10  Nu-Pharm was interested in taking on a patent
11  challenge in the United States, and we had...I had
12  these two new processes which I thought would be a
13  good basis for a challenge. And we offered, or
14  agreed, to be the manufacturer.
15  295.   Q.   When did you first develop these
16  processes, your revised flaking process, and your
17  spray-drying process?
18      A.   I can't give you exact dates, other
19  than what you might see in documentation. But when
20  the...it was apparent, even before the decision came
21  down, that we were going to lose at trial because of
22  the nature of the things that were going on in the
23  courtroom. And so, I was certainly giving thought
24  to it then as to, you know, what can we do about it.
25      It was a travesty, as far as I was concerned,

B.C. Sherman - 88

1  and I certainly wanted to see what alternatives
2  there were, and it certainly occurred to me that
3  since I believed that the material that was patented
4  didn't even exist, it had to be possible to develop
5  other processes of making something that we...
6  pharmaceutically equivalent, meaning the same
7  bioavailability, same therapeutic properties. And
8  to make it, hopefully, by processes that would
9  result in product that can be proven not to
10  infringe, larger crystals.
11      So, my thought was, "Let's try to find a way to
12  make product that would be different from what was
13  made before that might be more amenable to being
14  proven not to be what was patented, particularly if
15  we can get the crystal forms....crystal size larger.
16      And so, the two thoughts were, one way is to go
17  to a higher temperature in the hot melt to eliminate
18  the seeds in the hope that this would...because, you
19  know, when you have the seeds in there, you have got
20  a very large number of very small seeds, which might
21  individually cause precipitation and give you very
22  small particles.
23      If we can dissolve it and go to a higher
24  temperature so there are no seeds, as it cools, it
25  might be more likely to give larger structures. So,

B.C. Sherman - 89

1  that was the thought between the hot melt one and
2  the other process. The aqueous was on the basis
3  that...Abbott's evidence was that it doesn't form in
4  the water.
5  296.   Q.   You have talked to me a lot today
6  about seeds. Seeds, you are talking about seeds of
7  sodium valproate?
8      A.   Yes.
9  297.   Q.   And is a seed some small bit of
10  sodium valproate, as you were talking about it?
11      A.   Yes, exactly. That is often
12  critical in terms of the structure you get when you
13  are crystallizing a solid out of solution.
14  298.   Q.   In a bowl of divalproex sodium made
15  by the Torpharm process, can you see the seeds, just
16  looking at them?
17      A.   Not after it is solidified.
18  299.   Q.   What tests are you aware of that was
19  performed on the Torpharm material that would reveal
20  the presence of seeds?
21      A.   Not testing. It is observation
22  during the manufacturing process, the knowledge of
23  what happens at the temperature, depending on the
24  temperature you go to.
25  300.   Q.   So, this is your idea that you know

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 94

1  you pinpoint anymore precisely when you first came
2  up with the idea to pursue these processes, either
3  one of them?
4      A.  Well, it confirms it is in the time
5  frame March 2004.  And both of them, they would have
6  been independent ideas.  I am not sure which one I
7  thought of first.
8  318.    Q.  I realize it is a long time ago.
9  Tell me this, did the idea occur to you, and the
10  wheels started in motion before the trial started?
11      A.  No.  I thought that we would win the
12  trial and that would be the end of it.  I was
13  astounded when we hadn't.
14  319.    Q.  So, sometime during the trial, this
15  is when this occurred to you.  So, it would have
16  been sometime late February '04?
17      A.  At the end, when I could see that we
18  were going to lose it, then, of course...you know, I
19  am an inventive person, so my mind turns to what
20  alternatives are there that might get us there with
21  a product that the Court will hold not to be
22  infringing.
23  320.    Q.  Look at Plaintiff's 82, the e-mail
24  from you to Don Barber and others.  The first
25  sentence:

B.C. Sherman - 95

1  "...The first process is a modification of
2  hot melt process at increased temperature,
3  as already discussed and agreed..."
4  Do you remember any conversation you had with one or
5  more of the people on this e-mail before March 25,
6  '04 about your modification of hot melt process?
7      A.  No.  I mean, there are documents
8  that speak for themselves, but I don't recall
9  conversations.  So, if you show me documents that
10  might...
11  321.    Q.  Well, that is a good question.  Are
12  there documents that would reflect discussions you
13  had with these guys before...
14      A.  I assume you have all the documents
15  that I have that are relevant, as far as I know.
16  322.    Q.  Did you instruct somebody to search
17  through all of your files and your e-mails for
18  anything relating to this case?
19      A.  Whatever we were asked to do, we
20  would have done.  I don't recall specifically.
21  323.    Q.  It says:
22  "...already discussed and agreed..."
23  Who did you come to an agreement with to pursue this
24  modification of the hot melt process?
25      A.  I don't know what that means.  If

B.C. Sherman - 96

1  you show me any other earlier documents that you
2  have that set out my instructions, I think...did you
3  give me any, or not?
4  324.    Q.  No, I don't have them, so that...
5      A.  March 22nd...well, here is the March
6  22nd one.
7  325.    Q.  Yes.
8      A.  And so...
9  326.    Q.  I don't have a document, for
10  instance, that would be similar to Plaintiff's 82,
11  where here you have written down:
12  "...Here is how I want the spray-dry
13  process to look..."
14      A.  Well, I may have just handed it to
15  the person who...there would be meetings in my
16  office.  Here is a March 26th e-mail.  What is this
17  one?
18  327.    Q.  That is Plaintiff's 59.
19      A.  And that is the flaking process,
20  so...
21  328.    Q.  Yes.
22      A.  So, this must be consistent with the
23  instructions that I gave him.
24  329.    Q.  Do you recall right now whether you
25  sent a document similar to Plaintiff's 82, but with

B.C. Sherman - 97

1  relation to the flaking process...
2      A.  No.
3  330.    Q.  ...where you would actually write
4  out, "Here is the changes I want you to make"?
5      A.  I don't recall.  And you have
6  nothing here.
7  331.    Q.  I don't.  I have no such document.
8      A.  Well, I have no recollection, so...I
9  mean, it may have been just at my office.  Don
10  Barber would come over.  So, if he was around, I
11  would just talk to him and give him things verbally,
12  or perhaps give him pieces of paper with some
13  information on it, but I can't recall now.
14  But in any event, you know, at the end of the
15  day, you have the process here that he has followed,
16  and the temperature was higher to ensure that
17  everything was fully dissolved.
18  332.    Q.  Why was it important for you to
19  ensure that, in this revised process, you got full
20  dissolution?
21      A.  Because I wanted to eliminate the
22  seeds.
23  333.    Q.  Let's take this...and when you talk
24  about fully dissolved, do you mean fully dissolving
25  the solid sodium valproate in the liquid valproic

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 98

1 acid, right?
2    A.   Yes. You have got something that's
3 completely homogeneous, and a liquid with no seeds
4 present. So, in the hope that, as it cools, it will
5 form larger units.
6 334.    Q.   So, the importance to you in
7 ensuring that that was done, that the temperatures
8 be increased to where you get full dissolution was
9 to...
10    A.   In the expectation that this process
11 would be more likely to give larger units which,
12 although they would be homogeneous, and therefore,
13 in one sense be more capable of being divalproex
14 sodium because the other stuff couldn't be because
15 it was heterogeneous, that the units that were on
16 solidification would be larger and more amenable to
17 being characterized by crystallography.
18 335.    Q.   So, your goal was to actually just
19 to make something that might be more likely
20 infringing, but that you could test better?
21    MS. MAZZOCHI:   No...object....
22    THE DEPONENT:   No, neither could be
23 infringing. There would be infringing...
24 neither would be infringing. The original
25 stuff wasn't infringing, and this couldn't

B.C. Sherman - 99

1 be, either. But they are different
2 products made by different processes.
3    But in this case, I was looking for
4 something that, even though arguably it
5 could be more likely to be infringing, if
6 it were possible to be infringing. If, on
7 the other hand, it would be more likely to
8 be amenable to proving it non-infringing
9 because of larger structures that I would
10 expect to be present by reason of having
11 eliminated the seeds.
12
13 BY MR. WINCHESTER:
14 336.    Q.   Before the ANDA was filed, before
15 March '05, what did you do to undertake that proof?
16    A.   I didn't do anything. I didn't know
17 what to do. I didn't have the expertise. And from
18 our own results from the litigation previously, we
19 didn't have X-ray crystallography information.
20 Apparently, it was very difficult to do, and nobody
21 succeeded at it, although I suspect Abbott did.
22    The...so, I just figured, "Here are two
23 different processes. If Nu-Pharm is going to take
24 this on, I will do the best I can to put them
25 in...give them product that they will have the best

B.C. Sherman - 100

1 chance of being able to prove to be non-infringing,
2 and to have a chance of winning. So, that was the
3 extent of what I did.
4    I designed these two new processes in the hope
5 that one or both would be capable of being proven
6 not to be what was in the...claimed in the patent,
7 but to be simply crystals, ordinary crystals,
8 different from what was done before, and in the hope
9 that Nu-Pharm would be able to succeed in proving to
10 a court that neither...one or both were not
11 infringing products. That is what I did, and I
12 didn't put...as to go on beyond that for testing
13 them, to try to characterize them, that was beyond
14 my ability, and I didn't play any role in it.
15 337.    Q.   Did you ask anyone within Apotex who
16 has more of a chemistry background than yourself
17 what testing could be run to answer the questions
18 you had?
19    A.   No. I had asked questions like that
20 before we went to trial, and they had...there was no
21 internal expertise to do that, and so, I didn't even
22 bother. There was no point.
23 338.    Q.   Let's talk about the flaking process
24 for a minute.
25    A.   Yes.

B.C. Sherman - 101

1 339.    Q.   Is it fair to say what you did was
2 took the process you made for Torpharm and increased
3 the vessel temperature in the mixing vat, right?
4    A.   Well, it is simplistic. I did that
5 for a particular purpose, to effect certain
6 substantive changes, yes.
7 340.    Q.   All I want to know is process to
8 process, how are they different?
9    A.   They are different because the
10 temperature is higher, and as a result of the
11 temperature being higher, you get elimination of the
12 sodium valproate seeds, and you get a solution which
13 is completely homogeneous, and therefore, more
14 likely to precipitate into a homogeneous solid with
15 larger structures.
16 341.    Q.   Let's leave out what you think you
17 would get after it is done. I actually just need to
18 go the nuts and bolts.
19    A.   Well, you are leaving out the bolts.
20 You just had the nuts.
21 342.    Q.   Okay. Let's do the nuts, then.
22 Process to process....
23    A.   Yes.
24 343.    Q.   ...you took the Torpharm flaking
25 process that you had developed...

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 134

1  And I presume our staff have
2  cooperated in giving whatever information
3  or documents that Nu-Pharm would have
4  needed for the litigation, but I don't know
5  the details of that.
6
7  BY MR. WINCHESTER:
8  455.    Q.    Do you know how the ANDA in this
9  case was actually put together?
10    A.    No.
11  456.    Q.    Do you know anything that Nu-Pharm
12  actually provided for the ANDA?
13    A.    I don't know the answer to that. I
14  have no idea. I have never seen the ANDA. I don't
15  know who did what.
16  457.    Q.    Did you have any involvement in the
17  naming of Apotex Corp. as the U.S. agent for
18  purposes of the ANDA?
19    A.    I didn't even know that was a case.
20  If you are telling me...you are telling that Apotex
21  Corp. is the agent of Nu-Pharm for the filing of it,
22  I don't know.
23  458.    Q.    You have never heard that that is
24  the case?
25    A.    Not that I am aware of.

B.C. Sherman - 135

1  459.    Q.    And I take it you didn't do anything
2  before you came here today to try and understand the
3  role of Apotex Corp. in this ANDA, right?
4    A.    No, nobody asked me. I don't know,
5  but certainly Apotex Corp. has acted as an agent, I
6  mean...you just need a name in the United States to
7  be the agent for...name and address in the United
8  States. I don't know whether there is any
9  substantive rule.
10  460.    Q.    Look at 79 again, the 30(b)(6)
11  Notice. Did you read this thing?
12    A.    I looked at it. I can't tell you
13  that I necessarily read every detail.
14  461.    Q.    Did you read at least the topics for
15  which they say:
16  "...We are designating Barry Sherman to
17  testify for the company on these issues..."
18    A.    I glanced at it, and I am certainly
19  willing to testify and give you my full knowledge,
20  whatever it is, of any of the topics. But I did
21  not...if you are asking me if I have read it very
22  carefully to make sure I informed myself about every
23  detail, I didn't do that. I did read it, I did look
24  at it. So, I am generally aware of what is in here.
25  MS. MAZZOCHI:    I will just note that

B.C. Sherman - 136

1  these topics were objected to in many
2  respects, and are extremely vague and
3  over-broad. I don't think it would be
4  possible for someone to educate themselves
5  for every single...
6  THE DEPONENT:    But generally, I am
7  clearly the best, the most knowledgeable
8  person about the product in the company,
9  but that doesn't mean I know everything.
10
11  BY MR. WINCHESTER:
12  462.    Q.    You were designated to talk about
13  the discussions and agreements between Apotex Inc.
14  and Nu-Pharm with relation to this product, and it
15  sounds like you may not be the guy who was actually
16  involved with, or had that knowledge.
17    MS. MAZZOCHI:    That is your
18  characterization.
19    MS. MAZZOCHI:    That is his
20  characterization.
21    THE DEPONENT:    No. I am not sure that
22  there is anybody who has got any
23  substantive. There was really no
24  substantive discussion, other than, "Do you
25  want to do it?", and the answer was yes.

B.C. Sherman - 137

1  And Nu-Pharm...and we did our end of it,
2  and Nu-Pharm did its end of it. But I am
3  not sure that there was any discussion that
4  was complex in any way, other than, "Yes,
5  we will do it."
6
7  BY MR. WINCHESTER:
8  463.    Q.    Do you know what Nu-Pharm's end of
9  it was, what Nu-Pharm has done?
10    A.    I presume Nu-Pharm filed an ANDA and
11  is pursuing the litigation.
12  464.    Q.    Do you know who actually wrote and
13  prepared the ANDA?
14    A.    No.
15  465.    Q.    Do you know who made the bio batch
16  lots?
17    A.    We would. Apotex is the
18  manufacturer. We are going to...the physical
19  manufacturer for Nu-Pharm. We will supply them.
20  466.    Q.    Do you know who performed the
21  biostudies?
22    A.    No.
23  467.    Q.    Check number 11 in your book there.
24    A.    You named some laboratories before.
25  468.    Q.    I did.

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 146

1  491.  Q.  You have never heard that, that, in
2  fact, the current labelling for this product lists
3  "Distributed by Apotex Corp."?
4  A.  Well, that is presumably a possible
5  distributor. I imagine he is talking to other
6  people, too, but I don't know. That is possible.
7  Certainly, we would be...Apotex Corp., I presume,
8  would want to distribute the product, and that may
9  well be the outcome. I don't know of any
10  discussions along those lines.
11  492.  Q.  I get what Nu-Pharm is getting out
12  of this relationship. Apotex has developed the
13  product, you invented it, your people put together
14  the ANDA, did the biostudies, they are going to make
15  the product, package the product, test the product.
16  What does Apotex get out of cutting Nu-Pharm in on
17  this?
18  A.  I am not sure who is going to
19  package it because Nu-Pharm has their own packaging
20  facilities, I believe.
21  493.  Q.  If you look back at number 3, in
22  your big book there...I am sorry, I guess 4.
23  MS. MAZZOCHI:  No, 3.
24
25  BY MR. WINCHESTER:

B.C. Sherman - 147

1  494.  Q.  Four, I think, has it actually
2  broken out. Do you see that Apotex Inc. is listed
3  there in Plaintiff's 4, the Etobicoke site, under:
4  "...Manufacturer and packaging of final
5  dosage form release testing of components
6  in finished product and stability
7  testing..."
8  A.  All right. So, it looks like Apotex
9  will package, but that can be changed, too.
10  Sometimes things change, sometimes things go out to
11  other labs, or other places to do blister packing,
12  and the like. I don't know.
13  495.  Q.  You are not aware of any change that
14  has been made from what it says in the ANDA, right?
15  A.  No. If it says Apotex, the
16  Etobicoke site, will be packaging, then the
17  Etobicoke site is the intended packager in that
18  submission. But that might change, as I said. I
19  don't know.
20  496.  Q.  Then tell me, what does Apotex get
21  out of cutting Nu-Pharm in on this product?
22  A.  Nu-Pharm is carrying the litigation.
23  What does Apotex get, or what does...
24  497.  Q.  Yes.
25  A.  We are going to sell the product.

B.C. Sherman - 148

1  498.  Q.  All right. We talked earlier
2  before, you had a divalproex sodium product for
3  Torpharm on deck in 2004 when we went to trial,
4  right?
5  A.  Yes.
6  499.  Q.  And you told me before that if you
7  guys had won, you were going to go ahead,
8  manufacture that product, market and sell that
9  product with no role for Nu-Pharm?
10  A.  Yes.
11  500.  Q.  So, now you develop a new flaking
12  process, a spray-drying process. Why involve
13  Nu-Pharm rather than go forward and do it for
14  Apotex?
15  A.  Well, one of the principal concerns
16  was there is an injunction. I am not sure what it
17  means. I looked at it. It talks about divalproex
18  sodium that was the subject of the ANDA. I am not
19  sure whether that is parenthetical, whether the
20  injunction applies to Apotex with respect to
21  divalproex sodium regardless of process, or whether
22  it is only that one. I really don't know.
23  I don't know whether or not there is anything
24  in terms of that that would have prevented Apotex
25  itself from simply submitting a new ANDA for the new

B.C. Sherman - 149

1  products. We probably could have done that, but
2  because there was that uncertainty, it occurred to
3  me that it would be better if we just let...make the
4  product. We will get our profit out of it, anyway.
5  Make the product and sell, let somebody else
6  independent take it on. Whether or not that makes
7  any difference at the end of the day, I don't know,
8  but I didn't want to take that chance.
9  So, that is what went through my mind,
10  just..."I am not sure of the legal issues. Let's
11  not do it ourselves. Let's just sell the product
12  and let somebody else do it."
13  501.  Q.  So, it is your thinking that you
14  could take an infringing product, and as long as it
15  is under Nu-Pharm's name, you are okay?
16  MS. MAZZOCHI:  No, no, that is totally
17  not what he said.
18  THE DEPONENT:  No, non-infringing
19  process. My concern was, even if we have a
20  non-infringing product, Apotex might be
21  enjoined. That would be bizarre, but that
22  is a possible interpretation one could put
23  on the order. I don't know. But
24  certainly, Apotex can't be enjoined from
25  manufacturing the product in Canada and

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416-360-6117

# VICTORY VERBATIM COURT REPORTING SERVICES



**B.C. Sherman - 150**

1 selling it to someone else in Canada
2 because we are not in the United States.
3 And Nu-Pharm is not the subject to an
4 injunction.
5 It could certainly go ahead and get
6 manufactured a non-infringing product and
7 sell it in the United States, and we could
8 make that product. So, that is what went
9 through my mind, that just in case there
10 was some problem that I didn't think would
11 be there, in any event.
12 But I didn't want to get involved in
13 possibly doing something that somebody can
14 say was in violation of a Court order. So,
15 at the end of the day, I think we could
16 have just done it ourselves, but we decided
17 to limit ourselves to the manufacturing,
18 and not be involved in the litigation, or
19 the submission to the FDA.
20
21 BY MR. WINCHESTER:
22 502.    Q.    Other than for the purposes you have
23 told me about, about your questions in terms of the
24 injunction, is it fair to say Apotex Inc. doesn't
25 need Nu-Pharm to make this product, market this

**B.C. Sherman - 152**

1 discussions in our selection meetings, "Do we go
2 after the blockbusters that...because they are
3 tremendous sales?" We say, "Well, but 500 companies
4 are doing those, or do we go after the niche
5 products."
6 We always joke that even the niche
7 products...the problem is that all of those
8 companies could be going after the niche products,
9 in the expectation that nobody else will. So, they
10 could be...ones that would appear to be better for
11 that reason actually can be worse because you have
12 got a smaller market split in many ways instead of a
13 larger market, so who knows.
14 505.    Q.    Have you done any market analysis
15 with respect to this particular product?
16         A.    No. But I know that the sales
17 of...under the brand label are probably in the range
18 of $500 million a year. It is not a blockbuster.
19 The blockbusters are the multi-billion dollar
20 products. There are many of those.
21 506.    Q.    If you were to get this ANDA
22 approved before the expiry of Abbott's patents, is
23 it fair to say it is a multi-million dollar drug for
24 you?
25         A.    Not necessarily. It depends on who

**B.C. Sherman - 151**

1 product, package it, test it, and do everything
2 else?
3         MS. MAZZOCHI:    Objection. Compound.
4 Argumentative.
5         THE DEPONENT:    You could say that about
6 anything that we supply to Nu-Pharm. We
7 don't need them, but for a variety of
8 reasons, we do sell through various
9 companies under different circumstances.
10 We don't need any of them, I suppose. But
11 decisions are made for different reasons.
12
13 BY MR. WINCHESTER:
14 503.    Q.    This is potentially a big dollar
15 drug, right?
16         A.    Not so big, no. It depends what you
17 mean. There are much bigger ones.
18 504.    Q.    You don't pursue drugs that you
19 think you are not going to make money, right?
20         A.    Well, that is not true. We pursue a
21 large variety of drugs, and some of them, we have
22 very low expectations of making anything on, but
23 some of them surprise us and end up higher...to be
24 higher than what we think.
25 We always have these discussions, philosophical

**B.C. Sherman - 153**

1 else is approved. I don't know what problems will
2 be with exclusivity, how many other ANDAs will be
3 approved or filed, whether or not there will be an
4 authorized generic. It may be a product we make
5 nothing on even if we win, even if we are able to
6 sell it.
7 507.    Q.    You have got a product that you
8 could make, package, test, sell, market, all by
9 yourself?
10         A.    Yes.
11 508.    Q.    Why involve Nu-Pharm? Why give them
12 money?
13         A.    I gave you that.
14         MS. MAZZOCHI:    Objection. Asked and
15 answered.
16
17 BY MR. WINCHESTER:
18 509.    Q.    You are giving them money.
19         A.    I am giving them money. They are
20 taking on the litigation, and they are earning it.
21 I have got other things to do, too. You don't think
22 we are overwhelmed with things to do, with dealing
23 with lawyers. I didn't...I have got other cases I
24 have to work on, not this one. I have got no
25 involvement in this case.

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 154

1 510.   Q.   Is there any reason, other than them
2 taking on the litigation, to involve Nu-Pharm with
3 this product?
4           A.   I told you, there was a concern that
5 it might make a difference legally because someone
6 could say, "You can't do that because you are
7 enjoined from making divalproex sodium and selling
8 it in the United States, period."
9           I think that would be a wrong interpretation,
10 but I didn't want to take that chance. So, that
11 probably tipped the balance. And my thought was,
12 "Why even bother, we don't need that...to be
13 confronted with that. We will just make the
14 product."
15 511.   Q.   Who did you share these thoughts
16 with? I take it you didn't talk to Nu-Pharm. Who
17 did you share these thoughts about, "We should
18 involve Nu-Pharm in this"? Who have you talked to
19 about it?
20           A.   I didn't say necessarily, "We should
21 involve Nu-Pharm". I believe I spoke to Jack Kay
22 about it, and saying, "These are my thoughts. What
23 do you think?" And I believe he said, "Okay, I will
24 talk to Nu-Pharm and see if they want to do it."
25 And then the answer was yes.

B.C. Sherman - 155

1           But I don't recall the conversations, but that
2 is essentially what happened. I didn't turn...give
3 it much thought as to the details. I wanted to go
4 forward once the decision was made. And I am
5 dealing with other matters. I have got hundreds of
6 cases I have to deal with.
7 512.   Q.   Sure.
8           MS. MAZZOCHI:   Sorry, Jason, you are not
9 that special.
10           THE DEPONENT:   I spend half my time on
11 litigation, more than half of it.
12
13 BY MR. WINCHESTER:
14 513.   Q.   You invented this product. This
15 process is your intellectual property. Who owns it?
16           A.   All three of them. Apotex, I think.
17 I think we...Apotex owns it, but they are not
18 patented. My first one is patented, I think. The
19 first one is patented, the other two are not.
20 514.   Q.   Have you had any discussions with,
21 seen any licences with Nu-Pharm to give them the
22 right to practise your process?
23           A.   They are not going to steal it.
24 They are a company we do business with. It goes
25 back a long way. We trust them, they trust us. We

B.C. Sherman - 156

1 have a lot of good working relations with a lot of
2 people. Most things are not done on written
3 contracts when you have got ongoing relationships.
4 They are not going to steal it.
5 515.   Q.   Let me ask you this, in your view...
6           A.   Yes.
7 516.   Q.   ...would it be permissible for
8 Nu-Pharm, for Richard Benyak to call you tomorrow
9 and say, "Thanks for the process. I am going to
10 have Novopharm make it, market it, and sell it for
11 me. You are out."
12           A.   Well, if they said that...first of
13 all, it is inconceivable they would do that. If
14 they did that, what would be our recourse legally?
15 I don't know. Would we have a right to stop them?
16 I think we would probably say, "There is an
17 agreement, and that is in breach of an agreement,
18 that we gave you this..."
19           I think there is an agreement, in essence,
20 that, "We will give you the use of our technology,
21 and we will provide the batches for you to file a
22 U.S. ANDA if and when you get the approval. You
23 will buy the product from us, and we will do it on
24 reasonable commercial terms which we will negotiate
25 in good faith between us." That is the

B.C. Sherman - 157

1 understanding.
2           I think they are bound to that, and I think
3 they would honour it, regardless. I can't spend my
4 time being paranoid.
5 517.   Q.   So, you are not aware of any licence
6 agreement, anything like that, with respect to this
7 product?
8           A.   I have answered you. I think there
9 is, implicitly.
10 518.   Q.   Implicitly. How about a written
11 one?
12           A.   No.
13 519.   Q.   Are you aware of anybody from Apotex
14 who has actually had discussions with Nu-Pharm about
15 this arrangement, you are saying?
16           MS. MAZZOCHI:   You are talking about...
17           THE DEPONENT:   Asked and answered.
18           MS. MAZZOCHI:   ...did he have
19 conversations about Nu-Pharm for a
20 hypothetical arrangement that you are
21 talking about? That makes no sense.
22           MR. WINCHESTER:   That he is talking
23 about.
24           THE DEPONENT:   Asked and answered. I
25 told you there were discussions. We deal

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 158

1 with them...you can ask me the same thing
2 about 50 products that we supply them.
3 What are the discussions there? I don't
4 know. All I know is we supplied product,
5 and they sit down and discuss the prices,
6 and they agree on prices. There has never
7 been a dispute.
8 MS. MAZZOCHI: Jason, can we....
9 THE DEPONENT: If there were a dispute,
10 we would send it out to a mediator, or
11 something.
12 MS. MAZZOCHI: We have been going since
13 eleven o'clock for almost four straight
14 hours now, and if you are going to just
15 keep asking the same question over and over
16 again, that means you have clearly run out
17 of other questions to ask. So, we can be
18 done.
19 MR. WINCHESTER: We are not done.
20 MS. MAZZOCHI: Well, then ask a new
21 question.
22
23 BY MR. WINCHESTER:
24 520. Q. Are you aware of those conversations
25 happening with respect to this product?

B.C. Sherman - 159

1 A. I answered...I have told you that I
2 don't recall being involved in specific
3 conversations myself, although I might have been,
4 but there would be nothing remarkable about any
5 conversation that would cause me to remember it. I
6 presume Jack Kay has discussed things. I know that
7 we are, in fact, producing the material. I know
8 that Nu-Pharm has, in fact, filed an ANDA. I know
9 that Nu-Pharm is, in fact, litigating.
10 So, there must have been some brief
11 conversations about it, but they were...the extent
12 of the conversations was, "We will supply the
13 product. You file it and litigate it, and then if
14 you succeed, we will produce it for you, and you
15 will sell it." That would be the gist of it.
16 Nobody would have, I don't think, have gotten
17 specific about prices because it would have been
18 premature. Who knows what the market is going to
19 be. Who knows what the quantities will be. Who
20 knows what the costs will be. Who knows what the
21 competition will be. You can't predict those
22 things.
23 So, that is why it is good to deal with people
24 that you have ongoing relationships with that you
25 think you can trust. That is what we do.

B.C. Sherman - 160

1 521. Q. So, my question to you, as the
2 appointed representative of your company, is: Have
3 those conversations about specifics, with respect to
4 this product, actually taken place between Apotex
5 and Nu-Pharm?
6 A. No, that I am aware of. Why would
7 they? Those questions haven't been answered yet.
8 Nobody knows when the product will be marketable, if
9 it will be marketable, what FDA is going to say
10 about this submission, what the courts are going to
11 say, what the competition will be, what the volumes
12 will be, what the market will be, or anything else.
13 You can't sit down and reasonably deal with those
14 things. They are too speculative.
15 Now, if you are dealing with somebody for the
16 first time, you don't have a relationship with, you
17 have got to be a lot more careful. But there is an
18 ongoing history here.
19 522. Q. How many products does Apotex
20 currently manufacture for Nu-Pharm?
21 A. I would guess in the area of 50 to
22 100.
23 523. Q. Do you know if Nu-Pharm has any
24 products approved for sale that are made by someone
25 other than Apotex?

B.C. Sherman - 161

1 A. Well, there is one I know, was the
2 Enalapril product, which they certainly didn't get
3 from us. They would get that made somewhere else.
4 I am not sure where.
5 524. Q. They were supposed to get that from
6 you, though, right? This is the injunction issue we
7 talked about before.
8 A. Well, they would have but for the
9 fact that we were enjoined. But when we couldn't
10 supply them, they went and arranged to get someone
11 else to make it. But I don't know what they do with
12 any others. I don't know.
13 525. Q. Does Apotex pay for Nu-Pharm's legal
14 bills for this litigation?
15 MS. MAZZOCHI: I am going to instruct
16 you not to answer that question.
17 MR. WINCHESTER: That is not privileged.
18 MS. MAZZOCHI: Yes, it is.
19 MR. WINCHESTER: It is not. There is
20 case law left and right, Deanne. It is not
21 privileged who pays the bills.
22 MS. MAZZOCHI: Well, you cite that to
23 me, and maybe I will reconsider it. That
24 is a total improper question. You don't
25 have to answer that.

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 162

BY MR. WINCHESTER:
526.     Q.     Are you going to answer the
question, Doctor?
         A.     My solicitor says not to, so I
won't.
527.     Q.     Your who?
         A.     Solicitor, lawyer.
528.     Q.     Solicitor. Got you. Okay. I
thought you said 'sister'.
         A.     I can tell you this, I don't know
the answer, actually.
529.     Q.     Do you know whether there are any
agreements between Apotex and Nu-Pharm pursuant to
which Apotex will reimburse Nu-Pharm for legal costs
incurred in this case?
         MS. MAZZOCHI:   I will give you the same
instruction.

BY MR. WINCHESTER:
530.     Q.     Are you going to answer the
question, Doctor?
         A.     I am not aware of any agreements.
531.     Q.     Do you know whether, prior to the
submission of this ANDA, March 2005, anyone
undertook any scientific test to compare material

---

B.C. Sherman - 163

made by your Torpharm process to material made by
either your revised flaking process, or your
spray-dry process?
         MS. MAZZOCHI:   And in responding, I will
instruct you not to include any information
that you received through conversations
with counsel.
         THE DEPONENT:   The answer would be no,
except to the extent that the...they would
have tested the products as made by the
process to ensure they conform with the
appropriate specifications for divalproex
sodium, but that would be without regard to
any issues as to what it is at the...
structurally. And so, there would have
been no test done.
         We wouldn't even know what tests to do
if we wanted to do the test because there
is no definitive test to determine the
structure, that we were aware of, that was
within our capability to do.
         So, the answer to your question is
that testing was done, and it would have
been similar to the testing done for the
product, but only with respect to whether

---

B.C. Sherman - 164

or not the material was pharmaceutically
acceptable, not with respect to issues of
patent infringement.

BY MR. WINCHESTER:
532.     Q.     Are you aware of whether Nu-Pharm
commissioned testing relating to the...comparing the
structure of Torpharm process material, versus
spray-dry, or the revised flaking, prior to
submitting the ANDA in March 2005?
         MS. MAZZOCHI:   Objection. Calls for
speculation.
         THE DEPONENT:   I have no idea what
Nu-Pharm has done. I have not been
involved in the process of the litigation,
or generating evidence, or any of that.
That would have been arranged by Nu-Pharm
and/or its solicitors, and I don't know
what they did.

BY MR. WINCHESTER:
533.     Q.     As the representative of Apotex
Inc., who is here to tell me what the company did,
did Apotex Inc. commission, prior to March 2005, any
testing to determine the molecular structure of

---

B.C. Sherman - 165

either the flaked material, or the spray-dried
material in the ANDA under Nu-Pharm's name?
         MS. MAZZOCHI:   And again, I will
instruct you not to reveal any
communications, or testing that you may
have performed through counsel.
         THE DEPONENT:   Not that I am aware of,
not on my instructions. So, I think the
answer is no, almost certainly.
         MR. WINCHESTER:   I am going to mark as
Plaintiff's 83, the document that was
actually introduced at trial in the prior
case. Here is a copy for you, Deanne.

--- EXHIBIT NO. P83 : Memorandum from B. Sherman to
                      D. Coffin-Beach and N. Coppuccino,
                      December 9, 1996

BY MR. WINCHESTER:
534.     Q.     We have taken to calling this your
patent battle memo. It is a memorandum you sent to
David Coffin-Beach, Nick Cappuccino on or about
December 9th, 1996. Do you remember this document?
         A.     No.
535.     Q.     Does Nick Cappuccino still work for

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416-360-6117

# VICTORY VERBATIM COURT REPORTING SERVICES

B.C. Sherman - 186

1  that you think you actually acquired it rather than
2  formed it?
3       A.   I think so. I am not certain.
4  600.      Q.   Now I think you have answered me,
5  but just to get it clear, from the time you acquired
6  it, whenever that was, you don't really remember,
7  until the time you sold it, it was owned during that
8  period of time by Apotex, right?
9       A.   By the company that owns Apotex,
10  yes.
11 601.      Q.   Well, this is the pharmaceutical
12  holding company?
13      A.   Yes.
14 602.      Q.   Which you ultimately control?
15      A.   Yes. Well, as I said, we divested
16  of it for a couple of reasons, and since that time,
17  it has been no different from any other company that
18  we supply.
19       There are others...analogous situations where
20  we supply on the same terms at the same prices. And
21  also have no investment in those companies, either,
22  particularly ProDoc comes to mind, but there are
23  others, as well.
24 603.      Q.   Same terms and same prices, as well?
25      A.   As each other. Jack Kay has to be

B.C. Sherma

1
2
3                         ERRATA SHEET
4        PAGE       LINE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33       I, BERNARD CHARLES SHERMAN, have read and reviewed pages 1
34   187 and, with the exception of the above-noted corrections, her
35   accuracy of my statements recorded herein.
36
37      Date
38

B.C. Sherman - 1

1       fair. He sells to ProDoc and Nu-Pharm at the same
2       prices and the same products.
3  604.      Q.   Do you ever....
4            A.   A certain percentage of the
5       formulary prices which change from time to time.
6       They negotiate.
7            MR. WINCHESTER:   Subject to asking for
8       more documents, I have nothing else.
9            MS. MAZZOCHI:   Okay. We are done.
10
11
12
13
14
15
16       I hereby certify the foregoing to be a true and accurate tra
17   above noted proceedings held before me on the 17TH DAY OF JULY,
18   and taken to the best of my skill, ability and understanding.
19
20
21                    }  Certified Correct:
22                    }
23                    }
24                    }
25                    }
26                    }  _____
27                    }   Elisa Antonelli
28                    }   Verbatim Reporter
29                    }

**Ernst & Young Tower**
**222 Bay St. Suite 900**
**Toronto, Ont. M5K 1H6  416-360-6117**

**Donald Barber**

From:          Barry Sherman
Sent:          Thursday, March 25, 2004 10:47 AM
To:            Don Barber; Shawn Shirazi; David Coffin-Beach
Cc:            Jeremy Desai; Yogesh Dandiker; Paul Gordon
Subject:       divalproex

First process is modification of hot melt process, at increased temperature, as already discussed and agreed.

Second process is blending in water and spray drying in fluid bed, as follows:

    Purified water              280 g
    Sodium valproate            535 g
    Valproic acid               465 g
        Total Divalproex Sod.  1000g

1. Add about half the sodium valproate to the water while mixing
2. Heat to about 80 degrees, and then add the rest of the sodium valproate and the valproic acid, while blending and maintaining temp at about 80 degrees.
    It should all dissolve to form a clear solution at 80 degrees.  If not, continue blending while heating to higher temp, and record temp at which becomes clear
    solution.  Continuing stirring and maintain temp at about 80 degrees until spraying complete.
3. Spray dry in fluid bed system with supply air at 80 degrees.  Adjust spray rate so that exhaust temp does not fall below 60 degrees.
    Continue until all sprayed.
    Note - use short line from tank to spray system.  Do not begin pumping until system reaches 80 degrees, and once start, try not to stop until complete.
    This is because the solution may solidify in the line and spray gun if cools to below 80 degrees.
    When finished spraying, continue drying for another 15 minutes at 75-80 degrees.

Please do a trial run using KATWIJK materials, so as not to use any Signa materials until process finalized.
As soon as trial run is done, fully test to ensure meets our specs for divaproex sodium, including, in particular, water content.
If good, then proceed RUSH to make trial tabs, to ensure material from this process makes good tablets using identical tablet formulation and process as will be used for the hot melt material.

In the meantime, you are proceeding to make the needed material by the hotmelt process.  However, please do NOT proceed to make the tabs using divalproex from that process, until you have ensured, as aforesaid, that  that the spray-dried material also makes good tabs using identical tablet formulation and process.

Once all above is done, then please proceed ASAP to make needed divalproex by the aqueous spray-dry process using Signa materials, complete production of all 6 lots of tablets, and initiate new U.S. stability testing.

Would like to get all of the above done in next 1-2 weeks, so we can file new ANDA  4 months from now.

Thanks./

A0029

1

PLAINTIFF'S
EXHIBIT
NO. 82

APOI 000149
CONFIDENTIAL
ATTORNEYS' EYES ONLY

# VICTORY VERBATIM COURT REPORTING SERVICES

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EA/kc

ABBOTT LABORATORIES, an )
Illinois corporation          )
                              )
          Plaintiff,     )   Civil Action No. 05 C3714
                              )
     v.                  )
                              )
NU-PHARM, INC. a Canadian  )
corporation, APOTEX INC.,  )
a Canadian corporation,    )
and APOTEX CORP., a        )
Delaware corporation,      )
                              )
          Defendants.     )

C O N F I D E N T I A L

- - - - - - - - - -

This is the Deposition of RICHARD BENYAK, in the
above noted matter, taken at the law offices of McCARTHY
TÉTRAULT LLP, 44th Floor, Toronto Dominion Bank Tower, 66
Wellington Street West, Toronto, Ontario, on the 19th day
of July, 2006.

- - - - - - - - - - - - - - - - - - - - - - -

A P P E A R A N C E S :

JASON G. WINCHESTER, ESQ.  }   -- for the Plaintiff
Jones Day                  }
77 West Wacker             }
Chicago, Illinois          }
USA 60601-1692             }
DEANNE M. MAZZOCHI, MS.  }   -- for the Defendants
Rakoczy Molino, Mazzochi   }
  Siwik                    }
500-6 West Hubbard Street  }
Chicago, Illinois          }
USA 60610                  }

# VICTORY VERBATIM COURT REPORTING SERVICES

- i -

### INDEX OF PROCEEDINGS

PAGE NUMBER

RICHARD BENYAK, sworn
   Examination by:
      Mr. Winchester      1 - 156

   Errata      157

- iii -

### INDEX OF EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
| --- | --- | --- |
| 102 | Series of documents signed by Mr. Benyak dated March 2, 2005 | 146 |
| 103 | Series of documents with respect to ANDA, signed by Mr. Benyak or on Nu-Pharm, Inc. letterhead | 147 |

- ii -

### INDEX OF EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
| --- | --- | --- |
| 91 | Document entitled, "Defendant Nu-Pharm, Inc.'s Objections and Responses to 30(b)(6) Notice" | 1 |
| 92 | Articles of Incorporation of Nu-Pharm, Inc. dated August 4, 1989; Articles of Amalgamation of Nu-Pharm, Inc. dated August 31, 1998 | 21 |
| 93 | Third amended complaint, Abbott Laboratories versus N-Pharm Inc., et al | 98 |
| 94 | "Plaintiff, Abbott Laboratories, First Set of Interrogatories, Numbers 1 through 20 to Nu-Pharm, Inc." | 98 |
| 95 | E-mail to Mr. Winchester from Ms. Mazzochi dated July 18, 2006 | 107 |
| 96 | Documents with respect to people retained for biostudies, signed by Mr. Benyak | 119 |
| 97 | Document entitled, "A Minor Amendment to the ANDA", submitted May 26, 2006 | 125 |
| 98 | Copy of the physician's package insert | 125 |
| 99 | Product labelling | 125 |
| 100 | Document entitled, "Registration of Drug Establishment for Nu-Pharm" | 132 |
| 101 | Document entitled, "Paragraph IV Certification" | 138 |

R. Benyak - 1

1  RICHARD BENYAK, sworn
2  EXAMINATION BY MR. WINCHESTER:
3  1.    Q.  Mr. Benyak, good morning.
4       A.  Good morning.
5  2.    Q.  I am Jason Winchester. I am going
6  to ask you today a series of questions about your
7  company, Nu-Pharm, and in particular some questions
8  about the abbreviated new drug application or ANDA
9  that has been submitted to the USFDA for divalproex
10  sodium product in Nu-Pharm's name. You are familiar
11  with the ANDA I am talking about?
12       A.  Yes, I am.
13
14  — EXHIBIT NO. 91:  Document entitled, "Defendant Nu-
15      Pharm, Inc.'s Objections and
16      Responses to 30(b)(6) Notice"
17
18  BY MR. WINCHESTER:
19  3.    Q.  Before we get started, I have marked
20  as plaintiff's 91, just for you to take a look at, a
21  document entitled, "Defendant Nu-Pharm, Inc.'s
22  Objections and Responses to 30(b)(6) Notice".
23      Are you aware that you have been designated
24  to testify, not just on behalf of Richard Benyak,
25  but also on behalf of Nu-Pharm, the company, as to

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 14

1  that privilege to somebody else. Because it is just
2  ...anybody who has the least entrepreneurial spirit
3  will not survive.
4      And in the 18 months I was there, I
5  probably worked three years, because it was the
6  busiest that I have ever worked. But anyway, I
7  moved on.
8  59.   Q.   Where did you go in 1989?
9      A.   In '89 I went back to Novopharm for
10  just a short period of time....
11  60.   Q.   In what capacity?
12      A.   ...for several months. In the same
13  capacity as I had previously. And then in August,
14  perhaps earlier than that, maybe June or July of
15  '89, I had thought to myself that there are many
16  people who were entrepreneurs, Leslie Dan being one,
17  who was my mentor at Novopharm.
18      He had started his own pharmaceutical
19  company, as did Barry Sherman, as did Morris
20  Goodman, as did many other people. And I thought,
21  geez, you know, if they could do it, why can't I try
22  it?
23      So I had decided that I would go out and
24  ply my trade of sales and start my own company. And
25  it doesn't cost much to do that. I bought a new

R. Benyak - 15

1  car, I bought a detail bag and I bought a cell
2  phone.
3      When it became known that I was doing that,
4  I had job offers from two other companies. One of
5  them was Genpharm. I was interviewed by Tony
6  Tabatznik. I can't spell the name, I am sorry, but
7  you may know it.
8  MS. MAZZOCHI:   I can.
9  THE DEPONENT:   And a few other people
10  there. And they offered me the job to be
11  president of the company and they offered
12  me $80,000 and I said, 'No, I want $100,000
13  or I am not coming'. And they said, 'We
14  can only pay you 80', and I said, 'Thanks,
15  I am on my way'.
16      So I didn't work with them. It was
17  really that simple, it was two interviews
18  and there was a difference of a relatively
19  small amount of money and they weren't
20  prepared to pay it and I wasn't prepared to
21  go so it stopped.
22      I was also offered a job by another
23  fellow you may know, his name is Eugene
24  Melnyk. And he owns now Biovail. It is a
25  pretty big company.

R. Benyak - 16

1  BY MR. WINCHESTER:
2  61.   Q.   I have heard of them, yes.
3      A.   He had just sold his previous
4  business which was a publishing company, Trizac, I
5  think it was called, I am not sure. And he wanted
6  me to go work for him.
7      But there was another fellow that I had
8  previously dealt with who was on their team and I
9  didn't particularly get along with the fellow. I
10  had known him elsewhere, not from Eugene. And I
11  told Eugene I am not interested. It never got to
12  negotiation of money.
13  62.   Q.   So that one wasn't money, that was a
14  personality issue?
15      A.   Well, you got to like the people you
16  work with. If you don't like them, what is the
17  point? So I decided, no, I would go out on my own.
18  So I got in my car and I drove to Montreal because,
19  remember, when I worked in the government I had met
20  all of the CEOs of the innovator companies.
21      And the innovators were absolutely dying
22  with their products. Am I rambling here too much?
23  63.   Q.   What does that mean, 'absolutely
24  dying with their products'?
25      A.   Well, the generics were taking

R. Benyak - 17

1  business away from them and it was very obvious.
2  64.   Q.   So this, you are talking about the
3  branded companies?
4      A.   That is what I just said, yes. The
5  brand pharmaceutical companies were losing an
6  incredible amount of business to generics. And the
7  big generics at that time were Apotex and Novopharm.
8      So I went to all those fellow that I knew
9  quite well, being in the business for some time, and
10  the first person I went to was a fellow named Eddie
11  Campana from Ayerst.
12      And I said, 'Look, you folks are losing
13  tremendous dollars in your one big drug which is
14  Amoxil and that was amoxicillin. Why don't you
15  cross-licence it to me and I can sell it? I know
16  the markets that I could go to to sell that product
17  and at least you will keep some of your market
18  share, because it is just going to disappear'.
19      And Eddie said, 'Look, I have known you for
20  a long time but I can't tell you that product. I
21  can't even give you that product because that
22  product belongs to Beecham from England'.
23      So they said no. I asked them for Premarin
24  and he laughed at me. It is not an issue, 'I am not
25  going to give you a drug that is exclusive and still

# VICTORY VERBATIM COURT REPORTING SERVICES



R. Benyak - 18

1　exclusive".
2　　　　Anyway, then I went to see a few other
3　people from SmithKline, from Rhone-Poulenc, from
4　others. And not a single person would come across
5　and cross-licence a product to me.
6　　　　So it was a pretty devastating week,
7　thinking that I knew all these people and you
8　certainly learn who your friends are when you want
9　some help.
10　　　　So I went to see somebody else that I had
11　known for many, many years, and that was Jack Kay.
12　65.　　Q.　Jack Kay who is currently the
13　president of Apotex?
14　　　　A.　That is correct.
15　66.　　Q.　Where did Mr. Kay work at the time?
16　　　　A.　At Apotex.
17　67.　　Q.　Do you remember his position there?
18　　　　A.　Geez, I don't know. It is a long
19　time ago. I don't know what his title was.
20　68.　　Q.　Go ahead.
21　　　　A.　But Jack and I worked together as
22　sales reps. He was in Winnipeg, I was in Ottawa
23　and, you know, you get to know each other in various
24　meetings and so on.
25　　　　So I went to Jack and I said, "Look, I am

R. Benyak - 19

1　starting this little business, I need a few
2　products, would you be interested in cross-licensing
3　a few products to me?"
4　　　　And he hemmed and hawed, not for very long
5　because we have known each other, and he did say a
6　couple of days later, "I will cross-reference five
7　products to you".
8　　　　And these were all old products. Do you
9　need to know the names of them?
10　69.　　Q.　Probably not.
11　　　　A.　There were five products anyway.
12　You didn't need a Notice of Compliance at the time
13　for these products because they were all old
14　products. Many of them are not even on the market
15　now. He cross-licensed five to me. And then I
16　would go out and sell wherever I could sell them.
17　70.　　Q.　May I ask you a couple of questions
18　before you continue on? Can you tell me when you
19　first met Jack Kay, give me a year.
20　　　　A.　I will say 1970, probably earlier
21　than that. I have known him for a long time.
22　71.　　Q.　So you had worked with him in some
23　capacity when you were both...
24　　　　A.　Well, not directly, but, I mean, I
25　just met you, so if I go to Chicago, I will say,

R. Benyak - 20

1　well, I have met you. But I knew Jack because you
2　go to various meetings and you see each other and so
3　on.
4　72.　　Q.　Had you ever worked at the same
5　company as Jack?
6　　　　A.　No, he worked for, I think, another
7　company called Empire, or some other company, I
8　don't recall the name of the company. We were
9　competitors.
10　73.　　Q.　At the time when this was going on,
11　when you were initially starting out what I take it
12　is Nu-Pharm; is that right?
13　　　　A.　Yes, I started Nu-Pharm.
14　74.　　Q.　Did you know Barry Sherman?
15　　　　A.　No, I didn't know Barry. I just
16　knew Jack.
17　75.　　Q.　When did you first meet Barry
18　Sherman?
19　　　　A.　Sometime later. I don't recall
20　when. Sometime in the nineties. Like, I don't know
21　the man very well, I know him to see him. I don't
22　talk to him very often.
23　　　　I might see him once a year at one of our
24　association meetings. I can say for sure that I
25　missed him at the last two years. So I just don't

R. Benyak - 21

1　see him.
2　76.　　Q.　Let me ask you this before we
3　continue what is very helpful. Had you started up
4　Nu-Pharm before you had this conversation with Jack
5　Kay and actually got the five products to go and try
6　and sell?
7　　　　A.　Sure, I incorporated it.
8
9　— EXHIBIT NO. 92:　Articles of Incorporation of Nu-
10　　　　　　　　Pharm, Inc. dated August 4, 1989;
11　　　　　　　　Articles of Amalgamation of Nu-
12　　　　　　　　Pharm, Inc. dated August 31, 1998
13
14　BY MR. WINCHESTER:
15　77.　　Q.　Let's start with that. I want to
16　talk to you about a document, to just make sure I
17　understand what it is. I have marked it as
18　plaintiff's 92, for the record it is Bates numbered
19　NU011966 through 968.
20　　　　Take a look at that. It is actually a
21　couple of documents. I am not sure if they go
22　together or not.
23　　　　The first page appears to an Articles of
24　Incorporation for Nu-Pharm, Inc. dated, if I have
25　this right, August 4, 1989 and the next two pages

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 22

1    are what is called an Articles of Amalgamation
2    relating to Nu-Pharm, Inc.
3        Is this first page of plaintiff's 92 that I
4    handed you the original form that was filled out to
5    start up Nu-Pharm?
6        A.    Yes, it was. I can be more specific
7    about that, I got it at 10:00 in the morning.
8    78.    Q.    So you actually went and took care
9    of this document yourself?
10       A.    Well, obviously with a lawyer. You
11   need the lawyer's name?
12   79.    Q.    That is all right.
13       A.    His address is on here.
14   80.    Q.    You are listed as the first director
15   on this form. Were there any other directors?
16       A.    First and only.
17   81.    Q.    Did you own Nu-Pharm outright when
18   it started?
19       A.    Correct.
20   82.    Q.    No other owners but you?
21       A.    No.
22   83.    Q.    The next two pages, the Articles of
23   Amalgamation, is that something that...this is dated
24   1998. Does that relate at all to when you first
25   started up the company, this document on the front

R. Benyak - 23

1    or is that some later transaction?
2        A.    Well, it says 1998, so it is a much
3    later transaction when the company was sold.
4    84.    Q.    So this document, and we will come
5    back to it, then, does this have to do with the
6    Articles of Amalgamation when Nu-Pharm split off
7    from Apotex?
8        A.    Correct.
9    85.    Q.    We will go through all of that. But
10   this first document, you started up Nu-Pharm in
11   about August 1989...
12       A.    Do you want this back?
13   86.    Q.    Actually, you can just keep the
14   stock there as long as we...I will collect them up
15   later or give them to Deanne, whatever works for
16   you.
17       So you got five products from Apotex. When
18   you talk about cross-licences, did you have
19   licensing agreements with Apotex for those products?
20       A.    No.
21   87.    Q.    Am I correct that Nu-Pharm's
22   business at the time you started it, as you
23   described it, is to try and get these products that
24   are made by somebody else and then you went out and
25   tried to market them, right?

R. Benyak - 24

1        A.    That is correct.
2    88.    Q.    Did you market them under the name
3    Nu-Pharm at the time?
4        A.    Yes, of course. We still market it
5    under Nu-Pharm.
6    89.    Q.    So was there some deal with Apotex
7    with respect to those first five products, where
8    somehow or another would be packaged in the Nu-Pharm
9    name?
10       A.    Well, I don't know what you mean by
11   'deal'. There is an understanding about they get
12   paid for the product, they don't get the product for
13   nothing.
14   90.    Q.    Tell me with respect to those first
15   five products that Jack Kay from Apotex got you
16   started with. What was the business arrangement?
17       A.    Well, they weren't very successful
18   with those five products, that is why I got them. I
19   mean, they are not going to give me products that
20   they were selling tons of money in, they weren't
21   successful.
22       So they said fine, we will give it to you
23   and whatever extra they make from it, they are happy
24   with that.
25       And there was an arrangement on...do you

R. Benyak - 25

1    want to know what the arrangement on it and how we
2    paid for it?
3    91.    Q.    Yes. Just in the sense of did you
4    pay for it by, "You make one lot and I will pay you
5    X amount", or did you pay for it by the pill, by the
6    box?
7        A.    No, it doesn't work like that. The
8    way it works and it still works to this day the same
9    way, there are no fancy contracts or anything like
10   that.
11       They sell us...they cross-licence a product
12   to us and the amount of money they get is based on
13   our selling price.
14       It is top-down pricing, it is not bottom-up
15   pricing. The organization you work for works from
16   bottom up, we don't.
17       So let me put it in terms of a dollar and I
18   will just use round numbers. If I sell it to a
19   customer for a dollar, then Apotex will get 50
20   cents.
21       And for that 50 cents they do all of the
22   work on it; in other words, packaging, make the
23   pills, package it, put the desiccant bags in it, put
24   the cotton in it or whatever goes in it, and seal it
25   and put the label and so on. And it arrives on my

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 26

```
1     shelf. They get paid a percentage of what I sell it
2     for.
3   92.    Q.    And in the example you gave me it
4     was half?
5          A.    Yes, I will give you an example of
6     half. So that means now I have half to go out and
7     make money on it. So I go and sell it but for that,
8     I have to have a warehouse and I have to have staff
9     and I have to have salespeople and so on.
10  93.    Q.    The example you gave me was that it
11    was an even split. For every dollar you sell,
12    Apotex gets half. Is that true uniformly across the
13    products?
14         A.    Generally. It may work different on
15    some products. But the products that they have
16    nothing to do with, of course, they don't get
17    anything on.
18  94.    Q.    Sure.
19         A.    But if they manufacture it,
20    generally it is around half that they get. They
21    make money on this.
22  95.    Q.    Am I correct that when you are
23    getting products from Apotex, these are products
24    that generally have been designed by Apotex?
25         A.    Most of the time. They are Apotex
```

R. Benyak - 28

```
1          Apotex is not involved with and don't want to be
2     involved. Most of them are government markets.
3          There are only two competitors in the
4     government market. There is ourselves and another
5     company called Pharmascience. PMS is their product
6     or their logo on their tablets.
7   101.   Q.    We won't go there.
8          A.    Okay. What they did is they started
9     another company called Dominion Pharmacal. And
10    under the Dominion Pharmacal, they sell product into
11    the same markets as I was selling, the government
12    market.
13         But it is very expensive to put your logo
14    on a tablet and sell in a very selected market,
15    because there is only so big a market.
16         If you have to get a batch of, say a
17    million tablets, but you are only going to sell
18    300,000, what are you going to do with the rest?
19         So they come up with the idea,
20    Pharmascience, that since they are in that market,
21    they will take their PMS marked tablet and put it in
22    their DOM, Dominion bottle, and sell it in those
23    markets.
24         There is a huge advantage to that. Because
25    if they don't sell in that market, then they could
```

R. Benyak - 27

```
1     products that they sell, but their logo is APO and
2     mine is NU. So we were competitors in the market at
3     that time. We are no longer competitors, but at
4     that time we were.
5   96.    Q.    So when you first started out, when
6     you did this deal with, let's say the first five
7     products, did they actually make pills that said
8     "NU" on them for you?
9          A.    Of course.
10  97.    Q.    Is that generally true through today
11    with respect to the products that you sell that you
12    get from Apotex, they will be stamped with "NU"?
13         A.    Not all of them, but many of them
14    will. I mean, if it is a solution, it is not going
15    to be stamped with anything.
16  98.    Q.    Sure. How about for solids?
17         A.    Most solids have the NU.
18  99.    Q.    Is there any rhyme or reason to why
19    some would and some wouldn't?
20         A.    Yes, there is a great deal of logic
21    to why. It is a lengthy discussion to tell you, but
22    if you want me to kind of abbreviate it, I could do
23    that, if you need to know that.
24  100.   Q.    Sure, that would help.
25         A.    There are certain markets that
```

R. Benyak - 29

```
1     get the tablets back, dump them out and put them in
2     a PMS bottle.
3          So that idea made a lot of sense to me and
4     I figured well maybe I can get Apotex product at a
5     lower price if I put APO on the tablet instead of NU
6     on the tablet.
7          And I spoke to Jack and he said, "Well, it
8     sounds like a pretty slick idea, why don't you try
9     it?" And that is one of the cases where the value
10    of the 50 percent is lower, because it doesn't cost
11    them as much to do that, to put the NU on the
12    tablet. So there are some products that we have in
13    a Nu-Pharm bottle that have APO on the tablet.
14  102.   Q.    You have explained to me the
15    circumstance where you have this governmental issue,
16    where you are in a government market. Are there
17    other circumstances you can think of where an APO
18    mark would be on your tablet...
19         A.    No, that is the only market that we
20    sell. And unfortunately, with those products, it
21    restricts our sales dramatically. Because I can
22    only sell it in that particular government market.
23         So I don't have a market anywhere else if
24    it has got APO on the tablet. In other words, I
25    won't sell an APO tablet into British Columbia, as
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 30

1     an example, or into Ontario. Because the big market
2     for me in the government market is Saskatchewan.
3        And the people in Saskatchewan absolutely
4     don't care whether it has got APO or whatever is
5     marked on it. If they didn't care that PMS was
6     marked on it in a DOM bottle, they better not care
7     that I got APO on a Nu-Pharm bottle. And they
8     don't.
9   103.     Q.    Dr. Sherman was telling me that
10     there is some kind of interesting laws that have to
11     be contended with in terms of sales to Saskatchewan.
12        A.    Well, then it becomes an issue of
13     Quebec, because Quebec demands that they get the
14     lowest price product. So it is very, very,
15     complicated, very big legal case, much bigger than
16     this one.
17   104.     Q.    After starting out with the first
18     five products from Apotex, did you continue to add
19     on additional products that you cross-licensed over
20     from Apotex?
21        A.    Sure.
22   105.     Q.    Did there come some point in time
23     when Nu-Pharm was actually acquired by an Apotex
24     entity?
25        A.    Yes.

R. Benyak - 31

1   106.     Q.    When was that?
2        A.    I believe it was 1996, something
3     like that.
4   107.     Q.    Do you remember which of the Apotex
5     entities, I know there are a lot of them, acquired
6     Nu-Pharm at that time?
7        A.    I have no idea what Apotex even
8     owns. I don't know.
9   108.     Q.    So you don't remember the actual
10     full name of whatever Apotex company it was that
11     acquired you?
12        A.    No idea.
13   109.     Q.    Who did you deal with in terms of
14     the transaction for that acquisition of Nu-Pharm by
15     Apotex?
16        A.    I think it was a lawyer. You know,
17     I don't remember, it could have been Arnold Summers.
18     But I only know the name of the lawyer. Arnold
19     Summers is a lawyer, but I don't know what he
20     transacted, and the other one is Jack Rotsztain from
21     Kronis Rotsztain.
22   110.     Q.    So you dealt solely with lawyers, no
23     one from Apotex?
24        A.    No, just lawyers. I don't deal with
25     anybody from Apotex on that.

R. Benyak - 32

1   111.     Q.    So you wouldn't have talked to Jack
2     Kay about this or anything like that?
3        A.    No. I talk to him about product.
4     We are sales guys.
5   112.     Q.    How did this acquisition come about?
6     Did they approach you to buy your company?
7        A.    Well, we are skipping ahead quite a
8     bit. If you want any details in between, I will
9     tell you.
10   113.     Q.    Okay, give me the in-betweens.
11        A.    When I first started, the objective
12     of Nu-Pharm....and just let me as an aside tell you
13     where the name came from. This is not brilliant.
14        In the mandate of the company when I first
15     started, I wanted to start a new pharmaceutical
16     company to become formidable opposition to the other
17     companies, hence the name Nu-Pharm.
18        And the objective was to have four or five
19     staff, sell a few million dollars a year, and I can
20     go fishing.
21        And we over that period of time, from '89
22     on, grew quite substantially. The first year, I
23     think our first year ended from August until March.
24     I think we did $550,000.
25        The second year we did about a million-

R. Benyak - 33

1     five; the third year we did three-and-a-half, five-
2     and-a-half and then we got up into big numbers.
3     Bigger numbers, let me put it like that. Bigger
4     numbers meaning 15 million and up. There were some
5     years that we did over 50 million.
6        Now it seems to have levelled out between
7     15 and 20 million and I am very happy with that
8     number. So what happened is when we started making
9     money, you start getting a little ambitious.
10   114.     Q.    Then you look interesting.
11        A.    Yes, you start getting a little
12     ambitious. But it is interesting because you start
13     hiring people and you will end up with 300 people.
14     I don't want 300 people, I had 300 headaches.
15        So, you know, it became known that I would
16     be interested in getting out of this thing, I don't
17     want this kind of headache.
18        Remember, Apotex was making product for us,
19     so I guess they...I don't know exactly how, but they
20     found out that we were going to sell or interested
21     in selling and then the transaction took place.
22        Now, I guess what I should explain to you
23     here is how we ran the company because, I believe
24     me, I am not smart enough to run company with that
25     many people.

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 34

1  And I know absolutely nothing about
2  research and development, I know nothing about
3  product development.
4  So in the early years, I had worked with
5  another fellow by the name of Tony Vandoornik, he
6  was at Novopharm. And he worked in research and
7  development and product development.
8  So Tony and I sailed together, sailed, like
9  sailing boat. And I asked him, I said, "Look, you
10  know, I am setting up this little company and I have
11  got to find someone who might want to put a little
12  lab together for me, do you know anybody?"
13  And without batting an eye, he said, "Yes,
14  me". And I said, "But, Tony, you have been working
15  at Novopharm with Leslie for 15 years, you have got
16  100 people reporting to you, you have got a big
17  salary, I couldn't possibly do that. He said, "I
18  don't care, I am coming".
19  So he came on December the 15th, 1989. And
20  the objective was that since we were getting these
21  products from Apotex, they had to be tested. There
22  is an old expression, you may play cards with your
23  mother and you may trust her, but you still cut the
24  deck.
25  So just because Apotex was making it and

R. Benyak - 35

1  testing it and all that, I want to make sure that if
2  my name is on it, that it meets all the testing
3  requirements that are there. So I don't know how to
4  do testing but Tony does. So that is what he did.
5  115.  Q.  What is Tony's last name?
6  A.  Vandoornik.
7  116.  Q.  So he came aboard about 1989?
8  A.  Yes, and he was there virtually from
9  the beginning in that capacity. We had another
10  person who came aboard by the name of Joe Beyger and
11  he did regulatory affairs.
12  117.  Q.  So this would be dealing with Health
13  Canada with regard to your products?
14  A.  Correct. Now, let me just step back
15  a little bit, and please tell me if I am rambling
16  here, because I don't want to take all day to do...
17  118.  Q.  I will jump in when I need further
18  discussion. Go ahead.
19  A.  When we first started, I had met a
20  lot of very really bright people from the
21  government. And one person in particular, who wrote
22  the requirements for the documentation to get
23  products listed in various jurisdictions across the
24  country. Because in Canada, you don't only get the
25  Fed report or the Notice of Compliance, you have to

R. Benyak - 36

1  get each jurisdiction, 10 of them, to approve your
2  product for sale in the province.
3  Anyway, this fellow came and he knew all of
4  the regulatory reports on what you have to submit,
5  how you have to submit it.
6  And many people in the industry were
7  overwhelmed at how Nu-Pharm was able to get five
8  products listed in a very short period of time when
9  everybody else was taking six or eight or more
10  months.
11  Well, it is because we knew what to do.
12  And when Joe Beyger came along, he knew what to do
13  with the Feds, not only the jurisdiction. So Joe
14  came aboard.
15  And that is when we started growing, when
16  we got more products from Apotex at the time.
17  119.  Q.  Let me ask you a couple of follow-up
18  things. At the time in about 1996 or so, when you
19  were acquired by Apotex, was Nu-Pharm marketing any
20  products from a manufacturer other than Apotex?
21  A.  No, not at that time.
22  120.  Q.  Had it ever, since its inception in
23  1989, marketed a product that was not made by
24  Apotex?
25  A.  Any until now?

R. Benyak - 37

1  121.  Q.  Let's say between 1989 and the time
2  that Apotex acquired the company in '96?
3  A.  No. They were all Apotex products.
4  122.  Q.  Let's talk about the lab that Tony
5  Vandoornik set up.
6  A.  So Tony set up...go ahead.
7  123.  Q.  Tell me what sort of laboratory
8  facility Nu-Pharm had at the time?
9  A.  Well, it was a testing laboratory
10  first. Very small, just two or three people. We
11  had three HPLCs, and I will just interject something
12  funny here.
13  We had three HPLCs and they were from
14  Waters. And they wanted...they gave it to us for 30
15  days or something like that and they came back and
16  said, "Look, you have got to pay for this thing" and
17  it was $110,000 and I didn't have the money.
18  It was simple. We didn't have the money.
19  So I said, "Leave it here, don't take it". And they
20  said, no, and they took it. They brought three
21  gurneys in and they drove them out of there.
22  And I said, "That is fine. You are never
23  going to get any of our business again", and they
24  said fine. And after that, we bought probably 75
25  HPLCs from Hewlett Packard and the poor salesperson

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 46

```
1        employee of Apotex?
2            A.   Well, I guess it was Apotex. I
3   never thought of it that way. It was Nu-Pharm, my
4   cheque always came from Nu-Pharm. I guess it was
5   Apotex, but it is interesting, I never thought of it
6   in terms of that.
7   153.     Q.   At some point in time after this,
8   there was some transaction by which another Apotex
9   company bought out certain of the assets from Nu-
10  Pharm; right?
11           A.   Yes, that was sometime later.
12  Remember, I told you that Lester Gagnon came for
13  two years. After that, there was another person
14  that came in, much more skilled than Lester Gagnon.
15  It was a person by the name of Hank Kalkurka. It
16  sounds Hawaiian, but it is not.
17           Anyway, he came from Astra. And Astra, you
18  may know, specialized in nebules and other unique
19  types of products that are aerosol-type products.
20  154.     Q.   What is a nebule?
21           A.   A nebule is a...this would be a big
22  nebule. It comes in a plastic container like this,
23  but it is tiny. And you fill it with products for
24  inhalation, you cut off the top and you...
25  155.     Q.   The one with the punches, got you.
```

R. Benyak - 47

```
1            MS. MAZZOCHI:   The metered dose inhaler
2   pierces it that lets the liquid out, it
3   gets nebulized and goes....
4            MR. WINCHESTER:   Got it.
5            THE DEPONENT:   But that is liquid. The
6   other ones are powders. So that is what
7   Hank Kalkurka specialized in.
8
9   BY MR. WINCHESTER:
10  156.     Q.   And he came in in what title or
11  capacity?
12           A.   He was president. And he came in...
13  I wrote it down here somewhere. He came in on May
14  12th, '97. So Gagnon was there from '95 to '97 and
15  Kalkurka was there from May '97...I have got here
16  until April '98. I don't know where I got that, but
17  anyway, April '98. And he was president of Nu-
18  Pharm.
19  157.     Q.   Who was the president after....
20           A.   Kalkurka? I don't know. I became
21  president, but by this time the company had been
22  sold off, as you had said...I forgot how you put it,
23  but anyway, it was spun off, is that the word you
24  used? Whatever it was.
25  158.     Q.   Let's talk about that part. Is
```

R. Benyak - 48

```
1   there anything else of significance to the Nu-Pharm
2   business, during the reign of Hank Kalkurka until
3   Nu-Pharm was....
4            A.   If I think about it, I will come
5   back. I can't think of it. I am getting tired
6   talking here.
7   159.     Q.   So at some point in time on Apotex
8   entity bought certain assets from Nu-Pharm that was
9   owned by another Apotex entity; right?
10           A.   Correct.
11  160.     Q.   What assets were bought out?
12           A.   I don't know that. I don't have
13  documentation, I don't know...I am assuming the
14  assets...and I am assuming this...this assets that
15  were bought were the HPLCs and lab equipment.
16  161.     Q.   Did they basically buy out the
17  manufacturing side?
18           A.   Yes.
19  162.     Q.   When did that happen?
20           A.   I think it was '98, when this thing
21  happened. And it was sold to, whatever, 1312438
22  [sic]?
23  163.     Q.   The company that currently owns it?
24           A.   Yes.
25  164.     Q.   So this all happened in the same
```

R. Benyak - 49

```
1   series of transactions to where...and maybe this
2   will make it clear. After this acquisition of the
3   manufacturing assets happened, did Nu-Pharm continue
4   to be owned by Apotex?
5            A.   No. I then again became president.
6   See, when this happened, the name changed to Novex.
7   165.     Q.   Apotex acquired the assets from Nu-
8   Pharm and renamed it Novex?
9            A.   Novex.
10  166.     Q.   What was left of Nu-Pharm after the
11  one Apotex entity acquired assets of Nu-Pharm from
12  the other Apotex entity?
13           A.   I can tell you that. What was left
14  were all our products.
15  167.     Q.   And how many products were there at
16  the time?
17           A.   I don't know. I will guess 90. I
18  don't know that. Please, I am just guessing that
19  number. It is a large number.
20  168.     Q.   All Apotex made?
21           A.   At that time, yes.
22  169.     Q.   So you had the products, what else?
23           A.   Staff. I think there were 17 that
24  came over. But we kept 17 of the staff, Apotex took
25  the assets. I guess, I don't know if you would call
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 62

```
1    wife. That is why after 7:00, that is the most
2    important time of the day to me, because that is
3    when I spend time with her. We have been married
4    for 40 years.
5    213.    Q.    Good for you.
6           A.    It keeps her happy. So on Saturday
7    and Sunday, I spend the time with her, though she is
8    still sleeping, imagine, in the morning, when I am
9    at work.
10   214.    Q.    Nu-Pharm's business today, do you
11   manufacture drugs?
12          A.    No, we buy everything. We have five
13   employees.
14   215.    Q.    Any laboratory facilities today...
15          A.    No.
16   216.    Q.    ...like the ones you talked about
17   before?
18          A.    No, they are all gone. We have five
19   people. Let me tell you what we have and then maybe
20   you don't need to ask the question.
21          The thing is we have a 10,000...actually,
22   9,720 square feet. They tried to get me for 10,000,
23   but part of it is an electrical room that I can't
24   use, so I am not paying for it.
25          So we have that. About 2,000 square feet
```

R. Benyak - 64

```
1           A.    Well, Jennifer. No.
2    220.    Q.    Jennifer is described in some of
3    your papers as an inside sales associate.
4           A.    Well, she answers the phone and if a
5    customer calls she takes the order.
6    221.    Q.    But basically, in terms of actually
7    going out and marketing the product, that is you?
8           A.    That is me.
9
10   — A BRIEF RECESS
11
12   RICHARD BENYAK, resumed
13   CONTINUED EXAMINATION BY MR. WINCHESTER :
14   222.    Q.    So currently, do you have anybody
15   that handles regulatory affairs inside Nu-Pharm?
16          A.    Not inside Nu-Pharm, no. We hire an
17   outside service.
18   223.    Q.    And you are relying on the people
19   that make the product for you to handle whatever
20   needs to happen by regulatory affairs?
21          A.    That is correct.
22   224.    Q.    And similarly, you are not double-
23   checking the testing that you are manufacturers do
24   at Nu-Pharm any more, right?
25          A.    No. Do you mean the product
```

R. Benyak - 63

```
1    of it is office and the rest of it is warehouse. We
2    have pared down our costs tremendously. We used to
3    have eight or nine or ten phone lines, but if you
4    have five people, what do you need more than five
5    phone lines for? If the line rings and it is busy,
6    nobody can answer it anyway. So we are down to five
7    phone lines.
8           We don't have a mail machine now. They can
9    lick and stick. And photocopier is small. We had a
10   big one, they wanted some kind of a security
11   agreement or something with it, forget it. We got a
12   small photocopier and so on. We pared down.
13   217.    Q.    I have got your current employees as
14   you, Tom Molnar, David Gainforth on accounting
15   associate, Peter Panopoulos who works with Tom in
16   terms of the warehouse beside, Jennifer Zima on
17   inside sales associate and Luis Sousa, your IT guy;
18   is that right?
19          A.    That is funny, I never counted
20   myself. Yes. That is six. But I never counted
21   myself. Five, yes. Five plus me.
22   218.    Q.    No clerical, no staff?
23          A.    Well, that is staff, it is five
24   people.
25   219.    Q.    Clerical? No others, receptionists?
```

R. Benyak - 65

```
1    comes in?
2    225.    Q.    Yes.
3           A.    I trust my mother, but...yes, I
4    test.
5    226.    Q.    You do?
6           A.    Absolutely. Just because they say
7    that that is what is in it, I am not going to
8    believe them.
9           Now, we don't do it on every product. It
10   goes to outside service. And randomly...Tom would
11   be able to tell you, because, I mean, that is what
12   he does.
13          But randomly we would pick product,
14   different product. So it might be a capsule, it
15   might be a tablet, it might be a liquid, it might be
16   a solution, I don't know how they pick them.
17          But three are randomly picked, not the same
18   three each time and it goes for outside laboratory
19   testing.
20   227.    Q.    So the things you used to run
21   before...
22          A.    I have no idea what is done, it is
23   just tested to make sure that if X is supposed to be
24   in the bottle, that is what is in the bottle. I
25   mean, from a testing point of view.
```

# VICTORY VERBATIM COURT REPORTING SERVICES



R. Benyak - 66

1  We have outside people who come in. If
2  product arrives, for example, that product is not
3  released from our facility for sale, until a QC or a
4  QA person checks it. And that may be on the list, I
5  don't know.
6  228.  Q.  Yes, take a look at the next one
7  there, plaintiff's 85, I think we have. It is a
8  more current chart where you have got a couple of
9  people listed there as on contract for QA?
10  A.  Yes, it is Tom Romita and Jo-Anne
11  Lenarduzzi. They are called in ad hoc. So a
12  product arrives, I don't know, whatever number of
13  tablets or bottles are in a batch and once the
14  paperwork arrives, then they are called and they
15  come in to test whatever they...they don't test
16  anything, I shouldn't say that.
17  They review the documentation to make sure
18  what the documentation says is correct, versus what
19  the tablet is.
20  They only at our facility do a visual. So
21  if it is supposed to be a round, white tablet that
22  is scored and it says whatever it says on one side,
23  they open the bottle and they see if that is what it
24  says.
25  Actually, it may be their responsibility to

R. Benyak - 68

1  And now, if you notice, these guys are in
2  different provinces. I select markets now and I
3  deal almost exclusively in government markets.
4  It is a very specific niche where there is
5  only one other person who wants to even compete in
6  that market. Nobody else wants it.
7  235.  Q.  Is this the PMS company you talked
8  about before?
9  A.  You remembered, yes.
10  236.  Q.  That one is hard to forget.
11  A.  Okay. I did my job.
12  237.  Q.  Does Nu-Pharm market products
13  anywhere other than Canada right now?
14  A.  No.
15  238.  Q.  Have you ever had a product approved
16  for sale in the U.S.?
17  A.  No. I must correct something,
18  though. We don't market a product, but from time to
19  time there are...well, far too often, people call
20  and want to sell our products to other countries.
21  And there are, from time to time, sales
22  that are made to...forgive me, I don't know what
23  they are, but let me say Lebanon or the old Bosnia-
24  Herzegovina or Peru. These are places that come to
25  mind.

R. Benyak - 67

1  select which products go out for testing. But they
2  don't all go out for testing, they are only randomly
3  selected.
4  229.  Q.  So random samples?
5  A.  Right.
6  230.  Q.  Take a look at that top document
7  that is in front of you, 84...
8  A.  The one I wrote on.
9  231.  Q.  Exactly. Which says it is your org
10  chart from October of 1999.
11  A.  Right.
12  232.  Q.  At least, according to this one, in
13  '99, you had about 27 people, including a host of
14  folks who look like outside sales reps within Nu-
15  Pharm?
16  A.  Yes.
17  233.  Q.  Obviously, there has been a pretty
18  big drop in head count to today, right?
19  A.  Yes.
20  234.  Q.  Why?
21  A.  Remember in the beginning, I said I
22  wanted four or five employees, a few million dollars
23  and no headaches? You get outside sales reps, you
24  got headaches. We don't need them. I know how to
25  do this, I have been doing it for a long time.

R. Benyak - 69

1  And they call and they want our products.
2  Because what they really want is they want a
3  domestic product, a Canadian product.
4  And there is one document they look for, it
5  is called a Certificate of Free Sale, which means
6  that we actually sell that product in our domestic
7  market. None of this is in the U.S., by the way.
8  It mentions three other countries.
9  The Bosnia-Herzegovina thing comes to my
10  mind because they wanted to buy, I think, four times
11  a year, a million tablets of erythromycin stearate.
12  I will sell it to them, I have no problem with that.
13  Send me the money, that is the way it
14  works. Send me the money, I send you the product.
15  But I get the money first, you know? I may have
16  "Stupid" written on my forehead, but I am not.
17  And the same thing happens with other
18  places. If somebody...for example, it comes to my
19  mind, a guy in Peru wanted to buy puffers from us,
20  and I said, "Fine, I will send you the puffers", he
21  says he wanted it on his door, so he will pay the
22  price but it has to be at his destination.
23  I said, "Not a chance, it is at our door".
24  Because he wanted it to go by ship, you know, and
25  longshoremen go on strike and there are hurricanes

# VICTORY VERBATIM COURT REPORTING SERVICES



R. Benyak - 70

1  and stuff gets stolen. It is on our door. And he
2  bought it, so that was fine.
3  239.    Q.    Do you have any current plans to add
4  any more employees or any more space for Nu-Pharm?
5      A.    I don't know. Not right now, no.
6  240.    Q.    Does Nu-Pharm maintain a website? I
7  haven't found one.
8      A.    No. You are not going to find one.
9  Though if you write "Nu-Pharm" in, you will hook up
10  with somebody from Texas.
11  241.    Q.    I have seen that. Yes, there is
12  somebody...
13      A.    So you did find somebody at Nu-
14  Pharm?
15  242.    Q.    Yes. That is not you?
16      A.    That is not us. No, because we have
17  a hyphen, they don't.
18  243.    Q.    I think I figured that out, but,
19  okay. Tom Molnar estimated for me you have about
20  125 products that you market right now...
21      A.    I can tell you exactly, there is
22  121.
23  244.    Q.    Of those 121, how many are made for
24  you by Apotex?
25      A.    Right now, all of them. Of those

R. Benyak - 71

1  121, 21...it is just an interesting number, the way
2  it comes up. Twenty-one give us 80 percent of our
3  business. Actually, 80.79 percent of our business
4  comes from 21.
5  245.    Q.    Not that you are checking?
6      A.    No, but I know these numbers. This
7  is what I do for a living. You do lawyering, I do
8  sales.
9  246.    Q.    Tom also mentioned to me some
10  company named Trillium that might make a product for
11  you?
12      A.    No, they don't anymore. Trillium
13  made a product for us, a very, very valuable product
14  called enalapril. Yes, they made it for us for
15  about a year.
16  247.    Q.    This is the product that Apotex was
17  going to make for you that is a Merck-based product,
18  but they got enjoined for making it; is that right?
19      A.    No, they were never going to make it
20  for us, they were making it for themselves and got
21  enjoined. And when you are enjoined, you can't have
22  anything to do with it.
23      So we got it and we got the Notice of
24  Compliance for it and...I don't want to hear about a
25  product until there is an NOC or whatever you call

R. Benyak - 72

1  it in the States there, an approval.
2      And as soon as the approval is given, then
3  we start moving. And because Apotex was enjoined,
4  we decided that we had to get it made somewhere else
5  and I was the one who found Trillium.
6      Trillium is an old Park Davis plant in a
7  city called Brockville. And they manufactured lots
8  of inventory for us and we really got...I made lots
9  of mistakes unfortunately, too, and I made a mistake
10  in the quantities. I tried to get her to take her
11  fee in pills, but she didn't want it.
12      MS. MAZZOCHI:    I would have a few
13  problems getting that across the border.
14      THE DEPONENT:    It is all outdated, you
15  couldn't use it anyway.
16
17  BY MR. WINCHESTER:
18  248.    Q.    Other than the ANDA application that
19  is at issue in this case, has Nu-Pharm ever filed
20  another ANDA, seeking a drug approval, in the U.S.?
21      A.    Not that I know of, no.
22  249.    Q.    Do you currently have any other ones
23  you are working on for the U.S.?
24      A.    No.
25  250.    Q.    Do you currently have anybody within

R. Benyak - 73

1  Nu-Pharm that is assigned to sales or marketing for
2  the U.S. marketplace?
3      A.    No. We don't have a product. I
4  mean, don't you think it would be premature to try
5  to get somebody to do sales and marketing if you
6  don't have an item?
7  251.    Q.    I do, but I am asking you.
8      A.    No, I have to have an item first. I
9  mean, that is...
10  252.    Q.    Are the products that you market now
11  that Apotex makes for you, are they marketed just
12  under the Nu-Pharm name or both Nu-Pharm and Apotex?
13      A.    No, Apotex sells the same product
14  but in different markets. They don't sell in my
15  market, they can't.
16  253.    Q.    And is it still the case today for
17  your products that the vast majority of them bear
18  the NU mark on the solid products?
19      A.    Yes.
20  254.    Q.    Is it still the case where the only
21  ones that would be different from that and bear the
22  APO mark would be the ones you are selling into the
23  government marketplace you talked about earlier?
24      A.    Yes, only into the government tender
25  market, correct. And that is the only place those

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 74

1  tablets are sold.
2  255.    Q.    You told me this before when you
3  were initially talking about the relationship with
4  Apotex, that you no longer consider them to be a
5  market competitor; is that right? You got to answer
6  out loud.
7       A.    No, they are not a competitor.
8  256.    Q.    What do you see as the relationship -
9  between Nu-Pharm and Apotex today? If they are not
10  a competitor, what are they?
11      A.    I like it, they manufacture product
12  for me.
13  257.    Q..    More of a business partner, in your
14  view?
15      A.    Yes, I guess they are...a business
16  partner might be...it is not a partner, it is not a
17  partnership. I mean, if you have somebody who buys
18  product, or if you go to the store and buy
19  something, you are not their partner, you are buying
20  something from them. If they don't want to sell it
21  to me, I could find other people to sell me product.
22  258.    Q.    Is it fair to say the more money you
23  make, the more they make?
24      A.    It is based totally on the selling
25  price of the product. So the more volume I sell,

R. Benyak - 75

1  they more they sell. It doesn't work on the number
2  of...it works on the number of tablets that I sell
3  out of our facility.
4       And they should be pretty happy, because
5  they don't have that market and whatever they make,
6  they do okay.
7  259.    Q.    It effectively allows Apotex to
8  increase the market of the product it makes, right?
9       A.    Yes, and they are not interested in
10  that market and I am.
11  260.    Q.    You told me about how things used to
12  work in terms of the products. Is it still the
13  same, there are no real written agreements between
14  you and Apotex concerning the products they give
15  you?
16      A.    I have known Jack Kay for a long
17  time. And when Jack Kay tells me that he is going
18  to do something, you can make book on it.
19      Because if you get lawyers involved, they
20  will put little weasel clauses into things which you
21  can get out of.
22      If Jack says he is going to do something,
23  it is going to happen. So his word is worth more to
24  me than any contract, and it has worked like that
25  since we started and it continues to work like that.

R. Benyak - 76

1  261.    Q.    So the arrangements that are made,
2  the business terms with respect to the products they
3  provide you, are negotiated directly between
4  yourself and Jack Kay; is that right?
5       A.    Products? Did you say...
6  262.    Q.    How about any of the business
7  arrangements that you have?
8       A.    No, there is no business
9  arrangements. I mean, we know what it is. It is
10  based on a dollar, it doesn't change.
11  263.    Q.    How do you decide, for instance,
12  whether to add new products or which products to
13  sell, things like that?
14      A.    I have to go back, I am going to go
15  back to the early part. Do you want me to do that?
16  264.    Q.    Whatever works for you.
17      A.    And I will tell you why we pick
18  certain products. That would be better. I said
19  earlier that if they have a product that is a big
20  product, they are certainly not going to give it to
21  me.
22      So when we first started, I looked at
23  products not only from Apotex, because I went to
24  other people first. And I tried to find products
25  that were between 2 million and 10 million dollars

R. Benyak - 77

1  in value at that time.
2       Because the big guys, like Apotex and
3  Novopharm and even Genpharm, et cetera, were all
4  interested in products that were of much greater
5  potential.
6       And then companies like Pharmascience and
7  other generics, smaller generics, were only
8  interested in products that were 2 million dollars
9  or less. And the reason they did that is because
10  they knew the big guys would never go after them, so
11  they had their niche market.
12      But there are lots and lots of products
13  between 2 million and 10 million. The numbers are a
14  little higher than that now. But those are still
15  the kind of products that I am after.
16  265.    Q.    What would you say that target range
17  is for the products you generally seek out now? You
18  said it is a little bigger than 2 to 10 million.
19      A.    Some of them, like, ranitidine, is a
20  big market, maybe 100 million. But I don't go after
21  big products. It is just in our interest to do
22  that.
23  266.    Q.    Your general wheelhouse for things
24  you look for is still in the sort of 2 to 10 or 20
25  range?

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 78

1  A.  Yes, something like that. Because,
2  you know, they are not going to give me a product
3  that is a 100 million dollar product that they are
4  selling, why would they give it to me?
5  They make more money on that. And those
6  products don't go into tender markets, because they
7  can sell it them themselves.
8  267.  Q.  So today, in terms of making your
9  product selection, is it the case that you can check
10  out the market, decide, here is a product that I
11  would like to add to Nu-Pharm's store?
12  A.  Yes. We haven't had a new product
13  in a long time, it gives me a lot of headaches for
14  the domestic market. It is a perfect little model
15  that we now have. You know, I don't want to upset
16  it.
17  If I make an extra 2 million or 5 million
18  dollars, am I going to be better off? Am I going to
19  be able to eat better food or more food or go more
20  places? I mean, I don't go away, I don't travel.
21  I like doing what I do. And we have a good
22  model for it, we have five employees, we do 20
23  million dollars in business. That ain't bad, you
24  know.
25  Take the return on investment. Take a look

R. Benyak - 79

1  at your firm and see how many of your lawyers make 4
2  million dollar return for all the employees that
3  they have. It is pretty good.
4  MS. MAZZOCHI:  I can tell you that his
5  firm doesn't come anywhere close to those
6  ratios.
7  THE DEPONENT:  I don't know, but
8  anyway...
9  MR. WINCHESTER:  If your does, I am
10  going to give you a resume.
11  THE DEPONENT:  It is a pretty simple
12  model, it works. You cut out your phone
13  lines, you cut out a lot of superfluous
14  stuff and you get people to work for the
15  client, the customer, the key.
16
17  BY MR. WINCHESTER:
18  268.  Q.  You said Nu-Pharm makes about 20
19  million a year right now; is that gross?
20  A.  I got to be correct, somewhere
21  between 15 and 20. Remember I told you in the
22  beginning that it seems to balance out between 15
23  and 20 million.
24  269.  Q.  Gross?
25  A.  Yes. I wish it were net, but I am

R. Benyak - 80

1  happy with where it is.
2  270.  Q.  When is the last time Nu-Pharm added
3  a new product?
4  A.  You know, I don't know that. I
5  can't tell you. I would have to check. If you want
6  me to check, I could get back to you, but I don't
7  know that.
8  271.  Q.  That is all right. Does Nu-Pharm
9  currently market a product called Nu Divalproex?
10  A.  Yes, actually, it is numbers 18 and
11  19 on our list of the 21.
12  272.  Q.  18 and 19, why are there two?
13  A.  Pardon?
14  273.  Q.  Why is it 18 and 19, is there more
15  than one product?
16  A.  Because there are two different
17  strengths. 250 is number 18 and the 500 is number
18  19. You see, I call that two products. You may
19  call it one.
20  274.  Q.  So in the number you gave me of 121,
21  that is not necessarily 121 different products...
22  A.  No, it is different...it is not 121
23  different molecules, it is 121 different...in Canada
24  we call it a drug identification number. Each
25  different SKU has a drug identification number on

R. Benyak - 81

1  it, so there are 121 products in our list.
2  Our top product, for example, is ranitidine
3  150 milligram, which is known as Zantac, is number
4  one. We sell about 3 million dollars a year in that
5  product. That is the ranitidine 150 milligram in
6  the 500 size.
7  The ranitidine 150 in the 100 size, I don't
8  know where it is, but it is probably around number
9  15. And we may sell $600,000 of it.
10  You may call it one product, or whatever.
11  You got to differentiate which is a product and what
12  is a molecule.
13  275.  Q.  So the list of 121 that you gave me,
14  that is your definition of product, meaning if you
15  sell Nu-Divalproex in five dosage strengths, that is
16  five?
17  A.  Correct. If it were in part of that
18  121. The 125 milligram is probably...I don't know
19  this, but is probably not part of the 121, because
20  there is no market for it.
21  276.  Q.  So that would be one you wouldn't
22  sell?
23  A.  Not very often, yes. It wouldn't be
24  part of it. And I am using that as an example, so
25  please don't quote me...

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 82

277.    Q.    I appreciate it. I misunderstood your definition.

A.    We have 243 SKUs altogether. SKUs, stock keeping units. So there might be five sizes of one particular product, but if the one size of that doesn't sell, then it is not part of the 121.

278.    Q.    Do you know what the active ingredient is in the Nu-Divalproex product?

MS. MAZZOCHI:    Objection, vague.

MR. WINCHESTER:    You can answer that.

MS. MAZZOCHI:    If you know the answer, you can answer.

THE DEPONENT:    It is divalproex sodium.

BY MR. WINCHESTER:

279.    Q.    Nu-Pharm was selling this product at the time it was still owned by Apotex, right?

A.    No, I don't think we got that product until 2000.

280.    Q.    Were you at all involved in the submission to Health Canada, the application for approval of that product?

A.    No, other than maybe looking at the documents and signing them. I don't prepare stuff like that, other people prepare them.

R. Benyak - 83

281.    Q.    Of course, I know the answer to this. You get this from Apotex, right?

A.    Yes.

282.    Q.    And this is a drug Apotex developed for you? Maybe not for you, strike that. This is a drug Apotex developed?

A.    Apotex or somebody else developed it. We get it from Apotex, I don't know who developed it.

283.    Q.    Were you aware that Nu-Pharm, when it was owned by Apotex, provided some information about that product to Torpharm, another one of Apotex's companies?

A.    I know the name Torpharm, but I have never been there. I don't know anything about them, other than Tom told me they manufacture divalproex for us, but I don't know it all.

Things like that are of no interest to me. You know, my interest is get the product on the shelf and then I will move it out. I don't care how you do it.

284.    Q.    So I take it that you didn't have any involvement with actually sending information from Nu-Pharm to Torpharm about divalproex sodium?

A.    No. Why would we send that to them?

R. Benyak - 84

No, I didn't do that.

285.    Q.    Do you ever deal with Barry Sherman at Apotex in a business capacity?

A.    No, I think I told you in the beginning, I never see the guy. I don't ever deal with him, no.

286.    Q.    You told me you run into him at certain meetings, things like that, but he is not the guy you deal with on business?

A.    No, I deal with Jack. And infrequently. I don't need to, we have a good relationship.

287.    Q.    Let's talk about the ANDA that is at issue for this case. First of all, tell me everybody that you have talked to or communicated with at Apotex about this ANDA or the product?

A.    Well, the first person was Jack.

288.    Q.    This is Jack Kay?

A.    Yes. I had told them that I would be interested in getting into the U.S. market. We have had many, many calls from people, even up to last week, somebody called and wanted us to get involved in the U.S. market.

So I spoke to him and I said, "Look, I am interested in getting into the U.S. market, do you

R. Benyak - 85

have any products that you might be interested in giving to us? I don't want any huge products, but something small that we would look at".

And I also made it clear to him that I am really interested in going into a very niche market for it. Like, a government or an HBO, or some sort of a tender situation with the product. It is not for Nu-Pharm to do mass distribution.

I guess, I don't know how long, a few days, a week or something later, he said, "We got a product you might be interested in, divalproex", I said, "Well, we already sell divalproex. Can we get some information from you on it?"

So he said sure. And I guess that is when it originally happened that somehow Eveline, whom I had not met before that...

289.    Q.    This is Eveline Eiteri?

A.    Yes, I didn't know her last name.

290.    Q.    Tell me before you move on to talking to Eveline, do you remember when these initial conversations between you and Jack Kay happened?

A.    See, we have our annual and semiannual meetings at the CGPA, the Canadian Generic Manufacturers, in December. So probably it

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyok - 86

1  was at that meeting.
2  291.    Q.    December of what year?
3      A.    It would be of 2004. You know, it
4  might have been January. I mean, I don't know how
5  close that is.
6  292.    Q.    Maybe January '05, sometime in that
7  time frame?
8      A.    Something around that, yes. That I
9  spoke to him. Nothing really happened until, you
10  know, a few months later.
11  293.    Q.    Did you, at any time, go and ask
12  Apotex, "Can you guys develop a divalproex product
13  for me to take to the U.S.?
14      A.    No, that is not the way it works. I
15  said, "Do you have a product that I can take to the
16  U.S.?" And he said, "I got divalproex". So that is
17  what I did. That is the way it happened.
18  294.    Q.    When he came back to you, this being
19  Jack Kay and said, "We have divalproex", was this a
20  conversation you had with him in person, over the
21  phone, how did it happen?
22      A.    Probably at CGPA, at our association
23  meeting. I don't see these guys. I mean, I might
24  see them once a year. He always calls me on my
25  birthday, it is kind of interesting. I call him on

R. Benyok - 87

1  his, too. But that is really...we don't talk very
2  much.
3  295.    Q.    Tell me everything you can remember
4  about that conversation, when Jack Kay came back to
5  you and said, "Here is a divalproex product, are you
6  interested?"
7      A.    I said, "Let me look at it, see what
8  size the market is and am I okay to get into it".
9  Because, like I said, I don't want billion dollar
10  products.
11      In the States generally what I look at,
12  when people call...and, I mean, I get people calling
13  about all kinds of weird things, products that they
14  want to sell me to the U.S. market. Some where there
15  is already 16 competitors and some where there is
16  exclusivity.
17      I try to look at products...if you recall,
18  I told you in Canada, we look between 2 million and
19  10 million. In the States, I look between 20
20  million and 100 million, it is about 10 times the
21  size.
22      Now, divalproex is much bigger than that,
23  but the thing is, that I am looking for a niche
24  market. So it is not like a 500 million dollar drug
25  that I am after. I am looking for smaller stuff,

R. Benyok - 88

1  'cause you can sure bet that everybody is going to
2  be after my tail if I have a billion dollar product.
3  296.    Q.    So did you go forward and actually
4  examine the marketplace for divalproex sodium in the
5  U.S.?
6      A.    No, I asked a couple of people,
7  saying, "Do you think this is a good product, and
8  how big is the market?" These are lawyers that I
9  asked here.
10  297.    Q.    The market of divalproex sodium in
11  the U.S., is it fair to say, is well above the 20 to
12  100 million dollar range that you were looking for?
13      A.    Yes, what it is, is it 500 million,
14  something like that?
15  298.    Q.    Yes, I think it is maybe even more
16  than that.
17      A.    I don't know.
18  299.    Q.    So this is a lot bigger product than
19  you generally look for, either in Canada or you had
20  mentioned for the U.S.; right?
21      A.    Yes.
22  300.    Q.    You said you weren't looking for a
23  great big product?
24      A.    Yes, but if he comes back and says,
25  "Here is a product you can have", would I be stupid

R. Benyok - 89

1  and not take it? Of course, if you have got it, I
2  will take it. If it is legal to take the product.
3  301.    Q.    Anything else you remember from this
4  initial discussion with Jack Kay, when he came back
5  and suggested divalproex to you?
6      A.    No, that is just generally the way
7  it works.
8  302.    Q.    What did he tell you that they had
9  at that time?
10      A.    He didn't tell me anything. He
11  says, "I will send somebody...I will give the
12  information to somebody and I will pass it on to
13  you". That is when I met Eveline.
14  303.    Q.    So the next thing that happened
15  after this conversation with Jack Kay, in terms of
16  dealing with Apotex, is you somehow came in contact
17  with Eveline Erfert?
18      A.    Yes, that is right. She, I guess,
19  called. I don't recall exactly how, probably sent
20  an e-mail or a telephone...you know, I don't recall
21  exactly how that happened.
22      But we have had many conversations since
23  and she comes in routinely and picks up documents
24  that I have signed.
25  304.    Q.    Can you give me a sense for how long

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 90

1　after the conversation you had with Jack Kay, where
2　he said, "We have some divalproex, are you
3　interested", and the next time you heard from
4　Eveline Eilert?
5　　　　A.　You know, I don't know. Let me take
6　a guess and say two or three months.
7　305.　　Q.　So this would put it into....
8　　　　A.　I will say March, but, you know, it
9　is kind of fuzzy, because this is not what I deal
10　with.
11　306.　　Q.　So maybe late February, March 2005?
12　　　　A.　Maybe. You know, the person to ask
13　for that would have been Tom. Did he say anything?
14　I mean, he gets the e-mails, I don't get them.
15　307.　　Q.　Yes, he didn't really know the
16　timeline.
17　　　　A.　Well, look at the e-mails and you
18　will know.
19　308.　　Q.　What do you remember getting from
20　Eveline Eilert initially?
21　　　　A.　I got a series of documents. You
22　know, I get documents in. Usually they come to us
23　by e-mail and I don't get them. It goes to Tom
24　because I am not there.
25　　　　So there is no point in sending it if you

R. Benyak - 91

1　need something quickly, because I don't access the
2　thing all the time. But Tom is there almost all
3　day, he is there until 2:30 every day.
4　　　　So he would get anything. And then have
5　them print it or copied or retyped and put on my
6　desk for signature.
7　　　　And I don't recall exactly what I got from
8　her because it comes for signature. Now, when I get
9　documents, I can very quickly see where it come from
10　or whether it is correct, whether we did it. I can
11　tell immediately. Would you like me to tell you
12　how?
13　309.　　Q.　Sure.
14　　　　A.　The name, Nu-Pharm, is written in a
15　very specific font, it is called Fritz Quadrata.
16　Nobody knows what that is. There is no other
17　company in pharmaceutical that uses that font.
18　　　　But if something comes in and it....there
19　are certain things in that font that I recognize
20　immediately. And if it is not there, that means we
21　didn't do it, because our stuff goes out with that
22　font.
23　　　　So I can see a document and it comes to me
24　and I can see whether somebody in our office, it
25　would only be Jennifer, or at that time it might

R. Benyak - 92

1　have been Janet who was there, who is on the list,
2　would either retype it or redo whatever was supposed
3　to be done in it for my signature. Because I won't
4　sign it if it has not got that font.
5　310.　　Q.　Do you have letterhead?
6　　　　A.　Yes. And the letterhead is unique.
7　You can see it, it is unique.
8　311.　　Q.　So if you were to get, or whomever,
9　Jennifer or Janet, would get on e-mail document,
10　they can print it off on Nu-Pharm's letterhead,
11　right?
12　　　　A.　Yes.
13　312.　　Q.　And that would have the font you are
14　talking about?
15　　　　A.　Yes.
16　313.　　Q.　Were the initial documents you got
17　from Eveline Eilert, documents...portions of the
18　ANDA?
19　　　　A.　I can't really answer that. It may
20　have been. When I get documents, I try to educate
21　myself as to what the documents are, I review them.
22　I mean, if you are sending me technical stuff with
23　...I saw something yesterday, CH, CH, C2, CH5 or
24　whatever the heck it is, forget it. You might as
25　well write it in Greek, it doesn't mean anything to

R. Benyak - 93

1　me.
2　　　　I can kind of look through things. If the
3　font is not correct, I pick it out right away
4　because that is the first thing I look for.
5　　　　If there are...like, I have looked through
6　some of it and sentences were duplicated, by error.
7　Obviously by error. People don't put two sentences
8　the same.
9　　　　So I have a knack of picking out things
10　like that. But if you asked me to review that ANDA,
11　the whole ANDA or things like that, I can't tell you
12　that I did that. I don't really know if I received
13　them all.
14　314.　　Q.　Going back to your initial
15　conversation with Jack Kay before you started
16　getting documents from Eveline, you told me before,
17　I think your words were something to the effect of,
18　"I am not interested in a product until it has got
19　an NOC or an approval".
20　　　　Were you aware that this divalproex product
21　that he was presenting to you was unapproved?
22　　　　A.　Well, the NOC has to be under my
23　name, not under his name. So once the product has
24　an approval in the U.S., then I am interested...he
25　doesn't get paid anything, by the way, until there

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 94

1  is an approval. He gets zero. My only risk in all
2  of this is to have to pay this lady.
3      MS. MAZZOCHI:  A couple of other people.
4      THE DEPONENT:  Well, and her
5      compatriots.
6
7  BY MR. WINCHESTER:
8  315.    Q.    Prior to this circumstance had you
9  ever involved Nu-Pharm with a product that was
10 unapproved?
11     MS. MAZZOCHI:  Objection, vague. If you
12     can understand his question and answer it,
13     you can answer.
14     THE DEPONENT:  Well, unapproved where?
15
16 BY MR. WINCHESTER:
17 316.    Q.    Here is my question. Generally, the
18 circumstance is you are making a deal with Apotex to
19 say, "Okay, I am going to market this product," and
20 it is already approved to go on market; right?
21     A.    By them.
22 317.    Q.    By them, yes. Somebody has got
23 approval to go and market it, such that you are not
24 going to have to deal with getting a drug approved
25 through Health Canada; right?

R. Benyak - 95

1      A.    Correct.
2  318.    Q.    Before this circumstance, had you
3  ever been involved with a product with Apotex where
4  nobody had approval to market it in the market you
5  were seeking?
6      A.    I can answer that. One drug.
7  319.    Q.    Which one?
8      A.    Enalapril.
9  320.    Q.    This is the Merck drug?
10     A.    Correct.
11 321.    Q.    And that was the circumstance when
12 Apotex got enjoined from marketing their generic
13 product?
14     A.    Yes. And we worked, or at that
15 time, I don't know the timing of it, but it was for
16 several years, Nu-Pharm and Novex worked on getting
17 approval of that product.
18     And my involvement in that, I think came
19 into effect...I will take a guess at the date,
20 February 28th, 1999. And that is the day we got a
21 piece of paper from the government that said you
22 have your Notice of Compliance.
23     Don't come to me until we got that.
24 Because there is nothing I can do. We got the
25 Notice of Compliance, then we started to go out and

R. Benyak - 96

1  figure out where we were going to manufacture. And
2  that was a little more complicated. Remember
3  Trillium?
4  322.    Q.    Right. So in that circumstance, in
5  terms of getting that enalapril product approved by
6  Health Canada, Novex handled the regulatory side?
7      A.    Yes, I guess it was Novex. It was
8  various staff, like Tony Vandoornik and Joe Beyger
9  and there were other staff that I guess prepared it.
10 323.    Q.    Not Nu-Pharm, though?
11     A.    No, we had no staff to do that.
12
13 --- DISCUSSION OFF THE RECORD
14
15 BY MR. WINCHESTER:
16 324.    Q.    When you were talking about this
17 with Jack Kay, were you aware that Apotex had been
18 involved in a legal fight with Abbott over one of
19 their own divalproex products they were trying to
20 get marketed in the U.S.?
21     A.    No. It is interesting, I only found
22 out about that two or three weeks ago when I got the
23 documents from our attorneys, where there was an
24 Exhibit A which showed that they were enjoined or
25 something from selling the product in the States.

R. Benyak - 97

1  But it was just recent.
2  325.    Q.    Have you ever had any discussion
3  with Apotex at all about the prior litigation they
4  had against Abbott?
5      A.    No.
6  326.    Q.    So they didn't tell you they had a
7  divalproex sodium product they got enjoined....
8      A.    I didn't care whether they did or
9  not.
10 327.    Q.    Did they?
11     A.    No.
12 328.    Q.    Did you get a copy of the complaint
13 that Abbott filed against Nu-Pharm in this case?
14     A.    I must have. If you want to show
15 me, I don't know.
16     MR. WINCHESTER:  Yes, I will show you.
17 I will mark as plaintiff's 93, the third
18 amended complaint in the case. This is
19 Abbott Laboratories versus Nu-Pharm, Inc.,
20 Apotex Inc., Apotex Corp. in the Northern
21 District of Illinois, case 05 C 3714.
22     I will also show you, just while we
23 are talking, a document called, "Plaintiff,
24 Abbott Laboratories, First Set of
25 Interrogatories, Numbers 1 through 20 to

# VICTORY VERBATIM COURT REPORTING SERVICES



R. Benyak - 98

1       Nu-Pharm, Inc.', in the same case. I will
2       mark that as plaintiff's 94.
3
4  --- EXHIBIT NO. 93:   Third amended complaint, Abbott
5          Laboratories versus Nu-Pharm Inc., et
6          al
7
8  --- EXHIBIT NO. 94:   "Plaintiff, Abbott Laboratories,
9          First Set of Interrogatories,
10          Numbers 1 through 20 to Nu-Pharm,
11          Inc.'
12
13       THE DEPONENT:    You know, I may or may
14       not have seen this. The only thing that I
15       recognize right now is this one page, the
16       Injunction Order.
17
18  BY MR. WINCHESTER:
19  329.     Q.    The Injunction Order?
20       A.    Which I just saw...now, whether it
21       came with this or not, I would have to ask Deanne if
22       it came. Because, you know, even if I got it, I
23       mean, this is all legal stuff here. Well, this
24       75112, that is not ours.
25  330.     Q.    That is the Apotex ANDA that got...

R. Benyak - 99

1       A.    No, I have never seen this one,
2       then. I just recognize the number, that is not our
3       number. I recognize this page, that is all I
4       recognize. So I probably didn't get this.
5  331.     Q.    Is it fair to say for the stuff that
6       gets filed in this case, all the legal papers, you
7       authorize your lawyers to take them on behalf of Nu-
8       Pharm?
9       A.    Well, of course.
10  332.     Q.    Have you ever seen this document,
11       plaintiff's 94, it also has the Injunction Order
12       appended to it?
13       A.    Yes, and this is where I saw it. It
14       is right near the end, a couple of pages from the
15       end.
16  333.     Q.    This document was actually served in
17       March of this year, March 9, '06. You are saying,
18       though, that you never actually saw it until a few
19       weeks ago?
20       A.    That is correct. Or I only recalled
21       seeing it then. I may have received it.
22  334.     Q.    When you saw this Order, is that the
23       first time that you had heard anything about the
24       fact that Apotex had been involved with litigation
25       with Abbott previously?

R. Benyak - 100

1       A.    You know, it could be that Deanne
2       talked to me before that. But, you know, I don't
3       recall dates like that. I mean, is that important?
4       MS. MAZZOCHI:    Well, you don't have to
5       reveal any communications that you had with
6       your attorneys, so to the exclusion of any
7       communications you had with attorneys.
8       THE DEPONENT:    I don't recall when the
9       date was. But I have seen this document.
10
11  BY MR. WINCHESTER:
12  335.     Q.    That being the one that I marked 94?
13       A.    Yes.
14  336.     Q.    Have you had any conversations with
15       anybody other than your lawyers about whether there
16       is any problem with Nu-Pharm going forward with this
17       ANDA, in light of the judgment against Apotex?
18       A.    Give me an example of what I might
19       have...I don't recall.
20  337.     Q.    Anybody at Apotex?
21       A.    No. I don't speak to anybody at
22       Apotex. I mean...
23  338.     Q.    You and Jack Kay never had that kind
24       of discussion?
25       A.    No, of course not. I mean, it is

R. Benyak - 101

1       not something that we would even talk about.
2  339.     Q.    You understand that under the ANDA,
3       as it has currently been filed with the FDA, it says
4       that if the drug gets approved, it is going to be
5       made for you by Apotex; right?
6       A.    Yes, I know that.
7  340.     Q.    And they are going to make it,
8       package it, test it and conduct all those functions;
9       right?
10       A.    Put it on my shelf.
11  341.     Q.    Is there any licence agreement,
12       anything of that sort, between Nu-Pharm and Apotex,
13       that has to do with your right to go out and market
14       this product that Apotex makes for you?
15       A.    In writing?
16  342.     Q.    Yes.
17       A.    No.
18  343.     Q.    This would be...
19       A.    It would be the same arrangement as
20       the other. If we sell this thing for a dollar, they
21       will get 50 cents, unless there is some other
22       arrangement that is made. But it wouldn't be.
23       Isn't it a good arrangement? It works every time.
24  344.     Q.    Let's talk about the respective
25       roles of Nu-Pharm and Apotex with this ANDA and the

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 102

```
 1      product.
 2              This isn't an exhaustive list, but at least
 3      as I understand it, and I want to make sure of what
 4      your understanding is, Apotex actually invented the
 5      process for making the divalproex sodium that is in
 6      this ANDA; is that your understanding?
 7      A.      I don't know who invented it. It
 8      could be they bought it from somebody else. I have
 9      no idea, how would I know that?
10  345.    Q.      You have no idea. Well, you haven't
11      talked to anybody at Apotex about that?
12      A.      No.
13  346.    Q.      Apotex developed the manufacturing
14      process?
15      A.      They may have.
16  347.    Q.      You don't know that?
17      A.      I don't know that.
18  348.    Q.      Apotex made the biobatch samples,
19      the submission lots, that are discussed in the ANDA?
20      A.      Well, because it says it there, I
21      have to make the assumption that it is correct. But
22      let me interject something by saying that on all of
23      our bottles of product that we sell, it says
24      "Manufactured by Nu-Pharm".
25              But Nu-Pharm didn't actually manufacture
```

R. Benyak - 103

```
 1      it, somebody else manufactured it. It is called
 2      contract manufacturing.
 3              I have no idea if Apotex contracted the
 4      manufacturing to somebody else or to one of their
 5      other units to manufacture it. How would I know
 6      that? There is just no way for me to know that.
 7  349.    Q.      Again, no discussions with Apotex
 8      about that?
 9      A.      No, the document says what it says,
10      and I can't...you know, swear to anything different
11      than what it says.
12  350.    Q.      Similarly, do you know if Apotex
13      conducted the analytical testing that is described
14      in the ANDA?
15      A.      Well, if it says that they did, then
16      they did. I can't tell you that they didn't. And
17      they wouldn't put something down that would be
18      false.
19  351.    Q.      Did Nu-Pharm have any involvement at
20      all in securing the access to the drug master files
21      that are referred to in the ANDA?
22      A.      How do you mean 'access'? I didn't
23      call somebody at Apotex and say, "Give me the drug
24      master file".. That may have been our attorneys who
25      did that.
```

R. Benyak - 104

```
 1  352.    Q.      You have no idea?
 2      A.      It happens by somebody else, it
 3      doesn't happen from me.
 4  353.    Q.      Is it fair to say that Apotex has
 5      actually handled the drafting and preparation of the
 6      ANDA and its amendments?
 7      MS. MAZZOCHI:    Objection, vague. The
 8      ANDA consists of multiple volumes. You
 9      can't possibly ask him to testify about
10      every single piece of paper that is in
11      there.
12
13  BY MR. WINCHESTER:
14  354.    Q.      Whether it is fair or not, let me
15      ask you this. What, if anything, did Nu-Pharm do,
16      in terms of actually drafting any documents that
17      appear in the ANDA or its various amendments?
18      A.      Well, I told you earlier what I did.
19      These documents come in to me for signature.
20  355.    Q.      From Apotex?
21      A.      From Eveline.
22  356.    Q.      Eilert at Apotex?
23      A.      That is correct. I mean, it may
24      come from somebody else, I don't know. It comes to
25      me from Tom. So if he gets it from Anna or Bernice
```

R. Benyak - 105

```
 1      or somebody else, I don't know that.
 2              You know, it arrives on your desk in the
 3      morning and here it is. Then I look through it, I
 4      try to review things in it.
 5              Some things make no sense, like that other
 6      document you just gave me, I think this thing here,
 7      with...it is all legal mumbo-jumbo, it doesn't mean
 8      anything to me. It is what lawyers do.
 9              And I will look through some of it and if I
10      see something that doesn't look right, then I will
11      bring it to Eveline's attention that this doesn't
12      look right and then she will say, "Well, it is
13      wrong, so I will redo it", or something. But that
14      is really the involvement.
15  357.    Q.      Other than the editing that you have
16      talked about, checking for font and checking for
17      duplicate sentences and things of that nature, did
18      Nu-Pharm ever draft any document for the ANDA from
19      the ground up?
20      MS. MAZZOCHI:    Objection, vague. Calls
21      for speculation and also a burdensome
22      question.
23      MR. WINCHESTER:    You can answer.
24      MS. MAZZOCHI:    If you can answer without
25      the documents in front of you.
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 106

1  THE DEPONENT:    I didn't prepare
2  anything. We have no staff to prepare
3  anything like that. So I would have to
4  say, other than looking at a document and
5  saying, you know, this document is here but
6  there is no signature on it, and I found
7  one in all of the documents with no
8  signature, I found perhaps a half a dozen
9  documents with Tom's name on it.
10        Obviously he signed it because I
11  wasn't there and there was some urgency in
12  getting that document out. That is all I
13  can say. But I didn't prepare any
14  technical or scientific things involved in
15  it, no.
16
17  BY MR. WINCHESTER:
18  358.    Q.    The editing that you did, did you
19  ever edit any information about....what I call
20  substantive information about the product itself?
21  What the product is, chemically, anything of that
22  nature?
23        A.    How would I do that? I am a
24  salesman. I don't do stuff like that. No, the
25  answer is no.

R. Benyak - 107

1  MR. WINCHESTER:    That is what I needed
2  to know. Let me mark something, and I want
3  to ask you about it, just so that I am
4  clear of who did what. This is an e-mail
5  your lawyer actually sent me yesterday.
6  THE DEPONENT:    How did you send him an
7  e-mail?
8  MR. WINCHESTER:    She is crafty. It was
9  actually forwarded by me to one of the
10  staff people here, so that the top
11  documents is irrelevant. The bottom one, I
12  want to see if you have any understanding
13  of this.
14
15  --- EXHIBIT NO. 95:    E-mail to Mr. Winchester from Ms.
16        Mazzochi dated July 18, 2006
17
18  BY MR. WINCHESTER:
19  359.    Q.    The first sentence there says that:
20        "...Nu-Pharm can confirm that any documents
21        that bear the Nu-Pharm logo and/or Richard
22        Benyak's signature or Tom Molnar signing on
23        his behalf were prepared by or at Nu-
24        Pharm..."
25  Do you have any idea what "prepared by or at Nu-

R. Benyak - 108

1  Pharm means"?
2        A.    Well, I mean, you have got to define
3  what "prepared"...I mean, a document comes in and if
4  it is retyped, does that mean it is prepared?
5  360.    Q.    That is what I am asking you.
6        A.    Well, that is what we do. We
7  prepare it like that. We might retype it, we won't
8  change anything in it unless it is a very obvious
9  change or reason to change it.
10        That is all I can tell you about prepared.
11  We didn't prepare the ANDA. I looked at the ANDA, I
12  tried to understand what some parts of the ANDA
13  were.
14        I didn't change anything in the ANDA, so I
15  am not sure what the word "prepared" is, I think we
16  have to discuss it...do you want to do a point of
17  privilege here to discuss this thing or what is
18  that?
19        MS. MAZZOCHI:    No, it is his problem. He
20  asks vague questions.
21        THE DEPONENT:    Okay.
22
23  BY MR. WINCHESTER:
24  361.    Q.    The second sentence says:
25        "...In addition, Nu-Pharm had the paragraph

R. Benyak - 109

1        4 certification prepared..."
2  Do you know what that means?
3        A.    Yes, that is the one that is sent
4  off. Obviously, lawyers prepare that. I am sure
5  you prepare it for your clients.
6        Clients don't do this themselves. At least
7  I don't, let me put it that way. I don't know,
8  somebody might. I don't do it.
9  362.    Q.    Put that one aside.
10        A.    Let's read the last one, the last
11  point here. Somebody wrote it, so...
12  363.    Q.    Okay, let's talk about it. This is
13  Deonne's understanding, so I can't obviously ask her
14  questions. She says:
15        "...It is [her] understanding that Richard
16        Benyak reviewed several ANDA documents and
17        made changes to them..."
18  But that you can't recall which ones they were?
19        A.    Right, we already talked about that,
20  didn't we?
21  364.    Q.    Yes.
22        A.    They come in and I look at them and
23  if something is wrong on it that I see that is
24  blatantly wrong, I corrected it.
25  365.    Q.    Do you know if before it was filed,

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 110

```
1     you actually laid eyes on the entire ANDA?
2         A.    How big is the ANDA?  I mean, you
3     know, how long is a piece of string?  I have no idea
4     how many pages there are.  I have many documents.
5     Is this an ANDA here, is this an ANDA?
6  366.    Q.    This would amount to about five or
7     six boxes of documents.
8         A.    No, I wouldn't see that.  I don't
9     know how many documents I looked at.  I looked at a
10    lot of them.  I looked in with a big handful of
11    stuff and what am I supposed to do?
12 367.    Q.    Does Nu-Pharm have a copy of the
13    ANDA in its office?
14        A.    You have to ask Tom.  He is the one
15    who keeps all of the documentation.  It is locked in
16    a vault.  I don't know why, but it is locked in a
17    vault, at great expense.
18 368.    Q.    So he would be the guy to answer
19    that question?
20        A.    Well, he would know whether it is
21    there or not.  I don't know whether it is there or
22    not.  I don't know whether we keep copies of every
23    single, whatever the submission is, for the Canadian
24    government.  I know we have many, many cupboards
25    full of these kind of things, binders.
```

R. Benyak - 112

```
1  376.    Q.    She was at Apotex?
2         A.    Well, she may still be at Apotex, I
3     don't know.
4  377.    Q.    A better question.  Does she work
5     for Nu-Pharm?
6         A.    No, she doesn't work for Nu-Pharm.
7  378.    Q.    Did she ever work for Nu-Pharm?
8         A.    No.
9  379.    Q.    Did Nu-Pharm have any involvement
10    with the biostudies that were conducted on this
11    product, the results of which are set out in the
12    ANDA?
13        MS. MAZZOCHI:    Objection, vague.
14
15 BY MR. WINCHESTER:
16 380.    Q.    You can answer.
17        A.    I don't know.  I think, is that the
18    one where there are various people that are involved
19    in taking the pills?
20 381.    Q.    These would be studies where samples
21    of this product that Nu-Pharm's name is on and they
22    are seeking approval of, were given to patients in a
23    sort of mini-clinical trial?
24        A.    We are the sponsor of that, but that
25    is all I know about it.  I don't know the patients,
```

R. Benyak - 111

```
1  369.    Q.    Let's talk about Apotex Corp. for a
2     minute.  You understand Apotex Corp. is the U.S.
3     agent for purposes of this ANDA?
4         A.    Well, I have seen the name, Apotex
5     Corp., but I don't know what is involved in it.  It
6     is a corp.
7  370.    Q.    Have you ever spoken to anyone from
8     Apotex Corp.?  Let me give you some names.  Marcy
9     Macdonald?
10        A.    No.
11 371.    Q.    Tommy McIntire?
12        A.    No.
13 372.    Q.    Kalpesh Shroff?
14        A.    No, but I saw his name on some
15    document that Tom signed.
16 373.    Q.    Do you have any idea how it is that
17    Apotex Corp. came to be named as the U.S. agent for
18    Nu-Pharm for purposes of this ANDA?
19        A.    Probably Bernice told me.
20 374.    Q.    This would be Bernice Tao?
21        A.    Correct.
22 375.    Q.    And she is at Apotex?
23        A.    Yes.  Well, I am assuming she is
24    still at Apotex.  I don't know.  In a big company,
25    people change.
```

R. Benyak - 113

```
1     for example.
2  382.    Q.    When you say you are the sponsor,
3     what involvement did Nu-Pharm have in actually
4     getting those biostudies run?
5         A.    A signature.
6  383.    Q.    Did Nu-Pharm pay any money to have
7     those biostudies run?
8         A.    No.  I told you, we don't pay
9     anything until we get the application approved.
10 384.    Q.    You have probably just answered this
11    question, but has Nu-Pharm paid Apotex anything with
12    respect to any of the work it has done so far on
13    this ANDA?
14        A.    We paid money to...I don't know,
15    experts or somebody to do testing, but that is all I
16    know.  I don't believe we paid any money to Apotex,
17    I don't recognize any of it, anyway.  It would be
18    extremely unusual if we did that.  I don't know of a
19    case where we would do that.
20 385.    Q.    When you are talking about the money
21    you have paid to experts who did testing, was this
22    testing that was done before March 2005, when the
23    ANDA got submitted?
24        A.    I don't know, you got to ask Deanne,
25    because...
```

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416-360-6117

A0051

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 114

```
1          MS. MAZZOCHI:  You don't have to reveal
2     the substance of any communications that
3     you had that related to us.
4          THE DEPONENT:  Okay, well, then, I am
5     not telling you. I don't know the answer.
6
7  BY MR. WINCHESTER:
8  386.      Q.    And I don't want you to tell me
9     anything you have talked about with your lawyer, but
10    do you know whether, in fact, these tests were
11    conducted before the ANDA got submitted in March
12    2005?
13         MS. MAZZOCHI:  You can answer that yes or
14    no.
15         THE DEPONENT:  Were they conducted
16    before?
17
18 BY MR. WINCHESTER:
19 387.      Q.    Before March 2005.
20         A.    I will say yes.
21 388.      Q.    What are you basing that on?
22         A.    Because when I originally spoke with
23    Jack that we have a product, I went to a lawyer
24    here. It may have been Tim, it may have been Irwin,
25    it may have been Harry, to say, "Can you please...
```

R. Benyak - 116

```
1     might be good at doing this for us."
2  391.      Q.    And I just need your best memory of
3     who it was. Was it Tim Gilbert, maybe somebody
4     else?
5          A.    It may have been Tim, it may have
6     been somebody from... I mean, I deal with many
7     lawyers at Goodmans. So it could have been somebody
8     from Goodmans.
9  392.      Q.    And your best memory is that
10    whatever scientific testing you are talking about
11    was conducted, was done before this ANDA got
12    submitted?
13         A.    Well, I can't swear to that. All I
14    can say is that I was told that testing would be
15    done and an ANDA...an ANDA wouldn't be filed if it
16    was obviously an infringing product, to my way of
17    thinking.
18         So if I am told that the product doesn't
19    infringe, then I am the one who is going to
20    authorize, go ahead and get the testing done on this
21    thing to see if it does infringe. And they came
22    back and said it doesn't infringe.
23         MS. MAZZOCHI:  Yes, don't reveal any
24    communications that you actually had with
25    the attorneys.
```

R. Benyak - 115

```
1     we know we are going to get sued on this", because I
2     get sued for everything.
3          "And we need to have a legal firm in the
4     U.S. market. Can you tell me who we should use?"
5     And this lady's name came up.
6          And I am delighted, because not only is she
7     extremely talented at doing this work and charming
8     and good looking, it is great to be around her, it
9     is fun. It puts a little levity into the day and
10    enjoy being around, doing it.
11         I believe that I asked them to do any of
12    the testing or to have it done, to make sure that
13    there wasn't an infringement.
14 389.      Q.    So your recollection is you got the
15    name of Deanne and her firm from some lawyer here in
16    Canada?
17         A.    Yes.
18 390.      Q.    Again, which lawyer might it be, Tim
19    Gilbert?
20         A.    You know, I mean, I speak to lawyers
21    all the time. So, you know, in passing you say,
22    "Look, I am thinking of coming out with a product in
23    the States", I am sure it happens to you, "I am
24    thinking of coming out with a product in the States,
25    I need a legal firm, can you tell me somebody who
```

R. Benyak - 117

```
1  BY MR. WINCHESTER:
2  393.      Q.    I have got one issue with this, and
3     that is that just in terms of timing, pre-ANDA,
4     post-ANDA, I have asked you before were there any
5     other tests other than the ones we have been given,
6     conducted pre-ANDA and you have told me no. Not,
7     yes, there were, but they are privileged, but no.
8          So if there were tests conducted pre-ANDA,
9     then we are at least entitled to know about them on
10    some kind of a privilege level. And I have asked
11    you about that before, so I have an issue hearing
12    today for the first time that maybe there are other
13    tests conducted pre-ANDA that we have had no notice
14    of.
15         A.    No, I said there may have been. I
16    don't know if there were.
17 394.      Q.    Did Nu-Pharm provide any of the
18    information that is in the ANDA about the product
19    itself or the process used to make it?
20         MS. MAZZOCHI:  Objection, vague. To who?
21
22 BY MR. WINCHESTER:
23 395.      Q.    You can answer the question.
24         A.    Yes, but she just told me no.
25 396.      Q.    No, she didn't. She made an
```

R. Benyak - 118

```
1    objection. That is what we have to do. She objects
2    to the way I made my question. As long as you
3    understand it, you can answer it.
4         MS. MAZZOCHI:  If you don't understand
5    it, you can ask him to rephrase the
6    question.
7         THE DEPONENT:  Rephrase it.
8
9    BY MR. WINCHESTER:
10   397.      Q.    Did Nu-Pharm provide any of the
11   information that is in this ANDA about the product
12   itself or the process used to make it?
13        MS. MAZZOCHI:  Objection, vague.
14
15   BY MR. WINCHESTER:
16   398.      Q.    You can answer the question.
17        A.   We have no staff who know anything
18   about this. So I can say that I personally, who
19   would be the senior person, did not give any
20   information about divalproex directly to the ANDA.
21        MR. WINCHESTER:  I am going to mark as
22   plaintiffs 96 some documents that appear
23   to relate to people retained for the
24   biostudies. They all bear your signature
25   in or around February of 2005.
```

R. Benyak - 120

```
1    400.      Q.    Is this your signature on all these
2    documents?
3         A.   Yes.
4    401.      Q.    Are these documents you got from
5    Apotex?
6         MS. MAZZOCHI:  The forms?
7         MR. WINCHESTER:  The documents that are
8    here.
9         MS. MAZZOCHI:  Objection, vague and
10   incomprehensible. It is an FDA form.
11
12   BY MR. WINCHESTER:
13   402.      Q.    Are these documents that were filled
14   out and provided to you by Apotex for your
15   signature?
16        A.   I don't know who filled them out. I
17   got them, but I don't know whether I got them in
18   this format. Very often documents will come to me
19   like this from Tom for signature. I don't have
20   piles of paper that come to me.
21   403.      Q.    These documents primarily are forms
22   that talk about particular people that look like
23   doctors, who were involved in clinical trials?
24        A.   Yes.
25   404.      Q.    Did Nu-Pharm have any involvement in
```

R. Benyak - 119

```
1    — EXHIBIT NO. 96:  Documents with respect to people
2    retained for biostudies, signed by
3    Mr. Benyak
4
5    BY MR. WINCHESTER:
6    399.      Q.    Do you recognize any of these
7    documents, other than...
8         A.   Well, all I know is this is the
9    first page of the document. There are many
10   documents that go with each one of these.
11        MS. MAZZOCHI:  Which are all these?
12   There are three different documents.
13        MR. WINCHESTER:  And I apologize for not
14   stapling those together, but basically it
15   is a group exhibit of things that appear to
16   relate to the same biostudy.
17        MS. MAZZOCHI:  Nu-Pharm 001363 through
18   68, Nu-Pharm 012027 through 032.
19        MR. WINCHESTER:  I think it is 028
20   through...
21        MS. MAZZOCHI:  Well, you have got 027.
22        MR. WINCHESTER:  That is right. Yes, so
23   that would be right.
24
25   BY MR. WINCHESTER:
```

R. Benyak - 121

```
1    retaining any of these doctors?
2         A.   No, I don't know any of these
3    people.
4    405.      Q.    Did Nu-Pharm pay any of these people
5    for whatever it is they did?
6         A.   We may or may not have, I don't know
7    that.
8    406.      Q.    Look in the stack in front of you
9    there, at the document that is marked 86.
10        MS. MAZZOCHI:  Do you have an extra copy
11   of that one?
12        MR. WINCHESTER:  I don't, I think Paul
13   took them. These would have been marked
14   yesterday, Deanne.
15
16   BY MR. WINCHESTER:
17   407.      Q.    I want to ask you actually about
18   some of the information about you that is on page 7.
19   This is a legal document in which we basically ask
20   some questions to say who has done what from Nu-
21   Pharm with respect to the ANDA, in a nutshell.
22        And the response is with respect to you
23   here on page 7:
24        "...With regard to the ANDA that is the
25   subject matter of the present action,
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 122

1 Richard Benyak serves as the liaison
2 between Nu-Pharm and outside vendors on the
3 sales and inventory side..."
4 MS. MAZZOCHI:  Where are you reading?
5 THE DEPONENT:  Can you just show me
6 where that is?
7
8 BY MR. WINCHESTER:
9 408.    Q.    Yes, right there at the end of the
10 paragraph. That second full paragraph toward the
11 end.
12 A.    Yes, I understand that.
13 409.    Q.    Who do you understand to be:
14 "...outside vendors on the sales and
15 inventory side..."
16 with respect to this product?
17 A.    Well, I am the one who is going to
18 be responsible. Once we get the approval, then I
19 will find somebody to sell the product. It is
20 pointless to do any of that until we have the
21 product.
22 410.    Q.    That is what I am trying to get at.
23 The way this sentence is phrased, I just want to
24 make sure in terms of timing, we are on the same
25 page. Because this says:

R. Benyak - 123

1 "...With regard to the ANDA, Richard Benyak
2 serves..."
3 Meaning present tense:
4 "...as the liaison between Nu-Pharm and
5 outside vendors on the sales and inventory
6 side..."
7 A.    Sure.
8 411.    Q.    Are there any right now?
9 A.    There are several. I just had a
10 call, perhaps two weeks ago, from someone who wants
11 to have a distribution agreement with us.
12 412.    Q.    For this product?
13 A.    For this product.
14 413.    Q.    So you have started to communicate
15 with companies about marketing this product?
16 A.    I haven't really communicated to a
17 great extent. People call me. There is one
18 particular company that I want them to do the
19 distribution and I have spoken to that company and
20 they are prepared to do it.
21 414.    Q.    What company?
22 A.    No, I am not going to tell you,
23 because that person said that if he is asked to come
24 and testify, which you may call him, he is not going
25 to distribute our product. So you are just going to

R. Benyak - 124

1 have to take my word for it that we have someone.
2 415.    Q.    Is it Apotex?
3 A.    No, it is not Apotex. You don't get
4 the guy who makes it for you to distribute it for
5 you, you have somebody else to do it. Why would I use
6 Apotex?
7 I mean, in the ANDA it says Apotex because
8 we don't have anybody else. But it is probably not
9 going to be Apotex.
10 MR. WINCHESTER:    That is what we will
11 mark and talk about. Let's mark as
12 plaintiff's 97...these are three documents
13 that all relate together.
14 Plaintiff's 97 is a document
15 entitled, "A Minor Amendment to the ANDA",
16 submitted May 26th, 2006. This is 97.
17 Plaintiff's 98 is a copy of the
18 physician's package insert that was
19 submitted with this minor amendment marked
20 as 97.
21 Let me just for the record say that
22 plaintiff's 97 is Bates numbered NU016995
23 through 017013; 98 is 017147 through
24 017179.
25 And 99, a document Bates numbered

R. Benyak - 125

1 NU017273 through 277.
2
3 — EXHIBIT NO. 97:   Document entitled, "A Minor
4 Amendment to the ANDA", submitted
5 May 26, 2006
6
7 — EXHIBIT NO. 98:   Copy of the physician's package
8 insert
9
10 — EXHIBIT NO. 99:   Product labelling
11
12 THE DEPONENT:    You don't expect me to
13 read this?
14 MR. WINCHESTER:    No.
15
16 BY MR. WINCHESTER:
17 416.    Q.    First of all, were any of these
18 documents, 97 through 99, actually drafted by Nu-
19 Pharm?
20 MS. MAZZOCHI:    Objection, vague.
21 THE DEPONENT:    I don't know if we
22 drafted them. You got to understand what
23 "draft" is. Do you mean did I write the
24 actual letter and sign it?
25

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 126

```
1    BY MR. WINCHESTER:
2    417.      Q.    What I mean is other than signing
3          the name and printing this out on Nu-Pharm
4          letterhead to maybe editing the text, did Nu-Pharm
5          draft any of the text?
6                MS. MAZZOCHI:   Objection, vague.
7                THE DEPONENT:   No, I don't know if we
8          did.
9
10   BY MR. WINCHESTER:
11   418.      Q.    To the best of your knowledge, is
12         plaintiff's 98 the most current copy of the proposed
13         package insert for this product that has been
14         submitted to FDA?
15               A.    I can't tell you if it is the most
16         current. I am assuming if you gave it to me, it is
17         the most current, but I don't know that it is.
18   419.      Q.    Are you aware of any newer labelling
19         that has been done in with this ANDA since May 26th,
20         2006?
21               A.    I don't.
22   420.      Q.    I am sorry, I missed your answer.
23               A.    I don't know, sir.
24   421.      Q.    Take a look at the last page of
25         plaintiff's 98, Bates numbered NU017179, and on the
```

R. Benyak - 127

```
1    first page of plaintiff's 99, you see in both of
2    those places there is a reference that this product
3    be distributed by Apotex Corp.?
4          A.    Yes.
5    422.      Q.    Were you involved at all in adding
6          that information, the decision to add that
7          information to these documents?
8          A.    Well, when an ANDA is submitted,
9          somebody has to be on it as who the distributor is
10         going to be, to my understanding.
11               So it was easier to put Apotex Corp.,
12         because I am not going to tell you who is going to
13         distribute the product. It may or may not be
14         Apotex.
15   423.      Q.    Do you understand there is a
16         requirement to tell the truth to the FDA in things
17         you file with them?
18         A.    Absolutely. And right now, I am
19         telling you Apotex is going to be the distributor.
20         But if we decide to change that, we are allowed to
21         make an amendment to this and we may.
22   424.      Q.    Is there a current plan to do that?
23         A.    No, not right now.
24
25   — A BRIEF RECESS
```

R. Benyak - 128

```
1    RICHARD BENYAK, resumed
2    CONTINUED EXAMINATION BY MR. WINCHESTER:
3
4          MR. WINCHESTER:   Do you still have 86
5          around there anywhere?
6          MS. MAZZOCHI:   Yes.
7
8    BY MR. WINCHESTER:
9    425.      Q.    Same page, just to continue on down,
10         this would be in the third paragraph there. It
11         starts with:
12               "...With regard to the ANDA..."
13         Do you see that?
14         A.    Yes.
15   426.      Q.    This says:
16               "...Tom Molnar is the liaison between Nu-
17         Pharm and the vendors on the manufacturing
18         side..."
19         I already talked to him about that. The next
20         sentence says:
21               "...The current vendor is Apotex Inc..."
22         Do you see that?
23         A.    Yes.
24   427.      Q.    Do you have any plans to change the
25         manufacturing vendor for this product from Apotex
```

R. Benyak - 129

```
1    Inc?...
2          A.    The manufacturing?
3    428.      Q.    Yes.
4          A.    No.
5    429.      Q.    Do you believe that Nu-Pharm would
6          have the authority to take this process that is in
7          the ANDA and go have somebody other than Apotex make
8          it for you and cut Apotex out of the deal?
9          A.    Well, I am not sure Apotex would be
10         cut out of the deal, because they are producing all
11         of the information to have the product.
12               But if the courts were to come back and
13         say, 'Okay, Nu-Pharm, we will allow you to have
14         divalproex sodium in the U.S., but Apotex can't
15         manufacture it', do you think I am not going to try
16         to find another manufacturer real quick? I am going
17         to go to the ANDA right away and say we are changing
18         manufacturers.
19   430.      Q.    Let's say that happens. Do you
20         believe that Nu-Pharm owns this ANDA, free and clear
21         of Apotex, such that you could just go do that and
22         not pay Apotex for its process?
23         A.    Well, why are you assuming that they
24         wouldn't get paid?
25   431.      Q.    This is my question.
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 130

1  A. Well, of course they would get paid.
2  432.  Q. So you believe, actually, in order
3  to take this product, as described here, and go have
4  somebody other than Apotex make it for you, you
5  would have to pay Apotex for it?
6  A. Well, of course. They did work, you
7  don't steal it from them. That would be the end of
8  my relationship with Jack Kay and it probably would
9  be the end of Nu-Pharm.
10  433.  Q. So in your mind, you understand this
11  product, the process that has been invented, is
12  owned by Apotex?
13  A. Yes.
14  434.  Q. Look further on in the next
15  paragraph. It says:
16  "...[You] and Tom Malnar are going to have
17  eventual responsibility with Nu-Pharm for
18  sourcing the finished dosage product..."
19  Do you know what that means, that phrase, 'sourcing
20  the finished dosage product'?
21  A. It is probably going to Apotex and
22  saying, 'I would like you to manufacture 10 million
23  tablets and put it in this size bottle'.
24  435.  Q. The rest of the sentence:
25  "...and ensuring the final product will

R. Benyak - 131

1  include the accompanying notifications and
2  certifications..."
3  et cetera.
4  A. Right.
5  436.  Q. What does that mean to you,
6  'notifications and certifications'?
7  A. Well, once product comes in...we
8  talked about that earlier. Once product comes in to
9  us, there has to be documentation that goes with
10  that.
11  There are three people who are allowed so
12  far to review that documentation, unless the FDA
13  requires somebody else.
14  It would be myself, who is allowed to
15  review the documentation...and I don't do that, by
16  the way, because I don't ever want somebody to come
17  back and say, 'Well, Mr. Benyak, you released this
18  because you have a vested interest in doing that'.
19  So I don't do it.
20  That is why we, at pretty substantial
21  expense, hire outside ad hoc people like Jo-Anne and
22  Tom, to review the documentation.
23  437.  Q. Jo-Anne and Tom being the quality
24  assurance people on your report chart?
25  A. Yes, that is correct. The product

R. Benyak - 132

1  would not be released. And there have been times
2  when, for whatever reason, either documents haven't
3  come in or one of those two people didn't come in
4  when we expected them to come in and we are out of
5  inventory, and the customer complains, that product
6  does not go out the door until one of those other
7  two people sign it.
8  And Tom knows his job is on the line. If
9  it goes out without somebody else's approval...not
10  his because he is not authorized to do that...that
11  is the end of him. He has also been told if you are
12  out of ranitidine, you are fired.
13  438.  Q. That is the big seller.
14  A. Does that answer that?
15  439.  Q. No, that is fair.
16
17  — EXHIBIT NO. 100:  Document entitled, "Registration of
18  Drug Establishment for Nu-Pharm"
19
20  BY MR. WINCHESTER:
21  440.  Q. I am going to show you what I have
22  marked plaintiff's 100, Bates numbered NU012014
23  through 015. Do you recognize this document? It is
24  called a registration of drug establishment for Nu-
25  Pharm?

R. Benyak - 133

1  A. Well, I may have seen it, but I
2  don't...I mean, my name is on it, so I have seen it.
3  441.  Q. That is your signature at the
4  bottom?
5  A. Yes, it is.
6  442.  Q. Thank you. Did Nu-Pharm fill in any
7  information on this form document?
8  A. We may have filled in some of it. I
9  personally did not do that. It is pretty simple to
10  fill it in, your address. So we may or may not have
11  done it.
12  443.  Q. In the middle of the form toward the
13  right, do you see there is something called,
14  'Business Type', and it has several different boxes
15  you can check: manufacturer, re-packer, re-
16  labeller...
17  A. Yes.
18  444.  Q. ...distributor foreign country,
19  analytical lab or other?
20  A. I see it.
21  445.  Q. And in this instance, 'Other' is
22  checked and then it is listed as 'Applicant of
23  ANDA'; do you see that?
24  A. Yes.
25  446.  Q. Were you involved at all in the

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 134

```
1    decision of how to fill out that particular box on
2    this form?
3         A.   No, I wouldn't know to write that
4    in.
5    447.   Q.   You can put that aside. Take a look
6    in this binder, it should be the one closest to you,
7    at Exhibit number 2.
8         This we have previously marked and I
9    believe is the original actual application that went
10   in for the ANDA. Is that your signature that
11   appears on the third page of the exhibit?
12        A.   Well, it looks like my signature, so
13   it must be.
14   448.   Q.   It must be you?
15        A.   Yes.
16   449.   Q.   You have told me before, I think,
17   you have never actually talked to Marcy Macdonald?
18        A.   No, I don't ever recall talking to
19   her. I don't even think she is there anymore. But
20   I don't know that for sure.
21   450.   Q.   You are right, she is not. How did
22   you understand you had the authority to sign this
23   document on her behalf?
24        A.   Well, it is very interesting,
25   because Eveline came in and said, "This is a
```

R. Benyak - 136

```
1    Signa, I know, because they manufacture a particular
2    product for us and raw material, and that was the
3    endapril. But that is the only reason that I
4    recognize the name Signa. I had no contact with
5    them.
6         I recognize Nucro-Technics because of when
7    I told you that we sometimes send product out for
8    testing. Nucro is one of the companies that we use,
9    but I don't know this other person, Foye Niarchos,
10   or whatever. Other than that, I don't know them.
11        Apotex Richmond Hill is one that I know.
12   As it says, I was there, so I know that. I don't
13   know 400 Ormont, I don't know who Alpha is, I don't
14   know who SGS is. Apotex Etobicoke, 50 Steinway, I
15   have never been there.
16   455.   Q.   That is the one that used to be
17   called Torpharm.
18        A.   Well, I have never been there. The
19   only Apotex establishment that I go to, and here is
20   Ormont...the only one that I have ever been to is
21   150 Signet.
22   456.   Q.   That is the headquarters, right?
23        A.   It is. It is where the big guys
24   stay.
25   457.   Q.   Turn the tab to plaintiff's 4. This
```

R. Benyak - 135

```
1    document, just sign it and then put `for". And I
2    said, "Well, why doesn't Marcy Macdonald sign it?"
3    And she says, "No, you have to sign it", so I signed
4    it.
5    451.   Q.   Turn the page to Exhibit 3. Have
6    you seen this document before?
7         A.   I don't know if I have seen this
8    particular one. I don't know if I have seen this
9    particular one, and I can tell you why, because this
10   name, Roger Diamond, which is the last name on the
11   page, I happen to know this person, because I worked
12   with him at Novopharm. And the last page that I saw
13   this on, he was the first one on this next page.
14   452.   Q.   So you have seen something like this
15   before?
16        A.   I have seen something like this. I
17   can't tell you if I saw this particular page.
18   453.   Q.   This list of companies?
19        A.   Well, I saw the list of companies, I
20   just don't know whether I saw this particular
21   attachment.
22   454.   Q.   Did you have any involvement in the
23   decision to include on this form companies: Signa
24   SA de CV, Nucro-Technics, SGS or Alpha Laboratories?
25        A.   No, I don't know. I can tell you,
```

R. Benyak - 137

```
1    is a document that includes a number of what are
2    called applicant's contract facilities.
3         And a number of the same companies, they
4    may all be the same companies. Does Nu-Pharm
5    actually have contracts with any of the facilities
6    that are listed in plaintiff's 4?
7         MS. MAZZOCHI:   Objection, vague.
8
9    BY MR. WINCHESTER:
10   458.   Q.   And by that I mean written contracts
11   relating to this ANDA?
12        A.   I don't know if we have. I mean, I
13   don't know. I can't tell you.
14   459.   Q.   Did you or Nu-Pharm generally have
15   any involvement in determining which company should
16   be listed with which responsibilities in the chart
17   that appears on the first two pages of Exhibit 4?
18        A.   No, it just seems to make sense that
19   if you make it one place and you can't test it at
20   that place, you just send it to another place. But
21   I don't know that that is what they do. I assume
22   that is what they do.
23   460.   Q.   But Nu-Pharm had no involvement in
24   assigning responsibility for these companies?
25        A.   No, I didn't pick Nucro, for
```

# VICTORY VERBATIM COURT REPORTING SERVICES

## R. Benyak - 138

1  example. I just told you, I don't even know these
2  companies.
3      MS. MAZZOCHI:  By the way, in case I
4  didn't do it already, I would like to
5  designate the entire transcript as
6  confidential, subject to the Protective
7  Order.
8      MR. WINCHESTER:  And you didn't. I am
9  going to mark as plaintiff's 101 a document
10  that is Bates numbered NU012000. It is
11  entitled, "Paragraph 4 Certification".
12
13  --- EXHIBIT NO. 101:  Document entitled, "Paragraph IV
14      Certification"
15
16      THE DEPONENT:  Is that in this binder?
17
18  BY MR. WINCHESTER:
19  461.    Q.  It is not in that binder, I am going
20  to hand it to you right now. Is that your signature
21  on the document?
22      A.  It sure is.
23  462.    Q.  Did you sign this document on or
24  about March 7, 2005?
25      A.  I signed it exactly on March 7,

## R. Benyak - 139

1  2005, because I wouldn't put a date down that was
2  incorrect.
3  463.    Q.  Did Nu-Pharm draft any of the text
4  on this document?
5      MS. MAZZOCHI:  Object to that as vague.
6
7  BY MR. WINCHESTER:
8  464.    Q.  Obviously your letterhead appears at
9  the top, that would be the firm's letterhead?
10      A.  Yes, that is fine. But the fact is
11  that this is all legal stuff. I don't know anything
12  about that. Obviously lawyers drafted this.
13  465.    Q.  So nobody from Nu-Pharm drafted it?
14      MS. MAZZOCHI:  No, that is not what he
15  said. Are you talking about a physical Nu-
16  Pharm employee?
17      MR. WINCHESTER:  Of course that is what
18  I am talking about.
19      THE DEPONENT:  Well, we didn't write
20  this letter. We may have copied it and put
21  it on here, but I didn't write it.
22
23  BY MR. WINCHESTER:
24  466.    Q.  Do you know who did?
25      A.  Probably the attorneys.

## R. Benyak - 140

1  467.    Q.  In the second paragraph in this
2  document 101, it says:
3      "...Nu-Pharm, Inc. hereby certifies that in
4  its opinion and to the best of its
5  knowledge U.S. patent..."
6  and it gives some numbers:
7      "...held by Abbott Laboratories, both
8  expiring January 29, 2008, will not be
9  infringed by the product described in the
10  ANDA..."
11  Do you see that?
12      A.  Yes, that is what is here.
13  468.    Q.  At the time you signed this
14  document, March 7, 2005, what was Nu-Pharm's opinion
15  and the best of its knowledge relating to
16  infringement of Abbott's patents based on?
17      MS. MAZZOCHI:  Well, wait. To the
18  exclusion of any communications that he had
19  with his attorneys.
20      MR. WINCHESTER:  Sure.
21
22  BY MR. WINCHESTER:
23  469.    Q.  Did you have any basis other than
24  talking to lawyers to sign this document saying that
25  in your opinion and to the best of your knowledge...

## R. Benyak - 141

1      A.  No.
2  470.    Q.  ...the product doesn't infringe?
3      A.  Not anyone else.
4  471.    Q.  Had you ever seen the two Abbott
5  patents that are listed here before you signed this
6  document?
7      MS. MAZZOCHI:  Again, to the extent you
8  looked at them outside the context of
9  communications with counsel, you can
10  answer. But in answering, don't reveal any
11  communications you had with counsel.
12      THE DEPONENT:  No, I didn't see them
13  elsewhere.
14
15  BY MR. WINCHESTER:
16  472.    Q.  Other than tests that might have
17  been conducted through your lawyers, has Nu-Pharm
18  commissioned any testing to reveal anything about
19  infringement of this product?
20      A.  You mean did I personally send them
21  somewhere for testing?
22  473.    Q.  Maybe not you personally, but did
23  you direct anyone from Nu-Pharm to send them for
24  testing, other than through your lawyers?
25      A.  We have five employees, none of them

**Ernst & Young Tower**
**222 Bay St. Suite 900**
**Toronto, Ont. M5K 1H6  416-360-6117**

# VICTORY VERBATIM COURT REPORTING SERVICES



R. Benyak - 142

```
1      do that.
2   474.     Q.   None of that happened. Are you
3   aware of any tests that were conducted by Apotex
4   that would go to the issue of whether this product
5   would infringe Abbott's patents?
6          A.   I don't know if Apotex did the
7   testing. I know that we have outside experts who
8   did testing. And the only reason I know that is
9   because we got bills for testing.
10  475.     Q.   And this is what we talked about
11  earlier?
12         A.   Yes, that is right. But I don't
13  know who those people are. I personally have not
14  paid any money to Apotex for doing testing.
15  476.     Q.   Before you signed this document,
16  were you aware of any tests that had been undertaken
17  to compare the divalproex sodium product in this
18  ANDA that you signed to the divalproex sodium
19  product that Apotex got enjoined from making in the
20  legal case against Abbott?
21         MS. MAZZOCHI:   Again, to the extent you
22         can answer that...in answering that
23         question, don't reveal any communications
24         that you would have had with counsel.
25         THE DEPONENT:   I can't answer that
```

R. Benyak - 143

```
1      question, then. Rephrase it somehow so
2      that I understand it better.
3      MR. WINCHESTER:   Okay. That is a
4      different issue.
5
6   BY MR. WINCHESTER:
7   477.     Q.   Before you signed this document,
8   March 7, 2005, were you aware of any testing that
9   had been undertaken where somebody took some of the
10  divalproex sodium made according to the process in
11  this ANDA that you were signing and some of the
12  divalproex sodium that was the subject of the former
13  case between Apotex and Abbott, and compared the two
14  to see if they are the same?
15         MS. MAZZOCHI:   Again, in answering,
16         exclude any communications that you would
17         have had with lawyers.
18         THE DEPONENT:   I can't_] personally
19  didn't do that. If we received bills from
20  somebody who did it, well, then, fine, but
21  I personally don't know that that ever
22  happened.
23
24  BY MR. WINCHESTER:
25  478.     Q.   Look in your book there at Exhibit
```

R. Benyak - 144

```
1      number 6. And really, I am just asking you about
2      the first page. You are welcome to look through as
3      much of it as you would like.
4          A.   I did. It might as well be in a
5      different language.
6   479.     Q.   Answered that question for you.
7      Have you ever seen this document before?
8          A.   Yes.
9   480.     Q.   Let's talk about this paragraph
10  before the chart on the first page of plaintiff's 6.
11  Do you see what I am talking about?
12         A.   This one, yes.
13  481.     Q.   Yes. Did any physical person at Nu-
14  Pharm draft that paragraph?
15         A.   No.
16  482.     Q.   Are you aware of any alternative
17  structure for divalproex sodium, as is hinted at in
18  this paragraph?
19         MS. MAZZOCHI:   And to the extent your
20         answer would reveal any attorney/client
21         communications, you can exclude that from
22         your answer.
23         THE DEPONENT:   I don't know the answer
24         to that.
25
```

R. Benyak - 145

```
1   BY MR. WINCHESTER:
2   483.     Q.   Is there any current plan to amend
3      the labelling in this ANDA to include some
4      alternative structure for divalproex sodium?
5          A.   You are asking someone who is
6      totally ignorant about these kind of issues. So I
7      really can't answer them. You would have to get
8      somebody who understands what this is all about to
9      answer that question logically. Please don't ask
10  me, because I can't give you the answer. And it is
11  going to sound like I don't know anything, but I
12  don't know anything in this issue.
13  484.     Q.   Not the substance. Are you aware on
14  behalf of Nu-Pharm of whether there is any plan,
15  whether you drafted it or not, to put in some new
16  labelling that would have a different or alternative
17  structure for divalproex sodium?
18         A.   I don't know about that, no. I
19  don't have any idea.
20  485.     Q.   That is fair. Did you have any
21  involvement at all in setting things like the
22  melting point range, that are included in this ANDA?
23  I know the answer to the question, I just need you
24  to tell me.
25         A.   No.
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 146

```
1   486.    Q.   Were you aware at any point in time
2      that the FDA had asked a question about this ANDA
3      and said, "We think your proposed melting point
4      range is too broad, give us a tighter one"?
5           A.   No.
6   487.    Q.   Were you involved in any way in
7      substantively responding to any of the questions
8      that FDA has ever asked about this ANDA?
9           MS. MAZZOCHI:   Objection, vague.
10          THE DEPONENT:   No.
11          MR. WINCHESTER:   I am going to mark as
12       plaintiff's 102, a group exhibit, which is
13       a series of documents that seem to bear
14       your signature and are all dated March 2nd,
15       2005.
16
17   --- EXHIBIT NO. 102:   Series of documents signed by Mr.
18              Benyak dated March 2, 2005
19
20   BY MR. WINCHESTER:
21   488.    Q.   My question, I guess, is this ANDA
22      was submitted on March 7, 2005. There is a whole
23      series of these same documents that are signed and
24      dated by you, March 7, 2005. Do you have any idea
25      why there is a set of them dated March 2nd, 2005?
```

R. Benyak - 147

```
1           A.   Probably because somebody put these
2      on my desk on March 2nd, 2005, and then come back
3      and said there are probably mistakes in this and
4      redid it. But I don't know that because a lot of
5      this would be too technical for me.
6
7   --- EXHIBIT NO. 103:   Series of documents with respect to
8              ANDA, signed by Mr. Benyak or on Nu-
9              Pharm, Inc. letterhead
10
11   BY MR. WINCHESTER:
12   489.    Q.   I hand you plaintiff's 103. This is
13      a group exhibit of as many other documents from this
14      ANDA as I could find, other than the ones we have
15      already talked about, that have your signature or
16      are on Nu-Pharm letterhead.
17          A.   Why don't we agree that if it looks
18      like my signature, it is my signature.
19   490.    Q.   We can agree to that, I just need
20      you to confirm it. I don't know whether somebody
21      might have tried to sign your name.
22          A.   Nobody knows how to sign my name.
23   491.    Q.   So take a look through those. And
24      my question is, is there any one of these documents
25      for which Nu-Pharm did anything other than print a
```

R. Benyak - 148

```
1      document from Apotex out on Nu-Pharm letterhead and
2      sign?
3           MS. MAZZOCHI:   Objection, vague. Calls
4       for speculation.
5           THE DEPONENT:   There may have been some
6        corrections. The one that is March 2nd
7        versus March 7 may have been something that
8        I found.
9
10   BY MR. WINCHESTER:
11   492.    Q.   It could have been one of the
12      editorial...
13          A.   It may have been. Because I would
14      not just arbitrarily go and correct something,
15      because that is not what I do. But if I see
16      something that is blatantly wrong, then I will go
17      back to Eveline and say, "This is wrong".
18          MS. MAZZOCHI:   I will also note for the
19       record that at least page NU014236, 237,
20       are forms that are actually FDA forms.
21          THE DEPONENT:   There is no signature on
22       this.
23
24   BY MR. WINCHESTER:
25   493.    Q.   That is true. Those would be forms
```

R. Benyak - 149

```
1      that would come from FDA that would have to be
2      filled out, those documents that Ms. Mazzochi just
3      referred to.
4           A.   This is probably the one that I was
5      referring to that I had seen, because Roger Diamond
6      is the first one on the next page.
7   494.    Q.   Just so we have it for the record,
8      the ones you are talking about, down the lower
9      right-hand corner, is it 014239 through 240?
10          A.   Correct. That is pretty good, I
11      signed them all.
12   495.    Q.   Those are all your signatures in
13      plaintiff's 103?
14          A.   Where it looks like my signature it
15      is.
16   496.    Q.   Have you ever talked about this
17      legal case with anyone from Apotex?
18          A.   No, I don't talk to anybody from
19      Apotex other than Eveline and, I don't know, two
20      other people, Anna, Bernice.
21   497.    Q.   Anna, last name Ivic?
22          A.   I don't know.
23   498.    Q.   This would be Anna Ivic and Bernice
24      Tao, as we talked about before. Does Apotex pay Nu-
25      Pharm's legal bills for this case?
```

# VICTORY VERBATIM COURT REPORTING SERVICES

R. Benyak - 150

1  MS. MAZZOCHI:  I am going to object to
2  the form of the question and, Jason, I read
3  the cases that you provided me with last
4  night.
5       First, the cases that you sent me,
6  where it ostensibly said that someone has
7  to be obligated to answer, that was in the
8  context of grand jury proceedings where
9  criminal activity was involved, which I
10  don't think is the case here.
11      Similarly, I also checked our prior
12  discovery request to Abbott and Abbott has
13  refused to identify for Nu-Pharm who was
14  involved with and paying for patent
15  prosecution activities with regard to the
16  patents in suit.
17      So I am willing to allow Mr. Benyak
18  to answer your question yes or no, if we
19  get reciprocal discovery from Abbott on
20  that score.
21      And similarly, as long as Abbott
22  agrees that in answering that question, it
23  is not going to constitute a subject matter
24  waiver with regard to the contents of the
25  bills themselves, because I do consider

R. Benyak - 151

1  that to contain privileged communications.
2  MR. WINCHESTER:  That is a fair
3  statement.  We will not assert a subject
4  matter waiver as to the bills.
5       As to the remainder, there is no tit
6  for tat.  You are either going to instruct
7  him not to answer or you are not.
8  MS. MAZZOCHI:  Can you repeat the
9  question?
10
11  -- DISCUSSION OFF THE RECORD
12
13  MS. MAZZOCHI:  I will reiterate my same
14  objection.  And you can answer that
15  question yes or no, if you know the answer.
16  THE DEPONENT:  I already answered the
17  question about two hours ago.  No, they
18  don't pay her legal bill.
19
20  BY MR. WINCHESTER:
21  499.    Q.   Is there any agreement between Nu-
22  Pharm and Apotex that at some point in the future,
23  Apotex will reimburse you for any of the legal costs
24  you have expended for this case?
25          A.   Why would they do that?  It is an

R. Benyak - 152

1  interesting question, maybe I should ask them, but
2  it is not something that...I told you in the
3  beginning that my only exposure to this whole case
4  is the legal bill.  That is a long yes or no.
5  MS. MAZZOCHI:  I know.
6
7  BY MR. WINCHESTER:
8  500.    Q.   Were you involved in any way in
9  responding to any of the discovery requests Abbott
10  served in this case?
11  MS. MAZZOCHI:  We may need a better
12  explanation of that, Jason.
13  THE DEPONENT:  I am sorry, I don't know
14  what that means.
15
16  BY MR. WINCHESTER:
17  501.    Q.   One of the documents I had shown you
18  earlier was a set of interrogatories, questions that
19  we put to Nu-Pharm.
20          A.   Yes.
21  502.    Q.   You said you saw that a few weeks
22  ago.  Have you ever seen any other documents like
23  that, where Abbott has put questions to Nu-Pharm
24  related to this case?
25          A.   Yes.  That was only one.  There are

R. Benyak - 153

1  several, though.
2  503.    Q.   Have you been involved in helping
3  your lawyers to prepare responses to those
4  questions?
5          A.   Yes.
6  504.    Q.   Did anybody ever ask you to go
7  through your files and produce any documents
8  relating to this case?
9          A.   Many times, to the point of
10  irritation.  They called me and said, "Send me
11  documents".  I don't have any documents.  I sent
12  them everything I have.
13      They gave me words that I should put into
14  my computer to send them stuff.  I did.  I sent them
15  things that were totally irrelevant, but they are
16  still there because...well, they wanted them so they
17  got them.
18  505.    Q.   When you have meetings or
19  discussions with, let's say, people from Apotex,
20  Jack Kay, is it your general practice ever to write
21  notes?
22          A.   No.  Neither is it his.
23  506.    Q.   Do you have any notes, memoranda to
24  your files or to yourself, anything of that nature,
25  that relate in any way to this product or this ANDA?

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416-360-6117

# VICTORY VERBATIM COURT REPORTING SERVICES



R. Benyak - 154

1  A.  Memo to file, no.
2  507.  Q.  How about any notes you might have
3  written to yourself about this ANDA or this product?
4  A.  Well, I have, but I am not going to
5  tell you, because it is a manufacturer that I might
6  be interested to do distribution in a very specific
7  market, and I am not going to give you the name.
8  508.  Q.  This is the one you told me about
9  earlier?
10  A.  Yes. But it is only in a very
11  selected market that I want them to do distribution.
12  509.  Q.  Do you know what the pills look like
13  that Apotex made for...
14  A.  Yes, for the U.S. market?
15  510.  Q.  Yes, for this product.
16  A.  Yes, there is a problem with it,
17  they are not scored. Round, off-white.
18  511.  Q.  Do you know if they say APO or NU?
19  A.  They don't say NU. According to the
20  ANDA, I think it says APO 125, 250, 500 on it. I
21  would like them scored. Maybe we can make some
22  arrangement, I am not sure.
23  MR. WINCHESTER:  Give me five minutes, I
24  can wrap up.
25  MS. MAZZOCHI:  Sure.

R. Benyak - 156

1  A.  I don't know what you mean by "did
2  anything happen"? I don't even believe I spoke to
3  them again.
4  517.  Q.  Was there any discussion, then,
5  between you and Jack Kay about the fact that an ANDA
6  would need to be submitted for the product?
7  A.  No, I didn't speak to Jack about
8  that. He said he would take care of it.
9  518.  Q.  And the next thing you know, here
10  come some documents from Eveline Eilert, right?
11  A.  Yes.
12  MR. WINCHESTER:  That is all I have.
13  MS. MAZZOCHI:  Okay. No questions.
14
15
16
17
18  I hereby certify the foregoing to be a true and accurate tran
19  noted proceedings held before me on the 19TH DAY OF JULY, 2006  and t
20  best of my skill, ability and understanding.
21
22
23
24  Certified Correct:
25
26
27
28
29
30  Elisa Antonelli
31  Verbatim Reporter

R. Benyak - 155

1  — DISCUSSION OFF THE RECORD
2
3  BY MR. WINCHESTER:
4  512.  Q.  Just a few more questions. One
5  thing you told me early on is that you do a monthly
6  report for Joel Ulster...
7  A.  Yes.
8  513.  Q.  ...about the business of Nu-Pharm;
9  is that right?
10  A.  Sales reports.
11  514.  Q.  Anything other than sales that you
12  report on?
13  A.  No.
14  515.  Q.  Have you ever talked to Joel Ulster
15  about this litigation or this product?
16  A.  No.
17  516.  Q.  I just want to be clear about
18  something. Let's go back to the initial talk you
19  had with Jack Kay.
20  He comes back to you and says, "Here is
21  divalproex, are you interested?" Did anything
22  happen between you and Apotex between that
23  discussion and the time, which you said was a few
24  months later, that you got some documents from
25  Eveline Eilert?

R.

1
2
3
4  ERRATA SHEET
5
6
7
8  PAGE        LINE
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29  I, RICHARD BENYAK, have read and reviewed page 1 to 156 a
30  exception of the above-noted corrections, hereby agree to the accura
31  recorded herein.
32
33
34
35
36  Date
37
38
39  RICHARD BENYAK

# VICTORY VERBATIM COURT REPORTING SERVICES

EA/ml

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ABBOTT LABORATORIES, an )
Illinois corporation )
) 
    Plaintiff,          )  Civil Action No. 05 C 3714
                        )
v.                      )  Judge Rebecca Pallmeyer
                        )
NU-PHARM, INC., a Canadian  )
corporation,            )
APOTEX INC., a Canadian )
Corporation, and        )
APOTEX CORP., a Delaware )
corporation,            )
                        )
    Defendants.         )

- - - - - - - - - -

This is the Deposition of TOM MOLNAR, in the
above-noted matter, taken at the law offices of
McCARTHY TÉTRAULT, Toronto Dominion Bank Tower, Toronto
Dominion Centre, 44th Floor, Toronto, Ontario, on the
18th day of July, 2006.

C O N F I D E N T I A L

- - - - - - - - - -

**A0063**

**Ernst & Young Tower**
**222 Bay St. Suite 900**
**Toronto, Ont. M5K 1H6  416-360-6117**

# VICTORY VERBATIM COURT REPORTING SERVICES

APPEARANCES:
JASON G. WINCHESTER, ESQ.                    -- for the Plaintiff
Jones Day
77 West Wacker
Chicago, Illinois 60601-1692
(312) 782-3939
PAUL J. MOLINO                               -- for the Defendants
Rakoczy Molino Mazzochi Sivik
6 West Hubbard St.
Suite 500
Chicago, Illinois 60610

---

- ii -

### INDEX OF EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| 84 | Bates number NU015565, an organizational chart of Nu-Pharm dated October 28th, 1999 | 31 |
| 85 | Bates number NU015566, an organizational chart for Nu-Pharm dated November 9, 2005 | 31 |
| 86 | Defendant Nu-Pharm Inc.'s objections and answers to plaintiff, Abbott Laboratories first set of interrogatories. Numbers 21 through 24 to defendant Nu-Pharm Inc. | 52 |
| 87 | Bio-Equivalency Amendment dated August 5, 2005 | 58 |
| 88 | Bates numbered NU011979. Document entitled "Change in Contact Information" dated September 6, 2005 | 60 |
| 89 | Bates numbered NU015543 through 015558. Telephone amendment to the ANDA filed on or about March 6, 2006 | 61 |
| 90 | Bates numbered NU015526, e-mail correspondence including an e-mail from Anna Ivic to Tom Molnar dated Friday, March 4, 2005 at 6:14 p.m. containing a number of attachments | 63 |

---

- i -

### INDEX OF PROCEEDINGS

PAGE NUMBER

TOM MOLNAR, sworn
Examination by Mr. WINCHESTER                1 - 81

---

T. Molnar - 1

1  TOM MOLNAR, sworn
2  EXAMINATION BY MR. WINCHESTER:
3  1.      Q.   Mr. Molnar, good morning.
4          A.   Good morning.
5  2.      Q.   My name is Jason Winchester. I am
6  going to ask you some questions today about the
7  abbreviated new drug application, or the ANDA, that
8  has been filed in Nu-Pharm's name for divalproex
9  sodium product. Do you know what I am talking
10 about?
11         A.   Yes.
12 3.      Q.   Have you ever given your deposition
13 before?
14         A.   No.
15 4.      Q.   I am sure Mr. Molino has talked to
16 you a little abut the ground rules, but you
17 understand you are under oath?
18         A.   Yes.
19 5.      Q.   And you need to tell the truth when
20 you answer my questions, right?
21         A.   Yes.
22 6.      Q.   Is there any reason today why you
23 wouldn't be able to answer my questions truthfully
24 and accurately?
25         A.   No.

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 6

```
1         Toy?
2            A.   Bausch & Lomb.
3     36.      Q.   And that was from roughly 1990 until
4     when?
5            A.   Ninety-one.
6     37.      Q.   What did you do for Bausch & Lomb?
7            A.   I worked in the warehouse.
8     38.      Q.   Did you have a title at Bausch &
9     Lomb?
10           A.   Just a warehouse supervisor.
11    39.      Q.   Where did you go after leaving
12    Bausch & Lomb?
13           A.   I went to Nu-Pharm.
14    40.      Q.   So, I have that at roughly 1991,
15    does that sound right to you?
16           A.   Yes.
17    41.      Q.   Was Nu-Pharm just starting out at
18    that point or had it been around for a while?
19           A.   I think they had been in business
20    about a year-and-a-half.
21    42.      Q.   What was your first position at
22    Nu-Pharm?
23           A.   Warehouse manager.
24    43.      Q.   Have you been employed by
25    Nu-Pharm...I understand it has changed hands a few
```

T. Molnar - 7

```
1     times...
2            A.   Yes.
3     44.      Q.   ...but have you been employed by
4     that same company since 1991?
5            A.   No.
6     45.      Q.   We will come back to this a little
7     bit, but tell me where you were between being at
8     Nu-Pharm in '91 and being at Nu-Pharm now?
9          MR. MOLINO:   And he will explain it was
10    all the same, I am sure.
11         THE WITNESS:   Well, in '91 I was with
12    Nu-Pharm, and then we moved to a new
13    location on Elgin Mills and then I think
14    it was in '98 or '95...I am not sure of the
15    date, when the assets were bought by Apotex
16    and then we became Novex.
17
18    BY MR. WINCHESTER:
19    46.      Q.   Okay, so...
20           A.   So, I was part of the assets that
21    went to Novex.
22    47.      Q.   I got you.
23           A.   Okay.
24    48.      Q.   Yes, there were some corporate
25    changing hands, we will go through that. Let's talk
```

T. Molnar - 8

```
1     about Nu-Pharm in or about 1991. Who hired you?
2            A.   Richard.
3     49.      Q.   So, Richard Benyak was with Nu-Pharm
4     at that time?
5            A.   Yes.
6     50.      Q.   Do you remember his position at that
7     time?
8            A.   President.
9     51.      Q.   How many employees did Nu-Pharm have
10    when you started in 1991, your best guess?
11           A.   Twenty.
12    52.      Q.   In all the time you have been there,
13    what is the largest number of employees Nu-Pharm has
14    had?
15           A.   Three hundred-plus...I am sorry, are
16    you talking about the...in 91 or in the whole time
17    I have worked there?
18    53.      Q.   The whole time you have been there.
19           A.   Three hundred-plus.
20    54.      Q.   When you started with Nu-Pharm, what
21    was Nu-Pharm's business?
22           A.   Generic pharmaceuticals.
23    55.      Q.   In the time you started in 1991, was
24    Nu-Pharm a manufacturer of generic drugs?
25           A.   We never manufactured it.
```

T. Molnar - 9

```
1     56.      Q.   At the time that you started in 1991
2     with Nu-Pharm, did Nu-Pharm have laboratory
3     capabilities?
4            A.   Yes, it was a small lab.
5     57.      Q.   How many people worked in the lab?
6            A.   I don't know.
7     58.      Q.   Do you know what testing capability
8     Nu-Pharm had in the lab at that time?
9            A.   I have no idea.
10    59.      Q.   You mentioned that Nu-Pharm, at the
11    time, was not a manufacturer of generic
12    pharmaceuticals. What was Nu-Pharm's business with
13    respect to generic drugs?
14           A.   We were distributing
15    pharmaceuticals.
16    60.      Q.   In any particular marketplace?
17           A.   Just in Canada.
18    61.      Q.   Do you know who owned Nu-Pharm at
19    the time you started working there?
20           A.   No.
21    62.      Q.   At some point in time you understand
22    Nu-Pharm was acquired by Apotex, right?
23         MR. MOLINO:   Objection to the form, but
24    he can answer.
25         THE WITNESS:   I don't...like I said, the
```

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 42

1    answer.
2    THE WITNESS:  The only involvement I
3    would have had is if the product was
4    ordered by materials management at that
5    time, that we would have received it into
6    the building and I would have been the one
7    shipping it out after it was released.
8
9    BY MR. WINCHESTER:
10 282.    Q.   Do you have any involvement today
11    with the Nu-Divalproex product marketed by Nu-Pharm
12    that is any different than what you do with respect
13    to all of Nu-Pharm's other products?
14    A.   No.
15 283.    Q.   Who, within Nu-Pharm, makes the
16    decision about which products it is going to market?
17    MR. MOLINO:   Objection, foundation.
18    THE WITNESS:   I don't know.
19
20    BY MR. WINCHESTER:
21 284.    Q.   Are you ever involved in those
22    decisions?
23    A.   No.
24 285.    Q.   Before the application that is at
25    issue in this case came around, were you aware of

T. Molnar - 43

1    any strategic plan at Nu-Pharm to try and get a
2    product into the U.S. market?
3    A.   No.
4 286.    Q.   Let's talk for a minute about the
5    application that is at issue in this case. You are
6    aware of the application that was filed under the
7    Nu-Pharm name, right, for a divalproex sodium
8    product with the U.S. FDA?
9    MR. MOLINO:   I am just going to object
10    to 'aware of'. You might want to be a
11    little more clear about what application
12    because his involvement has been minimal.
13    So, I just want to make sure that we are...
14    THE WITNESS:   I am aware, yes.
15
16    BY MR. WINCHESTER:
17 287.    Q.   You know it was filed?
18    A.   Yes.
19 288.    Q.   You know there is some application
20    that has been filed under Nu-Pharm's name for a
21    divalproex sodium product with the U.S. FDA?
22    A.   Yes.
23 289.    Q.   When did you first hear about this
24    application or the product intended for the U.S.
25    market?

T. Molnar - 44

1    A.   It was sometime around the end of
2    2004.
3 290.    Q.   How did you first hear about it?
4    A.   Through an e-mail.
5 291.    Q.   From whom?
6    A.   I think it was forwarded to me from
7    Richard or...I don't exactly remember.
8 292.    Q.   Do you remember who wrote the
9    e-mail?
10    A.   Not off the top of my head.
11 293.    Q.   Did Richard write it or was it
12    someone from Apotex?
13    A.   I am not sure.
14 294.    Q.   What did it say?
15    A.   It was something to do with printing
16    off some documents that Richard needed to sign, I
17    believe.
18 295.    Q.   So, somebody had sent some e-mail
19    attachments and asked you to print them off on
20    Nu-Pharm letterhead?
21    A.   Yes.
22 296.    Q.   Go and have Richard sign them?
23    A.   Yes.
24 297.    Q.   And you did that?
25    A.   Yes.

T. Molnar - 45

1 298.    Q.   And that is the first that you ever
2    heard about this application?
3    A.   Yes.
4 299.    Q.   Who have you talked to within
5    Nu-Pharm about this and/or the product intended for
6    the U.S. market?
7    A.   Richard and I may have had some
8    conversation.
9 300.    Q.   Anybody else?
10    A.   Nobody.
11 301.    Q.   Have you talked to anybody at Apotex
12    about this application or the product?
13    A.   No.
14 302.    Q.   Have you traded some...
15    MR. MOLINO:   Can you...
16 303.    MR. WINCHESTER:   Sure.
17
18    BY MR. WINCHESTER:
19 304.    Q.   And there are two things, I know you
20    have traded some correspondence back and forth.
21    A.   Yes.
22 305.    Q.   But first of all, let's say, I asked
23    who you talked to. Have you personally spoken to
24    anybody from Apotex?
25    A.   Yes, I have.

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 46

306.     Q.   Who?

A.   Anna Ivic and Eveline Eilert.

307.     Q.   Do you know what Ms. Ivic and Ms. Eilert do for Apotex?

A.   My understanding is they are in regulatory affairs.

308.     Q.   So, you have spoken to them and you have traded some correspondence with them about the ANDA; is that right?

A.   Regarding forms that needed to be signed and returned, that type of thing.

309.     Q.   There has been some e-mails back and forth between you?

A.   Yes.

310.     Q.   And these are circumstances in which they would send you documents and say, "Please print these on Nu-Pharm letterhead and have them signed by Richard", right?

A.   Yes.

311.     Q.   And there have been some occasions where you have actually signed the documents?

A.   I believe there was one occasion or twice. I am not exactly sure.

312.     Q.   Is there anybody else within Apotex that you have talked to or had any written

---

T. Molnar - 47

communication with other than Anna Ivic and Eveline Eilert?

313.     Q.   Bernice Tao or...

MR. MOLINO:   Tao.

THE WITNESS:   ...Tao.

BY MR. WINCHESTER:

314.     Q.   What has your contact with Bernice Tao been?

A.   It has the same idea, something to do with forms or something, I don't recall.

315.     Q.   Have you ever actually spoken to Bernice Tao?

A.   I am not sure.

316.     Q.   Have you had any communications, either orally or in writing, with anybody from Apotex that was for a purpose other than, "Here are some documents, please go have them signed"?

A.   Regarding our regular, everyday products, yes.

317.     Q.   And that is fair. What I mean is with regard to this product.

A.   No.

MR. MOLINO:   And I think, Tom, for the majority of the questions that Jason will

---

T. Molnar - 48

be asking now, I think he is focusing on this application.

THE WITNESS:   Okay.

MR. MOLINO:   And I think, if not, he will let you know.

318.     MR. WINCHESTER:   That is right.

THE WITNESS:   Okay.

BY MR. WINCHESTER:

319.     Q.   Yes, if I want to know about your relationship with regard to all the other products, I will let you know. Otherwise, assume I am talking about this one.

A.   Okay.

320.     Q.   Tell me what you can recall discussing with Richard Benyak about either this application or the product.

A.   The only thing I really recall is when he told me that I had to come and do this deposition and that was it.

321.     Q.   And you were thrilled to death...

A.   Well, I couldn't understand why I had to be here.

MR. MOLINO:   And do you yet?

THE WITNESS:   No.

---

T. Molnar - 49

BY MR. WINCHESTER:

322.     Q.   What did he tell you about needing to come here today?

A.   Well, he just said that, "You have to go and do a disposition or a"...

323.     Q.   Deposition.

A.   Whatever, yes, and that...and I asked him if I had to go and he said, "Yes, you have to go." And I said, "I don't understand why. All I did was print some papers off for you to sign or whatever, and that is all I am involved in." I don't understand why I had to come.

324.     Q.   Did you and Mr. Benyak talk at all about any of the claims that have been raised in this legal case?

A.   No.

325.     Q.   Other than having this conversation with Mr. Benyak about having to come here today, any other discussions you have had with him about this application or the product?

A.   Not that I remember.

326.     Q.   Are you aware that Apotex had its own divalproex product at some point that it sought to have approved by the U.S. FDA?

A.   No, I am not.

---

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 50

```
1   327.    Q.   Are you aware of any litigation that
2          had occurred between Abbott Laboratories and Apotex
3          in the U.S. about a divalproex sodium product?
4                A.   No.
5   328.    Q.   Have you ever heard anyone, other
6          than lawyers, talk about any litigation between
7          Abbott Laboratories and Apotex?
8                A.   No.
9   329.    Q.   Are you aware of the fact that
10         Apotex had a divalproex sodium product that was
11         found by the court to infringe certain patents that
12         are owned by Abbott?
13               A.   No.
14  330.    Q.   Have you ever heard anybody talk
15         about the fact that that happened?
16               A.   No.
17  331.    Q.   Are you aware of the fact that
18         Apotex was enjoined by the court from making its
19         divalproex sodium product?
20               A.   No.
21  332.    Q.   Have you ever heard anybody talk
22         about the fact that Apotex was enjoined from making
23         its divalproex sodium product?
24               A.   No.
25  333.    Q.   Did Mr. Benyak or anyone else within
```

T. Molnar - 51

```
1          Nu-Pharm ever specifically assign you any task with
2          respect to this application?
3                A.   No.
4   334.    Q.   So, your memory is the first thing
5          you knew about it, somebody had sent some documents
6          over and you were just to print them out?
7                A.   Yes.
8   335.    Q.   Did you ask any questions about why
9          you were to do this?
10               A.   No. I had no reason to.
11  336.    Q.   So, among the things you have done,
12         did you provide some contact information for
13         Nu-Pharm to Apotex at some point?
14         MR. MOLINO:   Objection to the extent, if
15               he needs to look at e-mails...
16  337.    MR. WINCHESTER:   No, that is fine.
17
18  BY MR. WINCHESTER:
19  338.    Q.   Just if you remember.
20               A.   I may have. I recall something to
21         that effect.
22  339.    Q.   And you have personally had to sign
23         documents for the application on a couple of
24         occasions, right?
25               A.   Yes.
```

T. Molnar - 52

```
1   340.    Q.   Why would you be signing them as
2          opposed to Richard?
3                A.   Richard wasn't around to sign them.
4   341.    Q.   And on other occasions you have
5          printed the documents off on Nu-Pharm letterhead
6          that you got from Apotex and have given them to
7          Richard to sign, right?
8                A.   Yes.
9   342.    Q.   Is there anything else you have done
10         with respect to this application other than those
11         things?
12               A.   No.
13
14  --- EXHIBIT NO. 86 :  Defendant Nu-Pharm Inc.'s objections
15               and answers to plaintiff, Abbott
16               Laboratories first set of
17               interrogatories.  Numbers 21 through
18               24 to defendant Nu-Pharm Inc.
19
20  BY MR. WINCHESTER:
21  343.    Q.   Let me mark...just have you look at
22         here, it is Plaintiff's 86. This doesn't have any
23         Bates number.  It is titled "Defendant Nu-Pharm
24         Inc.'s objections and answers to plaintiff, Abbott
25         Laboratories first set of interrogatories. Numbers
```

T. Molnar - 53

```
1          21 through 24 to defendant Nu-Pharm Inc."
2          A lot of legal gobbledegook, but some of it
3          involves you. So, I want to ask you a couple of
4          questions. Take a look, if you would, Mr. Molnar,
5          at page 7 of this document, plaintiff's 86. This is
6          a question that we put to Nu-Pharm and said,
7          "...Tell us everybody within Nu-Pharm who
8               has had anything to do with this product or
9               the ANDA and what their role is..."
10         Okay?
11               A.   M'hmm.
12  344.    Q.   And this is your company's response
13         on page 7 that you will see.  In the third
14         'paragraph, it says:
15         "...With regard to the ANDA that is the
16               subject matter of the present action, Tom
17               Molnar serves as the liaison between
18               Nu-Pharm and outside vendors on the
19               manufacturing side..."
20         Do you see that?
21               A.   Yes.
22  345.    Q.   Has anybody ever referred to you as
23         a liaison?
24               A.   No.
25  346.    Q.   Do you know what that means?
```

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 54

```
1            A.   Yes, I do.
2    347.     Q.   Do you regard your role as being a
3    liaison with respect to this product?
4            A.   I guess, yes.
5    348.     Q.   What is your role as liaison consist
6    of?
7            A.   Well, communicating with the
8    manufacturers to make sure we get the products that
9    we need in the time that we need them.
10   349.     Q.   And this one is not with respect to
11   your general role.  This is what they are saying as
12   to the ANDA that we are talking about.  Just this
13   ANDA.  They are saying you have been the liaison
14   between Nu-Pharm and the outside vendors.  Is
15   that...
16           MR. MOLINO:   Can I just have the witness
17   read the entire sentence.
18
19   BY MR. WINCHESTER:
20   350.     Q.   Sure.  Read as much as you need.
21           MR. MOLINO:   Read the entire paragraph.
22   351.     MR. WINCHESTER:   Yes, you may want to
23   read the next one too, because we will talk
24   about that.
25           THE WITNESS:   I am sorry, what was the
```

T. Molnar - 55

```
1    question?
2
3    BY MR. WINCHESTER:
4    352.     Q.   My question was...in just this first
5    sentence where they are talking about your role with
6    respect to this ANDA...so, this divalproex's product
7    intended for the U.S. market under Nu-Pharm's
8    name...
9            A.   Yes.
10   353.     Q.   You have been described as a liaison
11   between Nu-Pharm and outside vendors on the
12   manufacturing side.
13           A.   If that means communicating with
14   Anna and Eveline.
15   354.     Q.   Have you talked to...this says
16   'vendors', plural, have you talked to anyone from
17   anything you would describe as a vendor, other than
18   Apotex?
19           A.   No.
20   355.     Q.   The next sentence says:
21           "...The current vendor is Apotex Inc..."
22   Are you aware of any plans to change to a different
23   vendor with respect to this product?
24           A.   Not to my knowledge.
25   356.     Q.   Is it your understanding that if
```

T. Molnar - 56

```
1    this application gets approved by the U.S. FDA,
2    that, like almost all your other products, this one
3    will be made for you by Apotex?
4            A.   I don't know.
5    357.     Q.   You haven't heard anything about
6    that?
7            A.   No.
8    358.     Q.   You haven't seen any documents in
9    the ANDA that would describe...
10           A.   No.
11   359.     Q.   ...the roles post-approval?
12           A.   The only documents I have seen are
13   the letters that I printed off.  I do the warehouse
14   stuff.
15   360.     Q.   Do you know if there is a copy of
16   the full ANDA anywhere in Nu-Pharm's office?
17           A.   Not to my knowledge.
18   361.     Q.   This thing would be about four or
19   five or six boxes worth of paper.
20           A.   Not to my knowledge.  I haven't seen
21   any.
22   362.     Q.   In the next sentence:
23           "...Mr. Molnar, where needed, also has
24   assisted with the preparation of the ANDA
25   for submission to FDA..."
```

T. Molnar - 57

```
1    Let's talk about just that part of the sentence.
2    How have you assisted with the preparation of the
3    ANDA?
4            MR. MOLINO:   Objection.  It has been
5    asked and answered.  It was an earlier
6    question, but he can answer again.
7            THE WITNESS:   It is strictly printing
8    off the letters that needed to be signed.
9
10   BY MR. WINCHESTER:
11   363.     Q.   Have you drafted any of the
12   documents that you reviewed or signed?
13           A.   Never.
14   364.     Q.   Do you know if anyone within
15   Nu-Pharm has ever drafted any documents for this
16   ANDA?
17           A.   I don't know.
18   365.     Q.   Do you know if Richard Benyak ever
19   drafted any documents for this ANDA?
20           A.   Not to my knowledge.
21   366.     Q.   Let's move on in the sentence there.
22   It says:
23           "...[You] have assisted with the
24   preparation of the ANDA for submission to
25   FDA and in obtaining the correct
```

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 58

```
1          documentation from Nu-Pharm to submit to
2          FDA..."
3      Do you recall obtaining some documentation from
4      Nu-Pharm for the purpose of this ANDA?
5          MR. MOLINO:    Objection, it has been
6      asked and answered, but he can answer
7      again.
8          THE WITNESS:    Just those letters, that
9      is all.
10
11  BY MR. WINCHESTER:
12  367.     Q.    The ones that were drafted by Apotex
13      and you printed on Nu-Pharm letterhead and had them
14      signed?
15          A.    Yes.
16  368.     Q.    Anything else you have done in terms
17      of getting documents from within Nu-Pharm for the
18      purposes of this ANDA?
19          A.    I don't recall, but no.
20  369.     Q.    Let me show you what I will mark as
21      a group exhibit, 87.  These are a few documents that
22      you signed that relate to a filing for the ANDA.
23      Called a "Bio-Equivalency Amendment" dated August 5,
24      2005.
25
```

T. Molnar - 60

```
1      documents?
2          A.    Richard must not have been
3      available, so I signed it for him.
4   376.     Q.    On several of these documents you
5      are signing for a person named Kalpesh,
6      K-A-L-P-E-S-H Shroff, S-H-R-O-F-F.  Do you know Mr.
7      Shroff?
8          A.    No.
9   377.     Q.    Have you ever talked to Mr. Shroff?
10          A.    No.
11  378.     Q.    To the best of your recollection,
12      all these documents in plaintiff's 87 were things
13      that were sent to you by Apotex and they just asked
14      you to print them off and have them signed, right?
15          A.    Yes.
16
17  --- EXHIBIT NO. 88 :  Bates numbered NU011979.  Document
18          entitled "Change in Contact
19          Information" dated September 6, 2005
20
21  BY MR. WINCHESTER:
22  379.     Q.    I am going to show you one more,
23      which I think will be similar.  Plaintiff's 88, I
24      will mark.  It is Bates numbered NU011979.  This is
25      another document relating to the ANDA.  A "Change in
```

T. Molnar - 59

```
1   --- EXHIBIT NO. 87 :  Bio-Equivalency Amendment dated
2          August 5, 2005
3
4   BY MR. WINCHESTER:
5   370.     Q.    Take a look at that and let me know
6      if you remember any of these documents.
7          A.    That is my signature.
8          MR. MOLINO:    Was there a question
9      pending?
10  371.     MR. WINCHESTER:    Yes, I just asked him
11      if he remembered any of these.
12          MR. MOLINO:    Yes.  You can answer that.
13          THE WITNESS:    Yes.  Yes, I believe so.
14
15  BY MR. WINCHESTER:
16  372.     Q.    So, that is your signature?
17          A.    Yes.
18  373.     Q.    Am I correct that you did not draft
19      any of these documents?
20          A.    Yes.
21  374.     Q.    Are these documents that you
22      received from Apotex?
23          A.    Yes.
24  375.     Q.    I think I know the answer to this,
25      but how is it that you ended up signing these
```

T. Molnar - 61

```
1      Contact Information" is what it is called, dated
2      September 6, 2005.  Do you recognize that document?
3          A.    Yes.
4   380.     Q.    Is that your signature?
5          A.    Yes, it is.
6   381.     Q.    Again, did you draft this document?
7          A.    No.
8   382.     Q.    Is this one that was provided to you
9      by Apotex?
10          A.    Yes.
11  383.     Q.    And are you signing it because
12      Richard was gone as far as you know?
13          A.    Yes.
14  384.     Q.    This, at least purports to notify
15      the FDA that the new U.S. agent is this person,
16      Kalpesh Shroff.  Do you see that?
17          A.    Yes.
18  385.     Q.    Did you ever talk to anybody about
19      Mr. Shroff and his role with respect to the ANDA?
20          A.    No.
21
22  --- EXHIBIT NO. 89 :  Bates numbered NU015543 through
23          015558.  Telephone amendment to the
24          ANDA filed on or about March 6, 2006
25
```

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 66

```
1    407.    Q.   Does Mr. Benyak typically come into
2         the office on weekends?
3              A.   I have no idea.
4    408.    Q.   I take it, then, you don't typically
5         come into the office on weekends?
6              A.   No, I have a family.
7    409.    Q.   Are you aware of anybody at Nu-Pharm
8         whose common practice is to work either or both of
9         the weekend days?
10             A.   No.
11        MR. MOLINO:   Do you need to take a
12        break, Tom?
13        THE WITNESS:   No, I am okay.
14   410.   MR. WINCHESTER:   You are okay?
15        THE WITNESS:   Yes.
16
17   BY MR. WINCHESTER:
18   411.    Q.   Grab that big book from Paul over
19        there and take a look just at number 1.
20        MR. MOLINO:   One page?
21   412.   MR. WINCHESTER:   Yes.
22        MR. MOLINO:   Okay.
23   413.   MR. WINCHESTER:   Exhibit 1, plaintiff's
24        1, formally marked.
25
```

T. Molnar - 67

```
1    BY MR. WINCHESTER:
2    414.    Q.   This looks like a similar e-mail
3         from Anna Ivic to you dated March 21, 2006 with a
4         similar set of attachments.
5              A.   Yes.
6    415.    Q.   Including a Paragraph IV
7         Certification. Do you see that?
8              A.   Mhmm.
9    416.    Q.   To put this in context for you, this
10        e-mail that she is sending you the attachments, is
11        March 21, 2006. On March 24, 2006, three days
12        later, there was an amendment filed to the ANDA to
13        add in new dosage strengths, 125 milligram and 250
14        milligram. Do you have any recollection of that
15        amendment being filed?
16             A.   No.
17   417.    Q.   Did you do as Ms. Ivic asked and
18        have these documents printed up and get them signed
19        by Richard?
20             A.   I probably would have, yes.
21   418.    Q.   Do you recall any discussions with
22        Mr. Benyak about any of these documents?
23             A.   No.
24   419.    Q.   Do you know if you were there when
25        he signed the documents?
```

T. Molnar - 68

```
1              A.   I don't know.
2    420.    Q.   Other than providing Nu-Pharm's
3         address and signing some documents that you got from
4         Apotex, are you aware of anything that...anything
5         else that Nu-Pharm has actually contributed to this
6         ANDA?
7              A.   No.
8    421.    Q.   If the ANDA gets approved are you
9         aware of any plans for how the product is going to
10        be marketed and sold?
11             A.   No.
12   422.    Q.   Do you have any understanding of
13        what your role is to be if the product gets approved
14        for sale?
15             A.   Not at this point, no.
16   423.    Q.   Look again at this document,
17        plaintiff's 86 right here in front of you. And,
18        again, on page 7. I want to talk with you about the
19        last paragraph.
20             A.   Okay.
21   424.    Q.   So, in this response, Nu-Pharm, when
22        we asked:
23        "...What are everybody's respective roles
24        and responsibilities..."
25        They have said:
```

T. Molnar - 69

```
1         "...Both Richard Benyak and Tom Molnar will
2         have eventual responsibility within
3         Nu-Pharm for sourcing the finished dosage
4         product..."
5    I will stop there.
6         MR. MOLINO:   He is going to ask about
7         that one.
8         THE WITNESS:   Yes.
9
10   BY MR. WINCHESTER:
11   425.    Q.   I am, yes. What does:
12        "...sourcing the finished dosage
13        product..."
14   Mean?
15             A.   My interpretation would be finding
16        somebody who is going to make it for us.
17   426.    Q.   Has anyone talked to you about this
18        role you are supposed to have in sourcing the
19        finished dosage product if this ANDA gets approved?
20             A.   No.
21   427.    Q.   Do you usually have a role in
22        finding who is going to make a product for Nu-Pharm?
23             A.   If I am asked to do that, yes.
24   428.   MR. WINCHESTER:   Mr. Molino needs to
25        take a phone call. We can go off for a
```

# VICTORY VERBATIM COURT REPORTING SERVICES



T. Molnar - 70

```
1           second.
2
3    --- A BRIEF RECESS
4
5    TOM MOLNAR, resumed
6    CONTINUED EXAMINATION BY MR. WINCHESTER :
7    429.      Q.    When we left off you had started to
8          talk to me about some occasions when you had been
9          tasked with what you have described as sourcing a
10         finished dosage product. And you told me that, to
11         you, that means finding a manufacturer for the
12         product, right?
13              A.    Yes. I have never had to source a
14         product.
15   430.      Q.    You have never actually had to do
16         that?
17              A.    No. I typically look after the
18         distribution.
19   431.      Q.    Has anybody ever talked to you about
20         the idea that you are going to be responsible for
21         sourcing the finished dosage product with respect to
22         this application?
23              A.    No.
24   432.      Q.    Moving on in the sentence, in
25         plaintiff's 86. It says:
```

T. Molnar - 71

```
1             '...[You] and Mr. Benyak will be
2          responsible for ensuring that the final
3          product will include the accompanying
4          notifications and/or certifications that
5          the products are in compliance with the
6          specifications called for by the ANDA prior
7          to its eventual sale and/or
8          distribution...'
9    Do you see that?
10              A.    Yes, I see that.
11   433.      Q.    Has anyone talked to you about this
12         being your role if the product gets approved?
13              A.    Can I just read it again, please?
14   434.      Q.    Sure, go ahead.
15              A.    No, nobody has talked to me about
16         that.
17   435.      Q.    Does this phrase:
18             '...The accompanying notifications and/or
19         certifications...'
20         mean anything to you?
21              A.    No.
22   436.      Q.    Do you, in your position as
23         materials manager, generally deal with notifications
24         and certifications of compliance?
25              A.    No.
```

T. Molnar - 72

```
1    437.      Q.    Do you know who handles that aspect
2          of the business with respect to Nu-Pharm's products?
3              A.    No, I don't.
4    438.      Q.    In your experience, though, you have
5          told me that handling things like regulatory issues
6          with Health Canada would be dealt with by your
7          vendor, right?
8              A.    Yes.
9    439.      Q.    Generally Apotex?
10              A.    Yes.
11   440.      Q.    The last phrase here is:
12             '...Prior to its eventual sale and/or
13         distribution...'
14         Do you have any knowledge of any plans for how this
15         product, if approved, will be distributed or sold?
16              A.    No.
17   441.      Q.    Have you ever dealt with anyone
18         employed by Apotex Corp., the U.S. Apotex company
19         with respect to this case?
20              A.    No.
21   442.      Q.    Are you aware of any scientific
22         testing that has ever been done on this product?
23              A.    No.
24   443.      Q.    Have you heard anybody talk about
25         any scientific testing on the product?
```

T. Molnar - 73

```
1              A.    No.
2    444.      Q.    Are you aware of Nu-Pharm's basis to
3          say that this product, if it gets approved, won't
4          infringe Abbott's patents?
5              A.    No.
6    445.      Q.    Have you ever talked to anybody at
7          Nu-Pharm about anything relating to Abbott's
8          patents?
9              A.    Never.
10   446.      Q.    Have you heard anybody at Nu-Pharm
11         talk about anything relating to Abbott's patents?
12              A.    No.
13   447.      Q.    Other than the conversation you had
14         with Mr. Benyak who told you to show up today and
15         talk to me, have you spoken to anyone within
16         Nu-Pharm about this legal case?
17              A.    No.
18   448.      Q.    Were you aware there was a legal
19         case between Abbott and Nu-Pharm?
20              A.    Not until they told me I had to be
21         here.
22   449.      Q.    Were you given any documents to
23         prepare for your deposition today?
24              A.    Yes.
25   450.      Q.    Are those things you have reviewed
```

# VICTORY VERBATIM COURT REPORTING SERVICES

T. Molnar - 78

1    A.  Out of the 10,000 square feet I told
2  you, two-thirds of it is warehouse and one-third is
3  office.
4  473.   Q.  All the same building?
5    A.  All the same thing, yes.
6  474.   Q.  There is no separate warehouse
7  facility somewhere?
8    A.  It is not another building, no.
9  475.   Q.  I got you.  Well, thanks for coming.
10  I appreciate it, particularly given how
11  uncomfortable you are.  That is all I have got.
12  MR. MOLINO:  Just one question. Tom,
13  were you asked by Richard or other to
14  collect all your e-mails and any documents
15  relating to divalproex sodium that were in
16  your possession?
17  THE WITNESS:  Yes, I did that.
18  MR. MOLINO:  And did you do that?
19  THE WITNESS:  Yes.
20  MR. MOLINO:  And do you remember about
21  when you did that?
22  THE WITNESS:  A few months ago, five
23  months ago, something like that.  I
24  searched all my e-mails and anything...any
25  kind of correspondence or anything I had.

T. Molnar - 80

1  any time?
2  THE WITNESS:  No.
3  MR. MOLINO:  And all those documents
4  that you found you provided to Richard
5  Benyak; is that correct?
6  THE WITNESS:  That is correct.
7  MR. MOLINO:  Fine.
8  479.   MR. WINCHESTER:  Do you want to reserve
9  signature?
10  MR. MOLINO:  I will reserve signature.
11  We will mark everything as confidential on
12  a protective order, including the
13  transcript and the exhibits.
14  480.   MR. WINCHESTER:  There you go.
15  MR. MOLINO:  Thank you.
16  481.   MR. WINCHESTER:  That is it, thank you.
17
18
19
20
21  I hereby certify the foregoing to be a true and accurate trans-
22  above noted proceedings held before me on the 18TH DAY OF JULY,
23  and taken to the best of my skill, ability and understanding.
24
25
26          }  Certified Correct:
27
28
29
30
31
32             Elisa Antonelli

T. Molnar - 79

1  MR. MOLINO:  And did you hold back any
2  documents?
3  THE WITNESS:  No.
4  MR. MOLINO:  And you gave them all to
5  Richard?
6  THE WITNESS:  Everything.
7
8  BY MR. WINCHESTER:
9  476.   Q.  Last question though.  Do you ever
10  remember anybody telling you or sending you any
11  message that said, "We are in litigation with
12  Abbott, make sure you don't delete any e-mails or
13  throw away any documents relating to this
14  divalproex"?
15    A.  I don't recollect.  It may have
16  been, I am not sure.
17  477.   Q.  You don't recall anything like that
18  happening?
19    A.  I don't recall, no.
20  478.   MR. WINCHESTER:  That is all I have got.
21  MR. MOLINO:  One last question.  Did you
22  delete, destroy any documents whatsoever
23  relating to divalproex sodium?
24  THE WITNESS:  No.
25  MR. MOLINO:  Or this ANDA submission at

T. Molnar

1
2      }  Verbatim Reporter

C O N F I D E N T I A L


UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ABBOTT LABORATORIES              )
                                 )
        Plaintiff,               )
                                 )    Civil Action No.
                                 )    05 C 3714
                                 )
NU-PHARM, INC.,                  )
APOTEX INC. and                  )
APOTEX CORP.                     )
        Defendants.              )
                                 )


DEPOSITION OF

DONALD JOHN BARBER

JULY 7, 2006


**A0074**

Arnold Goldstine & Associates, Ltd.                          Chicago, Il 60611
312.222.1644              agaltd@earthlink.net              Fax: 312.222.1645

**Page 2**

```
 1
 2
 3
 4
 5
 6        The video deposition of DONALD JOHN BARBER,
 7   called for examination by the Plaintiff pursuant to
 8   notice and pursuant to the provisions of the Federal
 9   Rules of Civil Procedure of the United States Court,
10   pertaining to the taking of depositions, taken
11   before Arnold N. Goldstine a Certified Shorthand
12   Reporter within and for the County of Cook and State
13   of Illinois, at 77 West Wacker Drive in the City of
14   Chicago, County of Cook and State of Illinois on the
15   7th day of July 2006, commencing at the hour of 9:30
16   o'clock a.m.
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                    I N D E X
 2
 3   WITNESS:                 PAGE:
 4
     DONALD JOHN BARBER
 5
     DIRECT EXAMINATION
 6
     BY MR. WINCHESTER            6
 7
 8
 9          E X H I B I T S
10   Plaintiff's Nos.
11
12   Nos. 53, 54 and 55         7
     No. 56                52
13   No. 57                55
     No. 58                64
14   No. 59                67
     No. 60                72
15   No. 61                74
     No. 62                78
16   No. 63                81
     No. 64                83
17   No. 65                91
     Nos. 66 and 67       100
18   No. 68               102
     No. 69               102
19   No. 70               107
     No. 71               108
20   No. 72               111
     No. 73               114
21   Nos. 74 and 75       116
     No. 76               118
22   No. 77               122
     No. 78               125
23
24
```

**Page 3**

```
 1   APPEARANCES:
 2
 3
 4       Mr. Jason G. Winchester, Esq.
         Jones Day
 5       77 West Wacker Drive
         Chicago, Illinois 60601
 6
 7           appeared on behalf of
             Plaintiff;
 8
 9
10       Ms. Deanne M. Mazzochi, Esq.
         Rakoczy Molino Mazzochi Siwik LLP
11       6 West Hubbard Street
         Suite 500
12       Chicago, Illinois 6061
13           appeared on behalf of the
             Defendants.
14
15   Also Present:
16   Mr. Steven Crowley
17
18
19
20
21
22
23
24
```

**Page 5**

```
 1       THE VIDEOGRAPHER:  Good morning.  We
 2   are on the video record.
 3       My name is Robert Zellner.  I am a
 4   video technician for Depovision located at
 5   77 West Washington Street in Chicago,
 6   Illinois.
 7       The date is July 7, 2006, and the
 8   time is 9:30 a.m.  We are present here
 9   today at 77 West Wacker Drive in Chicago,
10   Illinois with reference to the case
11   entitled Abbott Laboratories versus
12   Nu-Pharm, Inc. pending in the United
13   States District Court for the Northern
14   District of Illinois, Eastern division,
15   · civil action number 05 C 3714.
16       The witness is Donald Barber.  An
17   audiovisual recording of this deposition
18   is at the request of the plaintiff.
19       And will the attorneys please
20   identify themselves for the record?
21       MR. WINCHESTER:  Jason Winchester of
22   Jones Day for Abbott Laboratories, with me
23   is Coral Shaw also with Jones Day and
24   Steve Crowley from Abbott Laboratories.
```

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net

Chicago, Il 60611
Fax:  312.222.1645

A0075

Page 22

1    Q   All right.
2        I'm going to want to ask you some
3    questions about that, but let me start first.
4        If I have it right, you started
5    working for TorPharm at the time in about
6    September 1993, right?
7    A   Yes.
8    Q   And at the time you were the analytical
9    development manager?
10   A   Yes. It may have been called lab manager
11   at that time. It went through a series of lab
12   titles.
13   Q   Is September '93 about the time that
14   TorPharm was getting started as a business?
15   A   Yes.
16   Q   And did you help actually get the lab
17   going, order equipment, things of that nature?
18   A   Yes, I did.
19   Q   I have it the next title you had within
20   TorPharm, I believe, was in about November 1998,
21   when you assumed the title of formulation
22   development administrative manager, is that right?
23   A   Yes, that's correct.
24   Q   Have you had any titles with Apotex or

Page 23

1    TorPharm between being the formulation development
2    administrative manager and your current title,
3    formulation development manager?
4    A   No.
5    Q   How if at all is your job different as the
6    formulation development manager than it was as the
7    formulation development administrative manager?
8    A   As the administrative manager, I was
9    responsible for formulation development
10   documentation, creation of master documents,
11   generation of reports, so the paperwork side of
12   formulation development was my responsibility.
13   Q   When did you change from being the FD
14   administrative manager to the FD manager?
15   MS. MAZZOCHI:  Asked and answered.
16   A   I don't really recall when that change
17   happened.
18   BY MR. WINCHESTER:
19   Q   Was it this year?
20   A   No.
21   Q   Do you remember if it was within the last
22   five years?
23   A   It was sometime ago. It may have been
24   within the five years, it may have been outside of

Page 24

1    that.
2    Q   So as the formulation development
3    administrative manager, you said you dealt with the
4    I guess putting on paper formulations and drafting
5    of the actual manufacturing processes, things of
6    that nature, right?
7    A   Yes.
8    Q   What do you do now as the formulation
9    development manager?
10   A   I oversee a staff of technicians that
11   actually execute what is documented on the paper.
12   Q   And what do you mean by execute?
13   A   We make batches, basically.
14   Q   Was your group not responsible for making
15   batches when you were the formulation development
16   administrative manager?
17   A   No.
18   Q   Who made the batches when you held that
19   title?
20   A   There was a separate formulation
21   development manager that was responsible for the
22   plant activities.
23   Q   So this is someone you worked with who
24   handled the actual creation of the lots, is that

Page 25

1    right?
2    A   Yes.
3    Q   In your same group?
4    A   Yes.
5    Q   What title did you hold at the time that
6    you worked on the product that is the subject of
7    this case, the divalproex sodium product that's been
8    submitted under Nu-Pharm's name?
9    A   Formulation development manager.
10   Q   So your group actually was responsible for
11   not only drafting the formulation but also for
12   creating the biobatches, is that right?
13   A   That's correct.
14   Q   How many people report to you as the
15   formulation development manager?
16   A   I would say in the neighborhood of 45 to
17   50 people.
18   Q   How many of those 45 to 50 people are
19   involved with what you characterized as the paper
20   side of formulation development, the actual drafting
21   of manufacturing processes and things of that
22   nature?
23   A   Six to eight people, something of that
24   magnitude.

7 (Pages 22 to 25)

Page 46

1  counsel in that regard.
2  A  I didn't perform any tests, no.
3  BY MR. WINCHESTER:
4  Q  Are you aware of anyone within Apotex that
5  did perform tests to determine whether the
6  divalproex sodium made by the processes under
7  Nu-Pharm's name is any different from the divalproex
8  sodium made and found to be infringing under the
9  TorPharm process?
10  MS. MAZZOCHI:  I am going to object
11  to the form of the question.
12  And further I will instruct you not
13  to reveal any communications that you may
14  have had with counsel in that regard.
15  A  I don't know what testing was done on the
16  material.
17  BY MR. WINCHESTER:
18  Q  Did it ever occur to you that it would be
19  important to undertake that comparison --
20  MS. MAZZOCHI:  Objection, vague
21  ambiguous.
22  BY MR. WINCHESTER:
23  Q  -- to decide if the new stuff you were
24  making is the same as the old stuff?

Page 47

1  MS. MAZZOCHI:  Same objection.
2  A  No.
3  BY MR. WINCHESTER:
4  Q  Did you ever ask Dr. Sherman whether it
5  would be useful to undertake that comparison of
6  whether the new stuff he told you to make is the
7  same as the old stuff?
8  A  No, I don't believe I did.
9  Q  It didn't occur to you as important?
10  A  No.
11  Q  Did you work with any team of people
12  within Apotex on this product submitted under the
13  Nu-Pharm name?
14  A  There was no team, per se.  No.  I mean,
15  in the routine course of business there are people
16  that we interact with, for example the labs.
17  Q  Before we get into that let me ask a
18  broader question.
19  In the context of any of the work
20  you've done with respect to this product submitted
21  under Nu-Pharm's name, have you ever had any
22  interaction with anyone who actually works for
23  Nu-Pharm?
24  A  No.

Page 48

1  Q  Who were the persons within your group
2  formulation development that you worked with in
3  conjunction with this product submitted under
4  Nu-Pharm's name?
5  A  I don't recall specific people.  I would
6  have interacted with our technical writers, I would
7  have interacted with my supervisors.  I may have
8  interacted with technicians.
9  Q  When you say your supervisors, do you mean
10  persons in a supervisory role who report to you?
11  A  Yes.
12  Q  Not the people you report to, right?
13  A  Correct.  The people who report to me.
14  Q  And the technical writers you mentioned,
15  were those the persons you assigned to actually
16  draft the formulation process documents?
17  A  Yes.
18  Q  Is there a team leader with respect to
19  this product submitted under Nu-Pharm's name?
20  A  Not that I am aware of, no.
21  Q  What was Dr. Sherman's role with respect
22  to this product submitted under Nu-Pharm's name to
23  the best of your knowledge?
24  A  Outside of providing me with the process

Page 49

1  and formulation for making it, I don't know what his
2  role was.
3  Q  Did you have further communications or
4  discussions with Dr. Sherman after he initially told
5  you go forth and make this product?
6  A  I seem to recall that he wanted to see
7  some of the documents before we went ahead and made
8  the batches.  So I think there was some exchange of
9  information.
10  Q  Did you provide Dr. Sherman with periodic
11  updates on your progress?
12  A  I believe we would have done that.  Yes.
13  Q  Do you know how frequently you updated him
14  on the progress with this project?
15  A  I don't recall.
16  Q  Did he direct you to keep him informed of
17  the progress you were making?
18  A  Well, he likes to be informed on all the
19  projects that we're working on, so that's routine.
20  Q  Did you ever personally participate in any
21  meetings with Dr. Sherman relating to this product
22  submitted under Nu-Pharm's name?
23  A  I believe I was in one meeting, that's a
24  project issues meeting, where one of the projects

13  (Pages 46 to 49)

Page 50

1 discussed at that meeting was divalproex DR tablets.
2    Q   Tell me what you remember from that
3 meeting specifically with respect to the divalproex
4 sodium product?
5    A   I believe we were having some issue with
6 dissolution. And there what was some discussion
7 around the method used for testing the product.
8    Q   Dissolution being an in-process test,
9 right?
10    A   It is a test on the final tablets.
11    Q   Is that also referred to as an assay test?
12    A   No.
13    Q   What is a dissolution test?
14    A   Dissolution test is a test we conduct on
15 final tablets to measure the rate of release of the
16 drug in the specified media. For example water, 0.1
17 normal HCl or something of that nature.
18    Q   This is where you would test the time
19 release of this product, right?
20    A   That's correct.
21    Q   This is intended to be a product that
22 releases the medication over some time after
23 ingestion?
24    A   I believe so, yes.

Page 51

1    Q   So in a dissolution test you would
2 simulate, for instance, the conditions in the
3 stomach of a patient, right, to see how the drug
4 releases?
5    A   That's the intent of the test. Yes.
6    Q   Do you recall what issues you were having
7 with respect to dissolution and that you discussed
8 with Dr. Sherman in this meeting?
9    A   I believe we had concerns about whether
10 the enteric coating of the tablets was holding up in
11 the acid phase of the test.
12    Q   Did you make any changes to the product as
13 a result of these issues with dissolution that you
14 had encountered?
15    A   I believe we eventually did make some
16 modification to the process, yes.
17    Q   What were those modifications to the best
18 of your knowledge?
19    A   Within the roll compaction granulation
20 that we make, there's an ingredient that we used
21 called microcrystalline cellulose. And part of that
22 ingredient was put in and roll compacted with the
23 rest of the ingredients, part of it was blended in
24 after that compaction was completed.

Page 52

1       And I believe we changed the process
2 to put all of that microcrystalline cellulous into
3 the granulation, to go through the whole roll
4 compaction and then nothing was blended in
5 afterwards.
6    Q   Microcrystalline cellulose is what is
7 known as an excipient material, is that right?
8    A   That's correct.
9    Q   It is not an active ingredient in this
10 formulation?
11    A   It is not active, no.
12    Q   Did you make any changes to the active
13 ingredient divalproex sodium as a result of these
14 concerns over dissolution?
15    A   No.
16    Q   Did you consult anyone from Nu-Pharm about
17 the dissolution concerns that you raised in this
18 meeting with Dr. Sherman?
19    A   No.
20       (The document referred to was
21       marked Plaintiff's Deposition
22       Exhibit No. 56 for
23       identification.)
24    Q   I show you what I have marked as

Page 53

1 Plaintiff's 56, a document Bates numbered NU 012129
2 through 142.
3       Take a look at that and let me know
4 if you have seen it before. The first page appears
5 to be an e-mail.
6       MS. MAZZOCHI: I am sorry. This was
7 56?
8       MR. WINCHESTER: This is 56, yeah.
9    Q   An e-mail from a person named Rita Sankar,
10 whose title is technical writer, to you dated
11 March 22, 2004? Have you seen this before
12    A   Yes, I believe so.
13    Q   Attached to the e-mail it looks like is an
14 initial draft formulation process for the flaking
15 process, is that right?
16    A   That's correct.
17    Q   Is this the initial draft of the process
18 that you created at Dr. Sherman's direction?
19    A   I can say it is a draft. I don't know if
20 it's the initial draft. I don't recall if there was
21 more than one draft.
22    Q   Is it fair to say, though, this e-mail
23 when this Mr. or Mrs. Sankar, is Rita a male or
24 female?

14 (Pages 50 to 53)

Page 98

1    A   The tests I have described there would not
2   be testing to see if something is an oligomer or
3   not.
4    BY MR. WINCHESTER:
5    Q   Are you aware of any testing that is
6   required as a part of the process submitted in the
7   ANDA under Nu-Pharm's name that would be directed to
8   whether the material is or is not an oligomer?
9    MS. MAZZOCHI:  Same objection.
10    A   I don't know.
11    BY MR. WINCHESTER:
12    Q   You are not aware of any, is that right?
13    MS. MAZZOCHI:  Same objection.
14    A   I'm not aware of any.
15    BY MR. WINCHESTER:
16    Q   When talk about raw material testing, what
17   are you talking about raw materials?
18    A   I am talking about materials we purchase
19   from outside vendors that we're going to use to go
20   make a product.  They may be active ingredients,
21   they may be excipient ingredients.
22    Q   In this case let's refer specifically to
23   the divalproex sodium created by the flaking or
24   spray-drying process, okay?

Page 99

1    A   Okay.
2    Q   Would your answers be the same, there's no
3   tests you are aware of that would be required to
4   determine whether that material is or is not an
5   oligomer?
6    MS. MAZZOCHI:  Same objection, lack
7   of foundation, it calls for speculation.
8   And further objection to the extent you're
9   trying to elicit expert testimony.
10    A   I am saying as a general process, any
11   material we're going to use in a batch gets --
12   undergoes some level of testing.  What is
13   specifically on that battery of tests for the
14   divalproex resulting from this I don't know.
15    BY MR. WINCHESTER:
16    Q   So, again, you are not aware of any test
17   that is required as a part of the process described
18   in the ANDA for testing the divalproex sodium to
19   determine if it is or is not an oligomer, is that
20   right?
21    MS. MAZZOCHI:  Same objection and
22   asked and answered, and also vague because
23   you haven't defined what an oligomer is.
24    A   I'm not aware of any tests.

Page 100

1    BY MR. WINCHESTER:
2    Q   Your department was responsible for
3   creating the actual biobatch lots of divalproex
4   sodium that were submitted to FDA as part of ANDA,
5   right?
6    A   Yes.
7    THE VIDEOGRAPHER:  Tape number 1, the
8   deposition of Donald Barber.  We are off
9   the record at 11:51 a.m.
10    (Whereupon, a brief recess
11   was taken.)
12   We are beginning tape number 2 of the
13   deposition of Donald Barber we are back on
14   the record at 11:33 a.m.
15    (The documents referred to were
16   marked Plaintiff's Deposition
17   Exhibit Nos. 66 and 67,
18   respectively, for
19   identification.)
20    BY MR. WINCHESTER:
21    Q   You started to talk about the actual
22   biobatch lots, and so we can keep some of the
23   numbers straight I'm going to hand you a couple of
24   exhibits here.

Page 101

1    Plaintiff's 66 is a document Bates
2   numbered NU 001377, and Plaintiff's 67 is Bates
3   numbered NU 001546.
4    Looking at Plaintiff's 66, it says
5   that the samples of finished product submitted with
6   the ANDA for the 500-milligram strength are lot
7   numbers FD 4165 and FD 4175.
8    Do you see that?
9    A   I see that.
10    Q   Do you know, is one of those lots made
11   with the flaked divalproex sodium and one made with
12   the spray-dried?
13    A   Yes, I would believe so.
14    Q   Let's look at Plaintiff's 67 which I think
15   clears this up.  For lot FD 4165 it looks like that
16   correlates to the flaking process, right?
17    A   Yes.
18    Q   And that look like, at least according to
19   Plaintiff's 67, the lot of divalproex sodium that
20   was used to make this 4165 batch was lot number 4050
21   made by the flaking process, right?
22    A   Yes.
23    Q   And for the final pill lot 4175 that looks
24   like that correlates to a spray-dried lot of

A3178

26 (Pages 98 to 101)

Arnold Goldstine & Associates, Ltd.
312.222.1644                agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

A0079

**Page 102**

1  divalproex sodium FD 4161, right?
2      A   Yes.
3          (The document referred to was
4          marked Plaintiff's Deposition
5          Exhibit No. 68 for
6          identification.)
7      MR. WINCHESTER: I will mark as
8  Plaintiff's 68 a document Bates numbered
9  NU 002394 through 2408.
10     And 69 a document Bates numbered NU
11 002409 through 2455.
12         (The document referred to was
13         marked Plaintiff's Deposition
14         Exhibit No. 69 for
15         identification.)
16     Q   Let me know if you recognize those
17 documents, Plaintiff's 68 and 69?
18     A   Yes.
19     Q   Let's start with 68. What is that
20 document?
21     A   This document is a copy of the executed
22 batch record for divalproex sodium flakes, batch
23 number FD number 4050.
24     Q   This is the actual executed batch record

**Page 103**

1  for making the divalproex sodium flakes that as we
2  saw before were used in the biobatch submitted with
3  the ANDA, right?
4      A   Yes.
5      Q   Similarly with Plaintiff's 69, what is
6  that document?
7      A   It is a copy of the executed batch record
8  of divalproex sodium related to the spray-dried
9  batch number FD 4161.
10     Q   And, again, FD 4161 is the spray-dried
11 divalproex sodium that was ultimately used in the
12 lot of pills 4175 submitted as part of the ANDA,
13 right?
14     A   Yes.
15     Q   Were both of these lots 4050 and 4161
16 prepared according to the manufacturing instructions
17 that we have talked about before?
18     A   Yes. I believe they would have been.
19     Q   Take a look at Plaintiff's 68, the batch
20 record for 4050.
21         On the first page it looks like your
22 signature there under "checked by," is that right?
23     A   That's correct.
24     Q   And dated March 25, '04?

**Page 104**

1      A   Yes.
2      Q   Was this lot of divalproex sodium flakes
3  prepared at your direction?
4      A   Yes.
5      Q   When it says "checked by," what is your
6  actual function with regard to checking this
7  executed manufacturing record?
8      A   Actually the signatures in that particular
9  box are for approval of the master manufacturing
10 document, not for the execution of the document. So
11 we go through the process of approving a master
12 document that will be executed sometime in the
13 future.
14     Q   Did you actually review and check this
15 executed document that's marked as Plaintiff's 68?
16     A   I don't review the documents as a routine
17 course of what I do. No.
18     Q   This signature, your signature here you're
19 saying you would have signed this before it was
20 filled out?
21     A   Yes.
22     Q   Is the same true for Esther Barber who
23 also appears here under, "QA approved by"?
24     A   Yes.

**Page 105**

1      Q   Are you related to Esther Barber?
2      A   Yes.
3      Q   How so?
4      A   She's my wife.
5      Q   You work with your wife, all right.
6          The same questions on Plaintiff's 69.
7  Both of you appear in the upper left-hand corner,
8  Don Barber and Esther Barber.
9          Is it also the case that you would
10 have signed these documents before they were
11 actually filled out?
12     A   Yes.
13     Q   So you approved the process, you don't
14 necessarily review it after it is all filled in, is
15 that right?
16     A   That's correct.
17     Q   Turn back to Plaintiff's 68, the lot of
18 flakes. Can you tell when this lot of flakes was
19 actually made?
20     A   The lot of flakes was manufactured on
21 March 30 of 2004.
22     Q   So that explains to me actually the
23 difference why you're signing on March 25, '04 and
24 the lot is made March 30. If you look --

27 (Pages 102 to 105)

## Page 106

1    MS. MAZZOCHI: July 30.
2    MR. WINCHESTER: I am looking at
3  4050.
4    MS. MAZZOCHI: Okay.
5  BY MR. WINCHESTER:
6    Q  It looks like Mr. Barber signing off on
7  the process of March 25, '04 but the actual
8  manufacture of this lot was performed on March 30,
9  '04, is that right, Mr. Barber?
10   A  Yes.
11   Q  And then on Plaintiff's 69 with respect to
12 the spray-dried lot, it looks like you signed off on
13 the process May 27, 2004. Can you tell can you tell
14 when this lot actually was created?
15   A  It looks like June 24, 2004.
16   Q  Do you know whether there were any lots of
17 flaked or spray-dried divalproex sodium created
18 before these two?
19   MS. MAZZOCHI: You mean following
20   these processes?
21   MR. WINCHESTER: Yes.
22   A  I don't believe so.
23      These are referred to as small trial
24 of the spray-dried, that was the subject of one of

## Page 107

1  the e-mails we looked at that was the Katwijk
2  material, but that was a trial, not a submission --
3  not a submission batch. I believe these are the
4  only submission batches.
5  BY MR. WINCHESTER:
6    Q  So were these lots 4050 and 4161 among the
7  initial batches that you made after getting the
8  directions from Dr. Sherman to go forward and pursue
9  these methods?
10   A  Yes.
11      (The document referred to was
12      marked Plaintiff's Deposition
13      Exhibit No. 70 for
14      identification.)
15   Q  You can set those aside.
16      I show you what I'll mark as
17 Plaintiff's 70, a document Bates numbered NU 012261.
18 This is a series of e-mails, the top one the one the
19 first page is from Jean Horton Ali to Esther Barber,
20 Eveline Eilert, you are not copied on this, but I
21 wanted to ask you a question about it just to see if
22 you know.
23      In this e-mail Ms. Ali says, "I just
24 spoke to Lili, and she had told me that the

## Page 108

1  in-process samples that have just failed, i.e.,
2  investigation, are lot numbers FD 4166 and a couple
3  of others."
4       4166 is the spray-dried biobatch lot.
5  Actually no, it is not. It is a different one. Do
6  you know what 4166 is?
7    A  I don't recollect. No.
8    Q  Have you ever heard of the -- of this
9  issue of certain lots failing an investigation?
10   A  I'm not -- I don't recall anything about
11 this. No.
12      (The document referred to was
13      marked Plaintiff's Deposition
14      Exhibit No. 71 for
15      identification.)
16   Q  Put that one aside.
17      Mark as Plaintiff's 71 a document
18 Bates numbered NU 012161 through 167.
19      Is this the tooling we were talking
20 about earlier, the actual tablet punches? It
21 appears to be documents from Natoli?
22   A  Yes, these are Natoli drawings,
23 engineering drawings, representing what the tooling
24 would look like.

## Page 109

1    Q  And, in fact, is this the tooling that was
2  used to create the biobatches?
3    A  I'm not certain.
4    Q  If you look through these, it looks like
5  the first couple pages would be the front and back
6  of the 125, is that right?
7    A  Yes.
8    Q  The front of the pill would read AP0 046
9  and the back would say 125?
10   A  Yes.
11   Q  Similarly, the next couple, or the 250's,
12 the front would read AP0 045, the back 250, and
13 finally for the 500 the front would read APO O48 and
14 the back 500?
15   A  Yes.
16   Q  And the AP0 short for Apotex?
17   A  Yes.
18   Q  Do you know what the designation 046, 047
19 and 048 refer to?
20   A  They refer to the list number, which is an
21 internal number at Apotex we used many years ago.
22 And it is a designation for the divalproex series of
23 125, 250, and 500 were 0046, 0047 and 0048.
24   Q  Were those designations developed for

28 (Pages 106 to 109)

Page 110

1  purposes of the old TorPharm process?
2      A   They would have been used for the old
3  TorPharm process, yes.
4      Q   You said you don't know whether these were
5  actually use on the biobatch.
6          I am going to show you, I can't
7  really mark it, one of the tablets produced to us as
8  coming from the FD 4165 lot of 500-milligram
9  tablets, which as we talked about before was made
10  from the flaked material.
11          Would you take a look at that and
12  just let me know if it bears the APO 048 on the
13  front and 500 on the back as we have just seen in
14  Plaintiff's 71?
15     A   Yes, it does.
16     Q   Thanks.
17          Your group provided samples of
18  divalproex sodium material you had made for use with
19  the biostudies in conjunction with this ANDA, right?
20     A   Can you repeat the question?
21     Q   Sure.
22          You're aware that samples of this
23  material were used to conduct biostudies on patients
24  in conjunction with the submission of the ANDA,

Page 111

1  right?
2      A   Yes.
3      Q   And your group submitted or provided the
4  samples of materials used in those biostudies,
5  right?
6      A   Yes.
7          (The document referred to was
8          marked Plaintiff's Deposition
9          Exhibit No. 72 for
10          identification.)
11     Q   Mark as Plaintiff's 72 a document Bates
12  numbered NU 012121, which is an e-mail from yourself
13  to Yogesh Dandiker and others August 26, 2004.
14          Do you recall this e-mail?
15     A   Yes, I have seen this e-mail before.  Yes.
16     Q   I am sorry?
17     A   I've seen it before.  Yes.
18     Q   It looks like in statement number 2 you
19  state, "The 500-milligram batch from the flaking
20  process only will be required to go to biostudy.
21  Eveline Eilert has spoken to Barry yesterday on this
22  and confirmed that this is a requirement, whereas
23  previously we believed both processes were going to
24  biostudy."

Page 112

1          Do you see that?
2      A   I see that.
3      Q   Who is Eveline Eilert?
4      A   She works in the regulatory affairs
5  department.
6      Q   Is the "Barry" you're referring to in this
7  sentence Barry Sherman?
8      A   Yes.
9      Q   So it is your understanding that
10  Dr. Sherman directed that only the material made
11  from the flaking method would be used in biostudies?
12     A   I am sorry.  Can you repeat the question?
13     Q   Certainly.
14          So is it your understanding that
15  Dr. Sherman directed that only the divalproex sodium
16  material using the flaked process would be used in
17  the biostudy as opposed to using both the flaked and
18  spray-dried material?
19     A   Yes.  It appears that Eveline had conveyed
20  that to me.
21     Q   In step 6 or point 6 you make here in your
22  e-mail you said, "Both processes will be submitted
23  by Nu-Pharm."
24          So at least as of August 26, '04 it

Page 113

1  appears that you were aware this ANDA would be
2  submitted under the Nu-Pharm name.
3          Does looking at this e-mail help you
4  to further pinpoint when you first learned of
5  Nu-Pharm's role with respect to this ANDA?
6      A   No, not in relationship to whether it was
7  before or after the batches.  I still don't recall.
8      Q   All right.  You can set that aside.
9          Was your group also responsible for
10  conducting stability studies on samples of
11  divalproex sodium for this project?
12     A   No.
13     Q   Which group would be responsible for that?
14     A   There's a group at Apotex called product
15  evaluation that's responsible for conducting the
16  stability studies.
17     Q   You do understand that samples of the
18  divalproex sodium product made under the process
19  that we have been talking about today were submitted
20  for stability, right?
21     A   They were.  My group would be responsible
22  for manufacturing them.  This product evaluation
23  group would conduct the studies.
24     Q   Did your group provide the samples used in

29  (Pages 110 to 113)

Page 114

1 those stability studies?
2    A  We would have, yes.
3    Q  Did your group also provide samples of
4 material for use in physical characterization
5 studies?
6    A  It's possible.  Any of the product samples
7 required for any purpose would be provided by my
8 group.
9    Q  If anybody needs some of this stuff you're
10 the guy they're calling, right?
11    A  Yes.
12        (The document referred to was
13        marked Plaintiff's Deposition
14        Exhibit No. 73 for
15        identification.)
16    Q  Not to make you guess on any of this, I'm
17 going to mark Plaintiff's 73 a NU 012119 Bates
18 number series of e-mails again.  The top one being
19 one from you to -- I am not even going to attempt
20 that name -- on February 2, 2005.
21       Can you tell us who the person you
22 sent the e-mail to is?
23    A  Prabhjinder Dosanjh.
24    Q  Arnie, I will help with you that one.

Page 115

1 First name P-r-a-b-h-j-i-
2        MS. MAZZOCHI:  h-j.
3        MR. WINCHESTER:  -h-j-i-n-d-e-r.
4        Last name D-o-s-a-n-j-h.
5    Q  Looking down the page at the e-mail on the
6 bottom from Elizabeth Szlagyi to yourself including
7 yourself and Uri Goldberg.  It appears that there's
8 a request for some of the flaked material for use
9 with physical characterization, elemental analysis
10 studies.  Do you see that?
11    A  I see that.
12    Q  Ultimately through the series of e-mails
13 it looks like you eventually did provide some of the
14 requested material for that purpose, right?
15    A  Yes.
16    Q  Do you know what physical characterization
17 studies, if any, were actually performed on the
18 material you provided?
19    A  I don't know.
20        MR. WINCHESTER:  Mark as Plaintiff's
21 74 a U.S. Patent No. 4,988,731, and as
22 Plaintiff's 75 a U.S. Patent
23 No. 5,212,326.
24

Page 116

1        (The documents referred to were
2        marked Plaintiff's Deposition
3        Exhibit Nos. 74 and 75,
4        respectively, for
5        identification.)
6    Q  Have you seen either of those patents
7 before?
8        MS. MAZZOCHI:  I will instruct to you
9 exclude from your answer any instances
10 where you may have reviewed these patents
11 with counsel.
12 BY MR. WINCHESTER:
13    Q  I don't want to get into any conversations
14 you might have had with counsel about them.  But,
15 just let me know if you have actually seen them
16 before?
17    A  I don't recall having seen them.  These
18 may have come up at the previous deposition.
19       There may have been something that
20 was shown to me at that time.  I don't recall.
21       I may not have seen them for a very
22 long time if I have seen them at all.
23 BY MR. WINCHESTER:
24    Q  You understand from the prior litigation

Page 117

1 at least that Abbott owns patents that it contends
2 cover divalproex sodium, right?
3    A  Yes.
4    Q  Are you aware of whether Apotex has
5 conducted or commissioned any testing to determine
6 whether the material, the divalproex sodium made by
7 either the flaking or spray-drying process in the
8 ANDA under Nu-Pharm's name would infringe either of
9 Abbott's two patents?
10        MS. MAZZOCHI:  Object to the form of
11 the question.
12       It also seeks an improper legal
13 conclusion and, furthermore, to the
14 extent -- if you can answer the question I
15 would also instruct to you exclude any
16 conversations that you may have had with
17 Apotex's counsel.
18 BY MR. WINCHESTER:
19    Q  That was a lot of talking.  Do you
20 remember the question?
21    A  I don't.
22       I think the question was am I aware
23 of any testing that Apotex has done in regards to
24 whether we infringe the patent or not?

30 (Pages 114 to 117)

## Page 138

1    MR. WINCHESTER: Give me two minutes.
2  I think I might be done.
3    MS. MAZZOCHI: Let me just designate
4  the transcript as confidential under the
5  protective order. Any pages that relate
6  to commercial capabilities we will also
7  designate that as outside -- I am sorry,
8  as higher confidential standards.
9    MR. WINCHESTER: Okay.
10    THE VIDEOGRAPHER: Go off the record
11  at 12:34 p.m.
12      (Whereupon, a brief recess
13      was taken.)
14    MR. WINCHESTER: Actually go back on.
15    THE VIDEOGRAPHER: Back on the record
16  at 12:34 p.m.
17    MR. WINCHESTER: I have nothing else.
18  Thank you, Mr. Barber.
19    MS. MAZZOCHI: No questions on our
20  end. Thank you.
21    MR. WINCHESTER: You're going to
22  reserve, I take it?
23    MS. MAZZOCHI: Yes, reserve
24  signature.

## Page 139

1    THE VIDEOGRAPHER: This concludes the
2  deposition of Donald Barber.
3      We are off the record at 12:34 p.m.
4
5
6
7      DEPOSITION CONCLUDED
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 140

1  UNITED STATES OF AMERICA    )
   NORTHERN DISTRICT OF ILLINOIS )
2  EASTERN DIVISION        ) SS:
   STATE OF ILLINOIS        )
3  COUNTY OF COOK          )
4
5    I, Arnold N. Goldstine, a Certified Shorthand
6  Reporter within and for the County of Cook and State
7  of Illinois, do hereby certify that heretofore,
8  to-wit, personally appeared before me DONALD JOHN
9  BARBER, a witness in a certain cause now pending and
10  undetermined in the United States District Court,
11  Northern District of Illinois, Eastern Division.
12    I further certify that the said witness was
13  first duly sworn to testify to the truth, the whole
14  truth, and nothing but the truth in the cause
15  aforesaid; that the testimony then given by said
16  witness was reported stenographically by me in the
17  presence of said witness, and afterward reduced to
18  typewriting via Computer-Aided Transcription, and
19  the foregoing is a true and complete transcript of
20  the testimony so given by said witness as aforesaid.
21
22
23
24

## Page 141

1    I further certify that the signature of the
2  witness to the foregoing deposition was not waived
3  by agreement of counsel for the respective parties;
4  and that I am not counsel for nor in any way related
5  to any of the parties to this suit nor am I in any
6  way interested in the outcome thereof.
7    In witness whereof, I have hereunto set my hand
8  and affixed my notarial certification on this 12th
9  day of July 2006.
10
11
12
13
14
15
16
17
18
19
20  _____
   Arnold N. Goldstine, CSR
21  CSR License No. 084-000288
22
23
24

36 (Pages 138 to 141)

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ABBOTT LABORATORIES        )
                           )
        Plaintiff,         )
                           )-      Civil Action No.
                           )      05 C 3714
                           )
NU-PHARM, INC.,            )
APOTEX INC. and            )
APOTEX CORP.               )
        Defendants.        )
                           )

DEPOSITION OF

EVELINE EILERT

JUNE 26, 2006

**A0085**

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

**Page 2**

```
 1
 2
 3
 4
 5
 6        The video deposition of EVELINE EILERT, called
 7   for examination by the Plaintiff pursuant to notice
 8   and pursuant to the provisions of the Federal Rules
 9   of Civil Procedure of the United States Court,
10   pertaining to the taking of depositions, taken
11   before Arnold N. Goldstine a Certified Shorthand
12   Reporter within and for the County of Cook and State
13   of Illinois, at 77 West Wacker Drive in the City of
14   Chicago, County of Cook and State of Illinois on the
15   26th day of June 2006, commencing at the hour of
16   11:00 o'clock a.m.
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                 I N D E X
 2
 3   WITNESS:            PAGE:
 4   EVELINE EILERT
 5
     DIRECT EXAMINATION
 6
     BY MR. WINCHESTER        6
 7
 8   CONTINUED          80
 9
10       E X H I B I T S
11   Plaintiff's Nos.
12   No. 1          142
     No. 2          150
13   No. 3          158
     No. 4          168
14   No. 5          173
     No. 6          183
15   No. 7          188
     No. 8          191
16   No. 9          195
     No. 10         210
17   No. 11         220
     No. 12         226
18   No. 13         233
     No. 14         236
19   No. 15         237
     No. 16         241
20   No. 17         247
     No. 18         249
21   No. 19         253
     No. 20         255
22   No. 21         256
     No. 22         263
23   No. 23         263
24
```

**Page 3**

```
 1   APPEARANCES:
 2
 3
 4       Mr. Jason G. Winchester, Esq.
         Jones Day
 5       77 West Wacker Drive
         Chicago, Illinois 60601
 6
 7       appeared on behalf of
         Plaintiff;
 8
 9
10       Ms. Deanne M. Mazzochi, Esq.
         Rakoczy Molino Mazzochi Siwik LLP
11       6 West Hubbard Street
         Suite 500
12       Chicago, Illinois 6061
13       appeared on behalf of the
         Defendants.
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
 1       THE VIDEOGRAPHER:  Good morning.  We
 2   are on the video record.
 3       My name is Robert Zellner.  And I am
 4   a video technician for Depovision located
 5   at 77 West Washington Street in Chicago,
 6   Illinois.
 7       The date is June 26, 2006 and the
 8   time is 11:04 a.m.
 9       We are present here today at 77 West
10   Wacker Drive in Chicago, Illinois with
11   reference to the case entitled Abbott
12   Laboratories versus Nu-Pharm, Inc. pending
13   it United States District Court for the
14   Northern District of Illinois Eastern
15   Division.  Civil Action number 05 C 37014.
16   The witness is Eveline Eilert.
17       A video recording of this deposition
18   is at the request of the plaintiff.
19       Will the attorneys please identified
20   the for the record?
21       MR. WINCHESTER:  Jason Winchester for
22   Abbott Laboratories.
23       MS. MAZZOCHI:  Deanne Mazzochi on
24   behalf of Nu-Pharm, Inc., Apotex, Inc.
```

2 (Pages 2 to 5)

Page 46

1  litigation in that prior case against Abbott?
2     A   No.  I don't believe so.
3     Q   Let's talk about the ANDA 77615, the one
4  filed under Nu-Pharm's name.  Okay?
5     A   Okay.
6     Q   If that application is approved, who is
7  proposing to manufacture it, what company?
8     A   Currently the way it's written in the
9  ANDA, Apotex will be manufacturing.
10    Q   Are you aware of any plans to change that?
11    A   I don't know.
12    Q   Yes or no.  Are you aware of any plans to
13 change that?
14    A   I haven't been told.
15    Q   Have you seen any documents that would
16 suggest there's going to be a change in the proposed
17 manufacturer from Apotex Inc. to some other company?
18    A   No, I haven't.
19    Q   When did you first become involved with
20 the ANDA submitted under Nu-Pharm's name?
21    A   When it was assigned to me.
22    Q   When was that?
23    A   I don't remember.
24    Q   How long after you had started with

Page 47

1  TorPharm in November of '03?
2     A   I don't remember.
3     Q   Do you remember if you had started on the
4  project in 2003?
5     A   No.
6     Q   So we're into 2004.  Were you working on
7  the project in 2004?
8     A   I believe so, yes.
9     Q   Can you tell me was it the first half of
10 the year or the second half of the year when you
11 first started working on the project?
12    A   I don't remember.
13    Q   Did you do anything in terms of reviewing
14 your file materials to prepare to come here today?
15    A   I read a few e-mails.
16    Q   What e-mails did you read?
17    MS. MAZZOCHI:  If you can recall
18 them.
19    A   I don't remember.  It's about the ANDA,
20 some of the issues.
21 BY MR. WINCHESTER:
22    Q   What issues?
23    A   The ones that were in the e-mail.
24    Q   When did you look at the e-mail?

Page 48

1     A   Last week, Friday.
2     Q   Last week, Friday.
3        And we're now at Monday.  You're
4  blanking after three days?
5     A   Well, I don't remember.
6     Q   How many e-mails?
7     A   Forty.
8     Q   Do you know if all the e-mails --
9     A   Thirty.
10    Q   -- have been turned over to Apotex's
11 lawyers?
12    MS. MAZZOCHI:  I can tell you they
13 have been.
14 BY MR. WINCHESTER:
15    Q   Do you know?
16    A   Yes, they have, as far as I know.
17    Q   Were these all e-mails that you either
18 sent or were copied on?
19    A   Not all of them.
20    Q   Sometime in 2004 you were asked to work on
21 this project.  Who assigned it to you?
22    A   Jennifer did.  Jennifer Docherty.
23    Q   What did she tell you when she first
24 assigned to you the project?

Page 49

1     A   That we were going to submit divalproex
2  and that Nu-Pharm was going to be the sponsor.
3     Q   Anything else that you discussed with her
4  when you first got the project?
5     A   Just when we were going to submit it.
6     Q   When was that?
7     A   When she assigned it.  I can't remember.
8     Q   You don't remember what the proposed
9  filing date was at the time you got the project?
10    A   Not the exact date.  No.
11    Q   So your memory now is she told you you're
12 going to file divalproex sodium under the Nu-Pharm
13 name, see you later?
14    A   Well, then we wait until we get the
15 documents filed.  Then once we get them, we know
16 when we are going to file.
17    Q   Did she tell you what your responsibility
18 was with respect to the project?
19    A   I am responsible to make sure that the
20 submission goes out on time and as correctly as
21 possible.
22    Q   What were your responsibilities with
23 respect to this ANDA submitted under the Nu-Pharm
24 name?

13  (Pages 46 to 49)

Arnold Goldstine & Associates, Ltd.
312.222.1644                     agaltd@earthlink.net                     Chicago, Il 60611
Fax:  312.222.1645

A0087

Page 50

1    A  My responsibility was to compile the
2  submission.
3    Q  What does that mean, compile the
4  submission?
5    A  Gather all the documents and put them in
6  the proper format.
7    Q  Did you have a team of people who worked
8  with you in compiling the ANDA?
9    A  I have another associate who works with me
10  who did the hands-on work.
11    Q  Is that Ana Ivic?
12    A  That's correct.
13    Q  Did you assign Ms. Ivic to work on the
14  project?
15    A  That's correct.
16    Q  What responsibility did you give her
17  relating to this project?
18    A  She compiles the submission and when -- if
19  there's any questions or issues, then I deal with
20  the answer.
21    Q  You mentioned that one of the two facts
22  you remember from your initial conversation with
23  your boss about this project was that it would be
24  submitted under the Nu-Pharm name.

Page 51

1      What did she tell you about that?
2    A  That's all she told me.
3    Q  Did you ask why it was being submitted
4  under Nu-Pharm's name rather than Apotex?
5    A  No.  We were just told to do this.  That's
6  what we did.
7    Q  Had you ever worked on any application
8  prior to that time that was compiled by and drafted
9  by Apotex, submitted under another company's name?
10    A  Not since I worked at Apotex.
11    Q  Did it strike you as strange that you were
12  doing all this work compiling it under another
13  company's name?
14    A  No.
15    Q  Did you ever hear anyone at Apotex other
16  than lawyers talk about why this ANDA is submitted
17  under the Nu-Pharm name rather than Apotex's or
18  TorPharm?
19    A  I don't remember.
20    Q  Did you ever see any document that would
21  discuss why this application is being submitted
22  under the name Nu-Pharm?
23    A  No, I haven't.
24    Q  Have you ever asked anyone why the

Page 52

1  application is submitted under the name Nu-Pharm
2  rather than Apotex?
3    A  No.
4    Q  Do you know when the development of the
5  product described in the ANDA under Nu-Pharm's name
6  began?
7    A  I don't remember that.
8    Q  Do you know who made the decision to
9  develop the product?
10    A  I don't know that.
11    Q  Do you know who made the decision to file
12  the ANDA?
13    A  I don't know that.
14    Q  Who generally makes decisions about which
15  products Apotex is going to develop?
16    A  There's a committee who works on products,
17  and also Barry.
18    Q  Is it fair to say Barry -- this would be
19  Barry Sherman, correct?
20    A  For Apotex products, is that what you're
21  talking about?
22    Q  Yes.
23      Well, first what I am talking about
24  is you and I said Barry.  I know what you mean, you

Page 53

1  mean Barry Sherman?
2    A  That's right.
3    Q  He is on a first name basis with me as
4  well.
5      Is it fair to say that Dr. Sherman
6  makes the final decision about which products Apotex
7  is going to develop?
8      MS. MAZZOCHI:  Objection.  Calls for
9  speculation.
10    A  I don't know.
11  BY MR. WINCHESTER:
12    Q  Are you aware of anyone higher in the
13  Apotex organization than Dr. Sherman?
14    A  No.
15    Q  He's the boss, right?
16    A  But there's a committee that works --
17    Q  For him?
18    A  -- for him.  Yes.
19    Q  Nobody supervises Dr. Sherman within the
20  Apotex enterprise, isn't that right?
21    A  Well, the committee chooses products.
22  There's two tiers we have at Apotex.  There's
23  Barry's products, and then there's the committee's
24  products.

14  (Pages 50 to 53)

Page 54

1    Q    Which are Barry's products?
2    A    I don't know which ones are Barry's. They
3  all come into the same pot.
4    Q    How are you aware then that there are
5  certain products that are Barry's products versus
6  the committee's products?
7    A    It depends on the priorities that are
8  given to the products.
9    Q    What does that mean?
10    A    It means that some products are more
11  priority than others.
12    Q    And would the higher priority products
13  fall within the Barry camp or the committee camp?
14    A    Sometimes Barry, the Barry camp.
15    Q    Does the product described in the ANDA
16  under Nu-Pharm's name fall within the Barry camp or
17  the committee camp?
18    A    I'm not really sure. It depends how it's
19  classified.
20    Q    How is it classified?
21    A    I don't remember.
22    Q    Classified by whom?
23    A    By the committee.
24    Q    If I told you it was classified priority

Page 55

1  A, does that mean something to you?
2    A    Yeah.
3    Q    And what would that mean with respect to
4  what you believe this is a Barry product or a
5  committee product?
6    A    And you don't really know. It is
7  classified A to Z. So if it is a Z product, it is
8  not very -- its priority is much lower.
9    Q    Is priority A the highest priority?
10    A    No. G is, G.
11    Q    Give me the rundown, what is highest to
12  lowest?
13    A    It is G, A, B, C, D. G is the highest.
14    Q    Is that a Canadian thing?
15    A    It is G for gold.
16    Q    Got you.
17         What is A for?
18    A    A is for A, B is for B.
19    Q    In your experience would a priority A
20  project fall within the Barry camp or the committee
21  camp?
22    A    I don't know.
23    Q    How many projects have you worked on that
24  involve priority A designations?

Page 56

1    A    The time that I have been there, oh, I
2  don't know.
3    Q    More that be more than five?
4    A    Probably, yes.
5    Q    More than ten?
6    A    Probably around there.
7    Q    Let's assume ten.
8         How many of those priority A projects
9  have been within the committee realm versus
10  Dr. Sherman's realm?
11    A    The committee is new since we've merged
12  the three companies. That's when the committee was
13  set up. So, it just depends on if you're talking
14  the old products, they were all Barry's products,
15  but the new ones are starting to become more the
16  committee's products.
17    Q    What three companies merged?
18    A    Apotex, Richmond Hill and Etobicoke.
19    Q    Richmond Hill is known as Novex Pharma?
20    A    That's correct.
21    Q    That was also a part of Apotex, just
22  operating under a different name, is that right?
23    A    I don't know.
24    Q    You knew that Apotex owned Novex Pharma,

Page 57

1  though, right?
2    A    I know there was a connection but I don't
3  know anything else.
4    Q    You talked about Etobicoke, that's
5  TorPharm, right?
6    A    That's TorPharm.
7    Q    So you're talking about the time in which
8  certain of the Apotex facilities were renamed as
9  Apotex Inc., right?
10    A    Correct.
11    Q    The same thing happened with the TorPharm
12  facility is now called Apotex Inc. and the what was
13  formerly called Novex Pharma is now called Apotex
14  Inc. right?
15'    A    It is called Apotex Richmond Hill.
16    Q    And what used to be called TorPharm is now
17  Apotex?
18    A    Etobicoke.
19    Q    I won't be able to pronounce that the way
20  you did.
21         MS. MAZZOCHI: I am going to take
22  this opportunity as to well to designate
23  this deposition testimony as confidential
24  under the protective order.

15 (Pages 54 to 57)

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net                    Chicago, Il 60611
                                                                        Fax: 312.222.1645

A0089

Page 58

1    BY MR. WINCHESTER:
2      Q  Getting back to the issue of what we will
3    call the Barry camp versus the committee camp.
4          You mentioned that the committee
5    became more an issue after the companies were
6    realigned as Apotex, right?
7      A  Yes.
8      Q  So that's after about April of 2004?
9      A  I don't remember exact dates.
10     Q  Who is on the committee?
11     A  I don't know.
12     Q  Do you know if Dr. Sherman is on the
13   committee?
14     A  I don't know.
15     Q  Do you know if the committee reports to
16   Dr. Sherman?
17     A  I'm not really sure how the setup or
18   structure works.
19     Q  Are you aware of any circumstance in which
20   Dr. Sherman has made a decision that Apotex would
21   develop a particular product and he got trumped by
22   the committee?
23     A  I don't know.
24     Q  You are not aware of any situation where

Page 59

1    that happened?
2      A  I'm not aware of any, any ongoing.
3          I get assigned my projects and I work
4    on my projects.
5      Q  So again, just answer my question.
6          You are not aware of any time in
7    which Dr. Sherman has made a decision about pursuing
8    a product and he's been overruled by anyone else,
9    either person or committee within Apotex, is that
10   right?
11         MS. MAZZOCHI: Objection. Asked and
12   answered.
13         You have a lack of foundation that
14   this witness even has information on the
15   subject.
16   BY MR. WINCHESTER:
17     Q  You can answer.
18     A  I don't really know.
19     Q  Have you ever dealt directly with Barry
20   Sherman relating to the ANDA submitted under
21   Nu-Pharm's name?
22     A  Personal. I've sent an e-mail to him.
23     Q  How many?
24     A  One. I don't remember exactly.

Page 60

1      Q  What was it about?
2      A  Just the file strategy.
3          It was at the point at the time that
4    there was no manager, Jennifer left, and she would
5    have dealt with him.
6      Q  Do you know if, in fact, Jennifer had
7    dealings directly with Dr. Sherman about this
8    product or this ANDA?
9      A  I don't know that.
10     Q  When was it that your current manager,
11   Sandra, started in that position?
12     A  She started -- oh, I don't think she's
13   been there a year yet.
14     Q  How long did you go without a manager in
15   your group?
16     A  A couple of months.
17     Q  And during that period of time in which
18   you were without a manager, you had occasion to send
19   an e-mail to Dr. Sherman, is that right?
20     A  Yes, that's correct.
21     Q  Tell me what it was about.
22         MS. MAZZOCHI: Objection. Asked and
23   answered.
24

Page 61

1    BY MR. WINCHESTER:
2      Q  You can answer.
3      A  It was an e-mail on filing the submission,
4    which -- how many biostudies we needed and that was
5    the main -- the main purpose.
6      Q  Why did you contact Dr. Sherman about
7    those issues?
8      A  Because they were going to be run in our
9    biolab, so I thought he may know.
10     Q  Were you asking Dr. Sherman to make
11   decisions, seeking his input; what was the purpose?
12     A  Just to know if we had to run one biostudy
13   or two biostudies.
14     Q  Again, why contact him to answer that
15   question as opposed to say the committee?
16     A  There was no committee at that point.
17     Q  Is there currently any committee that's in
18   charge of this particular product or this ANDA?
19     A  The committee only chooses new products.
20     Q  So is this committee you have been talking
21   about involved in any way with this product for this
22   ANDA?
23     A  No.
24     Q  So this is --

16 (Pages 58 to 61)

Page 74

1    A   Well, the people who work for him. When I
2    say Don Barber, it is also the people who work for
3    him.
4    Q   Okay. That's what I was hoping.
5        So these materials that you talked
6    about, the manufacturing instructions, the scale-up
7    instructions, those would be materials you obtained
8    from Don Barber or anyone else in formulation
9    development?
10   A   That's correct, yes.
11   Q   And you don't recall right now whether you
12   also obtained sample materials from formulation
13   development, is that right?
14   A   I'm not sure. I don't think we did, no.
15   Q   And the specific samples I am referring
16   to -- I'll help you with this.
17       Do you have to obtain samples to
18   provide to the companies who conducted the biostudy?
19   A   Well, that's not our job so we don't do
20   that. Hold on. Maybe, we may have for this one
21   still.
22       We used to send out the biosamples,
23   but then that job went to the QA group, so we don't
24   do that anymore.

Page 76

1        MR. WINCHESTER: Do you want to take
2    a break?
3        MS. MAZZOCHI: Do you want to take a
4    lunch break?
5        MR. WINCHESTER: That's fine.
6    We can go off the record.
7        THE VIDEOGRAPHER: We are off the
8    record at 12:30 p.m.
9
10       (Whereupon a recess was taken
11       until 1:30 o'clock p.m. of the
12       same day.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 75

1    Q   That's quality assurance?
2    A   Quality assurance, yes. I think for this
3    one it's -- may still have been in our hands, but I
4    would have to check the documents.
5    Q   Do you know, for instance, who made the
6    product samples that were provided to the patients
7    for purposes of the biostudies?
8    A   Those were the ST logs that were --
9        THE REPORTER: I am sorry. Those
10   were?
11   A   The formulation logs.
12   BY MR. WINCHESTER:
13   Q   So these samples came from and were made
14   my Apotex, is that right?
15   A   That's right.
16   Q   And, again, the samples that were provided
17   to the patients for the biostudies were samples
18   prepared using the flaking process, is that right?
19   A   That's correct, yes.
20   Q   Were any biostudies ever done using the
21   spray-dried process?
22   A   I don't believe so.
23       MS. MAZZOCHI: Jason, we have been
24   going for over an hour an a-half.

Page 77

1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3
4    ABBOTT LABORATORIES        )
                                )
5        Plaintiff,    )
                       ) Civil Action No.
6                      ) 05 C 3714
                       )
7    NU-PHARM, INC.,   )
     APOTEX INC. and   )
8    APOTEX CORP.       )
         Defendants.   )
9    _____)
10
11
12
13
14
15
16
17       DEPOSITION OF
18   EVELINE EILERT
19   JUNE 26, 2006
20
21
22
23
24

20  (Pages 74 to 77)

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

**A0091**

Page 78

```
 1
 2
 3
 4        The video deposition of EVELINE EILERT, called
 5   for examination by the Plaintiff pursuant to notice
 6   and pursuant to the provisions of the Federal Rules
 7   of Civil Procedure of the United States Court,
 8   pertaining to the taking of depositions, taken
 9   before Arnold N. Goldstine a Certified Shorthand
10   Reporter within and for the County of Cook and State
11   of Illinois, at 77 West Wacker Drive in the City of
12   Chicago, County of Cook and State of Illinois on the
13   26th day of June 2006, commencing at the hour of
14   11:00 o'clock a.m.
15
16
17
18
19
20
21
22
23
24
```

Page 79

```
 1   APPEARANCES:
 2
 3
 4      Mr. Jason G. Winchester, Esq.
        Jones Day
 5      77 West Wacker Drive
        Chicago, Illinois 60601
 6
 7        appeared on behalf of
          Plaintiff;
 8
 9
10      Ms. Deanne M. Mazzochi, Esq.
        Rakoczy Molino Mazzochi Siwik LLP
11      6 West Hubbard Street
        Suite 500
12      Chicago, Illinois 6061
13        appeared on behalf of the
          Defendants.
14
15
16
17
18
19
20
21
22
23
24
```

Page 80

```
 1        THE VIDEOGRAPHER:  We are back on the
 2   record at 1:34 p.m.
 3            Eveline Eilert
 4        having been previously duly sworn,
 5     was examined and testified as follows:
 6        DIRECT EXAMINATION (Continued)
 7   BY MR. WINCHESTER:
 8   Q   Welcome back.
 9         Just to refresh, when we left we were
10   talking about the various groups that you had
11   contact with to try and get information for the
12   ANDA.
13         And we were talking specifically
14   about the formulation development group, and the
15   materials you mentioned that you had received from
16   them including the manufacturing instructions and
17   scale-up documents.
18         Again, are there any other types of
19   documents that you remember getting from the
20   formulation development group before we move on?
21   A   Well, that's the basic documents we got
22   from them.
23   Q   The next group that you had mentioned was
24   the labs group.  What is that group?
```

Page 81

```
 1   A   They do all the testing for us.
 2   Q   Would that include biostudy testing?
 3   A   No.  That comes from the bio -- biogroup.
 4   Q   So which type of testing, and let's make
 5   it specific, with respect to this product did the
 6   labs group --
 7   A   Well, they do the C of A testing and any
 8   method development.
 9   Q   C of A is certificate of analysis?
10   A   Certificate of analysis, yes.
11   Q   You mentioned methods development, is that
12   right?
13   A   That's -- yeah.
14   Q   What is methods development?
15   A   Methods.  When you have a new ANDA you
16   have to develop the methods, then they have to be
17   validated, so that's all done through the labs.
18   Q   You say the methods, are you referring to
19   in-process test methods?
20   A   The methods, the C of A, the
21   specifications have methods.  Those are the methods.
22   Q   There are certain tests?
23   A   Chemical methods.
24   Q   Okay.
```

21  (Pages 78 to 81)

Page 82

1    There are certain tests that are done
2 or that are proposed to be done with respect to the
3 batches of this product if it gets approved, right?
4    A    Right.
5    Q    And on a certificate of analysis there's
6 things like IR, right, assay testing, things like
7 that?
8    A    Assay identification.
9    Q    So when you talk about methods
10 development, are you referring to the documents that
11 would tell you how to perform those tests?
12    A    The actual methods that have to be
13 developed. So if you have a new product you have an
14 assay, so that method has to be developed. So they
15 would develop that method and then test it.
16    Q    And are those methods developed for use
17 with each particular product?
18    A    That's correct.
19    Q    So were new methods developed for the
20 purposes of the product being submitted under the
21 Nu-Pharm name?
22    A    As far as I know.
23    Q    What other types of documents did you get
24 from the labs group?

Page 83

1    A    That's basically -- the method validation,
2 the C of A is what the labs do.
3    Q    Who was your primary contact in the labs
4 group?
5    A    Michelle Zheng. This was before -- okay,
6 I'm not sure. This product was right during the
7 restructure, so I'm not sure if we got it from
8 Michelle or from -- Elizabeth Kovacs is the new
9 person in charge.
10    Q    Was the labs group restructured at some
11 time?
12    A    Yes.
13    Q    When was that?
14    A    When the company reorganized with the
15 merger of the three.
16    Q    That's what we have talked about before?
17    A    Right.
18    Q    You referred to that as a merger when the
19 name got changed?
20    A    Yeah. The three companies were merged.
21    Q    Those being Apotex, TorPharm and Novex
22 Pharma?
23    A    That's correct.
24    Q    What was the change in the labs group when

Page 84

1 that happened?
2    A    They made major changes.
3    Q    What were they?
4    A    I don't work for the lab, so I don't
5 really know. I just know everybody we dealt with
6 before were all new people
7    Q    Was Elizabeth Kovacs' group before or
8 after the change with respect to this product?
9    A    She's after the change.
10    Q    So if you had a question that came up
11 today, and you needed information about something
12 from the labs group, do you contact Elizabeth
13 Kovacs?
14    A    Elizabeth Kovacs or her group, peopl- in
15 her group.
16    Q    That's K-o-v-a-c-s?
17    A    K-o-v-a-c-s, yes.
18    Q    Spell the last name of Michelle.
19    A    Zheng. Z-h-e-n-g. She is no longer
20 there.
21    Q    Are you aware that there were certain
22 tests done at some point in time to determine some
23 of the structural characteristics of the divalproex
24 sodium product that is the subject of the ANDA?

Page 85

1    You got to answer out loud?
2    A    No, I don't.
3    Q    I know what you're talking about.
4    Are you familiar with Yuri Goldberg?
5    A    Yes, I -- he works under Ms. Elizabeth
6 Kovacs.
7    Q    Have you ever seen any test reports that
8 Dr. Goldberg either conducted or signed off on
9 relating to this product?
10    A    No, I don't remember.
11    Q    Stability group, obviously stability
12 testing.
13    What sorts of documents and
14 information would you get from the stability group
15 with respect to this project?
16    A    We would get the stability results from
17 the batch that they test.
18    Q    What is stability testing?
19    A    When you submit a product to the FDA you
20 need to include accelerated stability data in your
21 submission. So you test it at 40 degrees, 65,
22 relative humidity, 1, 3 -- 1, 2, 3 and also we do
23 6-month testing.
24    Q    The point of it is to show how quickly the

22 (Pages 82 to 85)

Arnold Goldstine & Associates, Ltd.
312.222.1644

agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

A0093

Page 86

1  material degrades, if at all?
2     A   That's correct.
3        The shelf life is based on these test
4  results that we submit.
5     Q   And I take it samples of the product
6  described in the ANDA submitted under Nu-Pharm's
7  name were subjected to stability testing, is that
8  right?
9     A   That's correct.
10    Q   How many lots of material were stability
11 tested?
12    A   The batch that we submitted.
13    Q   So that would be the batch made using the
14 flaked material as the active?
15    A   That was, as well as spray-dried.
16    Q   So there were stability studies undertaken
17 with some material created using the spray-dried
18 product, is that right?
19    A   Yes.  We submitted those.
20    Q   When you say submitted, you mean as part
21 of the --
22    A   As part of the ANDA.
23    Q   To your knowledge, has Apotex actually
24 submitted product samples to the FDA?

Page 87

1     A   I don't think so.  I don't recall.
2     Q   Has FDA ever requested product samples?
3     A   I don't recall.
4     Q   Is that something would you be likely to
5  know as the project leader for this ANDA?
6     A   Some of the requests would come through us
7  with some products.
8     Q   How about this product?
9     A   But not -- I don't remember if we got a
10 request for that one or not.
11    Q   Again, I am not asking you about anything.
12 I am just saying you are the project leader for this
13 ANDA, right?
14    A   Yes.
15    Q   Would you expect that if FDA asked a
16 question from Apotex that we would like some product
17 samples, that you would know about that kind of
18 request?
19    A   If they request, then I would know about
20 them.
21    Q   The labeling group.  What sorts of
22 documents did you request and obtain from the
23 labeling group?
24    A   The labeling group does our -- they design

Page 88

1  our labels for us.
2     Q   When you talk about labels, are you
3  talking about just the bottle labels or also the
4  physician's package insert?
5     A   Yes, the whole thing.  Our labels are all
6  in one.
7     Q   What do you mean they are all in one?
8     A   Well, the label has got the face panel and
9  the label is attached to it.
10    Q   Oh, the things that are folded up like
11 origami?
12    A   That's correct, that's our label.
13    Q   So this particular group would both format
14 the actual sticker that goes on the bottle and then
15 the poster-sized sheet that gets folded up, which is
16 physician information, is that right?
17    A   Physician information, right, package
18 insert.
19    Q   So in the ANDA, the proposed labeling and
20 the proposed package insert was all drafted at
21 Apotex by this labeling group, is that right?
22    A   I'm not a hundred percent sure if we
23 actually submitted a complete label like that.  We
24 often will put a draft in as a Word document.  I

Page 89

1  can't remember what we did then.
2     Q   I don't mean fully formatted.  You
3  included in the ANDA --
4     A   The information that all goes in there is
5  in the ANDA.  Yes.
6     Q   And my question was the proposed package
7  insert, let's say --
8     A   Okay.
9     Q   -- that was included with the ANDA, that
10 was drafted by the labeling group at Apotex, right?
11    A   If we put in a label, it's drafted by
12 them.  If we put in a Word document, it is drafted
13 by us.
14    Q   I don't know what a Word -- what do you
15 mean a Word document?
16    A   Just all it is is a Word file.  And we
17 just draw a picture, we make a square box of what
18 the face panel would look like.  So, it is not an
19 actual face panel.
20    Q   I am sorry.
21    A   And that's our draft.
22        And sometimes we put a draft in and
23 sometimes we will put one that's been manufactured
24 by the labeling group or designed by the labeling

23  (Pages 86 to 89)

Page 90

1  group.
2      Q   You mean the actual sticker?
3      A   That's right, yes.
4      Q   Rather than just a piece of paper that
5  shows what the sticker would look like, that is what
6  you're talking about?
7      A   That's right.
8      Q   What is in the ANDA -- which we will talk
9  about a in a few moments -- is the paper not the
10  actual sticker, just the paper that shows what it
11  would look like?
12     A   Just the paper, so it is just a draft.
13     Q   That's a draft.  Who would have prepared
14  that draft?
15     A   We would prepare that draft, regulatory.
16     Q   Regulatory.
17         And how about the same question with
18  respect to the physician's insert, which again it is
19  not a fully formatted poster, but it is many pages,
20  which would be all the information on the poster?
21     A   That's right.  We would do that.
22     Q   So that was drafted actually by the
23  regulatory group?
24     A   By regulatory, yes.

Page 91

1      Q   With input from the labeling group?
2      A   No.
3      Q   Who within the regulatory group actually
4  drafted the proposed physician's package insert
5  filed as part of the ANDA?
6      A   The actual person, it would be one of my
7  associates.
8      Q   Who other than Ana Ivic worked with you on
9  this project in regulatory affairs?
10     A   Often the labeling is done by other
11  associates, so I'm not really sure who worked on
12  that label.
13     Q   Who would have assigned the person to do
14  it?
15     A   I would have assigned the person, just
16  depends how busy the associates are.
17     Q   You don't remember who you assigned to do
18  it for this one?
19     A   No.
20     Q   Did you assign Ms. Ivic to do it?
21     A   I read the e-mail tonight, I saw Ka-Ling's
22  name in there.  She may have worked on it, but we do
23  so many labels.
24     Q   You're going to have to help with that

Page 92

1  name.
2      A   Ka-Ling.  K-a-L-i-n-g.  She was just a
3  contact person who worked for us a couple of months.
4  Usually we have the students do the label.
5      Q   Ka-Ling, is that someone's first name or
6  last name?
7      A   Ling that is the last name.  L-i-n-g.
8      Q   Okay.  First name Kay, K-a-y?
9      A   K-a.
10     Q   Okay.
11         MS. MAZZOCHI:  Multicultural Canada.
12         MR. WINCHESTER:  That's all right.
13     A   I am not sure if that's how you spell it.
14  She was just here a short time.
15         BY MR. WINCHESTER:
16     Q   I am assuming you don't remember exactly
17  who you assigned to do this.
18         What information did you provide to
19  whomever you assigned that allowed them to actually
20  go and create this physician's package insert that
21  was included in the ANDA?
22     A   Well, when we put -- when we create a
23  label, we take the brand label and just make the
24  changes that apply to our product.

Page 93

1      Q   So you would have taken the current
2  approved labeling for Abbott's Depakote?
3      A   Yes.
4      Q   And modified it for this product, right?
5      A   Yeah.
6      Q   How did you know which changes should be
7  made?
8      A   Well, usually when you see Depakote you
9  would put Nu-Pharm's -- or you would just put the
10  generic name, divalproex sodium.
11     Q   And if there are changes other than
12  just --
13     A   Then the how applied section is different,
14  because we use the bottles that we are going to
15  package.  And generally if there's exclusivity, we
16  have to take those out.
17     Q   What do you mean exclusivity?
18     A   Well, there's certain companies that have
19  exclusivity.  So then we -- we are not allowed to
20  market for those indications, so we remove those.
21     Q   Is that an issue here that you remember?
22     A   I don't think so.  I don't remember.  I
23  don't know exactly what was changed.
24     Q   Did you provide whomever you assigned to

24 (Pages 90 to 93)

Page 94

1  actually draft this package insert with the
2  information about what changes should be made?
3      A   Standard for all products, so the
4  associates who are working on labels know what needs
5  to be changed.
6      Q   What if there are any changes of substance
7  rather than just we have a new name or we make it in
8  a different place, if there's any substantive
9  change?
10      A   Then we would have let them know what
11  other changes need to be made.
12      Q   Do you recall whether there was any
13  substantive change, what you would regard as
14  substantive change, made between the proposed
15  labeling for the product submitted in the ANDA under
16  Nu-Pharm's name and the approved label for Depakote?
17      A   I don't remember that.
18      Q   If there were a substantive change like
19  that, though, that's something that you would have
20  discussed with whichever associate you assigned to
21  draft the material?
22      A   It would be, yeah.
23      Q   Do you recall having any conversation like
24  that with whomever you assigned to draft those

Page 95

1  materials?
2      A   No.
3      Q   Has the labeling group gone forward to
4  actually prepare what I will call the finished
5  labeling at this time for the product submitted
6  under Nu-Pharm's name?
7      A   I believe they're doing some work on it.
8  There was a deficiency that came in and there was a
9  label, so it's being worked on or it's been
10  completed.  I can't remember.
11      Q   Do you remember the nature of the
12  deficiency?
13      A   We had to put in an NDC number.  When we
14  submitted the NDC number it was 000.
15      Q   What is an NDC number?
16      A   It is a number that -- on every label that
17  identifies the product.
18      Q   When you talk about a deficiency notice,
19  that's simply what is referred to when the FDA
20  writes back and says we need some new information;
21  is that right?
22      A   That's right.
23      Q   And is it your understanding that when
24  this deficiency notice came from FDA, that the task

Page 96

1  of responding was given to the labeling group?
2      A   I believe it went, but I'm -- I would have
3  to check.  I can't remember.
4      Q   Could it have gone to your group since it
5  sounds like your group was the one that actually
6  drafted the materials in the ANDA?
7      A   It could have, but I believe that it may
8  have gone to the labeling group.
9      Q   Who is your contact in the labeling group?
10      A   At this -- at the time when we were doing
11  this?  It's changed.  There's lots of different
12  people there now than --
13      Q   Who is it currently?
14      A   Brian Wilson is responsible for the
15  labeling group.
16      Q   Who would have been responsible for the
17  labeling group at the time that the ANDA submitted
18  under the Nu-Pharm name was prepared?
19      A   Brian was also in charge then.
20      Q   This shift you are talking about happened
21  sometime prior to 2004?
22      A   Well, it is just new people working on the
23  labels.  Brian is still the same person.
24      Q   Are there other contacts within the

Page 97

1  labeling group that you would request information
2  from other than Brian Wilson?
3      A   Could you repeat that, please?
4      Q   Are there other persons in the labeling
5  group that you have requested information from
6  relating to this project other than Mr. Wilson?
7      A   I can't remember who was there two years
8  ago.
9      Q   Do you know whether the person who drafted
10  the proposed package insert and product labeling
11  included with the ANDA under Nu-Pharm's name was
12  provided with a copy of the proposed labeling for
13  TorPharm's product?
14      A   No, I don't believe so.  We always take
15  the generic, or we take the brand label, the current
16  one, and they change very often, so we always make
17  sure we have the current one.
18      Q   Documentation group.
19          You said some of these material would
20  flow through the documentation group.  What is that
21  group?
22      A   They're the ones that file all the
23  documents.  So they file all the batch records.
24  They file all the documents that are prepared by the

25 (Pages 94 to 97)

**Page 98**

1  rest of the company. They get signed into
2  documentation and they file them.
3      Q  File them in what, some sort of central
4  repository?
5      A  Like a central filing system, yes.
6      Q  So somewhere or another all of the
7  documents that appear in the ANDA would be on file
8  in some kind of central repository at Apotex, is
9  that right?
10      A  That's correct.
11      Q  Would drafts of all those materials be on
12  file as well?
13      A  What do you mean by drafts?
14      Q  Well, for instance, if an initial draft of
15  a manufacturing process is circulated for discussion
16  amongst formulation development or regulatory
17  affairs, would that be filed by the documentation
18  group?
19      A  No. I think that's filed in FD,
20  formulation development. But, I'm not a hundred
21  percent sure of it. That's FD's.
22      Q  Is it only then final documents that are
23  filed with the central repository as far as you
24  know?

**Page 99**

1      A  All the batch documents are filed there.
2      Q  How about drafts of labeling materials?
3      If your group prepares, for instance,
4  labeling materials as we've discussed for purposes
5  of ANDA submission, would any draft of that material
6  be filed in the central repository you've talked
7  about?
8      A  No. The labels are filed in our -- within
9  our group. Regulatory affairs is responsible for
10  labels.
11      Q  And is that true even once the label is
12  finalized and submitted as part of an ANDA?
13      A  That's correct.
14      Q  So which documents actually are filed with
15  the documentation group versus kept in the specific
16  outlying groups?
17      A  I'm not a hundred percent sure what
18  documents are all filed there. I know labels aren't
19  and I don't think stability is either. Stability
20  files their own.
21      Q  The five groups you have mentioned,
22  formulation development, laboratory group,
23  stability, labeling and documentation group. Were
24  there any other specific groups within Apotex that

**Page 100**

1  you had to contact to collect information for
2  purposes of compiling the ANDA?
3      A  The NDC number, we get those from Apotex
4  Corp.
5      Q  What is Apotex Corp.?
6      A  That's the marketing division of Apotex in
7  the U.S.
8      Q  What are Apotex Corp.'s responsibilities
9  as you understand them with respect to products that
10  are approved for sale in the U.S.?
11      A  It's the sales force, the marketing and
12  sales there.
13      Q  Does Apotex Corp. handle all marketing --
14  or, sorry.
15      Does Apotex Corp. handle the
16  marketing and sales within the U.S. of all of
17  Apotex's products that are currently approved by the
18  USFDA?
19      A  No. I don't -- there's other -- there's
20  other companies that sell our product as well.
21      Q  How about marketing?
22      A  The marketing for Apotex is set up at
23  Corp.
24      Q  Are you familiar with Marcy Macdonald?

**Page 101**

1      A  Yes.
2      Q  Is Ms. MacDonald the president of Apotex
3  Corp.?
4      A  She is the -- I know her as our U.S.
5  agent.
6      Q  You say our U.S. agent. What do you mean?
7      A  Or she was our U.S. agent. She's no
8  longer there.
9      Q  The U.S. agent for Apotex?
10      A  When you're a foreign country as Canada is
11  you have you have a U.S. agent. You have to have a
12  presence within the U.S. So, Marcy was our agent.
13      Q  When you say our, you mean Apotex's agent?
14      A  Apotex's, also TorPharm.
15      Q  When did Ms. Macdonald leave Apotex Corp.?
16      A  I don't remember.
17      Q  Was it this year?
18      A  No. I think it was last year.
19      Q  Do you know why she left?
20      A  I believe she got another job.
21      Q  Have you spoken to her since she left?
22      A  No.
23      THE VIDEOGRAPHER: This is tape
24  number 1 of the deposition of Eveline

Arnold Goldstine & Associates, Ltd.
312.222.1644

agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

**A0097**

Page 102

1    Eilert.  We are off the record at
2    2:00 p.m.
3        (Whereupon, a brief recess
4            was taken.)
5        Tape number 2, the deposition of
6    Eveline Eilert.  We are back on the record
7    at 2:02 p.m.
8    BY MR. WINCHESTER:
9    Q   You mentioned now a variety of groups
10   within Apotex where you obtained information to
11   compile the ANDA.
12       You mentioned that you also obtained
13   NDC code information from Apotex Corp.
14       Is that the only information that you
15   obtained from Apotex Corp. for purposes of compiling
16   this ANDA?
17   A   That's correct.
18   Q   Did you ever contact Nu-Pharm for
19   information for purposes of compiling the ANDA
20   submitted in Nu-Pharm's name?
21   A   They're the ones who signed all the
22   documents that were filed in the ANDA.
23   Q   Did Nu-Pharm draft any of the documents
24   that they signed that are included in the ANDA?

Page 103

1    A   Most of the documents were drafted by us.
2    Q   You said most.
3        Are you aware of one single document
4    in this whole ANDA that was drafted by Nu-Pharm?
5        MS. MAZZOCHI: Objection,
6        argumentative.
7        Do you want her to page through every
8    single page of the ANDA?
9        MR. WINCHESTER: She can do it if she
10       likes.
11   Q   Do you know of one single page in that
12   ANDA that you compiled and submitted for which you
13   were the project leader that was drafted by
14   Nu-Pharm?
15       MS. MAZZOCHI: Put the ANDA in front
16       of her.  Go page by page.
17   BY MR. WINCHESTER:
18   Q   You can answer the question.
19   A   Let me think.
20       The documents that we would take over
21   for signing, those are the ones we -- we created.  I
22   don't remember if there's any other documents in
23   there that we didn't create.
24

Page 104

1    Q   Are you aware of any occasion on which
2    other than getting them to sign documents that were
3    drafted at Apotex you contacted Nu-Pharm for any
4    information for the purpose of assembling the ANDA?
5        MS. MAZZOCHI: Objection. Asked and
6        answered.
7    A   I don't recall, but I can't say for
8    certain.
9    BY MR. WINCHESTER:
10   Q   Who could say for certain?
11   A   I guess you have to talk to Nu-Pharm.
12   Q   About whether they drafted any documents
13   in the ANDA you put together?
14   A   I don't remember putting any in there, but
15   I don't remember all the documents that are in there
16   either.
17   Q   Do you remember ever contacting anyone at
18   Nu-Pharm for information about this ANDA?
19       MS. MAZZOCHI: Objection. Asked and
20       answered.  You can repeat your prior
21       answer.
22   BY MR. WINCHESTER:
23   Q   You can answer the question.
24   A   Yeah.  Like I said, as far as I can

Page 105

1    remember, most of the documents that were drafted by
2    us were signed by them.  But, I'm not a hundred
3    percent sure if there's anything else in there or
4    not.
5    Q   My question was do you personally recall
6    any occasion on which you contacted anyone from
7    Nu-Pharm for information relating to this ANDA?
8        MS. MAZZOCHI: Objection. Asked and
9        answered.
10   A   Well, I can't -- I can't mention for sure.
11   BY MR. WINCHESTER:
12   Q   Do you remember sitting here right now?
13   A   I don't remember.
14   Q   Do you remember one piece of information
15   that you received from Nu-Pharm for purposes of
16   assembling this ANDA?
17   A   I don't remember.
18   Q   And you can't think of a single document
19   Nu-Pharm drafted for purposes of the ANDA either,
20   can you?
21   A   No, I can't remember.  I'm not sure.
22       MS. MAZZOCHI: Let the record reflect
23       he's refused to put the ANDA in front of
24       her.

27  (Pages 102 to 105)

## Page 106

1   MR. WINCHESTER: I have not refused
2  to do anything. She can tell me what she
3  knows.
4     MS. MAZZOCHI: The document was
5  prepared over two years ago.
6     MR. WINCHESTER: Don't testify.
7     MS. MAZZOCHI: You're asking unfair
8  questions.
9     MR. WINCHESTER: Don't testify.
10     MS. MAZZOCHI: If you are going to
11  make --
12     MR. WINCHESTER: We are done. We are
13  moving on. Don't testify. She can tell
14  me what she knows.
15     She has told me she knows nothing.
16  She can't recall a single bit of
17  information that came from them. That's
18  it, we are done.
19     MS. MAZZOCHI: Right.
20     I am just letting the record reflect
21  that you have not put the actual ANDA in
22  front of her.
23     MR. WINCHESTER: Nor do I need to.
24  She can tell me what she recalls and she

## Page 107

1  recalls nothing in that respect.
2     MS. MAZZOCHI: Sure. For a document
3  drafted two years ago.
4  BY MR. WINCHESTER:
5     Q   You have had questions come in from FDA
6  about this ANDA, correct?
7     A   Correct, yes.
8     Q   And you have been involved in assembling
9  the responses to FDA's questions?
10     A   Yes.
11     Q   And those have come more recently than two
12  years ago, right?
13     A   That's correct.
14     Q   You have had some this year in fact,
15  right?
16     A   I can't remember exactly when they came
17  in.
18     Q   You have had them within the last year?
19     A   Some of them are more recent.
20     Q   More recent.
21     Have you contacted Nu-Pharm for any
22  information to respond to FDA's questions?
23     A   I don't believe we --
24     Well, we contact them, they need

## Page 108

1  to -- it's their submission, so we do meet with them
2  to sign the documents.
3     Q   To sign the documents?
4     A   So they see what response we give.
5     Q   Have you ever talked to Nu-Pharm about the
6  substance of a response before giving it to them for
7  signature?
8     A   Most of the work comes from our group
9  because we're more knowledgeable on FDA's
10  requirements.
11     Q   My question was have you ever talked to
12  Nu-Pharm before preparing a response for FDA?
13     Have you talked to Nu-Pharm about the
14  substance of the response before you give it to them
15  and say sign this document?
16     MS. MAZZOCHI: Objection. Asked and
17  answered, and you're getting
18  argumentative.
19  BY MR. WINCHESTER:
20     Q   You can answer the question.
21     MS. MAZZOCHI: If you can.
22     A   I'm not a hundred percent -- I'm not sure.
23  Let me they think. I can't really remember.
24

## Page 109

1  BY MR. WINCHESTER:
2     Q   Do you recall any incident, any instance
3  sitting here today that you did that?
4     MS. MAZZOCHI: Objection, vague.
5  BY MR. WINCHESTER:
6     Q   Any instance as you sit here today that
7  you contacted Nu-Pharm to talk to them about the
8  substance of a response to a question from FDA
9  before giving them the response you drafted and
10  saying please sign?
11     A   I'm not sure. I can't -- like I can't
12  remember.
13     Q   Is that a no?
14     I am asking. Do you remember as you
15  sit here right now ever doing that?
16     A   I don't. No, I don't remember.
17     Q   Have you ever had a meeting with Richard
18  Benyak having anything to do with this ANDA?
19     A   I would meet with him, have the documents
20  to have him sign.
21     Q   Any other meetings with Mr. Benyak other
22  than to have him sign documents?
23     A   Not personally, no.
24     Q   Do you know if anyone working with you in

28 (Pages 106 to 109)

Page 110

1  the assembly of this ANDA had meetings with Richard
2  Benyak about the ANDA other than to have him sign
3  documents?
4      A  A typical meeting or e-mails?
5      Q  Anything.
6      A  Yeah.  Ana has dealt with him as well.
7      Q  What is your understanding of -- and
8  you're talking about Ana Ivic, right?
9      A  That's right.
10      Q  What is your understanding of Ms. Ivic's
11  relation with Richard Benyak relating to this ANDA?
12          MS. MAZZOCHI:  Objection.  Calls for
13  speculation.
14      BY MR. WINCHESTER:
15      Q  You can tell me what you know.
16      A  She prepared the documents, and so she
17  would send them to him for signing by e-mail.
18      Q  Okay.  So that's just him signing.
19          My question was are you aware of
20  anyone who has had conversations with Mr. Benyak
21  about this ANDA other than for purposes of getting
22  him to sign documents?
23      A  In my group?
24      Q  Anyone.

Page 111

1      A  I don't know that.
2      Q  Okay.
3          How about your group?
4      A  I believe not.
5      Q  When you personally have had dealings with
6  Mr. Benyak to get him to sign documents, have you
7  met with him personally?
8      A  Yes.
9      Q  How many times?
10      A  I don't know.  Quite a few.
11      Q  More than five?
12      A  Probably, yes.
13      Q  More than ten?
14      A  Probably not.  No.
15      Q  Between five and ten?
16      A  I'm guessing.
17      Q  You don't think it was more than twenty?
18      A  No.  I don't think it was more than
19  twenty.
20      Q  Now, in each of these five to ten meetings
21  you had, were they all in person?
22      A  Most of them were in person, yes.
23      Q  How many of the five to ten would you say
24  were in person?

Page 112

1      A  Most of them were in person, because he's
2  on my way home so I can stop by and pick up
3  documents.
4      Q  The Nu-Pharm office is on your way home
5  from Apotex?
6      A  That's right.
7      Q  How far away from the -- Etobicoke?
8      A  Etobicoke, yes.
9      Q  How far away from where you work is
10  Nu-Pharm's facility?
11      A  From where I work, thirty kilometers,
12  maybe forty.
13      Q  When you would take documents to meet with
14  Mr. Benyak, would you meet with him at Nu-Pharm's
15  offices or somewhere else?
16      A  At his office.
17      Q  And his office is at the Nu-Pharm
18  facility, is that right?
19      A  That's correct.
20      Q  You said most of these five to ten were in
21  person; eight, is that fair?
22      A  When documents needed to be signed, they
23  were all done in person, or most of them, not all.
24      Q  Let's just keep it at five to ten.

Page 113

1      A  Okay.
2      Q  In those instances when you would meet
3  with Mr. Benyak to have him sign documents, were
4  those documents that had been drafted by Apotex?
5      A  Yes.
6      Q  How long would you say each of those
7  meetings took?
8      A  Half hour.
9      Q  Each?
10      A  Roughly.  I'm just -- some shorter, some
11  maybe longer.
12      Q  You think you met with Mr. Benyak relating
13  to this ANDA for more than a half hour at any one
14  time?
15'     A  No, not relating to this ANDA.
16      Q  And that's fair, I probably should have
17  said that.
18          You might have been seeing him about
19  more than one issue, is that true?
20      A  No.
21      Q  So then of these five to ten meetings that
22  you had with Mr. Benyak, they were solely relating
23  to this ANDA, is that right?
24      A  That's correct.

29  (Pages 110 to 113)

Page 114

1    Q   Any one of them you recall going more than
2  half an hour?
3    A   I don't think so, not relating to the
4  ANDA.
5    Q   You might spend some time just small talk,
6  is that right?
7    A   Yes.
8    Q   Okay.
9        Do you recall Mr. Benyak ever asking
10 you any questions about the substance of any
11 documents that you gave him to sign?
12   A   What would you mean by that?
13   Q   I mean did he just sign the documents or
14 did he say what are these docu...ents, where do you
15 have the information that you put down here,
16 anything like that?
17       Did he ask you any questions about
18 the documents or did he just sign them?
19       MS. MAZZOCHI: Objection, vague,
20   compound.  You have got nine questions in
21   there.
22 BY MR. WINCHESTER:
23   Q   You can answer.
24       MS. MAZZOCHI: No.  Just read the one

Page 115

1  question for the record.
2  BY MR. WINCHESTER:
3    Q   Did you understand my question?
4    A   Can you repeat it?
5    Q   Sure.
6        When you gave Mr. Benyak documents to
7  sign at these five to ten meetings, did he ever ask
8  you questions about them or did he just sign them?
9    A   The documents were the cover letters for
10 the submission, so he -- I told him what we've done,
11 and then these are the cover letters.  And he would
12 sign them.
13   Q   The only things you recall having him sign
14 were cover letters?
15   A   Cover letters and any documents that
16 needed to be signed by him, the 356h form.
17   Q   Did you also have him sign the Paragraph 4
18 certification?
19       MS. MAZZOCHI: Objection, vague, lack
20   of foundation.
21   A   Can you repeat that?
22 BY MR. WINCHESTER:
23   Q   Did you also have Mr. Benyak sign the
24 Paragraph 4 certification that is included in the

Page 116

1  ANDA?
2        MS. MAZZOCHI: Objection. Lack of
3    foundation.
4        MR. WINCHESTER: Let me address her
5    point.
6    Q   You are aware there's a Paragraph 4
7  certification contained in the ANDA submitted under
8  Nu-Pharm's name, right?
9    A   Correct.
10   Q   Did you take that to Mr. Benyak and have
11 him sign?
12   A   I don't recall taking that one.
13   Q   Do you know that it was drafted at Apotex?
14   A   I don't recall drafting that.  No.
15   Q   Did you ever have a conversation with
16 Mr. Benyak about the Paragraph 4 certification?
17   A   I don't believe -- I don't recall that we
18 discussed it.
19   Q   Other than cover letters and what you call
20 the 356h form, that is the actual application for
21 the ANDA, right?
22   A   That's correct.
23   Q   Other than a cover letters and the 356h
24 form, what other documents did you personally take

Page 117

1  to Mr. Benyak to have him sign?
2    A   The debarment certificate, that's it.
3    Q   For any of those that you recall, did he
4  ask you any questions about them?
5    A   No.  I don't believe so.
6    Q   Did you ever have group meetings with
7  others who were working on particular aspects
8  relating to the ANDA?
9    A   Within Apotex?
10   Q   Let's start there.
11   A   We normally meet with the different groups
12 when we start, so we're all working on the same
13 page.
14   Q   How about as the project progresses, do
15 you meet periodically?
16   A   Only if necessary.  If there's issues,
17 then we'll meet.
18   Q   So there aren't periodic meetings among
19 the groups at which multiple products including this
20 one would be discussed; is that right?
21   A   I think it's changed.
22       In those days we did have meetings
23 with each of the groups and discuss all products.
24 So if we were working on that product, it would be

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

**A0101**

Page 186

1 You were the project leader on this
2 and compiled the ANDA. What do you understand to be
3 the purpose of this introductory paragraph?
4    A    We were told to put this in with the
5 label. We didn't question it.
6    Q    You were told by whom?
7    MS. MAZZOCHI: Objection. Asked and
8 answered.
9    A    I can't remember who indicated we had to
10 put that in here.
11    BY MR. WINCHESTER:
12    Q    Somebody in the science group?
13    A    I really don't remember.
14    Q    This paragraph mentions that there is a
15 potential alternative structure other than the
16 picture we were just talking about of the formula of
17 divalproex sodium. This paragraph suggests there's
18 another structure which might be more accurate.
19    Are you familiar with any other
20 structure?
21    A    No.
22    Q    Have you been asked to submit any
23 amendment to this ANDA to include a different
24 structure in the labeling?

Page 187

1    A    No.
2    Q    Are you aware of any plans to do that, to
3 submit an amendment with an alternative structure?
4    MS. MAZZOCHI: I am going to instruct
5 you not to reveal any communications you
6 have had with counsel in that regard. If
7 you have any knowledge independent of
8 that.
9    A    I have no knowledge of what -- no. I
10 haven't been told.
11    BY MR. WINCHESTER:
12    Q    No one within Apotex has told you that
13 there are plans to make an amendment to change the
14 molecular structure in the labeling; is that right?
15    A    No.
16    MS. MAZZOCHI: Same instruction.
17    A    Not that I have been told.
18    BY MR. WINCHESTER:
19    Q    You haven't had any conversations with
20 lawyers about that either?
21    MS. MAZZOCHI: I am going to instruct
22 you not to answer that.
23    MR. WINCHESTER: She can tell me
24 whether she's --

Page 188

1    MS. MAZZOCHI: No, because that would
2 reveal the content of the communication,
3 so I am not going to have her answer that.
4    BY MR. WINCHESTER:
5    Q    Setting aside lawyers again, no one within
6 Apotex has told you that such an amendment is to be
7 prepared and submitted, is that right?
8    A    Yes.
9    Q    Has FDA ever asked any questions about
10 this introductory paragraph here in the side-by-side
11 comparison?
12    A    Not so far that I can remember. I don't
13 believe I have seen anything on that.
14    Q    In other applications that you have done,
15 have you ever seen an application submitted by
16 Apotex that contains this sort of disclaimer
17 paragraph saying that there might be a different
18 structure that's more accurate for the label?
19    A    I don't recall that there has been one.
20    (The document referred to was
21    marked Plaintiff's Deposition
22    Exhibit No. 7 for
23    identification.)
24    Q    Let's mark as Exhibit 7 a document Bates

Page 189

1 numbered NU 005483.
2    Look at this and let me know if you
3 have seen that before?
4    A    Okay. I've seen this.
5    Q    What is it?
6    A    That's for sending clinical supplies to
7 biomed. That's when I said to you earlier, I wasn't
8 sure when this was sent, because we used to do this,
9 but soon after this we stopped doing them.
10    We don't do that anymore today. It
11 hasn't been, oh, for a year and a-half, two years
12 that we haven't done it.
13    Q    Let's first talk about what it is.
14    We talked earlier about whether in
15 fact regulatory affairs had supplied the company
16 handling the biostudies with the actual samples to
17 be used. Is that what you're talking about?
18    A    That's right, yeah.
19    Q    You told me at the time you didn't
20 remember whether you had done that. Does looking at
21 this document, Plaintiff's 7, refresh your
22 recollection?
23    A    Yes. It means that we did it.
24    Q    So regulatory affairs actually supplied

48 (Pages 186 to 189)

Page 190

1  the sample materials for use in the biostudy?
2    A  That's correct.
3    Q  Who is Christine DiMarco?
4    A  Christine DiMarco --
5    Q  It is like in the receipt.  Is this the
6  person at biomed?
7    A  She must be at biomed.
8    Q  At the top left, this has the name
9  TorPharm.  Is that just an old TorPharm standard
10  form as far as you know?
11    A  It depends when this was shipped.
12    Q  It is signed 9/24/04, which would be after
13  the name change.
14    A  Yeah.  A lot of the documents didn't
15  change.  We still have TorPharm documents.
16    Q  Certain form documents would still say
17  "TorPharm" on them?
18    A  Yeah, yeah.
19    Q  And if I am reading it right, this product
20  shipment actually was signed off on by both yourself
21  and Ana Ivic, is that right?
22    A  Yes.
23    Q  Who is Suzette -- I can't read the last
24  name.

Page 191

1    A  Pandohie.  She's the administrator in our
2  department, so she helped us with shipping.
3    Q  We talked about before, is this lot of the
4  proposed generic product, FD4165A?  Is that the lot
5  prepared using the flaked material?
6    A  That's correct.
7    Q  And the other product that was provided
8  was a sample of the Depakote; is that right?
9    A  Yes.
10    Q  Because the purpose of the biostudies is
11  to compare performance between the two, is that
12  right?
13    A  That's right.
14    Q  And, again, you obtained this sample from
15  lot 4165 from the Apotex formulation development
16  group, is that right?
17    A  That's right.
18        (The document referred to was
19        marked Plaintiff's Deposition
20        Exhibit No. 8 for
21        identification.)
22    Q  Mark as Plaintiff's 8 a document Bates
23  numbered NU 008693 through 8721.
24        Take a look and let me know if you

Page 192

1  have seen that before?
2    A  That's part of the submission.
3    Q  I am not sure whether it is part of the
4  ANDA or not.  I was hoping you could tell me.
5    A  I wouldn't know.  When we --
6        When I review the submissions we are
7  not responsible for the biostudy, so we don't even
8  look at it.
9    Q  That would be a whole section of the ANDA
10  that's roughly --
11    A  Yeah.  It just gets attached and sent out.
12    Q  Have you seen this document before, do you
13  know?
14        I know it is not addressed directly
15  to you?
16    A  I don't -- no.
17    Q  This is the biostudy results, is that
18  right?
19    A  It looks like it.  Yeah.
20    Q  Let me ask you just a couple of quick
21  things about it.
22        If you can turn almost all the way
23  back, if you will look in the lower right-hand
24  corner you will see the numbers NU 8717.

Page 193

1    A  Last page?
2    Q  No, not quite all way back.  8717, in the
3  bottom right.
4    A  Okay.  Sorry.
5    Q  Okay.
6        Under section C about two-thirds of
7  the way down the page it says, "Apotex Inc. BMD
8  approval."  What is BMD?
9    A  Where is that?  Oh.  Apotex biomed.
10    Q  So that would be biomed you talked about
11  before.
12        At the very bottom of the chart I
13  guess one line up there's a sentence talking about
14  signature by the sponsor -- which here is listed as
15  Apotex Inc. Etobicoke -- confirms that the sponsor
16  is in agreement with study design characteristics
17  and costing.
18        Do you see that?
19        MS. MAZZOCHI:  Where is that?
20    A  The last line.  Almost the last line.
21        MR. WINCHESTER:  Yes.
22    A  This is just a standard document they use.
23    Q  We had talked a little bit before about
24  the cost, and it looks like if you look in the

49  (Pages 190 to 193)

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net                    Chicago, Il 60611
Fax: 312.222.1645

**A0103**

Page 194

1  middle of page there under section 4, project
2  management, there's a cost for this study proposed
3  of about $125,000.
4        Do you see that?
5     A  124,836.
6     Q  Yes.
7     A  Yes.
8     Q  Again, do you have any idea who paid that
9  money?
10    A  We don't get involved with it. I have no
11  idea.
12       MR. WINCHESTER: Take a quick break.
13  I am going to see if I can shave down some
14  of this.
15       THE VIDEOGRAPHER: Tape No. 2, the
16  deposition of Eveline Eilert. We are off
17  the record at 4:00 p.m.
18       (Whereupon, a brief recess
19         was taken.)
20       This is Tape No. 3 in the deposition
21  of Eveline Eilert. We are back on the
22  record at 4:10 p.m.
23
24

Page 195

1        (The document referred to was
2         marked Plaintiff's Deposition
3         Exhibit No. 9 for
4         identification.)
5  BY MR. WINCHESTER:
6     Q  Let me mark as Plaintiff's Exhibit 9 a
7  document Bates stamped NU 004939. It is an e-mail,
8  looks like it was sent from you to Shawn Shirazi,
9  copied to others on April 15, 2004.
10       Is Shawn Shirazi -- is his first name
11  actually Shaheen, the same person?
12    A  No, it is Shawn.
13    Q  Where does he work?
14    A  He's no longer with Apotex.
15    Q  Where did he work at the time you sent
16  this e-mail?
17    A  He was -- he was in charge of the labs.
18    Q  The labs group we talked about earlier?
19    A  That's correct.
20    Q  Who is Lisa Deadman?
21    A  She's the project manager for the
22  biomedical division. She was, she's no longer there
23  either.
24    Q  Do you have any idea where Shawn Shirazi

Page 196

1  works currently?
2     A  No, I don't.
3     Q  In this e-mail you're asking, "Please
4  provide input about whether we rerun the divalproex
5  sodium delayed-release to be submitted under the
6  Nu-Pharm name."
7        What do you mean by rerun?
8     A  I have no idea. I can only start
9  guessing.
10       MS. MAZZOCHI: You are not here to
11  guess.
12  BY MR. WINCHESTER:
13    Q  The document before, where it looked like
14  you were sending samples to biomed to do the
15  biostudies in about September of '04, and here it is
16  several months earlier.
17       Are you aware of any earlier
18  biostudies that were done for purposes of this ANDA?
19    A  No. I don't believe there were any
20  earlier studies.
21    Q  Would you possibly have been referring in
22  this rerun to the fact that there had been
23  biostudies done on the prior TorPharm product?
24       MS. MAZZOCHI: Objection. Calls for

Page 197

1  speculation.
2     A  It is hard to state.
3        What was the date the product was
4  manufactured, do we have that?
5  BY MR. WINCHESTER:
6     Q  Which product?
7     A  The one that we submitted.
8     Q  4165?
9     A  Yes.
10    Q  You keep looking at that and I'll find out
11  for you.
12    A  Okay. Then I can -- because otherwise I
13  don't know. They may have had to retest -- retest
14  one of the tests.
15    Q  It looks like the lot of the flakes that
16  was used to make that, those pills --
17    A  Yes.
18    Q  -- was made in March of 2004.
19    A  March. So this would be the release
20  testing for it. So they probably had a problem with
21  one of the tests.
22       I really don't know what exactly this
23  refers to.
24    Q  You are not familiar with any biostudies

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net                    Chicago, Il 60611
                                                                       Fax: 312.222.1645

A0104

Page 198

1  that had been conducted prior to the ones that were
2  done in or around September of '04?
3      A   No.  We only did the one biostudy for this
4  product.
5      Q   For purposes of any of the work you did
6  with respect to this ANDA submitted under Nu-Pharm's
7  name, did you consult or provide anyone else with
8  any biostudies conducted on the prior TorPharm
9  product?
10     A   Could you repeat that, please?
11     Q   Sure, sorry.
12         We are working with two of them here,
13 and I am trying to get the question specific for the
14 purpose of anything that you did with respect t:
15 compiling the ANDA submitted under Nu-Pharm's name.
16 Okay?
17     A   Okay.
18     Q   And part of that was biostudy information
19 included in the ANDA, right?
20     A   That's right.
21     Q   Did you consult or provide anyone else
22 with studies or data relating to biostudies on the
23 prior TorPharm product?
24     A   No.  Those were totally separate.  Those

Page 199

1  were a totally separate submission.
2      Q   This also mentions, you're asking if
3  there's a date for a biostudy on an extended-release
4  formulation of divalproex sodium.
5          Do you see that?
6      A   Yes.
7      Q   Is that also a project that you are
8  working on?
9          MS. MAZZOCHI:  I am going to instruct
10 the witness not to answer that.
11         MR. WINCHESTER:  On what basis?
12         MS. MAZZOCHI:  To the extent if
13 there's any extended-release product, it
14 is not part of this case.
15         MR. WINCHESTER:  It is a relevance
16 objection.
17     Q   You can answer the question.
18         MS. MAZZOCHI:  Then I move on the
19 record for a protective order with regard
20 to any divalproex sodium extended-release
21 product, which is not part of this case.
22         And it is my understanding there
23 hasn't been even an ANDA filed on it.  It
24 is not relevant.  It is far afield from

Page 200

1  the scope of this case.
2          MR. WINCHESTER:  It is a divalproex
3  sodium product.
4          Are you instructing the witness not
5  to answer the question on a relevance
6  ground?
7          The way I read this --
8      A   That is correct.  Currently I'm not
9  working on it.
10     Q   You are not currently working on it.
11         I am going to ask her some more
12 questions about it.  I will ask, you decide what
13 you're going to do.
14         When did you stop working on that
15 project?
16         MS. MAZZOCHI:  Objection.  Lack of
17 foundation.
18         MR. WINCHESTER:  That's fair.
19     Q   Were you ever working on a project
20 relating to divalproex sodium extended-release
21 product?
22     A   Do I answer?
23         Well, I have worked on
24 extended-release.

Page 201

1      Q   When did you start working on that project
2  for the extended-release product?
3      A   I don't remember.
4      Q   Is the active ingredient in that proposed
5  product divalproex sodium?
6          MS. MAZZOCHI:  There's a continuing
7  objection on relevance for this entire
8  line of questioning.
9  BY MR. WINCHESTER:
10     Q   You can answer.
11     A   It would be the same active ingredient.
12     Q   I may have asked and I have forgotten your
13 answer.
14         When did you start working on the
15 project relating to the extended-release divalproex
16 sodium product?
17     A   I don't know.  I can't remember
18     Q   When did you stop?
19     A   I can't -- I don't have dates.
20     Q   This year, last year?
21         MS. MAZZOCHI:  Objection.  Calls for
22 speculation.
23     A   I don't remember.  I have to look in the
24 files.

51 (Pages 198 to 201)

Page 202

1    BY MR. WINCHESTER:
2    Q   How long did you work on the project
3 relating to the divalproex sodium extended-release
4 product?
5    A   Not very long.
6    Q   One month, six months, one year?
7    A   Our group, regulatory ourself?
8    Q   Yes.
9    A   What was the time?
10   Q   You tell me.
11       I am asking how long you or your
12 group worked on the extended-release divalproex
13 sodium product?
14   A   To compile the submission how long it
15 took?
16   Q   We will get into what you did.  But, how
17 long --
18       MS. MAZZOCHI:  No.  We are not going
19 to get into what she did.
20   A   It is a whole different product.
21       MR. WINCHESTER:  I am asking how long
22 you worked on the project.
23   A   I don't know.
24

Page 203

1    Q   No idea.  You can't give it to me in a
2 month, one year?
3    A   A lot of the work is done in the
4 background that we don't know about yet.  We don't
5 get involved until close to submission time.
6    Q   How about just your group?  I understand
7 there are other groups that might be working on
8 things as well.
9    A   Two months.
10   Q   Why did you stop working on that project?
11   A   Is this confidential?
12   Q   We have a protective order.  You can
13 answer the question.
14       MS. MAZZOCHI:  Let's take a break.
15       MR. WINCHESTER:  There's a question
16 pending.  She can't take a break.
17       MS. MAZZOCHI:  Well, we're going to
18 take a break.
19       MR. WINCHESTER:  You can't take a
20 break with a question pending.
21       MS. MAZZOCHI:  If she's concerned
22 about revealing something, then we are
23 going to take a break.
24       MR. WINCHESTER:  It is not an

Page 204

1 attorney-client issue.  She cannot take a
2 break with a question pending.  There's no
3 privilege question.  I'm not trying to be
4 difficult.
5       MS. MAZZOCHI:  I understand.
6    BY MR. WINCHESTER:
7    Q   Is this something that you have talked to
8 attorneys about, the question you are about to
9 answer, you are about to give me?
10   A   No.
11   Q   Okay.
12       Then no, you can't take a break
13 before you answer my question.
14       MS. MAZZOCHI:  We are going to take a
15 break, take a quick break.
16       MR. WINCHESTER:  Okay.
17       THE VIDEOGRAPHER:  Off the record at
18 4:21 p.m.
19       (Whereupon, a brief recess
20        was taken.)
21       MS. MAZZOCHI:  Can I have the pending
22 question read back?
23       (The record was read by the
24        reporter as requested.)

Page 205

1       MS. MAZZOCHI:  Okay.  You can answer
2 that question.
3       THE VIDEOGRAPHER:  Ready to go back
4 on.
5       MS. MAZZOCHI:  Yes.  Just a moment,
6 please.
7       We are back on the record at
8 4:23 p.m.
9    A   We stopped working on it because it didn't
10 get accepted for filing at the FDA.
11   BY MR. WINCHESTER:
12   Q   So an ANDA was actually filed for the
13 project and it was not accepted?
14   A   That's correct.
15   Q   Why wasn't it accepted?
16   A   Because the biostudy didn't pass.
17   Q   Are you aware of whether there are
18 continuing efforts to try and rectify the issues
19 that led to the refusal to file?
20   A   I'm not sure what the plan is.  I don't --
21 I don't get told until there's a file, a submission
22 to go out.
23   Q   Who told you to stop working on the ER
24 product?

52 (Pages 202 to 205)

Page 206

1    A    Well, it was refused for filing, so
2  there's nothing to work on.
3    Q    Did anyone within Apotex tell you stop
4  working on this, this is a done deal?
5    A    There's nothing to do when there's a
6  refusal to file. We went through the submission.
7    Q    So this project hasn't been closed within
8  Apotex. It is just there is no pending ANDA right
9  now, is that right?
10    A    We withdrew the ANDA.
11    Q    When was the ANDA filed and when was it
12  withdrawn?
13    A    I don't remember the dates.
14    Q    Do you remember if it was this year or
15  last year?
16    A    I know we went through it not too long
17  ago. I don't remember exactly when it was filed.
18    Q    You say withdrew it not to long ago?
19    A    Yes.
20    Q    This year?
21    A    Yes. It would be this year.
22    Q    Within the last two months, three months;
23  can you estimate it for me anymore closely?
24    A    The last two months.

Page 207

1    Q    Who is the applicant for that product?
2    A    I believe it was Apotex.
3    Q    Does Nu-Pharm have any involvement with
4  the ER ANDA?
5    A    Not that I am aware of.
6    Q    Do you recognize the term CTA filing or TA
7  release?
8    A    Trial application, clinical trial
9  application.
10    Q    Clinical trial application. What is that?
11    A    You have to put in a clinical trial
12  application in order to run a clinical study.
13    Q    You say you have to put it in, who is you,
14  and who are you turning it into?
15    A    Before you can run a clinical study, it is
16  like an IND in the states.
17      You have to submit to Health Canada
18  an application that you're going to run a clinical
19  study on subjects, human subjects, called a clinical
20  trial application.
21    Q    You mentioned Health Canada. Does
22  clinical trial application mean anything to you with
23  respect to the USFDA?
24    A    It is not submitted to the US. It is

Page 208

1  submitted to Canada.
2    Q    Oh, I get it.
3      If you want to -- even if it is for a
4  product that would be submitted to the USFDA; if you
5  want to do a clinical study in Canada, you send this
6  CTA to Health Canada?
7    A    Because it is done on Canadian subjects.
8    Q    What is TA release?
9    A    Trial application release.
10    Q    What is a trial application release?
11    A    Well, CT, clinical trial. It is to
12  release the product to go into the clinical trial.
13    Q    So all of this would be basically telling
14  Health Canada here is a biostudy we would like to
15  conduct using human subjects?
16    A    Yes.
17    Q    Take a look and let us know it is okay?
18    A    You get some preliminary data, some
19  manufacturing documentation. It is like an IND.
20      You're giving them the basic
21  information they need. Then they'll give you an
22  approval to run it or not.
23    Q    So, there was some sort of CTA filed with
24  Health Canada relating to the biostudies conducted

Page 209

1  for purposes of the product submitted under
2  Nu-Pharm's name?
3    A    That's correct.
4    Q    Do you have copies of those CTA's?
5    A    No. It is done by the Canadian group. We
6  don't -- we don't do CTA's in our group.
7    Q    The Canadian regulatory group you mean?
8    A    Yes, they deal with Health Canada.
9    Q    So even if you need them done for purposes
10  of a project you are working on for the U.S., you
11  would still have the Canadian side of regulatory
12  handle this aspect; is that right?
13    A    That's correct.
14    Q    Do you recall which person within the
15  Canadian side of the regulatory group dealt with
16  Health Canada with respect to CTA's for this case?
17    A    I know the Canadian regulatory group does
18  it. I don't know exactly who the person is.
19    Q    Who heads the group?
20    A    John Hems is the director.
21    Q    How do you spell John's last name?
22    A    H-e-m-s.
23    Q    Is the Canadian regulatory group located
24  in the same facility where you are?

53 (Pages 206 to 209)

## Page 210

1   A   No, located in Signet.
2   Q   Which would be the headquarters?
3   A   That's right.
4   Q   How far away from your facility is the
5 Signet campus?
6   A   About 10, 15 kilometers.
7   Q   What does that amount to in drive time?
8   A   About 20 minutes, depending on traffic.
9       MR. WINCHESTER:  Let me mark number
10 10.
11
12        (The document referred to was
13        marked Plaintiff's Deposition
14        Exhibit No. 10 for
15        identification.)
16      It looks like a series of forwarded
17 e-mails Bates numbered NU 004945 -- well,
18 I apologize, they are not sequential.
19 They are a number of e-mails stuck
20 together.
21      It appears to be a number of forwards
22 of e-mails on the same conversation.  You
23 were copied on most, if not all of these,
24 I think.
    Q   I actually have some questions for you

## Page 211

1 about it would be the second page of the exhibit,
2 down in the right-hand corner it would be marked
3 946.  Are you with me?
4   A   Yes.
5   Q   Who is Vida Akramy?
6   A   She works for Don.  She's a formulation
7 development supervisor.
8   Q   Arnie, that's A-k-r-a-m-y.
9      She was the supervisor, she worked
10 for Don Barber?
11   A   That's correct.
12   Q   Is she still there?
13   A   She's still with Apotex, but in a
14 different position.
15   Q   Still in formulation development?
16   A   No.
17   Q   Where is she now?
18   A   She is in project, global project team.
19   Q   Who is Barinder Sandhu?  S-a-n-d-h-u.
20   A   She is another regulatory associate and
21 was project leader.  She was one of the other
22 projects leaders.
23      She was an associate at this time.
24 She was promoted to project leader when we started

## Page 212

1 reorganizing.
2   Q   At this time in about August 11 of 2004
3 when the e-mail was sent, was she working under your
4 direction?
5   A   No.
6   Q   Did she work on this project relating to
7 the ANDA submitted in Nu-Pharm's name?
8   A   No.  She was responsible for biostudy
9 shipments.  She did all our products.  That's how
10 come she's in here.
11   Q   The next one I wanted to ask you about
12 is -- this is a fabulous name.  Leacroft Longmore,
13 L-o-n-g-m-o-r-e.
14   A   He was the supervisor of the lab.
15   Q   Do you know if he conducted any particular
16 tests or directed tests relating to this product?
17   A   He didn't do any actual testing.
18      He did a review of the testing and
19 went to all the meetings.
20   Q   Michelle Zheng I think you mentioned to me
21 before.  She's in the lab, is that right?
22   A   Yes.  She was the director of the lab, and
23 Lili reported to her.
24   Q   Lili reported to her then both of them

## Page 213

1 recorded to Mr. Longmore, is that right?
2   A   No.  Longmore reported to Michelle Zheng.
3   Q   Okay.
4      It is going to be terrible with the
5 next name.  First name Parminder.
6   A   He did stability.  He's no longer there.
7   Q   Last name on that.  B-h-i-m-b-h.
8      The number I see on it, or I am
9 sorry, the name I see on a number of documents
10 Yolanda Mitchell, who is she?
11   A   She -- we started project teams, and she's
12 one of the coordinators.
13   Q   Of the project team?
14   A   Of the project team.
15   Q   'What was her involvement with this
16 particular project?
17   A   There wasn't really any except she would
18 maintain the database.
19      She got hired, the protect team
20 hadn't really started.  So she helped Don Barber
21 with the database that he kept.  So she would kind
22 of follow up on dates that were set to be met.
23   Q   What database are you talking about?
24   A   We have a project database that tracks all

54 (Pages 210 to 213)

Arnold Goldstine & Associates, Ltd.
312.222.1644                agaltd@earthlink.net

Chicago, Il 60611
Fax: 312.222.1645

A0108

Page 214

1  our projects.
2  Q    What information would be included in the
3  database?
4  A    Whether we have a final formulation,
5  whether we have -- a stability has started, the date
6  it starts; when the stability report is going to be
7  by out, when the bioreport is going to be completed;
8  when the submission is going out.
9  Q    Those are all dates.
10      Is there information other than
11 target dates or due dates that's collected in the
12 database?
13 A    There's a few comments in there.  If
14 something is late, they'll say why it is late.  If
15 the formulation hasn't finalized, it might say a few
16 words about that.
17 Q    Would there be in the database
18 descriptions or discussions about things like
19 testing on the product, the results of testing
20 rather than due dates and things of that nature?
21 A    If a biostudy fails, it would say that the
22 biostudy failed.  If stability fails, it would say
23 stability failed.
24 Q    How about the results of things like

Page 215

1  structural elucidation testing?
2  A    There's no detailed information, just
3  general for time lines.
4  Q    To help you keep track of the project?
5  A    That's right.
6  Q    Was there a particular target date or
7  schedule that you were under for the submission of
8  this ANDA?
9  A    Yes, as per the database.
10 Q    Who sets the dates?
11 A    In these days it would be Don Barber and
12 it just said on -- when the formulation, when we
13 have a final formulation, when the batches are made.
14 And then they just add so many months for stability
15 and so many months for bio, then that becomes our
16 target submission date.
17 Q    Are there different target submission
18 dates depending on the priority assignment of the
19 project?
20 A    No, because we work on all projects at the
21 same time.
22 Q    Is there an attempt to made, though --
23      With the understanding there are a
24 lot of things going on at once, is there an attempt

Page 216

1  made for higher priority projects to have them on
2  file or to meet your target sooner than if they were
3  lower priority?
4  A    I think we discussed that this morning
5  with your G, A, B, C products today, but in these
6  days we didn't have that.
7  Q    So in these days they were all the same?
8  A    Right.
9  Q    So you think if there were initially a --
10 we have a target date of February 2005 to file this
11 ANDA, that would be a date set by Don Barber?
12 A    Theoretical, yes, also based on patent
13 expiry.
14 Q    How would patent expiry come into play?
15 A    Depends if Paras 3's or 4's are being
16 filed, like Don would set the date.
17 Q    If he knows it is going to be a Paragraph
18 4 certification?
19 A    Yes.
20 Q    Then he would set a date accordingly,
21 depending on when the patents expire?
22 A    Yes.
23      If we file a Para 3 and we know it is
24 not going to expire until 2010, then this project

Page 217

1  wouldn't get as much priority.  But, I think at this
2  time when we were doing these, that wasn't really
3  taken into account.
4  Q    In any event --
5  A    There have been a lot of changes that have
6  taken place.
7  Q    In any event, at this time you were not
8  the person that would have been setting these dates;
9  is that right?
10 A    No.  Yeah, you're right.
11 Q    That was my question.
12 A    No.  I don't set the dates.
13 Q    Okay.  Chester Lastoria, who is he?
14 A    He set up the database.  I believe that's
15 why he's in there.
16 Q    Do you know what group he works in?
17 A    He works in the -- I don't even know where
18 he works now.
19 Q    Do you know where he worked then, was he
20 in formulation development?
21 A    No, no.
22 Q    All right.
23      Let's continue on the list here.  Who
24 is Frank Schneider?

55  (Pages 214 to 217)

Page 218

1    A    We don't really get too much involved with
2  Signet people.
3    Q    Frank Schneider is from Signet?
4    A    No, Frank Schneider is.
5    Q    I am sorry if I cut you off earlier there.
6    A    Chester is from Signet.
7    Q    Signet?
8    A    Yes. The head office.
9    Q    A different campus of Apotex?
10    A    A different campus. We are not too -- I
11  know what it reads.
12          He was looking after this project
13  team. The protect teams that were set up at around
14  this time, he was involved with that and so was
15  Frank Schneider, and so was Yolanda Mitchell and so
16  was Maria Adona, so was Jean Horton Ali.
17          So they copied all the project team
18  managers and coordinators.
19    Q    So it doesn't mean that any of those
20  people actually had involvement with this project?
21    A    No, they had no idea.
22    Q    The higher-ups, got you.
23          One of the things that it appears
24  like in the e-mail you sent at the top of this page

Page 219

1  August 11 at 5:00 o'clock at night to Lisa Deadman,
2  you were asking if she was aware there were two
3  different batches, and I think talking about the
4  spray-dried versus the flake material that had to go
5  to bio.
6          When did you first learn that there
7  were two different ways of making divalproex sodium
8  being proposed as part of this project?
9    A    When we were first told of the project we
10  were told it was going to be two, two different
11  processes.
12    Q    So you think, and correct me if I am
13  wrong, the way I am reading your e-mail is you're
14  suggesting I was unaware of this as of August 11,
15  2004; is that fair?
16    A    I was unaware that they were going to do
17  bios on both, because that wasn't really the
18  required.
19    Q    You knew that there were two different
20  methods, you just didn't know they were going to do
21  bios on them?
22    A    They were saying there's two bios. And I
23  was saying what are you going to do two bios for.
24  We only have to do one.

Page 220

1          So that was -- that is why I said are
2  you -- Lisa, are you aware, because she's doing the
3  protocol for the bios. So I didn't know if she had
4  protocols for both formulations or only one.
5    Q    As we talked about, ultimately only one of
6  them went to bio, right?
7    A    That's correct.
8          (The document referred to was
9          marked Plaintiff's Deposition
10          Exhibit No. 11 for
11          identification.)
12    Q    Mark as Plaintiff's 11 a document Bates
13  numbered NU 12230. I think you will recognize this
14  from what we were discussing earlier.
15    MS. MAZZOCHI: This is 11?
16    MR. WINCHESTER: In is 11. Yes.
17    Q    Do you recognize this document?
18    A    Yes, I recognize it.
19    Q    What is it?
20    A    It is an e-mail.
21    Q    Is this the e-mail that you sent to
22  Dr. Sherman that we discussed earlier?
23    A    Yes, it is.
24    Q    This looks to be both an attachment of

Page 221

1  your original e-mail and his response, right?
2    A    That's correct.
3    Q    And looking down at your question you sent
4  it on August 20, 2004, I want to talk about the
5  third bullet point where you say, "The batches
6  manufactured using the spray-dried process are for
7  legal purposes only and will not be submitted."
8          What did you mean that the
9  spray-dried process batches were for legal purposes
10  only?
11    A    I didn't know if we were submitting them,
12  so I just wanted to ask him if we were going -- if
13  they were going to be part of the ANDA or not.
14    Q    What would legal purposes be as you
15  understood it when you wrote this e-mail?
16    A    Well, were we submitting it to put in the
17  ANDA or not, or was he just doing it for -- I don't
18  know what he was doing it for.
19    Q    You used the word, the phrase legal
20  purposes. What did you mean by that?
21    A    The wrong phrase to use I guess,
22  because...
23          Whether it was going to be submitted
24  or not, that was my intent of this; or, was he just

56 (Pages 218 to 221)

Page 222

1   making it for some other reason.
2       Q   So your idea is that if it is not going to
3   be submitted, then it is made for legal purposes?
4       A   Yeah. Then it wouldn't be for release for
5   ANDA purposes.
6       Q   Why wouldn't it be for science purposes as
7   opposed to legal purposes?
8           I am just trying to get at what you
9   meant here when you wrote this.
10      A   I just wanted to know if we're going to
11  submit it or not. And are we going to do a bio
12  study on it. Because, people were saying that we're
13  going to do two biostudies and I couldn't figure out
14  what the purpose was, so I needed some clarification
15  on it.
16          And that was all this e-mail was for.
17  It was to see if we were going to do two bios or not
18  and whether we are going to submit the other, the
19  spray-dried process bio.
20      Q   Where did you get the idea that there was
21  discussion of submitting both processes for biostudy
22  that caused to you go and ask these questions of
23  Dr. Sherman?
24      A   Because at first we were told that we were

Page 223

1   going to submit both processes. Then some people
2   were saying that no, they weren't sure. So I was
3   just -- because we had no manager at that point. I
4   just -- before we put a whole submission together,
5   and waste our time, if we were going to submit one
6   batch, I wanted clarification that we are going to
7   submit everything.
8       Q   You said at first, sorry --
9       A   And how many bios were going to be
10  submitted.
11      Q   You said at first you were told both
12  processes would be submitted. Who told you that?
13      A   That came from Jennifer, my manager at the
14  time.
15      Q   Did Jennifer at that time give you any
16  indication that the spray-dried process had been
17  pursued only for legal purposes?
18      A   I'm not really -- I'm not sure exactly
19  what was done.
20      Q   I am just trying to get at where you came
21  up with the phrase?
22      MS. MAZZOCHI: Objection. Asked and
23  answered. You have asked her that
24  question five times already.

Page 224

1       BY MR. WINCHESTER:
2       Q   Had you had any discussion with Jennifer
3   or anyone else before you sent this to Dr. Sherman
4   that the spray-dried process was being prepared for
5   some legal purpose as opposed to for submission?
6       A   I had no discussions on that.
7       Q   This was just a phrase you used out of the
8   blue?
9       A   Well, it is either scientific or it's
10  legal, that's the only reason we make batches.
11      Q   It could be scientific and not be
12  submitted to FDA, right?
13      A   It could be, yeah.
14      Q   When would you decide to describe
15  something as legal versus scientific, it appears to
16  be a distinction you have?
17      A   Most batches -- that's too general, I
18  shouldn't say that. I wasn't then aware --
19          I was first told that we're going to
20  submit both batches. And then people were saying
21  that we weren't. And then I wasn't sure what we
22  were doing.
23          So then I sent Barry an e-mail,
24  because I had no one else to go to, to ask him, tell

Page 225

1   me what we're doing here because we need to put a
2   submission together. And that was all I was trying
3   to say.
4       Q   I understand that part.
5           So as you sit here now, you're
6   telling me you don't know what you meant by legal
7   purposes?
8       MS. MAZZOCHI: Objection,
9   mischaracterizes her prior testimony.
10      A   It was probably not the right word to use.
11      BY MR. WINCHESTER:
12      Q   Have you ever received any other e-mails
13  from Dr. Sherman other than this one as part that is
14  part of Plaintiff's Exhibit 11?
15,     A   I don't believe so. I don't remember.
16      Q   In his response he writes back and
17  basically tells you we will be submitting for
18  approval of both processes, but only the flakes will
19  be used for biostudy, right?
20      A   That's right.
21      Q   And that's ultimately what was done?
22      A   And that's what we needed to hear, because
23  of different stories going on.
24      Q   And just to my question. What Dr. Sherman

57 (Pages 222 to 225)

Page 226

1   said was to be done is what was ultimately done, is
2   that right?
3       A   That's correct.
4           (The document referred to was
5           marked Plaintiff's Deposition
6           Exhibit No. 12 for
7           identification.)
8       MR. WINCHESTER:  Mark as Exhibit 12
9   another of these e-mail chains.
10      Q   I actually want to ask you a couple of
11  quick questions.  On the page, if you look in the
12  lower right-hand corner ending 261, the top e-mail,
13  which for the record is an e-mail from Jean Horton
14  Ali to Esther Barber and Eveline Eilert dated
15  Tuesday, September 21, 2004.
16          Do you see that one?
17      A   Yes, I do.
18      Q   Do you remember receiving this e-mail?
19      A   I guess I did.
20      Q   Who is Jean Horton Ali again?
21      A   She's the project manager for global team.
22  She's no longer there.
23      Q   What were her responsibilities with
24  respect to this project?

Page 227

1       A   This was one of her projects on her team.
2       Q   Did her team include you?
3       A   Not directly, but I was part of -- I
4   suppose I was a member of her team.  Yes.
5       Q   Who were --
6       A   It was part of my project.
7       Q   Who were the members of her team with
8   respect to this project?
9       A   She would have a member from FD and a
10  member from the lab, a regulatory person, a member
11  from biomed and a stability person.
12      Q   Just looking down the line here, as far as
13  you know, were Esther Barber, Yolanda Mitchell and
14  Lili Zhang all members of this team?
15      A   Yolanda was the coordinator.  She kept the
16  minutes.
17      Q   When you say kept the minutes, were there
18  minutes created of meetings of this group?
19      A   Yes.
20      Q   How often did the group meet?
21      A   Once a week -- well, not at the start.
22  We meet once a week now.
23          This is when the teams first set up.
24  And not all projects were in teams at that point.

Page 228

1   They had a couple of pilot products.
2       Q   This project obviously was part of one of
3   the global teams, though, right, at least as of
4   September 2004?
5       A   I just can't say that.
6       Q   Is there any reason you know of that
7   Ms. Ali would be sending e-mails about this project
8   to the group of you?
9       A   They send e-mails about everything.  Can
10  you repeat the question?
11      Q   Sure.
12          Was Ms. Ali involved in a team having
13  to do with this particular project as of
14  September 2004?
15      A   I really can't recall, but from the e-mail
16  it looks like she was trying to push the project.  I
17  didn't think that project was on a team at that
18  point.
19      Q   Setting aside when, at some point in time
20  it became part of a project team?
21      A   Yes, that's right.  Today if she was here,
22  it would be on her team.
23      Q   Whose team is it on now?
24      A   It still the same team, but she's no

Page 229

1   longer there.  They just got somebody else in there.
2   I don't remember her name.
3       Q   So for at least some period of time there
4   have been team meetings at which this and
5   potentially other projects were discussed?
6       A   I don't remember having a meeting with her
7   on this project.  She may have been following up on
8   some time lines if she sees e-mails.
9           But, I don't remember having a
10  meeting with her on divalproex.
11      Q   When we started this little line of
12  discussion here, you mentioned that there were teams
13  that met weekly and there were meeting minutes
14  created for each of those meetings, right?
15      A   That's today, yes.
16      Q   How long has that process been going on?
17      A   Maybe the last year or so.
18      Q   And for the last year or so would that
19  meeting structure apply to all products?
20      A   For the last year or so, yes.  Before that
21  they only chose a few projects to go into this
22  global project teams, and this wasn't one of them.
23      Q   But for the last year or so has it been
24  one of them?

58 (Pages 226 to 229)

Page 254

1    This is basically the process we
2  talked about earlier, right, FDA contacts Marcy
3  Macdonald at Apotex Corp.?
4    A   Yes.
5    Q   She sends it on to Bernice. Bernice sends
6  it's on to you, is that right?
7    A   Yes. And I send it on to the associate.
8    Q   Do you know where Ms. Ivic obtained the
9  information necessary to respond to these questions
10  from FDA?
11    A   Sometimes we -- they are in the
12  submission, but they can't find them. So sometimes
13  we redirect them, sometimes they were missed.
14  Sometimes we put too much information in, so then we
15  get asked questions.
16    Q   Looks like there are --
17    A   So, there's different places this comes
18  from.
19    Q   There are a number of questions that FDA
20  has asked here.
21    A   That's correct.
22    Q   It passed by your desk.
23       Other than sending it along to Ana
24  saying let's address these issues, is there anything

Page 255

1  that you did with respect to coordinating a response
2  to FDA's questions?
3    A   Well, what I'll do is I'll send it on to
4  Ana. Then we talk about it. How we're going to
5  respond to the answers. And is it something that
6  she missed or is it something that is in there and
7  the FDA couldn't find it.
8    Q   Do you remember for this particular set of
9  questions that the FDA sent on or about April 28 of
10  '05, whether you or Anna requested any information
11  from Nu-Pharm for the purpose of responding to FDA's
12  questions?
13    A   This wouldn't have -- this wouldn't have
14  come from Nu-Pharm.
15       (The document referred to was
16       marked Plaintiff's Deposition
17       Exhibit No. 20 for
18       identification.)
19    Q   You can set that one aside.
20       I am marking as Plaintiff's 20 an
21  e-mail dated Tuesday May 10, 2005 from you to Tom
22  Mulnar Bates labeled NU 015528.
23       This e-mail simply says, "As per our
24  discussions, please find the acceptance for filing

Page 256

1  letter for the divalproex sodium Nu-Pharm ANDA
2  77615;" is that right?
3    A   Yes.
4    Q   Do you remember what discussion you had
5  with Tom Mulnar about that issue?
6    A   I just called him to tell him that we got
7  an acceptance for filing.
8    Q   Anything more than that?
9    A   No.
10       (The document referred to was
11       marked Plaintiff's Deposition
12       Exhibit No. 21 for
13       identification.)
14    Q   You can set that one aside.
15       I am marking as Plaintiff's 21
16  another e-mail Bates labeled NU 012520 this looks
17  like it is between you and Bernice Tau on May 19,
18  2005.
19       The original e-mail was sent by a
20  person named Manuel Galing. G-a-l-i-n-g.
21       Do you know who that person is?
22    A   He's a coordinator in our regulatory
23  group.
24    Q   What does a coordinator do?

Page 257

1    A   He sends out all our submissions. He does
2  filing, he helps out whenever he can. His basic job
3  was to send out submissions. It's changed a bit
4  now, because we are doing electronic submissions so
5  it isn't the same anymore.
6    Q   He was basically the person that once it
7  was finished who took care of actually getting it
8  submitted and on file with FDA; is that right?
9    A   That's correct.
10    Q   Who does he work for?
11    A   Now?
12    Q   How about, first of all, let's say at that
13  time.
14    A   He worked for Bernice.
15,    Q   He is within Apotex, then?
16    A   Oh yes. He's in the regulatory group.
17    Q   Is he within the same U.S. based group
18  that you're in?
19    A   Correct.
20    Q   The title of the e-mail and apparently the
21  attachment to it, although I don't have it, is,
22  "Nu-Pharm registration of drug establishment
23  deficiency."
24       Do you remember what that was?

65  (Pages 254 to 257)

Page 270

1       THE VIDEOGRAPHER: We are going to go
2   off the record at 6:09 p.m.
3           (Whereupon, a brief recess
4           was taken.)
5       THE VIDEOGRAPHER: One moment please.
6   Back on the record at 6:11 p.m.
7       MR. WINCHESTER: To finish. Those
8   are all the questions I have. Thanks very
9   much.
10      MS. MAZZOCHI: No questions from us.
11      THE VIDEOGRAPHER: This conclude the
12  deposition of Eveline Eilert. Off the
13  record at 6:11 p.m.
14      MR. WINCHESTER: Reserve signature?
15      MS. MAZZOCHI: We will reserve
16  signature, and make sure we are
17  confidential under the protective order.
18
19
20              DEPOSITION CONCLUDED
21
22
23
24

Page 272

1       I further certify that the signature of the
2   witness to the foregoing deposition was not waived
3   by agreement of counsel for the respective parties;
4   and that I am not counsel for nor in any way related
5   to any of the parties to this suit nor am I in any
6   way interested in the outcome thereof.
7       In witness whereof, I have hereunto set my hand
8   and affixed my notarial certification on this 12th
9   day of July 2006.
10
11
12
13
14
15
16
17
18
19
20  _____
    Arnold N. Goldstine, CSR
21  CSR License No. 084-000288
22
23
24

Page 271

1   UNITED STATES OF AMERICA      )
    NORTHERN DISTRICT OF ILLINOIS )
2   EASTERN DIVISION              ) SS:
    STATE OF ILLINOIS             )
3   COUNTY OF COOK                )
4
5       I, Arnold N. Goldstine, a Certified Shorthand
6   Reporter within and for the County of Cook and State
7   of Illinois, do hereby certify that heretofore,
8   to-wit, personally appeared before me EVELINE
9   EILERT, a witness in a certain cause now pending and
10  undetermined in the United States District Court,
11  Northern District of Illinois, Eastern Division.
12      I further certify that the said witness was
13  first duly sworn to testify to the truth, the whole
14  truth, and nothing but the truth in the cause
15  aforesaid; that the testimony then given by said
16  witness was reported stenographically by me in the
17  presence of said witness, and afterward reduced to
18  typewriting via Computer-Aided Transcription, and
19  the foregoing is a true and complete transcript of
20  the testimony so given by said witness as aforesaid.
21
22
23
24

Page 273

1   C O N F I D E N T I A L
2
3   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
4   EASTERN DIVISION
5
6   ABBOTT LABORATORIES      )
7       Plaintiff,           )
                             ) Civil Action No.
8                            ) 05 C 3714
9   NU-PHARM, INC.,          )
    APOTEX INC. and          )
10  APOTEX CORP.             )
        Defendants.          )
11  _____)
12
13
14
15
16
17
18
19          DEPOSITION OF
20          EVELINE EILERT
21          JUNE 26, 2006
22
23
24

69  (Pages 270 to 273)

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ABBOTT LABORATORIES            )
                               )
          Plaintiff,           )
                               )      Civil Action No.
                               )      05 C 3714
                               )
NU-PHARM, INC.,                )
APOTEX INC. and                )
APOTEX CORP.                   )
          Defendants.          )
_____)

DEPOSITION OF

ANA IVIC

JUNE 27, 2006

**A0115**

Arnold Goldstine & Associates, Ltd.                    Chicago, Il 60611
312.222.1644              agaltd@earthlink.net          Fax: 312.222.1645

## Page 2

```
 1
 2
 3
 4
 5
 6      The video deposition of ANA IVIC, called for
 7   examination by the Plaintiff pursuant to notice and
 8   pursuant to the provisions of the Federal Rules of
 9   Civil Procedure of the United States Court,
10   pertaining to the taking of depositions, taken
11   before Arnold N. Goldstine a Certified Shorthand
12   Reporter within and for the County of Cook and State
13   of Illinois, at 77 West Wacker Drive in the City of
14   Chicago, County of Cook and State of Illinois on the
15   27th day of June 2006, commencing at the hour of
16   10:27 o'clock a.m.
17
18
19
20
21
22
23
24
```

## Page 4

```
 1              I N D E X
 2
 3   WITNESS:              PAGE:
 4   ANA IVIC
 5
     DIRECT EXAMINATION
 6
     BY MR. WINCHESTER         5
 7
 8   CONTINUED          93
 9
10      E X H I B I T S
11   Plaintiff's Nos.
12   No. 24        102
     No. 25        108
13   No. 26        111
     No. 27        114
14   No. 28        116
     No. 29        120
15   No. 30        124
     No. 31        126
16   No. 32        135
     No. 33        137
17   No. 34        139
     No. 35        142
18   No. 36        144
19
20
21
22
23
24
```

## Page 3

```
 1   APPEARANCES:
 2
 3
 4      Mr. Jason G. Winchester, Esq.
        Jones Day
 5      77 West Wacker Drive
        Chicago, Illinois 60601
 6
 7         appeared on behalf of
           Plaintiff;
 8
 9
10      Mr. Paul Molino, Esq.
        Rakoczy Molino Mazzochi Siwik LLP
11      6 West Hubbard Street
        Suite 500
12      Chicago, Illinois 6061
13         appeared on behalf of the
           Defendants.
14
15   Also Present:
16
17      Mr. Steven Crowley
18
19
20
21
22
23
24
```

## Page 5

```
 1      THE VIDEOGRAPHER:  Good morning.  We
 2   are on the video record.
 3      My name is Robert Zellner.  I am a
 4   video technician for Depovision located at
 5   77 West Washington Street in Chicago,
 6   Illinois.  The date is June 27, 2006 at
 7   10:27 a.m.
 8      We are present here today at 77 West
 9   Wacker Drive in Chicago, Illinois with
10   reference to the case entitled Abbott
11   Laboratories versus Nu-Pharm, Inc. pending
12   in the United States District Court for
13   the Northern District of Illinois, Eastern
14   Division.  Civil action number 05 C 3714.
15   The witness is Ana Ivic.
16      An audiovisual recording of this
17   deposition is at the request of the
18   plaintiff.
19      And will the attorneys please
20   identify themselves for the record?
21      MR. WINCHESTER:  Jason Winchester and
22   Tom Hackney for Abbott Laboratories.
23      MR. MOLINO:  Paul Molino on behalf of
24   the witness and the defendant.
```

2 (Pages 2 to 5)

Page 42

1  your contacts were in formulation development that
2  you were in touch with to collect information about
3  this ANDA?
4      A   There was a guy named Alan. I don't
5  remember his last name. He's no longer with the
6  company. And the information I got from him was
7  mostly just the manufacturing documents. That's
8  about it.
9      Q   Was this Alan Prollamante?
10     A   I believe -- I think so.
11     Q   P-r-o-l-l-a-m-a-n-t-e, something like
12  that?
13     A   I don't remember.
14     MR. MOLINO: Ana, don't guess.
15     A   I can't guess. I don't remember.
16     MR. MOLINO: If you remember, please
17  tell him.
18  BY MR. WINCHESTER:
19     Q   Okay.
20         So Alan of undetermined last name.
21  Who else?
22     A   It was just him. He was the one who was
23  assigned to provide me the documentation.
24     Q   Did you ever have any dealings with Don

Page 43

1  Barber in formulation development about this ANDA?
2      A   Not directly. No.
3      Q   Do you know Don Barber?
4      A   I know his name.
5      Q   Have you ever met him?
6      A   Not personally. I know who he is, he
7  passes by all the time.
8      Q   Do you know what his job is?
9      A   He works in formulation development,
10  that's all I know.
11     Q   The labs group.
12         What sort of information did you
13  obtain from the labs group for the purpose of
14  preparing the ANDA in Nu-Pharm's name?
15     A   Any kind of testing of the submission
16  logs, certificate of analysis, testing specs,
17  chromatograms.
18     Q   Would that include the methods validation
19  packages?
20     A   Yes.
21     Q   When you say testing, what do you mean by
22  that, the in-process tests?
23     A   Finished product, raw material.
24     Q   That would be the sorts of tests that are

Page 44

1  included in the certificate of analysis, is that
2  right?
3      A   Whatever, yeah. We submitted all these
4  tests.
5      Q   Did you also obtain from the labs group
6  any testing that involved attempted structural
7  elucidation relating to the product?
8      A   No.
9      Q   Are you familiar with any tests that
10  Apotex has conducted or commissioned to reveal
11  structural elucidation about the product described
12  in the ANDA under Nu-Pharm's name?
13     A   No.
14     Q   Have you heard anyone other than lawyers
15  talk about that sort of testing?
16     A   No.
17     Q   Any other information you obtained from
18  the labs group other than the testing we have
19  discussed, methods validation, and certificates of
20  analysis for purposes of preparing the ANDA?
21     A   All the testing I obtained from them is in
22  the ANDA.
23     Q   How about the stability group, what
24  information did you obtain from them for purpose of

Page 45

1  preparing the ANDA in Nu-Pharm's name?
2      A   Stability reports.
3      Q   Stability.
4          Is it fair to say in short form this
5  is just taking the product, exposing it to ambient
6  conditions and measuring its degradation over time;
7  is that right?
8      A   That's not my area of expertise. I can't
9  comment on that.
10     Q   What do you understand stability to be,
11  stability testing to be?
12     A   We have accelerated and room temperature
13  stability, and the product is exposed to different
14  environmental conditions and different tests are
15  performed following different time periods to see
16  how the product reacts to these conditions.
17     Q   To see whether it degrades or something?
18     A   I can't comment on that. I'm not sure.
19     Q   Do you know this -- this sort of data is
20  used to develop shelf life, is that right?
21     A   I believe so.
22     Q   Expiration dates are set based on how your
23  studies go, is that fair?
24     A   Sometimes.

12 (Pages 42 to 45)

Page 46

1    Q   Anything other than obviously the reports
2  of stability testings that you got from that group?
3    A   No.
4    Q   Am I correct that a sample of the proposed
5  product made both by the flakes and the spray-dried
6  was subjected to stability studies, is that right?
7    A   I believe so, yeah.
8    Q   The next one was biomedical group that you
9  mentioned.  What is the biomedical group?
10   A   It's the group that performs biostudies.
11   Q   Is the biomedical group a part of Apotex?
12       MR. MOLINO:  Objection to foundation.
13  BY MR. WINCHESTER:
14   Q   You can answer.
15   A   I think so.  I'm not sure.
16   Q   Where is the biomedical group?
17   A   The address is included in the ANDA, I
18  forget.  Gararray (phon.)
19   Q   Have you ever been there?
20   A   No.
21   Q   Do you remember the name of the group?
22       MR. MOLINO:  I just want to advise
23  the witness if she does need to see a
24  document to answer a question, she has

Page 47

1  that opportunity.  But, you can continue.
2    A   I believe there's a document in the ANDA
3  that states the name of the group.  We use the
4  common lingo so I really don't know.
5  BY MR. WINCHESTER:
6    Q   And the common lingo you just used is the
7  biomedical group?
8    A   That is right.
9    Q   This biomedical group, did they conduct
10  all of the biostudies that were included in the
11  ANDA?
12   A   I'm not sure.
13   Q   Are there any biostudies you are aware of
14  that have been performed on the product described in
15  the ANDA that were conducted by some group other
16  than the biomedical group?
17   A   I don't know.
18   Q   Did you ever have contact with anyone
19  other than the biomedical group relating to
20  biostudies for this product?
21   A   No.
22   Q   Are you aware of anyone in regulatory
23  affairs whoever had contact with anyone other than
24  the biomedical group about biostudies for this

Page 48

1  product?
2    A   No.
3    Q   Have you ever heard of any group other
4  than the biomedical group conducting biostudies for
5  this product?
6    A   No.
7    Q   The labeling group.
8        What sort of information did you
9  obtain from the labeling group for the purpose of
10  compiling this ANDA?
11   A   They would provide the final printed
12  labels later on, but they mostly do the graphics,
13  the artwork.
14   Q   They do the actual formatting of the
15  bottle stickers and things of that nature, is that
16  right?
17   A   I think so.
18   Q   And if the time ever comes they would be
19  the ones to create the physician's package insert
20  that then gets folded up really small and put on the
21  bottle; is that right?
22       MR. MOLINO:  Objection to foundation.
23       If you know.
24   A   I'm not sure.

Page 49

1  BY MR. WINCHESTER:
2    Q   Do you know what a physician's package
3  insert is?
4    A   Yes.
5    Q   Have you seen one for an approved product?
6    A   Not physically.  No.
7    Q   Okay.
8        Never gotten a prescription on your
9  own that you have seen this little packet folded up
10  like origami and it unfolds to the size of a bed
11  sheet?
12   A   Yes.
13   Q   And that's the physician's package insert;
14  is that right?
15   A   Yes.
16   Q   And if this product gets approved, the
17  labeling group at Apotex would be the one you would
18  turn to to produce that final version of the package
19  insert, right?
20   A   I think so.
21   Q   And the same question, if the ANDA is
22  approved, it would be that labeling group that would
23  actually make the bottle labels, the stickers to go
24  on the bottles of product; right?

13  (Pages 46 to 49)

Arnold Goldstine & Associates, Ltd.
312.222.1644                    agaltd@earthlink.net                    Chicago, Il 60611
Fax:  312.222.1645

A0118

Page 78

1    Q   Do you remember what those documents are
2  or were at the time that you were trained on them?
3    A   Just procedures, how to compile a
4  submission, instructions, mostly administrative.
5    Q   Do you currently have copies of those
6  SOP's available in regulatory affairs?
7    A   They are available online, an internal
8  website.
9    Q   An internal website.
10       For the biostudies that were
11 conducted in this case, Apotex produced the
12 materials that were used in the studies, right?
13   A   I believe so. I'm not sure.
14   Q   In fact, you provided those materials to
15 the biostudy group, right?
16       MR. MOLINO:  You personally?
17       MR. WINCHESTER:  Her personally.
18   A   The samples were given to me, yes.
19 BY MR. WINCHESTER:
20   Q   And the samples were given to you by whom?
21   A   I don't remember.  By the -- FD possibly,
22 the manufacturing department.
23   Q   Someone within Apotex?
24   A   Correct.

Page 79

1    Q   And it is your understanding that those
2  samples that were used for the biostudies were
3  created at Apotex, right?
4    A   I'm not sure, can't answer that.
5        MR. MOLINO:  Jason, she needs to see
6    a document.  I think that might be -- I
7    know you're going to get to them, but I
8    just think it is unreasonable to ask too
9    many general questions.  She can see some
10   documents.
11       MR. WINCHESTER:  I want to know what
12   she knows.
13   A   When samples were given to me they are
14 never given with, you know, the place of manufacture
15 and stuff like that, so I can't claim that.
16 BY MR. WINCHESTER:
17   Q   Did you ever obtain any sample of product
18 in this case from anywhere other than Apotex?
19   A   I personally didn't. No.
20   Q   In other words, did you ever obtain a
21 product sample from Nu-Pharm?
22   A   I personally didn't. No.
23   Q   Do you know of anyone in regulatory
24 affairs who ever got a sample of product from

Page 80

1  Nu-Pharm?
2    A   No, I don't.
3    Q   I will put this stack in front of you
4  here.  Look there at the document we previously
5  marked Plaintiff's Exhibit No. 1.  This is
6  previously marked again as Plaintiff's 1.  It is an
7  e-mail from you to Tom Mulnar at Nu-Pharm on
8  March 21, 2006.
9        Do you remember sending this e-mail?
10   A   Yes.
11   Q   And is it fair to say this is, as we
12 discussed before, you're sending a number of
13 documents to Tom Mulnar and asking him basically to
14 print them out and get Richard Benyak to sign them
15 and bring them back to you?
16   A   That's correct.
17   Q   Were all of these attached Word documents
18 drafted by Apotex?
19       MR. MOLINO:  Objection to the extent
20   as overbroad and compound.
21 BY MR. WINCHESTER:
22   Q   You can answer.
23   A   I think majority except the Paragraph 4.
24

Page 81

1    Q   Who drafted the Paragraph 4?
2    A   I believe if I remember correctly it came
3  from the attorneys it was just given to me.  So...
4    Q   Do you remember, what is your
5  understanding of which attorneys, internal Apotex
6  attorneys or some other attorneys?
7        MR. MOLINO:  Objection to foundation.
8    If you know.
9    A   I'm not sure.
10 BY MR. WINCHESTER:
11   Q   What gives you the idea that that was
12 drafted by attorneys?
13   A   If I remember correctly, that's what
14 Eveline said to me when she gave it to me.
15   Q   You got that document from Eveline Eilert?
16   A   Yes.
17   Q   Did you read the Paragraph 4
18 certification?
19   A   I don't remember.  I probably did.
20   Q   They are fairly standard.  You have seen
21 Paragraph 4 certifications before, right?
22   A   Correct.
23   Q   And is it your understanding that those
24 are certifications that say this product for which

21 (Pages 78 to 81)

Page 82

1  we want approval either won't infringe your patents
2  or your patents are invalid; is that fair?
3      MR. MOLINO: Objection to foundation.
4  She can answer.
5      A  I believe so.
6  BY MR. WINCHESTER:
7      Q  You have seen them before, you have seen
8  that sort of language included in Paragraph 4
9  certifications?
10     A  Yes.
11     Q  Before we move on, you said you think
12 these documents other than -- or you said most of
13 these documents other than the Paragraph 4 were
14 drafted at Apotex.
15        Do you know of any of these documents
16 in Plaintiff's Exhibit 1, other than the Paragraph 4
17 certification we have talked about otherwise, that
18 were drafted by Nu-Pharm?
19     A  No.
20     Q  Bad question.
21        You don't know or none of them were
22 drafted by Nu-Pharm?
23     A  I'm not aware of any other documents.
24     Q  Are you aware of whether -- strike that.

Page 83

1         Nu-Pharm didn't draft any of these
2  documents, did they?
3      A  The ones that I am attaching in the
4  e-mail. No.
5      Q  Correct.
6         After you sent these documents to Tom
7  Mulnar to have them signed by Richard Benyak, were
8  they returned to you signed?
9      A  Yes.
10     Q  Did either Tom Mulnar or Richard Benyak
11 ever contact you to ask you any questions about any
12 of these documents?
13     A  Not me personally. No.
14     Q  Do you know of anyone else at Apotex who
15 was contacted by Tom Mulnar or Richard Benyak with
16 any questions about these documents?
17     A  I don't know.
18     Q  Do you remember approximately how long it
19 took after you sent these documents over there to
20 get them back signed?
21     A  Approximately a couple to a few days.
22     Q  Take a look, if you would at Exhibit No. 2
23 there.
24        Do you know what this document is?

Page 84

1      A  Yes.
2      Q  What is it?
3      A  It is a 356h form.
4      Q  Is this the actual form application for an
5  ANDA?
6      A  Yes.
7      Q  I take it, it is a form document you can
8  actually obtain from FDA, is that right?
9      A  Yes.
10     Q  But it has to be filled in for the
11 particular application?
12     A  That's correct.
13     Q  Who filled this one in?
14     A  I did.
15     Q  Did Nu-Pharm fill in any portion of this
16 other than the signature of Richard Benyak?
17     A  No, but I obtained information from them.
18     Q  Which information did you get from
19 Nu-Pharm for purpose of this application?
20     A  Information like the address, the product
21 name.
22     Q  You got the product name from Nu-Pharm?
23     A  I confirmed with them.
24     Q  You confirmed the product name with

Page 85

1  Nu-Pharm. Tell me about that effort. Who did you
2  contact for that purpose?
3      A  I don't remember.
4      Q  Well, I think we covered the only person
5  you have ever talked to at Nu-Pharm is Tom Mulnar.
6         So are you telling me you called Tom
7  Mulnar and said what should the product name be?
8      A  No. I think I obtained it from Eveline
9  actually, the name. The address was the only thing
10 I obtained from Tom.
11     Q  And so the address then is the only thing
12 you obtained from Nu-Pharm, right, maybe the phone
13 number?
14     A  The phone number, the name.
15     Q  The name being the name of Nu-Pharm, okay,
16 and the fax number. Address information basically,
17 right?
18     A  Yes.
19     Q  Everything else came from Apotex?
20     A  I think so.
21     Q  Do you know why Richard Benyak is signing
22 for Marcy Macdonald on this application?
23     A  I don't know.
24     Q  Do you know if Richard Benyak works for

22 (Pages 82 to 85)

Page 86

1    Apotex Corp.?
2      A    No.
3           MR. MOLINO:  These are all marked
4    yesterday?
5           MR. WINCHESTER:  Yes.  There should
6    be the stickers on there.
7           MR. MOLINO:  I just wanted to make
8    sure.
9    BY MR. WINCHESTER:
10     Q    Take a look if you would at Exhibit 5.  Do
11   you recognize that document?
12     A    Yes.
13     Q    Is that the proposed physician's package
14   insert that was included with the original ANDA?
15     A    Yes.
16     Q    And is this then the document we talked
17   about earlier that you and Ka-Ling Chan drafted?
18     A    Yes.
19     Q    Do you have any reason to believe that any
20   of the information contained in this proposed
21   package insert is false?
22           MR. MOLINO:  Objection to form being
23     overbroad, to the extent asked and
24     answered.

Page 87

1      A    I don't know.
2    BY MR. WINCHESTER:
3      Q    My question was do you have any reason to
4    believe.
5           Have you had any conversations, have
6    you seen any documents that would suggest to you
7    that anything that is said in this proposed label is
8    false?
9      A    No, I haven't seen anything, other than
10   the footnote that was provided to me.  I haven't
11   seen anything else.
12     Q    The footnote suggesting there might be an
13   alternative structure, right?
14     A    Correct.
15     Q    A structure you have never seen?
16     A    Correct.
17     Q    You know that one of the requirements of
18   submitting an ANDA is that the information contained
19   in the ANDA needs to be truthful and accurate,
20   right?
21     A    That's correct.
22     Q    And you would not submit anything as part
23   of an ANDA you're working on that you knew or had
24   reason to know was false, is that right?

Page 88

1      A    Correct.
2      Q    Take a look very quickly at Exhibit 22 and
3    23.
4           Have you ever seen those documents
5    before?
6      A    They look familiar, I think.  Either these
7    documents or something similar was submitted as part
8    of the FDA update.
9      Q    As part of an amendment to the ANDA?
10     A    Patent amendment.  Yes.
11     Q    A patent amendment.  Okay.
12           These are documents that we marked
13   before, Exhibits 22 and 23 are from Apotex and
14   Nu-Pharm's lawyers to Miles White at Abbott
15   Laboratories.
16           Were you involved in any way in
17   drafting either of these documents, Plaintiff's
18   Exhibits 22 and 23?
19     A    No.
20           MR. WINCHESTER:  Do you want to break
21     for lunch, Paul?  I have got a few
22     documents we can run through.  I don't
23     think it will be much longer.
24           MR. MOLINO:  I assume we are going to

Page 89

1    go most of the day.  We should take a
2    lunch.
3           MR. WINCHESTER:  Yes, we should.  I
4    think actually I have got a few documents
5    to show her, but we shouldn't be more than
6    a couple of hours.
7           MR. MOLINO:  We will take lunch,
8    that's fine.  Good time for us.
9           THE VIDEOGRAPHER:  Going off the
10     record at 11:58 a.m.
11           (Whereupon a recess was taken
12     until 1:05 o'clock p.m. of the
13     same day.)
14
15'
16
17
18
19
20
21
22
23
24

23  (Pages 86 to 89)

Arnold Goldstine & Associates, Ltd.
312.222.1644          agaltd@earthlink.net

Chicago, Il 60611
Fax:  312.222.1645

Page 126

1  information about a Nu-Pharm person in the ANDA, is
2  that right?
3      A   That was the purpose, yes.
4      Q   And, obviously, it looks like in the top
5  e-mail Tom Mulnar did send you the address and phone
6  information for Richard Benyak, is that right?
7      A   That's correct.
8              (The document referred to was
9              marked Plaintiff's Deposition
10             Exhibit No. 31 for
11             identification.)
12     Q   You can put that one aside.
13         I will mark as Plaintiff's 31 a
14  document that again appears to be a series of
15  e-mails, these are not sequentially numbered so I
16  will just hand that to you.
17         Do you remember seeing these e-mails?
18     A   Yes.
19     Q   The question for you on one is at the
20  bottom of the first page of the exhibit, Plaintiff's
21  31, it is an e-mail from Ka-Ling Chan to Darla, no
22  last name, you and a couple of other people.
23         Who is Darla?
24     A   I don't know if I remember correctly, but

Page 127

1  I think she works for the labeling department.
2      Q   The e-mail here from Ka-Ling to Darla
3  mentions, "Please find enclosed a Nu-Pharm log."
4          What is a Nu-Pharm log?
5      A   Possibly a logo. It could be a typo, I am
6  not sure.
7      Q   Logo, okay.
8          Did you at some point in time obtain
9  the Nu-Pharm logo from Nu-Pharm?
10     A   Yes.
11     Q   And why did you need that logo?
12     A   To incorporate into the label.
13     Q   And the labeling all being drafted at
14  Apotex, is that right?
15     A   I'm not sure about that.
16     Q   Are you aware of any labeling associated
17  with this product that's been drafted by any company
18  other than Apotex?
19     A   I don't know that.
20     Q   You have not seen any labeling that's been
21  drafted by anybody other than Apotex, right?
22     A   I personally haven't, but I don't know.
23     Q   There's no proposed labeling included in
24  any submission to FDA with respect to this product

Page 128

1  that was drafted by anyone other than Apotex, right?
2      A   Can you repeat that?
3      Q   Sure.
4          There's been some proposed labeling
5  for this product that's been included in submissions
6  made to the FDA, right?
7      A   Correct.
8      Q   And of all that proposed labeling that's
9  been included in submissions to FDA, has any of it
10  been drafted by a company other than Apotex?
11     A   I'm not sure. It comes to me.
12     Q   It comes to you?
13     A   But I'm not sure where the labeling
14  department obtains it from.
15     Q   I see.
16         You get it from the labeling
17  department at Apotex, though, right?
18     A   Correct.
19     Q   You are not aware of Nu-Pharm for instance
20  drafting any of the proposed labeling that's been
21  given to FDA, right?
22     A   I'm not aware of that.
23     Q   Turn back a few pages in this exhibit, if
24  you look at the bottom right-hand corner that will

Page 129

1  end in 420.
2          Do you see that?
3      A   Yes.
4      Q   This is an e-mail February 22, 2005 from
5  again Ka-Ling Chan to Darla, coping you.
6          And, in fact, this may just be a
7  different version of the one we looked at a minute
8  ago.
9          MR. MOLINO: I think it is.
10  BY MR. WINCHESTER:
11     Q   It talks about a memo addressing changes
12  in the description section.
13         Do you see that?
14     A   Okay.
15     Q   And it refers to mark up copies of the
16  labeling, do you see that?
17     A   Yes.
18     Q   First of all, as to the -- you mention
19  there of a change in the description section. Do
20  you remember what change was made to the description
21  section in the labeling?
22     A   No, I don't.
23     Q   These revised mark up copies, I take it
24  this is a proposed label has been prepared and

33 (Pages 126 to 129)

Page 142

1 deadlines, is that right?

2    A  To meet the overall deadline.

3    Q  The overall deadline set for submission of

4 this ANDA, is that right?

5    A  Correct.

6       (The document referred to was

7       marked Plaintiff's Deposition

8       Exhibit No. 35 for

9       identification.)

10    Q  You can put that one aside.

11      I am marking Plaintiff's 35, document

12 Bates numbered NU 015527.

13     MR. MOLINO:  35.  Yes.

14     MR. WINCHESTER:  I think so.

15     MR. MOLINO:  You're right.

16 BY MR. WINCHESTER:

17    Q  Is an e-mail from you to Tom Mulnar at

18 Nu-Pharm dated April 29, 2005.  Do you remember this

19 e-mail?

20    A  Yes.

21    Q  It says, "Could you please print the first

22 two pages of the attached document below on Nu-Pharm

23 letterhead and have Richard sign them."

24      Do you see that?

Page 143

1    A  Yes.

2    Q  Do you remember what this document was,

3 this particular document sent in April of 2005?

4    A  No, but I believe it is one of the

5 submission documents that had to be signed by

6 Richard.

7    Q  Did Tom Mulnar or Richard Benyak ever call

8 you with any questions about these documents that

9 you asked to have him sign?

10    A  I don't remember.  I have never spoken to

11 Richard but I don't know in Tom did.

12    Q  Do you recall Tom Mulnar ever calling you

13 with questions about anything you sent him to be

14 signed?

15    A  Yes.

16    Q  Tell me about that.

17    A  Pretty much just asking me for

18 administrative purposes, like where exactly they

19 need to be signed or by what time they need to be

20 signed.

21    Q  Other than questions about where do we

22 sign and when do you need the documents back, any

23 other questions you ever got from Tom Mulnar about

24 documents you sent him?

Page 144

1    A  I don't remember, but I don't think so.

2       (The document referred to was

3       marked Plaintiff's Deposition

4       Exhibit No. 36 for

5       identification.)

6    Q  You can put that one aside.

7      I am marking as Plaintiff's

8 Exhibit 36 a documents Bates numbered NU 015535,

9 which is an e-mail from you again to Tom Mulnar on

10 August 5 of 2005.

11      Take a look and let me know if you

12 have seen that before?

13    A  Yes.

14    Q  Again, this is a field copy certification,

15 something to be included in the ANDA, you were

16 sending Mulnar to have it signed, put on Nu-Pharm

17 letterhead and brought back to you, right?

18    A  Correct.

19    Q  Who is Kalpesh?  K-a-l-p-e-s-h.

20    A  At one point he was the U.S. agent contact

21 person.

22    Q  So Kalpesh would have been a person at

23 Apotex Corp.?

24    A  Yes.

Page 145

1    Q  You're asking to have someone at Nu-Pharm

2 sign on behalf of Kapesh at Apotex Corp.?

3    A  That's correct.

4    Q  Rather than when Mr. Benyak signed for

5 Marcy MacDonald?

6    A  Kalpesh took over Marcy Macdonald at one

7 point.

8    Q  Is that position which went from Marcy to

9 Kalpesh now Tammy McIntire?

10    A  Exactly.

11    Q  You can put that aside.

12      Are you aware of any tests that

13 Apotex has either conducted or commissioned for the

14 purpose of determining if this product, meaning the

15 product in the ANDA under Nu-Pharm's name, would

16 infringe Abbott's patents?

17    A  No, I'm not aware of anything.

18    Q  Are you aware of any NMR tests that Apotex

19 has conducted or commissioned on this product?

20    A  No, I'm not.

21    Q  Are you aware of any powder x-ray

22 diffraction tests Apotex has conducted or

23 commissioned on this product?

24    A  No, I am not.

37 (Pages 142 to 145)

Page 146

1    Q   Have you ever heard anyone talk about any
2  testing Apotex has conducted or commissioned to
3  reveal whether this product would infringe Abbott's
4  patents?
5    A   No.
6    Q   Were you involved in responding to any of
7  the discovery requests Abbott served in this case?
8    A   I don't believe so.
9    Q   Are you aware of any of the claims or
10  defenses that have been made either by Apotex or
11  Nu-Pharm or Abbott Laboratories in this case?
12    A   No.
13    MR. WINCHESTER:  Give me five
14  minutes, Paul.
15    I think we can wrap up.
16    THE VIDEOGRAPHER:  Off the record at
17  1:06 p.m.
18    (Whereupon, a brief recess
19    was taken.)
20    THE VIDEOGRAPHER:  We are back on the
21  record at 2:13 p.m.
22    MR. WINCHESTER:  And I have no more
23  questions.  Thanks for coming.
24    MR. MOLINO:  No questions.  And we

Page 147

1  will reserve signature.
2    If we have a protective order or not,
3  I don't know.
4    MR. WINCHESTER:  You can reserve.  I
5  don't know whether you want to designate
6  it confidential?
7    MR. MOLINO:  Yes.  We will designate
8  it confidential.  It was confidential
9  information.  So thank you.
10    THE VIDEOGRAPHER:  We are off the
11  record at 2:13 p.m.
12
13
14    DEPOSITION CONCLUDED
15
16
17
18
19
20
21
22
23
24

Page 148

1    UNITED STATES OF AMERICA      )
    NORTHERN DISTRICT OF ILLINOIS  )
2    EASTERN DIVISION          ) SS:
    STATE OF ILLINOIS          )
3    COUNTY OF COOK            )
4
5    I, Arnold N. Goldstine, a Certified Shorthand
6  Reporter within and for the County of Cook and State
7  of Illinois, do hereby certify that heretofore,
8  to-wit, personally appeared before me ANA IVIC, a
9  witness in a certain cause now pending and
10  undetermined in the United States District Court,
11  Northern District of Illinois, Eastern Division.
12    I further certify that the said witness was
13  first duly sworn to testify to the truth, the whole
14  truth, and nothing but the truth in the cause
15  aforesaid; that the testimony then given by said
16  witness was reported stenographically by me in the
17  presence of said witness, and afterward reduced to
18  typewriting via Computer-Aided Transcription, and
19  the foregoing is a true and complete transcript of
20  the testimony so given by said witness as aforesaid.
21
22
23
24

Page 149

1    I further certify that the signature of the
2  witness to the foregoing deposition was not waived
3  by agreement of counsel for the respective parties;
4  and that I am not counsel for nor in any way related
5  to any of the parties to this suit nor am I in any
6  way interested in the outcome thereof.
7    In witness whereof, I have hereunto set my hand
8  and affixed my notarial certification on this 12th
9  day of July 2006.
10
11
12
13
14
15
16
17
18
19
20
    _____
21    Arnold N. Goldstine, CSR
    CSR License No. 084-000288
22
23
24

Arnold Goldstine & Associates, Ltd.                    Chicago, Il 60611
312.222.1644          agaltd@earthlink.net          Fax: 312.222.1645

A0124

**Lisa Deadman**

From:        Eveline Eilert
Sent:        Thursday, April 15, 2004 7:14 PM
To:          Shawn Shirazi
Cc:          Don Barber; Jennifer Docherty; Lisa Deadman
Subject:     Divalproex Sodium Delayed Release

Shawn,
Please provide input whether we re-run the Divalproex Sodium Delayed Release 500 mg to be submitted under Nu-Pharm name and if so do we have a date for the Bio study?

Do we have a date when the biostudy for Divalproex Sodium Extended Release will be run?

Thanks.

Eveline

**A0125**

PLAINTIFF'S EXHIBIT NO. 9

NU 004939
CONFIDENTIAL OUTSIDE
COUNSEL EYES ONLY

# Nu·Pharm INC.

50 Mural Street, Units 1 & 2, Richmond Hill, Ontario  L4B 1E4    Tel.: (905) 886-2344    Fax: (905) 886-0564

Food and Drug Administration
Center for Drug Evaluation and Research
Office of Generic Drugs
5600 Fishers Lane, HFD-240
Rockville, MD 20857

To whom it may concern:

Re:    **U.S. AGENT LETTER OF AUTHORIZATION**
       **Divalproex Sodium Delayed-Release Tablets USP 500 mg**

This letter is written to designate Apotex Corp., 616 Heathrow Drive, Lincolnshire, IL 60069, as the authorized representative for Nu-Pharm Inc. in all matters related to the Abbreviated New Drug Application for Divalproex Sodium Delayed-Release Tablets USP 500 mg. Apotex Corp. is hereby granted actual and apparent authority to act for Nu-Pharm Inc. as required by the regulations of the United States. The signature below is that of a responsible individual of Nu-Pharm Inc. with the appropriate authority to bind the corporation.

Sincerely,

Richard Benyak, President                    Date
Nu·Pharm Inc.

NU 012003

CONFIDENTIAL

A0126

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

## APPLICATION TO MARKET A NEW DRUG, BIOLOGIC, OR AN ANTIBIOTIC DRUG FOR HUMAN USE
*(Title 21, Code of Federal Regulations, Parts 314 & 601)*

Form Approved: OMB No. 0910-0338
Expiration Date: August 31, 2005
See OMB Statement on page 2

**FOR FDA USE ONLY**

APPLICATION NUMBER

### APPLICANT INFORMATION

| NAME OF APPLICANT | DATE OF SUBMISSION |
|---|---|
| No-Pharm Inc. | March 7, 2005 |

| TELEPHONE NO. (include Area Code) | FACSIMILE (FAX) Number (include Area Code) |
|---|---|
| (905) 886-2344 | (905) 886-0564 |

| APPLICANT ADDRESS (Number, Street, City, State, Country, ZIP Code or Mail Code, and U.S. License number if previously issued): | AUTHORIZED U.S. AGENT NAME & ADDRESS (Number, Street, City, State, ZIP Code, telephone & FAX number) IF APPLICABLE |
|---|---|
| 50 Mural Street, Units 1 & 2 Richmond Hill, Ontario L4B 1E4 Canada | Apotex Corp. 616 Heathrow Drive Lincolnshire, IL 60069 Tel: (847) 821-8005   Fax: (847) 353-2982 |

### PRODUCT DESCRIPTION

| NEW DRUG OR ANTIBIOTIC APPLICATION NUMBER, OR BIOLOGICS LICENSE APPLICATION NUMBER (if previously issued) N/A | | |
|---|---|---|
| ESTABLISHED NAME (e.g., Proper name, USP/USAN name) Divalproex Sodium Delayed-Release Tablets USP | PROPRIETARY NAME (trade name) IF ANY N/A | |
| CHEMICAL/BIOCHEMICAL/BLOOD PRODUCT NAME (if any) Divalproex Sodium | | CODE NAME (if any) N/A |
| DOSAGE FORM: Delayed-Release Tablets | STRENGTHS: 500 mg | ROUTE OF ADMINISTRATION: Oral |

(PROPOSED) INDICATION(S) FOR USE:

1. Mania – indicated for the treatment of the manic episodes associated with bipolar disorder. 2. Epilepsy – indicated as monotherapy and adjunctive therapy in the treatment of patients with complex partial seizures that occur either in isolation or in association with other types of seizures. Divalproex sodium delayed-release tablets are also indicated for use as sole and adjunctive therapy in the treatment of simple and complex absence seizures, and adjunctively in patients with multiple seizure types that include absence seizures. 3. Migraine – indicated for prophylaxis of migraine headaches.

### APPLICATION DESCRIPTION

APPLICATION TYPE

*(check one)*   ☐ NEW DRUG APPLICATION (NDA, 21 CFR 314.50)   ■ ABBREVIATED NEW DRUG APPLICATION (ANDA, 21 CFR 314.94)

☐ BIOLOGICS LICENSE APPLICATION (BLA, 21 CFR Part 601)

| IF AN NDA, IDENTIFY THE APPROPRIATE TYPE   505 (b)(1)   505 (b)(2) |
|---|

IF AN ANDA, or 505(b)(2), IDENTIFY THE REFERENCE LISTED DRUG PRODUCT THAT IS THE BASIS FOR THE SUBMISSION

| Name of Drug   DEPAKOTE® Tablets | Holder of Approved Application   Abbott Laboratories |
|---|---|

TYPE OF SUBMISSION (check one)   ■ ORIGINAL APPLICATION   ☐ AMENDMENT TO APENDING APPLICATION   ☐ RESUBMISSION

☐ PRESUBMISSION   ☐ ANNUAL REPORT   ☐ ESTABLISHMENT DESCRIPTION SUPPLEMENT   ☐ EFFICACY SUPPLEMENT

☐ LABELING SUPPLEMENT   ☐ CHEMISTRY MANUFACTURING AND CONTROLS SUPPLEMENT   ☐ OTHER

| IF A SUBMISSION OF PARTIAL APPLICATION, PROVIDE LETTER DATE OF AGREEMENT TO PARTIAL SUBMISSION:   N/A |
|---|

| IF A SUPPLEMENT, IDENTIFY THE APPROPRIATE CATEGORY   ☐ CBE   ☐ CBE-30   ☐ Prior Approval (PA) |
|---|

REASON FOR SUBMISSION

Original application to gain approval to market in the U.S.A.

PROPOSED MARKETING STATUS (check one)   ■ PRESCRIPTION PRODUCT (Rx)   ☐ OVER THE COUNTER PRODUCT (OTC)

| NUMBER OF VOLUMES SUBMITTED   12 | THIS APPLICATION IS   ☐ PAPER   ■ PAPER AND ELECTRONIC   ☐ ELECTRONIC |
|---|---|

ESTABLISHMENT INFORMATION (Full establishment information should be provided in the body of the Application.)
Provide locations of all manufacturing, packaging and control sites for drug substance and drug product (continuation sheets may be used if necessary. Include name, address, contact, telephone number, registration number (CFN), DMF number, and manufacturing steps and/or type of testing (e.g. Final dosage form, Stability testing) conducted at the site. Please indicate whether the site is ready for inspection or, if not, when it will be ready

See Attachment 1.

Cross References (list related License Applications, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, and DMFs referenced in the current application)

NDA # 018723
DMF #'s: 3310, 9644, 10767,17224, 17225, 15152

FORM FDA 356h (4/03)

PAGE 1

NU 001322

A0127

| | This application contains the following items: *(Check all that apply)* |
|---|---|
| X | 1. Index |
| X | 2. Labeling *(check one)*    ■ Draft Labeling    ☐ Final Printed Labeling |
| | 3. Summary (21 CFR 314.50 (c)) |
| X | 4. Chemistry section |
| X |    A.   Chemistry, manufacturing, and controls information (e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2) |
| |    B.   Samples (21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request) |
| X |    C.   Methods validation package (e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2) |
| | 5. Nonclinical pharmacology and toxicology section (e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2) |
| X | 6. Human pharmacokinetics and bioavailability section (e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2) |
| | 7. Clinical Microbiology (e.g., 21 CFR 314.50(d)(4)) |
| | 8. Clinical data section (e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2) |
| | 9. Safety update report (e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2) |
| | 10. Statistical section (e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2) |
| | 11. Case report tabulations (e.g., 21 CFR 314.50 (f)(1); 21 CFR 601.2) |
| | 12. Case report forms (e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2) |
| | 13. Patent information on any patent which claims the drug (21 U.S.C. 355(b) or (c)) |
| X | 14. A patent certification with respect to any pate.; which claims the drug (21 U.S.C. 355 (b)(2) or (j)(2)(A)) |
| | 15. Establishment description (21 CFR Part 600, if applicable) |
| X | 16. Debarment certification (FD&C Act 306 (k)(1)) |
| X | 17. Field copy certification (21 CFR 314.50 (l)(3)) |
| | 18. User Fee Cover Sheet (Form FDA 3397) |
| X | 19. Financial Information (21 CFR Part 54) |
| | 20. OTHER *(Specify)* |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following:
1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.

The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate.

Warning: A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| SIGNATURE OF RESPONSIBLE OFFICIAL OR AGENT | TYPED NAME AND TITLE | DATE: |
|---|---|---|
| | Marcy Macdonald<br>Director, Regulatory Affairs | March 7-05 |
| ADDRESS (Street, City, State, and ZIP Code)<br>616 Heathrow Drive<br>Lincolnshire, IL 60069 | | Telephone Number<br>(847) 279-7740 |

Public reporting burden for this collection of information is estimated to average 24 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

| Department of Health and Human Services | | |
|---|---|---|
| Food and Drug Administration<br>CDER, HFD-89<br>1401 Rockville Pike<br>Rockville, MD 20852-1448 | Food and Drug Administration<br>CDER (HFD-94)<br>12229 Wilkins Avenue<br>Rockville, MD 20852 | An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. |

FORM FDA 356h (4/03)             CONFIDENTIAL        NU 001323        PAGE 2

# Nu·Pharm INC.

50 Mural Street, Units 1 & 2, Richmond Hill, Ontario  L4B 1E4     Tel: (905) 886-2344     Fax: (905) 886-0564

### Paragraph IV Certification

In accordance with the Federal Food, Drug and Cosmetic Act, Patent Certification is hereby provided for our Abbreviated New Drug Application for Divalproex Sodium Delayed-Release Tablets USP 500 mg.

Nu-Pharm Inc. hereby certifies that, in its opinion and to the best of its knowledge, US Patent # 4,988,731 and #5,212,326 held by Abbott Laboratories, both expiring January 29, 2008, will not be infringed upon by the manufacture, use or sale by Nu-Pharm Inc. of Divalproex Sodium Delayed-Release Tablets USP 500 mg for which this application is submitted.

### STATEMENT CONCERNING NOTICE TO PATENT OWNER AND NDA HOLDERS

As required by Section 505(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act and 21 CFR 314.94(a)(12)(i)(A)(4) and 21 CFR 314.95, Nu-Pharm Inc. hereby states that Nu-Pharm Inc., upon receipt from FDA of an acknowledgement letter stating that this ANDA is sufficiently complete to permit a substantive review, will give the notice required by Section 505(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act and 21 CFR 314.95 to Abbott Laboratories, the holder of the approved application for DEPAKOTE® Tablets 125 mg, 250 mg and 500 mg, and the owner of US Patents 4,988,731 and 5,212,326.

This notice to Abbott Laboratories, which will be sent by Fedex, return receipt requested, shall meet the requirements of 21 CFR 314.59(a) and 21 CFR 314.95(c).

Concurrently with sending the notice to Abbott Laboratories, Nu-Pharm Inc. will, as required by 21 CFR 314.95(b), amend its ANDA for Divalproex Sodium Delayed-Release Tablets USP 500 mg to include a certification that the notice has been provided to each person identified under 21 CFR 314.95(a) and that the notice met the content requirements of 21 CFR 314.95(c).

Richard Benyak
President, Nu-Pharm Inc.

Date  07-05

PLAINTIFF'S
EXHIBIT
NO. 101
PENGAD-Bayonn, N. J.

NU 012000

CONFIDENTIAL

A0129

**Barinder Sandhu**

| | |
|---|---|
| From: | Barinder Sandhu |
| Sent: | Thursday, March 10, 2005 8:09 AM |
| To: | Eveline Eilert; Ana Ivic; Manuel Galing |
| Cc: | DL: Regulatory Affairs-Etobicoke |
| Subject: | RE: Divalproex DR ANDA |

Great job to you and your team!

Hats off on getting this out.

Regards,
Barinder

---Original Message---

| | |
|---|---|
| From: | Bernice Tao |
| Sent: | Wednesday, March 09, 2005 6:16 PM |
| To: | Eveline Eilert; Ana Ivic; Manuel Galing |
| Cc: | DL: RAD Reg. Affairs - Solid Dose US; Bruce Clark |
| Subject: | Divalproex DR ANDA |

Congratulations on getting this ANDA sent out yesterday! There were challenges which you overcame and thanks for all the efforts to get this submitted early in March.

Bernice

PLAINTIFF'S EXHIBIT NO. 34

NU 012336

CONFIDENTIAL

1

**Barinder Sandhu**

| | |
|---|---|
| From: | Bruce Clark |
| Sent: | Thursday, March 10, 2005 9:30 AM |
| To: | Bernice Tao; Eveline Eilert; Ana Ivic; Manuel Galing |
| Cc: | DL: R&D Reg. Affairs - Solid Dose US |
| Subject: | Re: Divalproex DR ANDA |

Well done you are all getting to be experts at managing adversity and still meeting deadlines....I need to get some pointers.....maybe in June when you can breathe again! Way to go!
Bruce
B.D.Clark PhD
Vice President Regulatory and Medical Affairs
Apotex Pharma Inc.
T:416.401.7875
M:416.558.6527


-----Original Message-----
From: Bernice Tao <btao@apotex.com>
To: Eveline Eilert <EEilert@Apotex.com>; Ana Ivic <AIvic@Apotex.com>; Manuel Galing <MGaling@Apotex.com>
CC: DL: R&D Reg. Affairs - Solid Dose US <R&DReg.Affairs-SolidDoseUS@apotex.com>; Bruce Clark <bclark@apotex.com>
Sent: Wed Mar 09 18:15:52 2005
Subject: Divalproex DR ANDA

Congratulations on getting this ANDA sent out yesterday! There were challenges which you overcame and thanks for all the efforts to get this submitted early in March.

Bernice

NU 012337

CONFIDENTIAL

A0131



**RAKOCZY**
**MOLINO**
**MAZZOCHI**
**SIWIK** LLP

6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

May 12, 2005

<u>Via Certified U.S. Mail, Return Receipt Requested and FedEx®</u>

Miles D. White
Chairman of the Board and
Chief Executive Officer                    <u>CONFIDENTIAL</u>
Abbott Laboratories
100 Abbott Park Road
Dept. 0392 – Bldg. AP6D
Abbott Park, Illinois 60064–4000

Re:    Notification of Certification of Noninfringement for U.S. Patent Nos. 4,988,731 and 5,212,326 Pursuant to § 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act

Dear Sir:

On behalf of Nu-Pharm Inc. ("Nu-Pharm"), pursuant to § 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act and 21 C.F.R. § 314.95, we hereby provide notice of the following information to Abbott Laboratories, the owner of U.S. Patent Nos. 4,988,731 ("the '731 patent") and 5,212,326 ("the '326 patent"), according to the records of the U.S. Patent and Trademark Office ("PTO"); and the holder of approved New Drug Application ("NDA") No. 18-723 for Depakote® (Divalproex Sodium) Delayed-Release Tablets 125 mg, 250 mg, and 500 mg, according to the records of the U.S. Food and Drug Administration ("FDA").

Pursuant to 21 C.F.R. § 314.95(e), Nu-Pharm requested and received from FDA permission to send this notice by additional means other than registered or certified mail. Specifically, Nu-Pharm requested that it be allowed to send this notice by Federal Express®. FDA granted Nu-Pharm's request prior to this notice being sent. Consequently, the operative date for determining the start of the 45-day clock under 21 U.S.C. § 355(j)(5)(B)(iii) began from the earliest receipt of this notice, as sent via Federal Express® or registered/certified mail, whichever is earlier.

I.    Pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(I) and 21 C.F.R. § 314.95(c)(1), we advise you that FDA has received an Abbreviated New Drug

Abbott Laboratories
May 12, 2005
Page 2

Application ("ANDA") from Nu-Pharm for Divalproex Sodium Delayed-Release Tablets USP, 500 mg. The ANDA contains the required bioavailability and/or bioequivalence data from studies on the divalproex sodium delayed-release tablet drug product that is the subject of the ANDA. The ANDA was submitted under 21 U.S.C. § 355(j)(1) and (2)(A), with a paragraph IV certification to obtain approval to engage in the commercial manufacture, use or sale of Divalproex Sodium Delayed-Release Tablets USP, 500 mg before the expiration of the '731 and '326 patents, which are listed in the Patent and Exclusivity Information Addendum of FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as "the Orange Book").

II. Pursuant to 21 C.F.R. § 314.95(c)(2), we advise you that FDA has assigned Nu-Pharm's ANDA the number 77-615.

III. Pursuant to 21 C.F.R. § 314.95(c)(3), we advise you that the established name of the drug product that is the subject of Nu-Pharm's ANDA is Divalproex Sodium Delayed-Release Tablets USP, 500 mg.

IV. Pursuant to 21 C.F.R. § 314.95(c)(4), we advise you that the active ingredient in the proposed drug product is divalproex sodium; the strength of the proposed drug product is 500 mg; and the dosage form of the proposed drug product is an oral tablet.

V. Pursuant to 21 C.F.R. § 314.95(c)(5), we advise you that the patents alleged to be not infringed in the paragraph IV certification are the '731 and '326 patents, which are listed in the Orange Book in connection with Abbott's approved NDA No. 18-723 for Depakote® (Divalproex Sodium) Delayed-Release Tablets 125 mg, 250 mg, and 500 mg. According to information provided by Abbott to FDA that is published in the Orange Book, the '731 and '326 patents will expire on or about January 29, 2008.

VI. Nu-Pharm alleges, and has certified to FDA, that in Nu-Pharm's opinion and to the best of its knowledge, the '731 and '326 patents will not be infringed by the commercial manufacture, use or sale of the drug product described in Nu-Pharm's ANDA. Therefore, pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(II) and 21 C.F.R. § 314.95(c)(6), Nu-Pharm's detailed statement of the legal and factual basis for the paragraph IV certification set forth in Nu-Pharm's ANDA is attached hereto and made a part hereof.

VII. Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of Confidential Access to Application. As required by § 355(j)(5)(C)(i)(III), Nu-Pharm offers to provide confidential access to certain information from its ANDA No. 77-615 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

Abbott Laboratories
May 12, 2005
Page 3

Section 355(j)(5)(C)(i)(III) allows Nu-Pharm to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information." That provision also grants Nu-Pharm the right to redact its ANDA in response to a request for Confidential Access under this offer.

As permitted by statute, Nu-Pharm imposes the following terms and restrictions on its Offer of Confidential Access:

(1)     Nu-Pharm will permit confidential access to certain information from its proprietary ANDA No. 77-615 to attorneys from one outside law firm representing Abbott Laboratories (collectively, "Abbott"); provided, however, that such attorneys do not engage, formally or informally, in any patent prosecution for Abbott or any FDA counseling, litigation or other work before or involving FDA. Such information (hereinafter, "Confidential Nu-Pharm Information") shall be marked with the legend "CONFIDENTIAL."

(2)     The attorneys from the outside law firm representing Abbott shall not disclose any Confidential Nu-Pharm Information to any other person or entity, including Abbott employees, outside scientific consultants, and/or other outside counsel retained by Abbott, without the prior written consent of Nu-Pharm's outside litigation counsel, RAKOCZY MOLINO MAZZOCHI SIWIK LLP.

(3)     As provided by § 355(j)(5)(C)(i)(III), Abbott's outside law firm shall make use of the Confidential Nu-Pharm Information for the sole and exclusive purpose of determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and for no other purpose. By way of example only, the Confidential Nu-Pharm Information shall not be used to prepare or prosecute any future or pending patent application by Abbott, or in connection with any filing to, or communication with, FDA relating to Nu-Pharm's ANDA No. 77-615. Abbott's outside law firm agrees to take all measures necessary to prevent unauthorized disclosure or use of the Confidential Nu-Pharm Information, and that all Confidential Nu-Pharm Information shall be kept confidential and not disclosed in any manner inconsistent with this Offer of Confidential Access.

(4)     The Confidential Nu-Pharm Information disclosed is, and remains, the property of Nu-Pharm. By providing the Confidential Nu-Pharm Information, Nu-Pharm does not grant Abbott and/or its outside law firm any interest in or license for the Confidential Nu-Pharm Information.

Abbott Laboratories
May 12, 2005
Page 4

(5)     Abbott's outside law firm shall, within thirty-five (35) days from the date that it first receives the Confidential Nu-Pharm Information, return to Nu-Pharm's outside litigation counsel, RAKOCZY MOLINO MAZZOCHI SIWIK LLP, all Confidential Nu-Pharm Information and any copies thereof. Abbott's outside law firm shall return all Confidential Nu-Pharm Information to RAKOCZY MOLINO MAZZOCHI SIWIK LLP before any infringement suit is filed by Abbott, if suit is commenced before this 35-day period expires. In the event that Abbott opts to file suit, none of the information contained in or obtained from any Confidential Nu-Pharm Information that Nu-Pharm provides shall be included in any publicly-available complaint or other pleading.

(6)     Nothing in this Offer of Confidential Access shall be construed as an admission by Nu-Pharm regarding the validity, enforceability, and/or infringement of any U.S. patent. Further, nothing herein shall be construed as an agreement or admission by Nu-Pharm with respect to the competency, relevance, or materiality of any such Confidential Nu-Pharm Information, document, or thing. The fact that Nu-Pharm provides Confidential Nu-Pharm Information upon request of Abbott shall not be construed as an admission by Nu-Pharm that such Confidential Nu-Pharm Information is relevant to the disposition of any issue relating to any alleged infringement of the '731 or '326 patents, or to the validity or enforceability of these patents.

(7)     The attorneys from Abbott's outside law firm shall acknowledge in writing their receipt of a copy of these terms and restrictions prior to production of any Confidential Nu-Pharm Information. Such written acknowledgement shall be provided to Nu-Pharm's outside litigation counsel, RAKOCZY MOLINO MAZZOCHI SIWIK LLP.

(8)     This Offer of Confidential Access shall be governed by the laws of the State of Illinois.

Section 355(j)(5)(C)(i)(III) provides that any request for access that Abbott makes under this Offer of Confidential Access "shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in [this] offer of confidential access" and that the "restrictions and other terms of [this] offer of confidential access shall be considered terms of an enforceable contract." Thus, to the extent that Abbott requests access to Confidential Nu-Pharm Information, it necessarily accepts the terms and restrictions outlined above. Written notice requesting access under this Offer of Confidential Access should be made to:

Abbott Laboratories
May 12, 2005
Page 5

Deanne M. Mazzochi
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 222-6305
Fax: (312) 222-6325
dmazzochi@rmmslegal.com

By providing this Offer of Confidential Access to Application, Nu-Pharm maintains the right and ability to bring and maintain a Declaratory Judgment action under 28 U.S.C. § 2201 *et seq.*, pursuant to 21 U.S.C. § 355(j)(5)(C).

The name and address of the agent in the United States authorized to accept service of process for Nu-Pharm, limited to commencement of a patent infringement suit based on this notification of certification, is:

Deanne M. Mazzochi
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 222-6305
Fax: (312) 222-6325
dmazzochi@rmmslegal.com

Very truly yours,

By: Deanne M. Mazzochi

Enclosure

# Detailed Factual and Legal Basis for
# Nu-Pharm's Paragraph IV Certification that
# U.S. Patent Nos. 4,998,731 and 5,212,326 Will Not Be Infringed

### I.    Introduction.

Pursuant to § 505(j)(2)(B)(iv)(II) of the Federal Food, Drug, and Cosmetic Act and 21 C.F.R. § 314.95(c)(6), this document is the detailed factual and legal basis for the paragraph IV certification of Nu-Pharm Inc. ("Nu-Pharm") that, in its opinion and to the best of its knowledge, U.S. Patent Nos. 4,988,731 ("the '731 patent") and 5,212,326 ("the '326 patent) will not be infringed by the commercial manufacture, use or sale of the drug product described in Nu-Pharm's ANDA No. 77-615. Nu-Pharm reserves all rights to raise any additional defenses relating to invalidity, unenforceability, and noninfringement should litigation ensue.

### II.    Nu-Pharm's ANDA Product.

Nu-Pharm's ANDA product is a delayed-released tablet containing, as the active pharmaceutical ingredient ("API"), a composition containing valproic acid and sodium valproate ("Nu-Pharm API") in the 500 mg strength (hereinafter "Nu-Pharm's ANDA Product").

The manufacturing conditions used to prepare the Nu-Pharm API results in a product which, in the solid state, is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and it is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$ containing about 4, 4-6 or 6 such units. Hence, Nu-Pharm's ANDA product is not a pharmaceutical composition wherein the API is an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and it is not a pharmaceutical composition wherein the API is an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$ containing about 4, 4-6 or 6 such units.

### III.    Legal Standards – Patent Infringement.

A patent infringement analysis consists of two steps: (1) determining the scope of the claims, a legal issue for the court; and (2) comparing the accused product to the claims, a factual question. *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). A claim may be infringed either: (1) literally; or, (2) under the judicially-created doctrine of equivalents. *See id.* Moreover, because a dependent claim incorporates all of the elements and limitations of the independent claim on which it depends, a dependent claim cannot be infringed unless each and every element of the

**A0137**

-1-

underlying independent claim is also infringed. 35 U.S.C. § 112; *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001).

A. **Claim Construction.**

"It is axiomatic that the claims mark the outer boundaries of the patent right to exclude." *AstraZeneca AB v. Mutual. Pharm. Co.*, 384 F.3d 1333, 1336 (Fed. Cir. 2004). The "goal of claim construction is to determine what an ordinary artisan would deem the invention claimed by the patent, taking the claims together with the rest of the specification." *Id.* at 1337 (citation omitted); *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001) (noting that claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims" (internal quotations and citation omitted)).

The intrinsic evidence, including the claims, the specification, and the prosecution history, is the primary source for determining claim meaning. *See AstraZeneca*, 384 F.3d at 1336; *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The claim construction inquiry begins with the plain and ordinary meaning of the claims, which define the scope of the right to exclude. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "When construing patent claims, there is a heavy presumption that the language in the claim carries its ordinary and customary meaning amongst artisans of ordinary skill in the relevant art at the time of the invention." *Housey Pharms., Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004) (internal quotations and citations omitted).

A patentee may assign a claim term a meaning "other than its ordinary and accustomed meaning . . . if the patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (examining the scope of the term "heading" through its use by the patentee throughout the specification). However, if a patentee intends to ascribe a meaning to a term other than its ordinary meaning, a clear and unambiguous demonstration of that meaning must be found in the specification. *See Markman*, 52 F.3d at 979-80; *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000). The Federal Circuit has made clear that rigid formalism is not required. *See AstraZeneca*, 384 F.3d at 1339 (rejecting argument that lexicography requires rigid formalism and explicit statements of definition). Lexicography does not require "a statement in the form 'I define ____ to mean ____,'" but rather can be accomplished in a more subtle manner or even by implication. *Id.*; *see also Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term may be clearly redefined without an explicit statement of redefinition. . . . [T]he specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" (citation omitted)).

**A0138**

The specification also should be consulted to determine whether the patentee has disavowed or relinquished claim scope. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims . . . might be considered broad enough to encompass the feature in question."); *AstraZeneca*, 384 F.3d at 1340 ("Where the general summary or description of the invention . . . criticizes other products . . . that lack that same feature, this operates as a clear disavowal of these other products . . . ." (citation omitted)).

In addition, a patentee cannot recapture in litigation a claim scope surrendered during prosecution of the patent, either by amendment or argument. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376-77 (Fed. Cir. 1999). "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citation omitted).

**B.  Comparison of the Accused Product to the Properly Construed Claims.**

**1.  Literal Infringement.**

Literal infringement requires a patentee to prove that every limitation of the asserted claim is literally met by the accused product. *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998); *see also Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) (recognizing that literal infringement occurs when "the properly construed claim reads on the accused device exactly"). The failure to meet even a single element within a claim mandates a finding that the accused product does not literally infringe the patent. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

**2.  Doctrine of Equivalents.**

Infringement under the doctrine of equivalents requires the patentee to show, for each claim asserted, the presence of each and every claim element or its substantial equivalent in the accused device. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732-33 (2002). An equivalent of a missing claim element or limitation is found only if "'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused [product]." *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1329 (Fed. Cir. 2003) (citation omitted).

**A0139**

However, the scope and application of this doctrine is limited. The Supreme Court has warned that "[i]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson*, 520 U.S. at 29. Under this "all elements rule, there can be no infringement under the doctrine of equivalents if even one limitation of a claim or its equivalent is not present in the accused device." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003) (citation omitted). In addition, the scope of permissible equivalents cannot encompass or ensnare what is already in the prior art. *See Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1367 (Fed. Cir. 1999). Likewise, under the doctrine of prosecution history estoppel, an equivalent cannot be extended to include subject matter surrendered by the patentee either in amendments to overcome patentability rejections or in arguments to secure allowance of a claim. *See Warner-Jenkinson*, 520 U.S. at 33; *Wang Labs., Inc. v Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1578 (Fed. Cir. 1997); *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577-78 (Fed. Cir. 1993).

## IV.    The '731 Patent.

The PTO issued the '731 patent on January 29, 1991, to named inventor Edwin Meade. According to the records of the PTO, Abbott owns the '731 patent by assignment.

The '731 patent contains two claims, which read as follows:

1.    An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 such units.

2.    An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures or convulsions, containing as the active principle an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 such units.

The commercial manufacture, use, sale, or offer for sale of Nu-Pharm's ANDA Product would not infringe any claim of the '731 patent, either literally or under the doctrine of equivalents.

### A.    No Literal Infringement of Claims 1-2.

The commercial manufacture, use, sale or offer for sale of Nu-Pharm's ANDA Product would not literally infringe claims 1-2 of the '731 patent.

**A0140**

Claims 1-2 both require at least an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 such units.

One dictionary definition of the term "oligomer" defines it as a polymer that consists of two, three or four monomers. THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

The specification of the '731 patent states of the product of the invention that "it has been found that the molecules are distributed as an ionic oligomer, rather than as a dimer as originally believed." ('731 patent at col. 1, lines 38-40).

The meaning of the term "oligomer" in the context of the '731 patent claims was first discussed in *Abbott Laboratories v. Alra Laboratories, Inc.*, No. 92 C 5806, 1997 U.S. Dist. LEXIS 16611 (N.D. Ill. Oct. 24, 1997) (Zagel, J.) [hereinafter *Alra*]. Judge Zagel observed that the "oligomeric structure is what distinguishes the invention from a simple mixture of valproic acid and sodium valproate." *Alra*, 1997 U.S. Dist. LEXIS 16611 at *7-8. The "generally accepted definition of oligomer among chemists is a composition made up of a relatively small number of identical repeating units joined end to end. Maitland Jones, Jr., Organic Chemistry, 821 (1997)." *Id.* at *8. Judge Zagel continued that "[t]here is no question that the basic definition of an oligomer applies here. The patented invention is made up of a relatively small number of identical repeating units joined end to end." *Id.* at *9.

The term "oligomer" was again discussed in *Abbott Laboratories v. TorPharm, Inc.*, 156 F. Supp. 2d 738 (N.D. Ill. 2001) (Norgle, J.) [hereinafter *TorPharm*]. Judge Norgle stated that:

> [T]he court begins with the general definition of oligomer. In the *Alra* case, Judge Zagel described the generally accepted definition of oligomer as "a composition made up of a relatively small number of repeating units joined end to end." *Alra*, 1997 WL 667796 at *3 (citing Maitland Jones, Jr. *Organic Chemistry*, 821 (1997)). This court's own research shows similar definitions. *See e.g.* McGraw-Hill Dictionary of Scientific and Technical Terms 1314 (4th Ed. 1989) (defining oligomer as "A polymer made up of two, three, or four monomer units."); *Webster's II New Riverside University Dictionary*, 819 (1988) (same). The court accepts Judge Zagel's description of oligomer as a generally accepted definition.

**A0141**

*TorPharm*, 156 F. Supp. 2d at 743. Judge Norgle concluded that "the court construes oligomer according to its generally accepted definition, which is 'a composition made up of a relatively small number of repeating units joined end to end.'" *Id.* at 744 (citing *Alra*).

The Federal Circuit commented on the meaning of oligomer in *Abbott Laboratories v. TorPharm, Inc.*, 300 F.3d 1367 (Fed. Cir. 2002). It observed that "[n]either Abbott nor TorPharm questions the district court's definition of 'oligomer' as 'a composition made up of a relatively small number of repeating units joined end to end.'" *TorPharm*, 300 F.3d at 1372. The Federal Circuit thus found "no error in the district court's claim construction." *Id.*

Oligomeric descriptions were also provided in *Abbott Labs. v. TorPharm, Inc.*, 309 F. Supp. 2d 1043 (N.D. Ill. 2004) (Posner, J.). Judge Posner characterized an oligomer as "an assemblage of several rather than, as in the case of a polymer, many identical units, in this case divalproex sodium complexes. In other words, it is a small polymer ... of about 4 to 6 units." *TorPharm*, 309 F. Supp. 2d at 1045. The court noted that crystalline material that is composed of monomers or polymers "would not be infringing." *Id.* at 1046. Further, to be connected "end to end," the court permitted both horizontal and spherical connections, stating that the "heads and the tails are the ends of the divalproex sodium complexes, and so the complexes are connected 'end to end,' just not horizontally, and so satisfy the legal (patent office and Federal Circuit) and scientific definition of oligomer." *Id.*

The foregoing constructions of the term "oligomer" are not fulfilled by the Nu-Pharm API. Nu-Pharm API is a composition that is not an oligomer, let alone one with the required number of repeating units of divalproex sodium complexes connected end to end.

Thus, Nu-Pharm's ANDA Product would not literally infringe claims 1-2 of the '731 patent as Nu-Pharm's ANDA Product will be made using an API that is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and it is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$ containing about 4 such units.

Because Nu-Pharm's ANDA Product fails to meet the above claim requirements, this precludes a finding of literal infringement.

For at least these reasons, the commercial manufacture, use, sale or offer for sale of Nu-Pharm's ANDA Product would not literally infringe claims 1-2 of the '731 patent.

**A0142**

**B.    No Infringement Under the Doctrine of Equivalents.**

The manufacture, use, sale or offer for sale of Nu-Pharm's ANDA Product would not infringe claims 1-2 of the '731 patent under the doctrine of equivalents.

Infringement under the doctrine of equivalents requires the patentee to show, for each claim asserted, the presence of each and every claim element or its substantial equivalent in the accused device. *See Warner-Jenkinson*, 520 U.S. at 40; *Wolverine World Wide*, 38 F.3d at 1199; *see also Festo*, 535 U.S. at 732-33.   An equivalent of a missing claim element or limitation is found only if "'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused [product]." *Abbott*, 323 F.3d at 1329 (citation omitted).

However, the scope and application of this doctrine is limited.   The Supreme Court has warned that "[i]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson*, 520 U.S. at 29. Under this "all elements rule, there can be no infringement under the doctrine of equivalents if even one limitation of a claim or its equivalent is not present in the accused device." *Lockheed Martin*, 324 F.3d at 1321.   Likewise, under the doctrine of prosecution history estoppel, an equivalent cannot be extended to include subject matter surrendered by the patentee either in amendments to overcome patentability rejections or in arguments to secure allowance of a claim. *See Warner-Jenkinson*, 520 U.S. at 33; *Wang Labs.*, 103 F.3d at 1578; *Haynes Int'l*, 8 F.3d at 1577-78.

The differences between Nu-Pharm's ANDA Product and the product recited in claims 1-2 of the '731 patent are substantial.

Judge Posner noted that "the patent examiner before whom Abbott prosecuted its patent application insisted that the patent claims include a specification of the chemical structure of divalproex sodium" beyond a mere mixture of sodium valproate and valproic acid. *TorPharm*, 309 F. Supp. 2d at 1045. In response, "Abbott obliged by claiming that divalproex sodium is an oligomer consisting of about 4 to 6 units of the divalproex sodium." *Id.*; *see also Alra*, 1997 U.S. Dist. LEXIS 16611 at *7-8 ("There is no dispute that the term 'oligomer' is the patentable element of this invention.   The oligomeric structure is what distinguishes the invention from a simple mixture of valproic acid and sodium valproate"). The doctrine of prosecution history estoppel and the All Elements Rule thus preclude application of the doctrine of equivalents to encompass a valproic acid/sodium valproate mixture or composition that lacks the oligomeric structure element.

As discussed above, Nu-Pharm's ANDA Product uses an API that is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and it is not an oligomer

having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$ containing about 4 such units, or any equivalent. Hence, the doctrine of equivalents cannot be used as the basis for a finding that Nu-Pharm's ANDA Product infringes the '731 patent. *See Lockheed Martin*, 324 F.3d at 1321; *Warner-Jenkinson*, 520 U.S. at 33.

For at least these reasons, Nu-Pharm's ANDA Product would not infringe any of the claims of the '731 patent under the doctrine of equivalents.

## V.   The '326 Patent.

The PTO issued the '326 patent on May 18, 1993, to named inventor Edwin Meade. According to the records of the PTO, Abbott owns the '326 patent by assignment.

The '326 patent contains 5 claims, which read as follows:

1. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 to 6 such units.

2. An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures of convulsions, containing as the active principal an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 4 to 6 such units.

3. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 6 such units.

4. An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures or convulsions, containing as the active principal an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and containing about 6 such units.

5. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and having physical/chemical properties as follows:

    a.   stable, white crystalline powder;
    b.   melting point of 98°-100° C; and
    c.   an infrared spectrum having strong absorption bands at about 2957, 2872, 2932, 1685, 1555 and 1370 cm$^{-1}$.

The commercial manufacture, use, sale, or offer for sale of Nu-Pharm's ANDA Product would not infringe any claim of the '326 patent, either literally or under the doctrine of equivalents.

## A.    No Literal Infringement of Claims 1-5.

The commercial manufacture, use, sale or offer for sale of Nu-Pharm's ANDA Product would not literally infringe claims 1-5 of the '326 patent.

All of the claims of the '326 patent require an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, or an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, containing about 4, 4 to 6 or 6 such units.

The meaning of the term "oligomer" in the context of the '326 patent is the same as that discussed above for the '731 patent, said discussion being fully incorporated herein by reference.

The Nu-Pharm API that is proposed for use in Nu-Pharm's ANDA Product would not literally infringe claims 1-5 of the '326 patent as the Nu-Pharm API is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and it is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$ containing about 4, 4 to 6 or 6 such units.

Because Nu-Pharm's ANDA Product uses the Nu-Pharm API, it fails to meet the above claim requirements for the '326 patent, which precludes a finding of literal infringement.

Thus, for at least these reasons, the commercial manufacture, use, sale or offer for sale of Nu-Pharm's ANDA Product would not literally infringe claims 1-5 of the '326 patent.

**A0145**

B.    **No Infringement of the '326 Patent Under the Doctrine of Equivalents.**

The manufacture, use, sale or offer for sale of Nu-Pharm's ANDA Product would not infringe claims 1-5 of the '326 patent under the doctrine of equivalents.

As noted above for the '731 patent, said discussion being incorporated herein by reference, infringement under the doctrine of equivalents requires a showing of insubstantial differences; moreover, application of the doctrine is limited by the All Elements Rule and prosecution history estoppel. The oligomer elements were essential to the patentability of all of the claims in the '326 patent.

Also as discussed above, Nu-Pharm's ANDA Product uses an API that is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$, and it is not an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula $(CH_3CH_2CH_2)_2CHCO_2Na/(CH_3CH_2CH_2)_2CHCO_2H$ containing about 4 such units, or any equivalent. The doctrine of prosecution history estoppel and the All Elements Rule thus preclude application of the doctrine of equivalents to encompass a valproic acid/sodium valproate mixture or composition that lacks the oligomeric structure. Hence, the doctrine of equivalents cannot be used as the basis for a finding that Nu-Pharm's ANDA Product infringes the '326 patent. *See Lockheed Martin*, 324 F.3d at 1321; *Warner-Jenkinson*, 520 U.S. at 33.

For at least these reasons, Nu-Pharm's ANDA Product would not infringe any of the claims of the '326 patent under the doctrine of equivalents.

\*    \*    \*

Nu-Pharm reserves all rights to raise any additional defenses relating to invalidity, unenforceability, and noninfringement.

**A0146**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05 C 3714 |
| | ) | |
| NU-PHARM, INC., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF APOTEX INC.'S AND APOTEX CORP.'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

Deanne M. Mazzochi, Bar No. 6243448
Adam G. Kelly, Bar No. 6277772
Tara M. Raghavan, Bar No. 6280908
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Suite 500
Chicago, Illinois 60610
Telephone: 312-222-6305
Facsimile:  312-222-6325


*Counsel for APOTEX INC. and APOTEX CORP.*          Dated:  April 28, 2006.

A0147

life essentially will be over. Apotex cannot be liable for inducing Nu-Pharm to infringe an expired patent.

## CONCLUSION

This case is about Nu-Pharm's paper submission of an ANDA containing a Paragraph IV Certification. As even Abbott's own allegations demonstrate, this case has nothing to do with Apotex, which did not file the ANDA or the Paragraph IV Certification. Nor does Abbott allege any other viable basis under the statute for a claim of patent infringement against Apotex. Simply put, Abbott had no basis for ever including Apotex in this case in the first place. The Court, therefore, should dismiss Apotex Inc. and Apotex Corp. as parties to this suit.

Dated: April 28, 2006.                      Respectfully submitted,

                                            APOTEX INC. and APOTEX CORP.

                                            By: _Tara Mythri Raghavan_
                                                One of its attorneys

Deanne M. Mazzochi, Bar No. 6243448
Adam G. Kelly, Bar No. 6277772
Tara M. Raghavan, Bar No. 6280908
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Telephone: 312-222-6305
Facsimile: 312-222-6325

*Attorneys for Apotex Inc. and Apotex Corp*

14

**A0148**

**Ana Ivic**

| | |
|---|---|
| From: | Tom Molnar [tmolnar@nu-pharm.com] |
| Sent: | Friday, January 21, 2005 10:05 AM |
| To: | Ana Ivic |
| Subject: | RE: Address for NU Pharm |

Richard Benyak
Nu Pharm Inc
50 Mural Street Units 1 & 2
Richmond Hill, Ontario
L4B 1E4
Ph# 905 886-2344
Fax# 905 886-0564
Email rbenyak@nu-pharm.com

Let me know if you need any more info.
Regards
tom

-----Original Message-----
From: Ana Ivic [mailto:AIvic@Apotex.com]
Sent: Friday, January 21, 2005 8:58 AM
To: Tom Molnar
Subject: RE: Address for NU Pharm

Good morning Tom,

For my NuPharm submission, I need the NuPharm contact person information. I
assume that would be the president, Richard Benyak. Could you please provide
the full info to include his phone number and email as he will be the person
signing all the letters.

Thanks,

Ana Ivic
Regulatory Affairs Associate
Apotex Inc. (Etobicoke Site)
' Tel: (416) 675-0338 ext.4005

-----Original Message-----
From: Tom Molnar [mailto:tmolnar@nu-pharm.com]
Sent: Tuesday, November 09, 2004 1:36 PM
To: Ana Ivic
Subject: Address for NU Pharm

 Hi Ana, you will find our complete address on the attached business card.

regards

Tom Molnar
Materials Manager
Nu-Pharm Inc.
Tel: 905-886-2344
Fax: 905-886-0564
E-Mail: tmolnar@nu-pharm.com

<<Tom Molnar.vcf>>



PLAINTIFF'S
EXHIBIT
NO. 30

I

NU 012355

CONFIDENTIAL

A0149

Divalproex DR NuPharm Submission                                                    Page 1 of 1

## Tom Molnar

| From: | Ana Ivic [AIvic@Apotex.com] |
|-------|------------------------------|
| Sent: | Friday, April 29, 2005 5:15 PM |
| To: | tmolnar@nu-pharm.com |
| Cc: | Eveline Eilert |
| Subject: | Divalproex DR NuPharm Submission |
| Importance: | High |

Hi Tom,

Could you please print the first 2 pages of the attached document below on the NuPharm letterhead and have Richard sign them. Please courier the signed letters back to us as soon as possible.

<<divalpr.PDF>>_
Thank you,
Ana

*Ana Ivic*
Regulatory Affairs Associate
Apotex Inc. (*Etobicoke Site*)
☎ Tel: (416) 675-0338 ext.4005

**A0150**



NU 015527
-CONFIDENTIAL

Divalproex DR Field Copy Certification                                    Page 1 of 1

## Tom Molnar

| | |
|---|---|
| **From:** | Ana Ivic [AIvic@Apotex.com] |
| **Sent:** | Friday, August 05, 2005 12:16 PM |
| **To:** | Tom Molnar |
| **Cc:** | Eveline Eilert; Manuel Galing |
| **Subject:** | Divalproex DR Field Copy Certification |
| **Importance:** | High |

Hi Tom,

I have attached the Field Copy certification for Divalproex Sodium DR below. Could you please print it on the Nu-Pharm letterhead paper and sign for Kalpesh so that Eveline can pick it up on Monday morning.

<<04-Field Copy Certification-NuPharm.doc>>

Thank you,

*Ana Ivic*
Regulatory Affairs Associate
Apotex Inc. (*Etobicoke Site*)
☎ Tel: (416) 675-0338 ext.4005

**A0151**



PLAINTIFF'S
EXHIBIT
NO. 36

NU 015535
-CONFIDENTIAL-

11/7/05

Tom Molnar

From:          Ana Ivic [Alvic@Apotex.com]
Sent:          Friday, March 04, 2005 6:14 PM
To:            Tom Molnar
Cc:            Eveline Eilert
Subject:       RE: Address for NU Pharm

Importance:    High

      

 

02-Exclusivity         03-Debarment        04-Field Copy       06-ReprocessingStmt-           10-EmrAssFxtStmt-NuP
Statement-NaPha...     Certification-NuP...  Certification-Nu...  NoPharm.do...                  harm.doc

1.3.4_US_agent_auth
~ orization.d...

356h.doc              Certification of      Cover_letter.doc    Paragraph IV
                      Virus.doc                                 Certification-NuP...

                                                                                    Tom,
I have attached the letters that need to be signed by Richard Benyak. Please have them
signed on Monday morning as Eveline will be in to pick them up. With the exception of 356h
form, please ensure that the letters are printed out on the Nu-Pharm letterheads.
Thank you,
Ana

-----Original Message-----
From: Tom Molnar [mailto:tmolnar@nu-pharm.com]
Sent: Tuesday, November 09, 2004 1:36 PM
To: Ana Ivic
Subject: Address for NU Pharm


 Hi Ana, you will find our complete address on the attached business card.

 regards

 Tom Molnar
 Materials Manager
 Nu-Pharm Inc.
 Tel: 905-886-2344
 Fax: 905-886-0564
 E-Mail: tmolnar@nu-pharm.com

  <<Tom  Molnar.vcf>>

A0152

PLAINTIFF'S
EXHIBIT
NO. 90

                                   1

NU 015526
-CONFIDENTIAL-

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2007-1019

Rec'd: _12-11-07_
orig to: _Docket_
cc to: _J.W._ _DER_
_J.D._
_PQ_

ABBOTT LABORATORIES,

Plaintiff-Appellee,

v.

TORPHARM, INC.,
APOTEX, INC., and APOTEX CORPORATION,

Defendants-Appellants.

# O R D E R

**A0153**

NOTE: This order is nonprecedential.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## O R D E R

A combined petition for panel rehearing and for rehearing en banc having been filed by the Appellants, and a response thereto having been invited by the court and filed by the Appellee, and the petition for rehearing and response, having been referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc and response having been referred to the circuit judges who are in regular active service,

UPON CONSIDERATION THEREOF, it is

ORDERED that the petition for panel rehearing be, and the same hereby is, DENIED and it is further

ORDERED that the petition for rehearing en banc be, and the same hereby is, DENIED.

The mandate of the court will issue on December 12, 2007.

Circuit Judge Schall did not participate in the vote.

FOR THE COURT,

*Jan Horbaly* /JB

Jan Horbaly
Clerk

Dated: 12/05/2007

cc:     Hugh S. Balsam
        Daniel E. Reidy

**FILED**
**U.S. COURT OF APPEALS FOR**
**THE FEDERAL CIRCUIT**

DEC - 5 2007

**JAN HORBALY**
**CLERK**

ABBOTT LABS V TORPHARM, 2007-1019
(DCT - 97-CV-7515)

**A0154**

# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 97 C 7515 |
| | ) | Richard A. Posner, |
| | ) | Circuit Judge, |
| | ) | sitting by designation |
| v. | ) | |
| | ) | |
| | ) | |
| APOTEX, INC. | ) | |
| and APOTEX CORPORATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## ORDER

Abbott has patented a chemical called divalproex sodium, but its claims are limited to an oligomer consisting of about four to six units of the chemical. After a bench trial in 2004, I found that an Apotex divalproex sodium product was an oligomer and thus was infringing. *Abbott Laboratories v. Tor-Pharm, Inc.*, 309 F. Supp. 2d 1043 (N.D. Ill. 2004). I issued an injunction, No. 97 C 7515 (N.D. Ill. Mar. 31, 2004), which the Federal Circuit summarily affirmed, 122 Fed. Appx. 511 (Fed. Cir. 2005) (per curiam).

In March 2005, Nu-Pharm, Inc., a tiny (six employees) company formerly owned by Apotex, filed an ANDA for a divalproex sodium product that had been developed by and was owned by Apotex, but was produced by one or the other of two processes different from the process by which the infringing

No. 97 C 7515                                                      2

product had been created. Abbott requested a ruling that Apotex was violating the injunction. After conducting an evidentiary hearing, I ruled that the "new" Apotex product was identical to both Abbott's product and Apotex's original product and was indeed an oligomer and thus was within the scope of the patent claims. No. 97 C 7515, 2006 U.S. Dist. LEXIS 76971 (N.D. Ill. Oct. 6, 2006). I issued a new injunction extending the previous injunction to encompass the new Apotex product. Apotex has appealed and now asks me to stay the injunction pending appeal. *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990).

Apotex's prospects for prevailing on appeal are exceedingly dim. The evidence that its "new" product is an oligomer is overwhelming. 2006 U.S. Dist. LEXIS 76971, at *22. Multiple tests conducted or reviewed by Abbott's expert, the eminent supramolecular chemist Jerry Atwood, showed this conclusively, while the evidence presented by Apotex's experts had serious flaws and some of it actually supported Abbott.

The best Apotex has been able to do in its motion for a stay is dispute my conclusion that the model for the structure of Apotex's product that one of its experts, Peter Stephens, generated by modifying the model that another one of Apotex's experts, Michael Hursthouse, had developed from a single crystal X-ray diffraction experiment was unreliable. Atwood showed that Stephens's model did not agree well with Hursthouse's data on which it was based as judged by "R value," a measure of the discrepancy between the hypothesized model and the data used to test it. Atwood determined that the R value for the Stephens model was 41.51%, whereas the R value of a reliable model is generally not significantly in excess of 5 to 10 percent. Jack D. Dunitz, *X-Ray Analysis and the Structure of Organic Molecules* 184 (1995). Apotex now argues that the R value of the Stephens model was actually 4.1%. The argument overlooks the questionable way in which Stephens constructed his model—manipulating the model Hursthouse had created from his single crystal X-ray diffraction study to fit Stephens's own data from a different test, powder X-ray diffraction analysis, which provides less information than a single crystal experi-

No. 97 C 7515                                                              3

ment. The 4.1% R value is a measure merely of the agreement of Stephens's model with the data that he altered Hursthouse's model to fit. If you change a model to fit given data, it will fit the data. Atwood's 41.51% R value measures the agreement of Stephens's model with *Hursthouse's* data, whereas Apotex's approach yields no information on the agreement of the model with the data collected from the crystal that the model purports to represent; it shows merely that Stephens's efforts to manipulate Hursthouse's model to fit his own data were successful.

Apotex also argues that I improperly concluded that Stephens's manipulation of the Hursthouse model resulted in a "break" every seven units in a divalproex sodium chain, which suggests an oligomer. But Atwood testified convincingly that Stephens's model revealed "a lengthening of sodium-oxygen distances" indicative of a "clear break in the strength of the sodium-oxygen interaction," and thus that the Stephens model suggested that Apotex's new divalproex sodium product was in fact an oligomer.

Apotex denies that it committed any act of infringement. But the submission of an ANDA that erroneously certifies that the commercial manufacture, use, or sale of the new drug would not infringe a patent is an act of infringement. 35 U.S.C. § 271(e)(2); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 677–78 (1990); *Allergan, Inc. v. Alcon Laboratories, Inc.*, 324 F.3d 1322, 1330 (Fed. Cir. 2003) (per curiam); *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1567–69 (Fed Cir. 1997). Apotex's use of Nu-Pharm as a stalking horse for filing the ANDA for a drug that Apotex, not Nu-Pharm, owned and manufactured, 2006 U.S. Dist. LEXIS 76971, at *8–9, does not relieve it of liability for infringement. *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1118 (Fed Cir. 2004); *Crowell v. Baker Oil Tools, Inc.*, 143 F.2d 1003, 1004 (9th Cir. 1944) ("one may infringe a patent if he employs an agent for that purpose."). Otherwise, generic manufacturers would be able to evade the Hatch-Waxman provision that filing an ANDA for a drug that infringes a patent is itself an act of infringement simply by recruiting others to file the ANDA. Apotex's principal, Bernard Sherman, admitted that his primary reason for selecting Nu-

No. 97 C 7515                                              4

Pharm to file the ANDA for Apotex's product was the concern that Apotex if it did it itself might violate the injunction I issued in 2004. Indeed it would.

Apotex is further liable for induced infringement under 35 U.S.C. § 271(b), for aiding and abetting Nu-Pharm's direct act of infringement (the filing of the ANDA). *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988). (Apotex drafted the ANDA.) Section 271(e)(2) defines the filing of an ANDA for an infringing drug as an act of infringement, and section 271(b) extends liability for induced infringement to "whoever actively induces infringement." Nothing in the language or legislative history of the Hatch-Waxman Act indicates that a party cannot be held liable for inducing the filing of an ANDA for an infringing drug.

Not only are Apotex's chances of prevailing on appeal remote, but the balance of equities strongly favors Abbott. Apotex has failed to demonstrate that either itself or its puppet Nu-Pharm would suffer harm as a result of the injunction's remaining in effect pending appeal. I did not enjoin Apotex from taking any steps in the ANDA approval process prior to final approval. Apotex has not yet obtained preliminary approval from the FDA, and the 30-month statutory stay of approval that was triggered by Abbott's infringement suit against Nu-Pharm, which is currently pending before another judge, *Abbott Laboratories v. Nu-Pharm, Inc.*, No. 05 C. 3714, (N.D. Ill. June 24, 2005), would prevent final approval at any time before November 2007. Apotex contends that Nu-Pharm is harmed because proceedings in the Nu-Pharm litigation have been stayed in response to my injunction, thus averting the possibility that Apotex might obtain a favorable judgment in that litigation, which would dissolve the 30-month stay and pave the way for final approval. In other words, Apotex hopes that it might obtain from another judge a judgment inconsistent with the injunction—a frank acknowledgment of forum shopping hardly worthy of legal protection. Staying the injunction might result in the resumption of the other litigation, which would require Abbott to incur further costs of litigation as a consequence of Apo-

No. 97 C 7515                                                    5

tex's attempt to obtain conflicting judgments before its appeal
is decided.

Apotex's contention that a failure to stay the injunction will
"chill" the development of generic alternatives to patented
drugs is frivolous. The only activity that will be "chilled"—and
rightly so—by the injunction is the filing of subsequent ANDAs
by adjudged infringers who tweak the process by which their
infringing products are made without conducting any scientific
testing to demonstrate that the new product is different from
the infringing one. The public interest in the conservation of
scarce judicial resources argues against a stay, as the stay
might lead to duplicative proceedings while the appeal in this
case is pending. The only reason for the other lawsuit, which
Apotex would like to pursue in the hope of generating a conflict
between district court judgments, is Apotex's use of a cat's paw
to file the ANDA, which induced Abbott to sue Nu-Pharm
rather than merely ask me to rule that the injunction was be-
ing violated.

For all these reasons, the motion for a stay is

DENIED.

Richard A. Posner
Circuit Judge

Dated: November 27, 2006

A0159

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES,　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　　Plaintiff,　　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　v.　　　　　　　　　　　) | Civil Action No. 05 C 3714 |
| 　　　　　　　　　　　　　　　　) | Civil Action No. 06 C 2494 |
| NU-PHARM, INC.,　　　　　　　　) | |
| APOTEX, INC., and　　　　　　　) | Judge Rebecca Pallmeyer |
| APOTEX CORPORATION,　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　　Defendants.　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |

## NU-PHARM'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NOS. 4,988,731 AND 5,212,326

Defendant, Nu-Pharm, Inc. ("Nu-Pharm"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for summary judgment of noninfringement in its favor, holding that the manufacture, use or sale of Nu-Pharm's proposed product, made according to the process conditions set forth in ANDA No. 77-615, will not infringe U.S. Patent Nos. 4,988,731 ("the '731 patent") and 5,212,326 ("the '326 patent").

In support of the instant Motion for Summary Judgment and in accordance with Local Civil Rule 56.1, Nu-Pharm is also contemporaneously filing: (1) a Memorandum of Law; (2) a Statement of Uncontested Material Facts as to which there is no genuine issue and that entitle Nu-Pharm to a judgment of noninfringement as a matter of law; (3) a supporting Declaration of Dr. Michael B. Hursthouse, with Exhibits; (4) a supporting Declaration of Dr. Peter W. Stephens, with Exhibits, and (5) a supporting Declaration of Adam G. Kelly, with Exhibits; all incorporated by reference in their entirety herein (collectively the "Summary Judgment Papers").

**A0160**

The claims of the '731 and '326 patents-in-suit were previously construed by the Federal Circuit to require an "oligomer," specifically one that is made up of about 4, 5 or 6 repeating units of a specifically constructed "monomer", the structure of which is also found in the claim language of the patents-in-suit. *Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1376-77 (Fed. Cir. 2002). In that same case, on remand, Judge Posner held that neither a monomer nor a polymer of divalproex sodium could infringe the patents-in-suit. *Abbott Labs. v. TorPharm, Inc.*, 309 F. Supp. 2d 1043, 1046 (N.D. Ill. 2004) (Posner, J., sitting by designation).

Under this claim construction, summary judgment in Nu-Pharm's favor is proper because Nu-Pharm's proposed ANDA product has a molecular structure of a polymer, as confirmed by single crystal X-ray diffraction analysis and related testing conducted on Nu-Pharm's proposed ANDA product.

Dated:  August 15, 2006.                Respectfully submitted,

                                        NU-PHARM, INC.

                                        Deanne M. Mazzochi, Bar No. 6243448
                                        Adam G. Kelly, Bar No. 6277772
                                        Tara M. Raghavan, Bar No. 6280908
                                        RAKOCZY MOLINO MAZZOCHI SIWIK LLP
                                        6 West Hubbard Street, Suite 500
                                        Chicago, Illinois 60610
                                        Tel:  312-527-2157
                                        Fax:  312-527-4205

                                        *Attorneys for Defendant Nu-Pharm, Inc.*

**A0161**

2

## CERTIFICATE OF SERVICE

I, Deanne M. Mazzochi, hereby certify that prior to the close of business on August 15, 2006, I caused a true and correct copy of the foregoing DEFENDANT NU-PHARM, INC.'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT, to be served via hand delivery, upon the following counsel of record:

Daniel E. Reidy
James R. Daly
Jason G. Winchester
Paula S. Quist
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois 60601

*Attorneys for Plaintiff Abbott Laboratories*

Deanne M. Mazzochi
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: 312-527-2157
Fax: 312-527-4205

*Attorneys for Defendant Nu-Pharm, Inc.*

A0162

# FDA U.S. Food and Drug Administration

### CENTER FOR DRUG EVALUATION AND RESEARCH

FAQ | Instructions | Glossary | Contact Us | CDER Home

Department of Health and Human Services

**Drugs@FDA**
FDA Approved Drug Products

Start Over | Back to Search Results

## Overview

**Drug Name**               DIVALPROEX

**Active Ingredient(s)**    • DIVALPROEX SODIUM

**Form(s) and**             • TABLET, DELAYED RELEASE; ORAL: 125MG; 250MG; 500MG
**Strength(s) Available**   • TABLET, EXTENDED RELEASE; ORAL: 250MG

Details about drugs are organized by FDA Application Number (NDA or ANDA or BLA).

## Click on a drug name or application number to view drug details:

Click on a column header to re-sort the table:

| Drug Name and FDA Application Number | Dosage Form/Route | Strength | Marketing Status | Company |
|---|---|---|---|---|
| DIVALPROEX (ANDA # 075112) | TABLET, DELAYED RELEASE; ORAL | Multiple Strengths | None (Tentative Approval) | APOTEX INC |
| DIVALPROEX (ANDA # 076941) | TABLET, DELAYED RELEASE; ORAL | Multiple Strengths | None (Tentative Approval) | TEVA PHARMS |
| DIVALPROEX (ANDA # 077100) | TABLET, DELAYED RELEASE; ORAL | Multiple Strengths | None (Tentative Approval) | ZYDUS PHARMS USA |
| DIVALPROEX (ANDA # 077143) | TABLET, EXTENDED RELEASE; ORAL | 250MG | None (Tentative Approval) | RANBAXY |

A0163

Drugs@FDA

| DIVALPROEX<br>(ANDA # 077254) | TABLET, DELAYED<br>RELEASE; ORAL | Multiple Strengths | None (Tentative<br>Approval) | GENPHARM |
| DIVALPROEX<br>(ANDA # 077296) | TABLET, DELAYED<br>RELEASE; ORAL | Multiple Strengths | None (Tentative<br>Approval) | WOCKHARDT |

**Back to Top | Back to Previous Page | Back to Drugs@FDA Home**

Disclaimer
CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research
Office of Training and Communications
Division of Information Services
Update Frequency: Daily

http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Overview&DrugName=DIVALPROEX

1/17/2008

**A0164**

# U.S. Food and Drug Administration

**Drugs@FDA**

FDA Approved Drug Products

CENTER FOR DRUG EVALUATION AND RESEARCH

FAQ | Instructions | Glossary | Contact Us | CDER Home

*Department of Health and Human Services*

**Start Over**    **Back to Search Results**

## Overview

**Drug Name**               DIVALPROEX SODIUM

**Active Ingredient(s)**    • DIVALPROEX SODIUM

**Form(s) and              • TABLET, DELAYED RELEASE; ORAL: 125MG; 250MG; 500MG
Strength(s) Available**    • TABLET, EXTENDED RELEASE; ORAL: 250MG; 500MG

Details about drugs are organized by FDA Application Number (NDA or ANDA or BLA).

## Click on a drug name or application number to view drug details:

Click on a column header to re-sort the table:

| Drug Name and FDA Application Number | Dosage Form/Route | Strength | Marketing Status | Company |
|---|---|---|---|---|
| DIVALPROEX SODIUM (ANDA # 077567) | TABLET, EXTENDED RELEASE; ORAL | Multiple Strengths | None (Tentative Approval) | MYLAN PHARMA |
| DIVALPROEX SODIUM (ANDA # 078182) | TABLET, DELAYED RELEASE; ORAL | Multiple Strengths | None (Tentative Approval) | UPSHER SMITH |
| DIVALPROEX SODIUM (ANDA # 078239) | TABLET, EXTENDED RELEASE; ORAL | Multiple Strengths | None (Tentative Approval) | ZYDUS PHARMS USA |

Back to Top | Back to Previous Page | Back to Drugs@FDA Home

A0165

Drugs@FDA

Disclaimer

CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research
Office of Training and Communications
Division of Information Services
Update Frequency: Daily

A0166

1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION

3

4 ABBOTT LABORATORIES, an Illinois)
  corporation,        )
5       Plaintiff,  )
6           )
    vs.      ) No. 97 C 7515
7           )
  TORPHARM, INC., a Canadian   )
8 corporation, APOTEX, INC.,  ) Chicago, Illinois
  a Canadian corporation, and  ) August 30, 2006
9 APOTEX CORP., a Delaware  ) 9:00 a.m.
  corporation,        )
10           )
      Defendants.  )
11

12     TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE RICHARD A. POSNER
13

14 APPEARANCES:

15 For the Plaintiff:    MR. DANIEL E. REIDY
            MR. JAMES R. DALY
16          MR. JASON G. WINCHESTER
            MS. PAULA S. QUIST
17          Jones Day
            77 W. Wacker Dr.,
18          Chicago, Illinois  60601
            (312) 782-3939
19

20 For the Defendants:    MR. TERRENCE P. CANADE
            Lord, Bissell & Brook
21          115 S. LaSalle Street
            Chicago, Illinois  60603
22          (312) 443-0700

23 Court Reporter:     CHARLES R. ZANDI, CSR, FCRR
            Contract Court Reporter
24          219 S. Dearborn Street
            Suite 2144-A
25          Chicago, Illinois  60604
            (312) 386-1225

2

```
1 APPEARANCES:  (Continued)

2 For the Defendants:       MS. DEANNE M. MAZZOCHI
                  Rakoczy, Molino, Mazzochi &
3                  Sewik, LLP
                  Six West Hubbard Street
4                  Suite 500
                  Chicago, Illinois  60610
5                  (312) 527-2157

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

20

1 infringement issues in this hearing in order to determine

2 whether there are substantial open issues.  If there are, the

3 Court should defer to the other pending action, which is

4 infringement issues.

5      THE COURT:  Why was this application filed in the

6 name of Nu-Pharm rather than Apotex?

7      MR. CANADE:  We'll produce proof on this, but Apotex

8 says that it did not want to deal with the distraction of the

9 litigation that came from this.  It wanted to focus on other

10 issues.  But what we would submit to your Honor --

11      THE COURT:  I think that's contemptuous in itself.

12 They didn't want the case to come back to me.

13      MR. CANADE:  But the case is back before you, and

14 fairly so, okay, for an injunction --

15      THE COURT:  Well, wait a second.  Look.  That doesn't

16 mean you necessarily -- because you didn't get away with it

17 doesn't necessarily mean that you walk away without a sanction.

18      MR. CANADE:  Except if you come up with new processes

19 and develop a product that doesn't infringe, you can, so --

20      THE COURT:  I want it made clear why you concealed

21 Apotex's product by having it filed under the name of this

22 nothing company, this tool, Nu-Pharm.

23      MR. CANADE:  And we won't agree that we concealed

24 this.

25      THE COURT:  I think it -- why on Earth would a --

**A0169**

59

Atwood - cross

1    MS. MAZZOCHI: Well, the time it takes to do these

2 tests, your Honor, I mean they can't --

3    THE COURT: Well, Hursthouse -- whatever -- look. He

4 had time to test Nu-Pharm product. He could have tested the

5 TorPharm product at the same time.

6    MS. MAZZOCHI: Well, in the context of the Nu-Pharm

7 litigation, I mean, that hasn't come up. I mean, the Nu-Pharm

8 litigation has been pending for over a year-and-a-half, and

9 that wasn't raised --

10    THE COURT: But surely, when you went back -- I don't

11 mean you personally, obviously. When Apotex decided to file a

12 new ANDA, it knew that this Nu-Pharm product was very similar,

13 obviously, to the TorPharm. So, you would think that if it was

14 going to hire Dr. Hursthouse to do this technical diffraction

15 test, whatever he did, on the Nu-Pharm product, at the same

16 time, he would do it on the TorPharm product, since if his

17 results were identical to show that it was the same product,

18 whether they were oligomers, polymers, monomers, whatever, that

19 it would be a violation of the injunction.

20    MS. MAZZOCHI: Well, Apotex didn't hire

21 Dr. Hursthouse. Nu-Pharm hired Dr. Hursthouse.

22    THE COURT: I don't buy any of that stuff. Nu-Pharm

23 is a tool of Apotex. It's a nothing company. It doesn't

24 develop drugs, doesn't make drugs, doesn't do anything. It

25 markets. It's a little spin-off from -- no, I'm sorry, but as

200

1 if I change the temperature in my plan or something like that,

2 fine, I can go ahead and make it with my eyes closed, without

3 getting any scientific opinion that this actually makes a

4 difference."

5      MR. REIDY:  Judge, if --

6      MS. MAZZOCHI:  But, your Honor, there's been no --

7      THE COURT:  And then doing it through Nu-Pharm,

8 that's so dishonest.

9      MS. MAZZOCHI:  Your Honor, there's been no --

10      THE COURT:  That is so dishonest.  Nu-Pharm doesn't

11 make anything.  This is Apotex's product.  The only

12 interpretation of what's going on is trying to hide the fact

13 that this is the TorPharm product.

14      MS. MAZZOCHI:  Well, I disagree with that, your

15 Honor.  And obviously, in the Nu-Pharm case, Nu-Pharm was very

16 forthcoming with all of the information about --

17      THE COURT:  Nu-Pharm is a nothing.  It's a tool.

18      MR. REIDY:  Judge, could I just shed one moment's

19 light on what I think your Honor is driving at, if I may?

20      When we deposed Barry Sherman, Judge, this question

21 and answer occurs at page 81:

22      "Question:  So, was this all an effort to take

23 another whack at a non-infringement finding?"

24      He says:

25      "Answer:  It is two more ways of making products

**A0171**

207

1 there's all these privy issues of Apotex we need discovery on."

2    So, we told Judge Pallmeyer in that case, "Fine,

3 Judge. We're convinced we've got a non-infringing product.

4 Let us put that evidence before you, and, you know, if we've

5 got a non-infringing product, then a lot of this becomes moot."

6 And she agreed with that.

7    And we provided Abbott with the single crystal test

8 results from Dr. Hursthouse, and then all of a sudden, they

9 said, "Oh, no, no. Now we've got to go back and see Judge

10 Posner." If they were truly concerned that Nu-Pharm was a tool

11 of Apotex --

12    THE COURT: Well, we know it's a tool of Apotex.

13 Please.

14    MS. MAZZOCHI: Okay. Fine. But if it's a question

15 of whether they thought they needed to go get some evidence on

16 that point, they had all the documents back in November. They

17 didn't do anything for seven months, and then finally, there

18 was this flurry of activity when the fact discovery deadline

19 closed.

20    THE COURT: Okay. Well, what the situation seems to

21 me to be is that they have presented evidence, mainly

22 Dr. Atwood, but also the admissions or whatever you want to

23 call them that Dr. Sherman made in his depositions, a lot of

24 evidence that this is the same product. And that's -- you

25 know, this is forum shopping. This is Dr. Sherman's refusal to

**A0172**

213

1 quite promptly.

2      MS. MAZZOCHI:  Thank you, your Honor.

3      MR. REIDY:  Thank you, your Honor.  Have a good

4 evening, your Honor

5     (Which were all the proceedings heard.)

6            CERTIFICATE

7

8      I hereby certify that the foregoing is a true and

9 correct transcript of the proceedings in the above-entitled

10 case.

11

12 _____        _____, 2006.

13 CHARLES R. ZANDI
   Contract Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

**A0173**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NU-PHARM, INC.,               ) | |
|                       ) | |
|          Plaintiff,        ) | |
|                       ) | |
|     v.                     ) | |
|                       ) | Civil Action No. 1:08-CV-00070 |
| FOOD AND DRUG ADMINISTRATION,   ) | |
| MICHAEL O. LEAVITT, Secretary of     ) | Judge Richard W. Roberts |
| Health and Human Services, and ANDREW   ) | |
| C. VON ESCHENBACH, M.D.,        ) | |
| Commissioner of Food and Drugs,      ) | |
|                       ) | |
|        Defendants.       ) | |

## [PROPOSED] ORDER

The Court having considered Abbott Laboratories' Omnibus Motion to Dismiss or Transfer and Memorandum in Support of Abbott Laboratories' Omnibus Motion to Dismiss or Transfer, and counsel for Plaintiff and Defendants having made their positions known on this Motion,

The Court finds that it serves the interest of justice, as well as the convenience of the parties, for this case to be transferred from this District to the Northern District of Illinois in accordance with 28 U.S.C. § 1404(a).

It is therefore ORDERED that Abbott Laboratories' Motion to Transfer is hereby GRANTED and the Clerk is directed to transfer this case to the Northern District of Illinois effective immediately.

SO ORDERED

Date:_____          _____

                                            U.S. District Court Judge Richard W. Roberts

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NU-PHARM, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Civil Action No. 1:08-CV-00070 |
| FOOD AND DRUG ADMINISTRATION, | ) |
| MICHAEL O. LEAVITT, Secretary of | )   Judge Richard W. Roberts |
| Health and Human Services, and ANDREW | ) |
| C. VON ESCHENBACH, M.D., | ) |
| Commissioner of Food and Drugs, | ) |
| | ) |
| Defendants. | ) |

**[PROPOSED] ORDER**

The Court having considered Abbott Laboratories' Omnibus Motion to Dismiss or

Transfer and Memorandum in Support of Abbott Laboratories' Omnibus Motion to Dismiss or

Transfer, and counsel for Plaintiff and Defendants having made their positions known on this

Motion,

The Court finds that the Complaint in this action fails to state a claim upon which relief

may be granted.  As such, pursuant to Federal Rule of Civil Procedure 12(b)(6),

It is therefore ORDERED that Abbott Laboratories' Motion to Dismiss is hereby

GRANTED and Plaintiff's Complaint is hereby DISMISSED.

SO ORDERED

Date:_____      _____

U.S. District Court Judge Richard W. Roberts